UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.   21cr10200 |
| | Violations: |
| v. | |
| ABHIJIT DAS, a/k/a "Beej" Das, | Count One:<br>Excessive Campaign Contributions; Aiding and Abetting<br>(52 U.S.C. §§ 30116(f), 30119(d)(1)(A)(i) and 18 U.S.C. § 2) |
| Defendant | |
| | Count Two:<br>Conduit Contributions; Aiding and Abetting<br>(52 U.S.C. §§ 30122, 30119(d)(1)(A)(i) and 18 U.S.C. § 2) |
| | Count Three:<br>Conversion of Campaign Funds; Aiding and Abetting<br>(52 U.S.C. § 30114(b) and 18 U.S.C. § 2) |
| | Count Four:<br>Scheme to Falsify, Conceal, and Cover Up Material Facts<br>(18 U.S.C. § 1001(a)(1)) |
| | Counts Five-Six<br>Making a Materially False Statement; Aiding and Abetting<br>(18 U.S.C. §§ 1001(a)(2) and 2) |

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

1.     The defendant, ABHIJIT DAS, a/k/a "Beej" Das ("DAS"), was a resident of

North Andover and Lowell and an attorney licensed in Massachusetts. In 2017 and 2018, DAS

was a candidate for the U.S. House of Representatives in the 3rd Congressional District of Massachusetts ("MA-03").

2.       Between in or about August 2014 and December 2019, DAS operated a financially struggling hotel business that included the Stonehedge Hotel & Spa in Tyngsboro, Massachusetts (the "Stonehedge"), the Daniel Hotel in Brunswick, Maine (the "Daniel"), and a 108-foot yacht called "Troca One." DAS owned and operated these properties through a series of Massachusetts entities including Troca Hotels Management, LLC; Boston East Tyngsboro Holding, LLC; Troca Yachts Management, LLC; and Troca Holdings, LLC.

<u>Relevant Entities and Individuals</u>

3.       Das-for-Congress ("DFC") was the authorized committee for DAS's congressional campaign (the "DFC Campaign") that accepted contributions and made expenditures on the campaign's behalf.

4.       "The Lobbying Firm" was a Boston-based strategic communications firm that managed the DFC Campaign from in or about November 2017 through May 2018. The "Fin-D" was an employee of the Lobbying Firm assigned to work as the Finance Director for DFC.

5.       "Person A" was a close friend of DAS and the campaign chair for the DFC Campaign.

6.       "Person B" was a friend of DAS in the hotel business in Pennsylvania, whom DAS also claimed to be the finance chair for the DFC Campaign.

7.       "Person C" was a friend of DAS's family residing in California who assisted the DFC Campaign with fundraising.

2

8.      The Operations Manager ("the OM") was the Director of Operations for the Stonehedge and the Daniel and was listed with the Federal Election Commission ("FEC") as the treasurer for DFC.

9.      "Family 1" was one of DAS's immediate family members.  DAS had a joint bank account with Family 1 at Bank of America ("BOA").  "Family 2" was Family 1's spouse.

### The Federal Election Campaign Act

10.      The Federal Election Campaign Act ("FECA"), 52 U.S.C. §§ 30101-45, imposes reporting requirements and financial limits in federal elections.  The FEC, an independent regulatory agency within the executive branch of the U.S. government, administers FECA and has jurisdiction over the financing of campaigns for the U.S. House, Senate, Presidency, and Vice Presidency.

11.      FECA provides for felony criminal penalties for any person who knowingly and willfully commits a violation of any provision of FECA which involves the making, receiving, or reporting of any contribution, donation, or expenditures aggregating $25,000 or more in a calendar year.  52 U.S.C. § 30109(d)(1)(A)(i).

*Contribution Limitations under FECA*

12.      FECA prohibits any person from making, and a candidate and the candidate's authorized campaign committee from accepting or causing, contributions exceeding FEC contribution limits in an election cycle.  52 U.S.C. §§ 30116(a)(1)(A), (f).  A "contribution" includes any "direct or indirect payment, distribution, loan, advance, deposit, or gift of money . . . ." 52 U.S.C. § 30118(b)(2); 11 C.F.R. § 114.2(b); 52 U.S.C. § 30101(8)(A)(i); 11 C.F.R. § 100.52(a).

13.     For the 2017-2018 campaign cycle, the FEC's limit for individual contributions was $2,700 per election, totaling $5,400 for both the primary and general election campaign.

14.     FECA also prohibits what are commonly known as "conduit contributions," contributions sourced from one individual but made in the name of another person who acts as an intermediary or conduit. 52 U.S.C. § 30122. The use of conduit contributions conceals the true source of a campaign's financial support from the voting public. Contributions made through a conduit or an intermediary are subject to the same monetary limitations on individual contributions during an election cycle. 52 U.S.C. § 30116(a)(8).

*Reporting Requirements under FECA*

15.     In general terms, FECA requires federal campaigns to designate a campaign bank account at a federal insured financial institution where all the funds received by the campaign must be deposited ("the Campaign Account"). 52 U.S.C. § 30102(h)(1); 11 C.F.R. § 103.3(a).

16.     FECA requires the treasurer of the authorized campaign committee to file quarterly reports with the FEC called a "Form 3, Report of Receipts and Disbursements." 52 U.S.C. § 30104(a). Once filed, the Form 3 is publicly available and assists voters in making informed decisions by providing a record of the identity of the campaign's individual donors, total contributions, and expenditures of campaign funds.

17.     The Form 3 requires the correct and complete disclosure of all receipts in an election cycle, including any contributions and loans. Among other things, the Form 3 requires an itemized list of contributions by source, amount, and date of contribution. The Form 3 also requires the correct and complete disclosure of the amount of "cash-on-hand" in the campaign account at the end of the reporting period. 52 U.S.C. § 30104(b); 11 C.F.R. § 104.3(a). "Cash-

4

on-hand" includes funds held in the Campaign Account as well as other monetary instruments and investments valued at cost. 11 C.F.R. § 104.3(a)(1). The amount of money a candidate has raised and the amount of cash-on-hand in the Campaign Account is typically a well-publicized indicator of a candidate's viability in a federal election.

18.     In addition to receipts, the Form 3 also requires the campaign committee to disclose the total amount of all "disbursements" for the reporting period by category including operating expenses, repayments of loans, and all other disbursements. 11 C.F.R. § 104.3(b).

*Unauthorized Personal Uses of Campaign Funds*

19.     While campaign funds are permitted to be used for ordinary and necessary expenses incurred in connection with the campaign, FECA prohibits the conversion of campaign funds for "personal use." 52 U.S.C. § 30114(b). Under FECA, a contribution or donation is considered to have been converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign. 52 U.S.C. § 30114(b)(2); 11 C.F.R. § 113.1(g).

The Das-for-Congress Campaign

20.     On or about September 25, 2017, DAS publicly announced his candidacy for Congress at an event at the Stonehedge.

21.     In or about September 2017, Person A and DAS asked the OM to be the treasurer for the campaign as a "figurehead" position. DAS directed the OM to sign up for an online FEC account. While named treasurer, the OM was not involved in the accounting of any campaign contributions or expenditures and did not prepare or file any reports with the FEC. Instead, the OM primarily worked for DAS's hotel business, managing DAS's two hotels.

22.     On or about October 8, 2017, DAS formally registered with the FEC as a candidate and filed a Statement of Organization with the FEC that named the OM as treasurer, DFC as the principal campaign committee, and the bank at which DFC held its Campaign Account as Lowell Five Savings Bank in Lowell, Massachusetts ("Lowell Five").

23.     On or about October 19, 2017, DAS opened the DFC Campaign Account at Lowell Five in the name of DFC (the "DFC Account"). The two signatories were DAS and the OM.

24.     In or about November 2017, DAS and DFC contracted with the Lobbying Firm to manage the campaign. The Fin-D assisted DAS in the preparation of the FEC reports for the Year-End 2017 and the First Quarter of 2018.

*Excessive Campaign Contributions to DFC*

25.     The first significant fundraising deadline for the MA-03 congressional race was December 31, 2017. By January 31, 2018, each congressional campaign was required to file a Year-End 2017 report with the FEC that would publicly disclose, for the first time in the congressional race, the total amount of funds each campaign had raised through December 31, 2017. The December 31, 2017 deadline was important because the total amount of cash-on-hand by that date was an early public indicator of a candidate's viability.

26.     By December 2017, DAS and DFC were significantly behind their fundraising goal of reaching $450,000 by December 31, 2017. In fact, by mid-December 2017, the total amount of funds on deposit in the DFC Account was only about $10,000. To overcome this fundraising deficit, DAS devised a scheme to solicit personal loans from friends and close

associates in excess of the legal limit that DAS then contributed to DFC in the form of personal loans.

27. In or about December 2017, DAS solicited personal loans from Persons A, B, and C for the purpose of funding and supporting his congressional campaign in excess of the FEC contribution limits. To circumvent both FEC contribution limits and reporting requirements, DAS structured the payments as a loan to Family 1 and instructed Persons A, B, and C to transfer the funds to a BOA joint checking account in the name of Family 1 and 2 at BOA with an account number ending in 8667 ("BOA-8667").

*$25,000 from Person C*

28. In or about mid-December 2017, DAS and Person A participated in a phone call to Person C during which DAS asked Person C for a personal loan of $25,000 to support DAS's campaign. In an email on or about December 11, 2017, DAS asked for Person C's financial support and said that the end of the year on *"12/31 is the one and only [test of] financial viability that my campaign will likely face."*

29. On or about December 20, 2017, the same day that Person C also made the maximum allowable contribution of $5,400 to DFC for both the primary and general election, Person C asked DAS in an email for the wire transfer instructions for the $25,000 loan.

30. On or about December 26, 2017, DAS emailed Person C the wire transfer instructions for BOA-8667. On or about December 27, 2017, following DAS's wire transfer instructions, Person C wired $25,000 to BOA-8667 and advised DAS that the money would be credited to the account by December 28, 2017.

*$50,000 from Person B*

31.     Beginning in or about November 2017 and continuing in December 2017, DAS asked Person B for a $50,000 loan to support his campaign but told Person B that he probably would not need the entirety of the funds and would only access the money as needed.

32.     In an email on or about December 17, 2017, DAS asked for Person B's support for his campaign to reach a specific fundraising goal, *"over the $450k level by 12/31"* and indicated that reaching that goal might need *"some engineering."*

33.     On or about December 19, 2017, DAS and Person A spoke with Person B about a contribution to DAS's campaign in a conference call.  During the call, DAS falsely told Person B that he had confirmed the legality of Person B's personal loan to the campaign with an attorney. In fact, DAS had never retained the services of an election law attorney during the campaign, but instead was acting as his own counsel. When Person B agreed to the loan, and asked DAS for a written loan agreement, DAS told Person B that the agreement needed to be signed with Family 1. DAS also told Person B that the funds needed to be transferred to Family 1 for "timing" issues and in order for DAS to comply with his FEC reporting requirements.

34.     On or about December 27, 2017, at approximately 2:38 a.m., DAS emailed Person B the wire transfer instructions for BOA-8667, thanked Person B for agreeing to make the loan, and wrote, he *"appreciate[d] the faith in the endeavor"* in supporting the DFC Campaign.  The same day, on or about December 27, 2017, Person B wired $50,000 to BOA-8667 and emailed DAS a signed copy of a loan agreement between Person B and Family 1.

*$50,000 from Person A*

35.     Beginning in or about mid-December 2017 and continuing until December 27, 2017, DAS sought to persuade Person A to loan $50,000 to the DFC Campaign to increase the DFC's amount of cash-on-hand for the end of 2017 reporting deadline.

36.     For example, during a series of text and email messages on or about December 27, 2017, DAS informed Person A that even with the loans from Persons A and B and DAS's family, the campaign was short of its fundraising goal.  The same day, during a series of text messages, DAS also informed Person A that DAS's family and Person B had "funded" his campaign, and asked Person A about the status of the $50,000 loan.  DAS also indicated that he would "aggregate" the loans into "one batch" and execute "the main transfer" to the campaign account by the end of the week.

37.     Following DAS's directions, on or about December 28, 2017, Person A wired a total of $50,000 to BOA-8667 and emailed DAS a signed copy of a loan agreement between Person A and Family 1.

38.     On or about December 28, 2017, the $125,000 loan payments from Persons A, B, and C were transferred from BOA-8667 to a joint BOA checking account in the name of Family 1 and DAS with an account number ending in 9551 ("BOA-9551").  From there, the same day, $170,000 - funded by the $125,000 in loan payments from Persons A, B, and C and approximately $50,000 in funds from Family 1 and 2 - was transferred from BOA-9551 to the DFC Account.

*The 2017 Year-End FEC Form 3 Report*

39.     Beginning on or about January 16, 2018, DAS represented to his campaign staff, potential donors, and the public that the DFC had raised approximately $425,000 in the fourth quarter of 2017 and had approximately $550,000 in cash-on-hand. In fact, between January 16, 2018 and January 31, 2018, the amount of cash-on-hand in the DFC Account was less than $380,000.

40.     In or about January 2018, DAS provided information to the Fin-D about the campaign's receipts and expenditures for the purpose of completing the DFC's 2017 Year-End Form 3 report ("YE-2017 report") due on January 30, 2018. DAS provided information to the Fin-D over email and in spreadsheets.

41.     In an email on or about January 30, 2018, at approximately 2:44 a.m., DAS falsely told the Fin-D that the December 27, 2017, December 28, 2017, and December 30, 2017 transfers of $48,000, $170,000, and $54,000 to the DFC Account were "cash loans from Abhijit Das to Beej Das for Congress."

42.     On or about January 30, 2018, DAS caused DFC to falsely assert, in the YE-2017 report, that DAS had loaned DFC a total of $279,574.04 from the personal funds of the candidate. In fact, $125,000 was funded by campaign contributions disguised as loans from Persons A, B, and C to Family 1, Family 2, and DAS and were not the personal funds of the candidate.

*DAS's Conversion of Campaign Funds from the DFC Account*

43.     Between in or about January 26, 2018 and May 19, 2018, DAS withdrew, and caused to be withdrawn, a total of approximately $314,500 in funds from the DFC Account. Out

of the $314,500 withdrawn from the DFC Account, DAS used at least $267,000 of these funds to pay outstanding debts related to his financially struggling hotel business. Among other expenses, the funds that DAS withdrew from the DFC Account were used to pay hotel vendors, expenses related to the Troca One yacht, and real estate taxes unrelated to his congressional campaign.

44.     In making the transfers from the DFC Account to his hotel business, DAS sought to conceal the fact that he was paying hotel business expenses with funds he had misappropriated from his campaign account by layering the transactions and portraying them as uncorrelated withdrawals and deposits rather than direct transfers among accounts.

*First Quarter FEC Form 3 for 2018 ("Q1-2018")*

45.     During the first quarter reporting period of 2018 ("Q1-2018") that ran from January 1, 2018 to March 31, 2018, DAS withdrew, and caused to be withdrawn, a total of $222,500 from the DFC Account which he then used to pay for expenses related to his hotel business, unrelated to his congressional campaign. DAS recorded these transfers from the DFC Account to the hotel business in the books and records of his businesses as short-term loans.

46.     For example, on or about January 26, 2018, DAS withdrew $10,000 from the DFC Account, used the funds to purchase a bank check payable to himself, and deposited the check into an account in the name of Boston East Tyngsboro Holding, LLC ("BETH, LLC"), with an account number ending in 8047 ("BETH-8047"). By taking the additional step of purchasing a bank check payable to himself rather than directly transferring the funds from the DFC Account to BETH-8047, DAS disguised the withdrawal of campaign funds as a generic

11

transaction instead of DAS's conversion of campaign funds for personal use to fund his hotel business.

47.     In the same manner, on or about January 30, 2018, DAS withdrew $10,000 from the DFC Account, used the funds to purchase a bank check payable to himself, and deposited the check into another account in the name of BETH, LLC, with an account number ending in 8074 ("BETH-8074").

48.     Beginning on February 7, 2018, instead of purchasing a bank check or transferring the funds to a hotel account, DAS directed Lowell Five bank tellers to break up the transfer of funds into two parts, a cash withdrawal from the DFC Account and then an immediate deposit of those same funds into one of the hotel accounts.

49.     For example, on or about February 13, 2018, DAS requested a $18,000 withdrawal from the DFC Account to be deposited into BETH-8047, but told the teller that he did not want the transaction to show up as a transfer on his DFC Account statement and requested that the transaction be made separately so that it looked as if the withdrawal from the DFC Account was a cash withdrawal and not a direct transfer to another account.

50.     Beginning on or about February 14, 2018, DAS instructed the OM to withdraw funds from the DFC Account in the same manner.  For example, on or about February 14, 2018, DAS and the OM withdrew $9,000 from the DFC Account and directed the money to be redeposited into BETH-8047 as a cash deposit instead of a direct transfer.

51.     On or about on February 15, 2018, the OM forwarded an email to DAS from Lowell Five indicating that a couple of checks were trying to clear an account in the name of Troca Hotels Management, LLC, with an account number ending in 3741 ("TROCA-3741") but

the account was short by approximately $5,800. In response, DAS directed the OM, "*Please do another $8k plus another $9k. Withdraw and re-deposit. No direct transfer.*" Following DAS's directions, the OM withdrew $8,000 from the DFC Account on February 15, 2018 and $9,000 on February 16, 2018. On both occasions, the OM directed the teller to deposit the funds into BETH-8047.

52.   On February 19, 2018, after the OM informed DAS about an overdue real estate tax bill for the Daniel, DAS informed the OM that he would "*work to get you funding by tomorrow*" but did not tell the OM that he would be withdrawing the funds from the DFC Account.

53.   The next day, on or about February 20, 2018, DAS withdrew $35,000 from the DFC Account and used the funds to purchase a $35,000 bank check payable to the Town of Brunswick for the Daniel's real estate taxes and gave the check to the OM.

54.   On or about February 28, 2018, DAS withdrew $30,000 from the DFC Account and used the funds to purchase two bank checks: a $5,000 check payable to one of DAS's employees at the hotel business and a $25,000 check payable to Person C. The same day, on or about February 28, 2018, DAS mailed the $25,000 check to Person C in California to repay Person C for the $25,000 loan that Person C transferred on December 28, 2017 to support the DFC Campaign.

55.   Even though DAS and the OM had withdrawn approximately $222,500 from the DFC account during Q1-2018, in early April 2018, DAS purposely omitted any mention of the withdrawals to the Fin-D either as an expenditure, loan, or loan repayment.

13

56.     On or about April 15, 2018, DAS caused the DFC to file an FEC Form 3 for Q1-2018 falsely claiming that by the end of Q1-2018, the total amount of cash-on-hand for DFC was approximately $398,000.  In fact, the total amount of cash-on-hand in the DFC Account on March 31, 2018 was approximately $107,000.

*Second Quarter FEC Form 3 for 2018 ("Q2-2018")*

57.     During the Q2 reporting period, between in or about April 3, 2018 and May 19, 2018, DAS and the OM withdrew a total of approximately $92,000 from the DFC Account.  Out of the $92,000, DAS, and the OM acting under DAS's directions, caused at least $84,000 of the withdrawn funds to be immediately redeposited into one of DAS's hotel business accounts in the name of BETH, LLC, Troca Yachts Management, LLC, and Troca Holdings, LLC.

58.     On or about July 15, 2018, the last quarterly report before the September 2, 2018 primary election, DAS caused an FEC Form 3 for Q2-2018 to be filed falsely claiming that by the end of Q2-2018, the total amount of cash-on-hand for DFC was approximately $440,000.  In fact, the total amount of cash-on-hand in the DFC Account as of June 30, 2018, was less than $5,000.

59.     Except for a $5,000 deposit into the DFC Account that DAS made on January 3, 2019, DAS and his hotel businesses never refunded DFC for any of the money that DAS took from the DFC Account to help pay for his hotel business expenses.

COUNT ONE
Accepting Excessive Contributions; Aiding and Abetting
(52 U.S.C. §§ 30116(f) and 30109(d)(1)(A)(i); 18 U.S.C. § 2)

The Grand Jury charges:

60.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-59 of this Indictment.

61.     In or about December 2017, in the District of Massachusetts and elsewhere, the defendant,

ABHIJIT DAS, a/k/a "Beej" Das,

as a candidate for the U.S. House of Representatives, knowingly and willfully accepted contributions to the DFC Campaign in excess of the limits of the FECA, which aggregated $25,000 and more during the 2017 calendar year, and did so by coordinating and accepting the transfers of money by Persons A, B, and C to the DFC Campaign.

All in violation of Title 52, United States Code, Sections 30116(f) and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

COUNT TWO
Conduit Contributions; Aiding and Abetting
(52 U.S.C. §§ 30122 and 30109(d)(1)(A)(ii); 18 U.S.C. § 2)

The Grand Jury further charges:

62.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-59 of this Indictment.

63.     In or about December 2017, in the District of Massachusetts and elsewhere, the defendant,

ABHIJIT DAS, a/k/a "Beej" Das,

knowingly and willfully caused contributions of money from Persons A, B, and C, which aggregated $25,000 and more during the 2017 calendar year, to be made in the name of another person, that is, DAS himself, to the DFC Campaign.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(ii), and Title 18, United States Code, Section 2.

16

<u>COUNT THREE</u>
Conversion of Campaign Funds; Aiding and Abetting
(52 U.S.C. §§ 30114(b) and 30109(d)(1)(A)(i); 18 U.S.C. § 2)

The Grand Jury further charges:

64.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-59 of this Indictment.

65.    From on or about January 26, 2018 until on or about May 19, 2018, in the District of Massachusetts and elsewhere, the defendant,

ABHIJIT DAS, a/k/a. "Beej" Das,

knowingly and willfully converted, and caused to be converted, $25,000 and more of campaign funds in the DFC Account to his personal use by using them to fulfill personal commitments, obligations, and expenses that would have existed irrespective of the DFC Campaign.

All in violation of Title 52, United States Code, Sections 30114(b) and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

<u>COUNT FOUR</u>
Scheme to Falsify, Conceal, and Cover Up Material Facts
(18 U.S.C. § 1001(a)(1))

The Grand Jury further charges:

66.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-59 of this Indictment.

67.     From in or about December 2017 and continuing until on or about January 30, 2018, in the District of Massachusetts and elsewhere, the defendant,

ABHIJIT DAS, a/k/a "Beej" Das,

knowingly and willfully falsified, concealed, and covered up by trick, scheme and device material facts from the FEC in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, the DFC's receipt of approximately $125,000 from Persons A, B, and C, which by statute, regulation, and government form DAS had a duty to disclose on the DFC's YE-2017 Report.

All in violation of Title 18, United States Code, Sections 1001(a)(1).

## COUNT FIVE
### Making a Materially False Statement; Aiding and Abetting
### (18 U.S.C. §§ 1001(a)(2) and 2)

The Grand Jury further charges:

68.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-59 of this Indictment.

69.     On or about April 15, 2018, in the District of Massachusetts and elsewhere, the defendant,

### ABHIJIT DAS, a.k.a. "Beej" Das,

knowingly and willfully made a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States by causing the submission of a Q1-2018 Report to the FEC which falsely stated that the DFC's total amount of cash-on-hand at the end of the reporting period was approximately $398,000, when in fact the total amount of cash-on-hand in the DFC Account on March 31, 2018 was approximately $107,000.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

19  SA

<u>COUNT SIX</u>
Making a Materially False Statement; Aiding and Abetting
(18 U.S.C. §§ 1001(a)(2) and 2)

The Grand Jury further charges:

70.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-59 of this Indictment.

71.     On or about July 15, 2018, in the District of Massachusetts and elsewhere, the defendant,

ABHIJIT DAS, a.k.a. "Beej" Das,

knowingly and willfully made a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States by causing the submission of a Q2-2018 Report to the FEC which falsely stated that the DFC's total amount of cash-on-hand at the end of reporting period was approximately $440,000, when in fact, the total amount of cash-on-hand in the DFC Account as of June 30, 2018 was less than $5,000.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

20    SA

A TRUE BILL

_____
FOREPERSON

_____
Neil J. Gallagher, Jr.
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: June 28, 2021
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK
6/28/2021 @ 1:42pm