UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 21-cr-10200-RGS |
| ABHIJIT DAS | ) | |
| a/k/a "Beej Das" | ) | |
| | ) | |
| Defendant. | ) | |

<u>UNITED STATES' PRE-TRIAL MEMORANDUM</u>

The United States respectfully submits the following memorandum for the trial

beginning on October 2, 2023.

<u>The Indictment and the Government's Theory of the Case</u>

On June 28, 2021, a grand jury returned a six-count indictment charging defendant

Abhijit Das, a.k.a. "Beej Das" ("DAS") with: (1) accepting excessive campaign

contributions, in violation of 52 U.S.C. § 30116(f) (Count One); (2) causing conduit

contributions, in violation of 52 U.S.C. 30122 (Count Two): (3) converting more than

$25,000 in campaign funds, in violation of 52 U.S.C. § 30114(b) (Count Three); (4)

falsifying, concealing, and covering up trick, scheme, and device, material facts from the

Federal Election Commission (the "FEC"), in violation of 18 U.S.C. § 1001(a)(1) (Count

Four); and (5) making a materially false statement to the FEC, in violation of 18 U.S.C.

§ 1001(a)(2).[1]  Each of the counts require the government to prove a knowing and willful

violation.

---

[1]Except Count Four, the indictment also alleges that DAS aided abetted each of these offenses, in
violation of 18 U.S.C. § 2.

There are three parts to this case.  First, around December 2017, while a candidate for the U.S. House of Representatives, and struggling to raise money in a crowded primary, DAS came up with a scheme to get around federal limits on individual campaign contributions set forth in the Federal Election Campaign Act ("FECA").[2]

Toward the close of the first reporting period of the election, in late December 2017, DAS asked the three individuals referenced in the indictment - his campaign chair (Person A), a person DAS claimed to be his finance chair in Philadelphia (Person B), and a close family friend in California (Person C) – for $25,000 - $50,000 loans to his congressional campaign.  Since loans[3] were reportable contributions subject to the same individual contribution limits, DAS disguised the contributions as personal loans to his mother.  DAS successfully solicited a total of $125,000 in loans from Persons A, B, and C for his campaign, directed the funds to his mother's bank account, which then through a series of transactions, DAS funneled to his campaign account before the end of the first reporting quarter of the campaign, December 31, 2017. By early January 2018, Das's campaign boasted that it had raised $425,000, the third highest among nine primary candidates—more than the ultimate election winner.

In his required reporting to the FEC – on a FEC Form 3 (Report of Receipts and Disbursements) - DAS also concealed the true source of funds and used himself as a

---

[2] 52 U.S.C. §§ 30101-45.  FECA provides for felony criminal penalties for any person who knowingly and willfully commits a violation of any provision of FECA which involves the making, receiving, or reporting of any contribution, donation, or expenditures aggregating $25,000 or more in a calendar year.  52 U.S.C. § 30109(d)(1)(A)(i).

[3] Under FECA, a "contribution" includes "any gift, subscription, *loan*, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i) (emphasis added).

conduit to conceal the excessive contributions.  DAS did that by falsely claiming that he "self-funded" and that the funds he had solicited from Persons A, B, and C were his money, the "personal funds of the candidate."   While there is no limit on the amount of money a candidate can contribute to their own campaign from their own "personal funds," 11 C.F.R. § 110.10, to qualify as "personal funds," the candidate must have had a legal right of access to or control over the assets or funds *at the time* the individual became a candidate.  11 C.F.R. § 100.33(a).  Since DAS did not have a legal right of access or control over these funds until December 27, 2017 (well after he became a candidate on October 8, 2017) the funds could not be considered his personal funds.

The second part of the case involves DAS's theft of funds from his campaign account and his efforts to conceal his misappropriation.  By February 2018, DAS's hotel business was struggling to pay bills and was consistently low on funds.  To make up the deficit and avoid a paper trail, DAS withdrew money from the campaign account in mock "cash" withdrawals, and then redeposited the same funds into several hotel business accounts to pay outstanding hotel related debts.  By structuring the transactions as a "cash withdrawal" from the campaign account and then an immediate re-deposit of funds into a business account, DAS sought to conceal the fact that he was withdrawing large sums of money from his campaign account.

Third, DAS further concealed his misappropriation of campaign funds by submitting materially false reports to the FEC.  Between January and May 2018, DAS withdrew about $314,500 from the campaign account and used at least $267,000 to pay outstanding debts related to his hotel business.  DAS omitted these expenditures from the

FEC 3 Form and provided false information to the FEC and the public about the amount of "cash-on-hand" in the campaign bank account.

Anticipated Evidence at Trial[4]

The witnesses at trial will consist of participants in DAS's congressional campaign (Scott Ferson, Eric Chast, Molly Horan, Toby Chaudhuri, Lucas Siebert, Deborah Belanger, Brennan Spencer, and Jay Shah), hotel employees (Sean Smith and Rise LaDebuache), Lowell Five bank tellers and employees, FEC records analysts (Jaime Amrhein and Benjamin Holly), the case agent for the investigation (FBI Special Agent Lindsay Capodilupo) and an FBI forensic auditor (Catherine Osilama) who will provide testimony about summary charts.  The exhibits will include emails and attachments from two email search warrants, text messages, bank records, FEC records, and summary charts.

A.    The Das-for-Congress Campaign

On August 9, 2017, Congresswoman Nikki Tsongas publicly announced her intention to retire and not seek re-election in Massachusetts' 3rd District ("MA-03"). Shortly thereafter, DAS and eight others became primary candidates for the September 4, 2018-Democratic primary.

In September 2017, DAS sought out Liberty Square Group ("LSG"), a Boston based strategic communications firm to help manage his campaign. The President of LSG

---

[4]This summary is intended to provide a brief outline of the evidence the government intends to offer at trial, so the Court may better anticipate the nature of the government's proof in this case. This outline is not intended as an exhaustive rendition of all the evidence, nor does it reflect the order in which the government intends to offer it. As in all cases, the ultimate proof may vary somewhat from what the government anticipates.

was Scott Ferson.  After meeting with several candidates, LSG started working with DFC in about mid-November 2017.  Ferson assigned Eric Chast to work as the Finance Director,[5] and Molly Horan as Communications Director.  DAS's family friend, Toby Chaudhuri ("Person A"), who was living in Virginia, took over the role as campaign chair. The first campaign manager was Lucas Siebert.

DAS touted his experience as a "constitutional lawyer" and local business owner. At the time, DAS operated a financially struggling hotel business that included the Stonehedge Hotel & Spa in Tyngsboro, Massachusetts (the "Stonehedge"), the Daniel Hotel in Brunswick, Maine, and a 108-foot super yacht called "Troca One."  DAS managed these businesses and properties through a series of companies, including Boston East Tyngsboro Holding, LLC ("BETH").  The Operations Manager for the Stonehedge, Sean Smith (the "OM" in the indictment), is expected to testify that the business was a "shoestring operation" that was overleveraged, short on cash, and had no budget. According to Rise Ladebauche, Stonehedge's bookkeeper, the business was consistently behind in paying vendors, employees, expenses, and taxes.  Ladebauche also kept track of the many inter-business transfers that DAS made to cover overdue expenses. DAS would constantly loan money from one of his companies to another or receive money from his parents' personal accounts when a company was short on the cash required to pay a bill or payroll.

DAS publicly announced his candidacy at a "kick-off" event at the Stonehedge on

---

[5]Chast is referred to as the "Fin-D" in the indictment.  DAS and Ferson signed an LSG "Statement of Work" on December 15, 2017.

September 25, 2017, DAS's birthday.  Thereafter with Chaudhuri's assistance, DAS

sought to assemble a campaign staff. While DAS and Chaudhuri contemplated hiring an

experienced treasurer and campaign finance manager, DAS and Chaudhuri ended up

approaching Smith to be the treasurer.  Chaudhuri assured Smith that it was just a

"figurehead" position and that they just needed someone to fill that role.

On October 8, 2017, DAS's campaign filed a FEC Form 1 (Statement of

Organization) with the FEC, formally registering DAS as a candidate for Congress.  The

Form 1 listed Smith as treasurer, "Das-for-Congress" ("DFC") as the principal campaign

committee, and the bank at which DFC "deposits funds, hold accounts, rents safety

deposit boxes or maintains funds" as Lowell Five.  DAS and Smith opened DFC's bank

account at Lowell Five on October 19, 2017, in the name of "Das for Congress" ending in

account number x3361 ("the DFC Account"). While registered as DFC's treasurer, Smith

continued working as the hotel's operations manager and did not perform any typical

treasurer duties.  While others were involved in submitting the actual reports to the FEC.

B.      DFC Fundraising and Contribution Limits

Several witnesses will testify that DAS did not put in the time and work needed to

raise money for a congressional campaign even though DAS often made outlandish claims

of success.  DAS claimed that he was going to run a $10 million campaign, and often

claimed to have raised money that never appeared.  DAS failed to put in enough "call

time" but actively solicited contributions and knew the basics on contribution limits.

Working with Chast, DAS composed emails to potential contributors and made clear he

knew that "*Couples can give $5,400 for the primary, and a total of $10,800 through the*

*entire election cycle.  To give $10,800, two separate contributions of $5,400 must be made, each under a separate name."*  In mid-October 2017, Chaudhuri also suggested several election attorneys that Chaudhuri suggested he hire.  DAS demurred because of the cost.

Several early events demonstrate that DAS consciously disregarded campaign finance rules.  DAS's first campaign manager, Lucas Siebert, left DFC after only three weeks not only because of DAS's unwillingness to devote time to fundraising, but also because of DAS's lack of concern for campaign finance rules. During one conversation with DAS, when Siebert expressed a concern to DAS about using his hotel business for campaign events (because if not reimbursed at fair market value, it would be an undisclosed corporate contribution), DAS dismissed Siebert's concerns and said that "Trump proves that campaign regulations don't matter."

DAS also encouraged other DFC staff members, including Deborah Belanger, the outreach director for DFC, to contribute the maximum amount, but with the assurance that the hotel could reimburse them "on the backend."  On another occasion, while at LSG's offices in Boston, DAS gave Chast several thousand dollars in cash to deposit into a bank account of one of his hotel employees so the employee could make a contribution close to the campaign limits.  The FEC Form 3 submitted by DFC claimed that employee, Kristen Campetti, made a $250 donation to DFC on December 17, 2017, and then a larger donation of $1,900 on December 31, 2017 (the last day of the quarter).  According to records from Webster Bank, Campetti wrote a $1,900 check to DFC dated on December 29, 2017, but which was drawn on her account on January 11, 2018, the same day Chast

deposited $1,900 in cash into her account on DAS's direction.

### C.      The December 31, 2017 (EOY-2017) Deadline

 The end of 2017, December 31, 2017, was a critical deadline for the campaign.  It was first time the candidates disclosed their "cash-on-hand" ("COH") to the FEC and the voting public.  The amount of COH was clear and a well-known indicator of a candidate's viability.  Successful campaigns needed money in the bank and early donations spurred future donations.  At the beginning of their campaign, Ferson told DAS he would need a total of about $1.5 million.  Though the goal often changed, DFC sought to reach at least $500,000 before the end of 2017, but was falling well short, with December 31st approaching.

By mid-December 2017, there was a sense of urgency and panic. On December 11, 2017, at 11:24 p.m., while pleading with a family friend in California, Ajoy Bose ("Person C") for a contribution, DAS wrote that, *"12/31 is the one and only test of financial viability that my campaign will likely face."*  In an email to Chaudhuri ("Person A") and potential contributors on December 13, 2017, DAS wrote:

> We need to focus on getting contributions in.  If we show $500k in the account, we will be a serious contender.  We are about $250k short.[6]  We will need to get creative and I'm working options.

### D.      The Excessive Contributions

DAS solicited loans from three different contributors, starting with Bose in California.  Around mid-December 2017, while together in the car driving to a campaign event, DAS and Chaudhuri called several potential donors, including Ajoy Bose, a

---

[6]On December 13, 2017, the DFC Account had less than $11,000 on deposit.

longtime family friend he affectionately referred as "Kaku."  Unlike the previous calls, where Chaudhuri gave a stock pitch about the importance of the campaign, and DAS and Chaudhuri asked for the maximum donation, this call was different. DAS not only asked Bose for the maximum campaign contribution, DAS asked Bose for a $25,000 loan. From the context of the call, it was clear that DAS was asking for a loan for the campaign, to close the fundraising gap and get to a higher number before the close of the quarter.

It was a moment that caused Chaudhuri some concern and led to DAS and Chaudhuri having a longer discussion that evening in one of the hotel rooms at the Stonehedge.  That evening, DAS and Chaudhuri discussed various ways to get around the election's contribution limits.  DAS knew that Chaudhuri had $50,000 available, and pressured Chaudhuri to give him a $50,000, short-term loan.  Chaudhuri indicated that he wanted to see, if during their upcoming call with Jay Shah, if Shah would loan the campaign $50,000 before committing to loaning DAS the money.

  *1.  Contribution from Ajoy Bose - $25,000*[7]

Around this same time, on December 19, 2017, at 12:20 a.m., DAS emailed Bose the standard instructions for the contributions: "*you will need to designate one contribution as coming from you and the other from [your spouse]. We will thereafter split the amounts for general election and the primaries.*"  The next morning, Bose asked

---

[7]The government will not be calling Bose as a witness, but instead will be relying on the emails from the search warrant that the government will seek to introduce through FBI Special Agent Linsday Capodilupo. Bose was interviewed on May 27, 2021.  When asked if DAS had solicited any other payments from him in furtherance on the campaign, Bose said that he may had lent money to one of DAS's parents but could not remember which one. When asked about the purpose of the loan, Bose said there was no purpose. When asked if DAS participated in the loan, Bose stated, "not as far as I remember."

for help in making the online contribution.  On December 20, 2017, Bose contributed the maximum for both he ($5,400) and his spouse ($5,400) for both the primary and the general election.[8]

The *same day* as the legal contributions, DAS also facilitated an illegal contribution, the first of three.  Instead of using his DFC email, DAS used his hotel email account[9] to coordinate Bose's transfer of $25,000 to his mother's bank account.

First, on December 20, 2017, at 2:27 p.m., Bose sent DAS a new email asking for the *"details of the wiring instructions."*  Early the next morning, on December 21, 2017, at 1:30 a.m., DAS got back to Bose, *"I will have wire details to you shortly."*  Days later, on December 26, 2017, at 6:13 p.m., DAS emailed Bose wire transfer instructions for an account in the name of his mother, Mitra Das, at Bank of America ("BOA") ending in 8667 ("BOA-8667").  In an email the next day, Bose confirmed the $25,000 wire, and DAS wrote, *"Will definitely advise you of the wire receipt once I speak with Mom tomorrow.  Thank you once again for your help."*  In contrast to Shah and Chaudhuri, DAS quickly paid Bose back.  On February 18, 2018, DAS withdrew $30,000 from the DFC Account and used $25,000 to purchase a bank check payable to Bose to repay the loan.  That repayment of a loan was reported on DAS's FEC filings.

2.  *Contribution from Jay Shah - $50,000*

Like DAS, Shah was also in the hotel business, and was the CEO of a publicly traded company based in Philadelphia that owns various hotels. DAS often referred to

---

[8]These contributions were accurately reported on the FEC Form 3 for the End-of-Year ("EOY") 2017.
[9]@trocahotels.com and not @dasforcongress.

Shah as his "finance chair."  Shah did not consider himself to be DFC's finance chair but was supportive of DAS's campaign and occasionally provided DAS with business advice through an informal network.   During the campaign, Shah also hosted DAS and other members of the campaign for a couple of meetings at Shah's vacation residence in Maryland, called Walnut Pond.

DAS solicited contributions from Shah over phone and email.  On December 11, 2017, DAS emailed Shah for a contribution, including the standard pitch about contribution limits, and asked Shah if they could use the "farm" (Walnut Pond) for a finance committee meeting and *"to discuss some of the other matters we've been discussing with Toby."*  When Shah indicated that he was too busy that week, DAS pushed back and wrote, *"I hear you, Jay, but this is a critical time for the campaign.  If we don't meet our targets for our next fundraisers, we are dead in the water."*  On December 17, 2017, after chartering DAS's yacht the "Troca One" for an event and offering his compliments, DAS told Shah that they were cancelling a campaign event in New York, asked if they could speak on the phone, and wrote:

> Toby and I are discussing what we need to do to get over the $450k level by 12/31, even with some engineering.  We would love your support; let's discuss how that might look.

The conference call to Shah took place on December 19, 2017.  DAS and Chaudhuri were on the call, though Chaudhuri called in from an airport on the west coast and was between flights.  During the call, DAS asked Shah for a maximum contribution, as well as a personal loan of $50,000.  DAS said it was a "personal" loan to him, but also made it clear that he would use the money for the campaign. Shah is expected to testify

that he did not consider the payment to be an illegal campaign contribution because DAS had touted his experience as a "constitutional lawyer," Chaudhuri had prior experience in federal campaigns, and Shah assumed that they would comply with campaign finance laws.  In an email the next day on December 20, 2017, encouraging work colleagues to contribute to DFC, Shah made clear that his loan was for the benefit of the campaign: *"About 4 or 5 friends and colleagues including myself are each making a $50k loan to him to loan to his campaign to help him get to the 400-500k bogey by 12/31."*

Before wiring the money, Shah asked for a loan agreement.  Days later, DAS told Shah that the loan agreement was going to be with his mother, Mitra Das, which Das explained was necessary to comply with his reporting obligations with the FEC and campaign finance laws.  DAS also told Shah that he probably would not need all the money but would drawdown upon it as necessary.   DAS emailed Shah the loan agreement and the wire transfer instructions for BOA-8667 (his mother's account) on December 27, 2017, from his hotel email account, and wrote, *"Thank you for doing this – I appreciate the faith in the endeavor."*  Shah clearly understood "the endeavor" to be DAS's campaign.[10]

### 3.  Contribution from Toby Chaudhuri - $50,000

After observing Shah agree to loan DAS $50,000, Chaudhuri also agreed to make his own $50,000 loan to the campaign.  On December 26, 2017, at 6:15 p.m., DAS emailed Chaudhuri the wire transfer instructions for BOA-8667, the same account DAS

---

[10]DAS failed to repay the loan but made a partial repayment of $10,000 to Shah in a check dated November 25, 2020.

provided to Bose and Shah.  Later that evening, at 9:46 p.m., DAS sent Chaudhuri a text, *"Please call when you can.  Spoke to Jay.  Need to coordinate with you."*  They agreed to talk the next morning.

That next morning, on December 27, 2017, at 9:04 a.m., DAS expressed his concern about getting to their fundraising goals in a text to Chaudhuri, *"Even with loans we are short.  Will struggle to hit high 300ks.  Ugh."* After talking on the phone, at 3:31 p.m., DAS wired Chauhduri a copy of the loan agreement *"between mom and Jay"* but this time the agreement was between Chaudhuri and DAS's mother.  DAS followed up with a text at 8:59 p.m.: *"Hey brother. Did you get the wire transfer info?  Jay and my parents have funded.  I'm planning to do the main transfer on Friday.  Will you be ok to fund?  Thank you so much – will help bring us over the line with any luck."*  Chaudhuri responded that he would do it as soon as he could, and DAS responded in an iMessage:

> No issue.  Thank you for doing it.  I will aggregate and send as one batch.  Total "self-fund" will be close to $250 plus likely $100k+ raised.

The next day, on December 28, 2017, Chaudhuri emailed DAS an executed loan agreement (between Chaudhuri and Mitra Das) along with the wire transfer confirmations from two separate transfers of $25,000 to BOA-8667.

Chaudhuri will be testifying pursuant to a use immunity agreement.  During the trial, the government anticipates that he will admit that he was not truthful in his statements to the FBI and the government during his first two interviews about his role in the campaign and his $50,000 loan payment to DAS for the campaign.  It is expected that he will admit that when he transferred the loan payment to DAS for the campaign, he

knew he was violating federal campaign finance laws, and was worried about making those admissions to the FBI.

E.     Transfer of "Self-Funded" Loans to DFC Account

The excessive contributions from Bose, Shah, and Chaudhuri were transferred to the DFC Account but first passed through accounts BOA-8667, a joint account for DAS's parents, and an account ending in 9951, a joint account in the name of DAS and his mother.  At trial, the government will demonstrate that the $125,000 from Bose, Shah, and Chaudhuri funded $125,000 of a $170,000 transfer from BOA-9951 into the DFC Account on December 28, 2017, the day after DAS said he would *"aggregate and send as one batch"* the illegal contributions to the campaign account.  The following is a draft summary chart of the transfers that will be a part of that presentation:



F.     First Report to the FEC

Eric Chast from LSG was the finance director for DFC and tried to keep track of

the contributions.  Chast and Deborah Belanger, the outreach director, inputted the checks that DAS gave them into a program called NGP-VAN.[11]  On December 31, 2017, at 12:16 p.m., Chast emailed a report from NGP that indicated DFC had raised $116,571 in contributions (excluding checks from the night before).  That report reflected the legal contributions from Ajoy Bose and Jay Shah, but not the "personal loans" they extended DAS for the campaign.

### 1.  The FEC Form 3 – Report of Receipts and Disbursements

Under FECA, the Form 3 requires the correct and complete disclosure of all receipts (above $200) in an election cycle, including contributions and loans, as well as expenditures.  There are three parts to the Form 3: Schedule A (Itemized Receipts), Schedule B (Itemized Disbursements), and Schedule C (Loans).  The Form 3 also requires the correct and complete disclosure of the amount of "cash-on-hand" (COH) in the campaign account at the end of the reporting period.  52 U.S.C. § 30104(b).  The amount of COH is simply the balance of the campaign's bank account, like the balancing of a checkbook.

Chast began preparing the FEC filings in early January 2018.  He asked DAS for his FEC login information but made clear that he *"won't be putting a thing into the FEC portal until it's reviewed by you."*  Chast inputted the data for the report but relied entirely on DAS's representations regarding his "personal funds" he said he was loaning to DFC.  Despite his regular requests, Chast could not get access to bank records for the

---

[11]NGP-VAN, Inc. is a company that provides fundraising and compliance software products for Democratic Party candidates.

DFC Account.  For the expenditures, DAS would email Chast Excel spreadsheets of transactions.  Smith was the only other co-signer on the DFC Account, but never had access to the account, and never played an active role in the campaign.

One of the FEC witnesses at trial will be Jamie Amrhein, an Assistant Branch Chief of the Reports Analysis Division ("RAD") at the FEC.  Ms. Amrhein has reviewed hundreds of thousands of FEC Form 3 Reports and is expected to testify it is important[12] to the mission of the FEC that the information in the FEC Form 3's is truthful and accurate.  In a general sense, Ms. Amrhein will also testify about the kind of information that is required in the reports, how they are reviewed, processed, and made available to the public.  Other than testifying that: (1) there are contribution limits under FECA; and (2) what the dollar contributions limits were during the 2017-2018 election cycle for the U.S. House of Representatives, Ms. Amrhein will not be providing any testimony or opinion about the law or FECA.  Instead, she will testify about what the FEC does to monitor compliance.

*2.  DAS Provides False Information to Chast for the FEC Form 3*

In mid-January 2018, Molly Horan, DFC's communications director from LSG and Chast worked with DAS to tout DFC's first quarter fundraising numbers in a press release.  It was a good number, and the campaign decided to disclose it early, prior to the filing deadline. On January 16, 2018, Chast reported to Horan that DAS's "Total Revenue" (COH) was *"over $425"* but clarified that *"his loans weren't always round numbers, waiting on totals."*  The same day, Horan emailed DAS a press release (which

---

[12] Ms. Amrhein will not testify that the information is "material" to the FEC, only that it is "important."

DAS approved) entitled, *"Beej Das Raises $425,000 in First Fundraising Quarter"* that claimed that DAS had raised "$425,000" and currently had "$550,000 in cash on hand." The campaign never had $550,000 in COH.   In fact, between January 12, 2018, and January 19, 2018, the balance in the DFC Account was less than $378,000.  Days later, on January 19, 2018, DAS shared the news with Shah and wrote, *"We hit the right numbers – the press is eating it up."*

As the January 31 deadline for filing their first FEC fundraising report, the End-of-Year ("EOY") Form 3, Chast emailed DAS for information to complete the report.  In an email on January 22, 2018, Chast told DAS, *"I can start on our compliance report today but will need an itemized list of expense and loans. [F]or each to I need the amount, date, name, address"*.  DAS was not responsive and was at times difficult to find.  The day before the deadline, at 1:16 a.m., DAS emailed Chast about a $7,574.04 loan to the campaign from Beej Das for *"campaign related charges and expenses on my personal credit card."*   Then at 2:44 a.m. on January 30, 2018, DAS wrote to Chast:

Eric

The following were cash loans from Abhijit Das to Beej Das for Congress in December:

12-27-17  Abhijit Das  $48,000
12-28-17  Abhijit Das  $170,000
12-30-17  Abhijit Das  $54,000

TOTAL $ 272,000

Later that morning, at 10:23 a.m., Chast asked DAS for an itemized list of the charges on DAS's personal credit and, in a frustrated manner, wrote, *"At this point you*

*may need to get me passwords to the accounts so that this will be done in time, unless your treasurer is willing to take the lead."*  Chast's email included a link to the FEC instructions for the Form 3.  DAS shot back at 10:31 a.m., *"I gave you a list of every single transaction.  There is no more itemization. The itemized list I gave you shows the account and each transaction in 2017."*

DAS never gave Chast access to the DFC Account, and never said anything to Chast about the "loans" that DAS had solicited from Bose, Shah, and Chaudhuri (as well as DAS's parents) that enabled him to "self-fund" approximately $272,000.  Relying on what DAS told him, Chast electronically submitted the FEC Form 3 for EOY-2017 on January 31, 2018.  In Schedule C (Loans), the Form 3 falsely indicated that on December 28, 2017, DAS had loaned DFC $170,000 that was the "personal funds of the candidate."  The assertion was false, concealed the excessive contributions and the true identity of the large contributors.  The Form 3 also claimed that DFC's total amount of COH as of December 31, 2017, was $412,324.37, but as clearly stated in the DFC Account's bank statements, the total balance was $331,467.84.

G.     Withdrawals from the Campaign Account –
       Conversion of Campaign Funds for Personal Use Related to Hotel Business

DAS's hotel business struggled financially.  DAS was consistently behind in paying bills, vendors, and payroll.  Employees at Lowell Five, including Sophavy Eath, would regularly contact DAS when his accounts were overdrawn and unable to cover outstanding payments.

Between January 26, 2018, and May 19, 2018, DAS and his hotel operations manager, Sean Smith, withdrew a total of $314,500 from the DFC Account, at least

$267,000 of which was transferred to hotel business accounts and used to pay expenses related to DAS's hotel business.  The business accounts were in the name of Troca Yachts Management (x6955), Troca Holdings LLC (x3085), Troca Hotels Management LLC (x3741), and Boston East Tyngsboro Holding (x8047 and x8074).  This was clear prohibited "personal use" because they were obligations and expenses that existed independent and irrespective of the campaign.[13]

The withdrawals were never reported to the FEC either as an expenditure, a repayment of loan, or as DAS later claimed to his bookkeeper, Rise LaDebauche, a short-term loan from the campaign to the hotel business.  Catherine Osilama, a forensic auditor at the FBI, reviewed the bank account records for DAS's various accounts, and observed that the money DAS withdrew from the DFC Account was not used for campaign fundraisers at the hotel. Instead, the money was used to pay outstanding debts related to the hotel business, including payments to hotel vendors, expenses related to the Troca One Yacht, and real estate taxes.  Ms. Osilama's analysis also revealed that the amount of funds that DAS withdrew from the account ($314,500) exceeded the amount of money he received in loans from his parents and the three illegal contributions ($272,000), and thus included funds from individual campaign donors.

The way DAS structured the withdrawal of funds from the DFC Account and the transfer to his business accounts will be offered to demonstrate his intent to convert

---

[13]While campaign funds are permitted to be used for ordinary and necessary expenses incurred in connection with the campaign, FECA prohibits the conversion of campaign funds for "personal use." 52 U.S.C. § 30114(b).  Under FECA, a contribution or donation is considered to have been converted to personal use if used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign. 52 U.S.C. § 30114(b)(2); 11 C.F.R. § 113.1(g).

campaign funds, and falsify and conceal material facts from the FEC.  First, on January 26 and 30, 2018, instead of simply transferring the funds from the DFC Account to a business account, DAS used the money to purchase a bank check, which he then immediately redeposited into a business account.  Second, starting on February 7, 2018, and continuing through February 13, 2018, DAS instructed the tellers at Lowell Five to break up the transfer into two parts: a cash withdrawal from the DFC Account and then an immediate redeposit of those funds into a hotel business account.  DAS told the tellers that he did not want any cash, nor did he want transfers to his business accounts to show the source of the funds.  The tellers found DAS's requests puzzling and out-of-the ordinary and reported these transactions to their compliance department.[14]

In early February 2018, the Stonehedge's bookkeeper, Ladebauche noticed that the hotel bank statements did not reveal the source of the deposits.  Ladebauche emailed DAS on February 9, 2018, *"Have you starting using the new Lowell Five phone app for transfers between accounts? The descriptions have changed on the statements and now the account number involved does not show up."* Ladebauche referenced a couple recent deposits into the hotel accounts and asked how to code the deposits into QuickBooks ("QB"): *"I will need to know how to code the deposits that you have put in recently, i.e., $9,500 and $13,000 today, $7,000 to TM* [Troca Management]", corresponding to the withdrawals from the DFC Account on February 8 and 9, 2018. On February 16, 2018, Ladebauche emailed DAS the same group of deposit entries corresponding to nine

---

[14]The government has listed six potential Lowell Five teller witness.  The government does not anticipate calling all six of these witnesses.

different withdrawals totaling $92,500 from the DFC Account to other hotel accounts

between February 3 and 16, 2018.  Following DAS's instructions, Ladebauche coded

them into Quickbooks as *"Beej Das – Short Term Loan."*

Beginning around February 13, 2018, DAS directed Smith to conduct the

withdrawals and transfers in the same manner.  The first time, DAS and Smith met at the

bank and did the transfer together.  Seeing that DAS was taking money out of the

campaign account and using it for hotel expenses and was unnecessarily breaking up the

transfer into two separate transactions, Smith asked DAS if doing this was on the "up-and-

up."  DAS told Smith that it was fine since he had loaned the money to the campaign, and

he could then use "his" money to pay these bills.

After that, Smith conducted several transactions on his own.  Following DAS's

instructions, Smith asked the tellers to withdraw a large amount of money from the DFC

Account "in cash," but instructed the teller to not give him the cash, but immediately

redeposit the cash into a business account.[15]  The way DAS structured the transaction had

its desired effect.  A review of the statements for the DFC Account did not reveal where

these withdrawals went to, and a review of the statements for the business account did not

reveal from where they deposits came.

DAS and Smith kept in touch over email about the money they needed to cover

hotel bills, and to conceal his theft of campaign fund, DAS directed Smith on how to

structure the transactions.  For example, on February 15, 2018, Smith forwarded an email

---

[15]Like DAS's transactions, tellers at Lowell Five also found Smith's transactions out-of-the-ordinary and
reported them to compliance.  Lowell Five's reporting of these transactions was the impetus for the FBI
investigation.

to DAS from Sophavy Eath from Lowell Five indicating that a couple of checks were trying to clear the Troca Hotels Management account (x3741), but it was short by $5,868.80.  In response, DAS directed Smith to withdraw $17,000 from the DFC Account, in two separate transactions and wrote, *"Please do another $8k plus another $9k. Withdraw and re-deposit.  No direct transfer."* Following DAS's directions, Smith withdrew $8,000 from the DFC Account on February 15, 2018, and $9,000 on February 16, 2018.  On both occasions, Smith directed the teller to deposit the funds into x8047.

Days later February 19, 2018, at 10:11 a.m., Smith emailed DAS that he needed *"to plan a trip to Brunswick this week to pay the taxes"* (a large real estate tax bill for the Daniel in Maine, which was in danger of foreclosure).  At 2:53 p.m., DAS responded, *"I will work to get you funding by tomorrow."* The next day, on February 20, 2018, DAS withdrew $35,000 from the DFC Account and used the funds to purchase a $35,000 bank check payable to the Town of Brunswick.  Records from the Town of News Brunswick reveal this same check was used on February 20, 2018, to pay the town for real estate taxes for the Daniel.[16]

### H.   The Second Report to the FEC: Q1-2018

By early April 2018, DAS shifted blame for his anemic fundraising to LSG and began to push Chast out of the campaign.  Around the same time, DAS brought in a new campaign strategist, Sean Sinclair, and campaign manager, Brennan Spencer.  Chast, nonetheless completed the Q1-2018 Report and without access to the bank account

---

[16]According to the real estate bill, the owner of the property was Boston East Brunswick Holdings, LLC. BETH's real estate bill was delinquent by about $45,091.54 and it first received a notice of impending foreclosure on or about January 17, 2018 .

statements, had to again rely on DAS's representations.

On April 9, 2018, in an email with a subject of "Expense Detail – Q1," at approximately 12:47 a.m., DAS emailed Chast a spreadsheet labeled *"Das for Congress_Proft+and+Loss +Detail.xlsx."* that listed an amount of expenses totaling $87,369.15.  The amount of total operating expenditures reported on the FEC Form 3 for Q1-2018 was $88,198.91.

This representation, for the purpose of reporting information to the FEC, was materially false.  Between January 26, 2018, and March 29, 2018 (within the Q1-2018 reporting period of January 1, 2018, to March 31, 2018) DAS and Smith had moved a total of approximately $222,500 out of the DFC Account to other hotel accounts. The data that DAS provided about the campaign's expenses omitted any reference to these withdrawals, causing the FEC Form 3 to vastly overstate DFC's COH.  The Form 3 reported that DFC had approximately $398,000 on COH.  The total balance in the DFC Account was about $107,000.[17]

Sometime around the completion of the Q1-2018 report, DAS retained Spencer to act as the Campaign Manager, complained about the $10,000 a month he was paying LSG, and told Spencer that he wanted to stop using Chast.  Spencer and DAS had a tumultuous working relationship and left the campaign after six weeks.  The first campaign manager, Lucas Siebert, had only lasted about three weeks.  Spencer regularly asked DAS for basic information that a campaign manager would want to know, including

---

[17]This FEC Form 3 Report for Q1-2018 forms the basis of Count Five, charging the making of materially false statement and aiding and abetting, in violation of 18 U.S.C. §§ 1001(a)(2) and 2.

fundraising and expenses.  DAS told Spencer he needed to *"better understand your role in the campaign"* and kept Spencer away for the books and records of the campaign.

Spencer left the campaign on March 25, 2018.  During a heated text exchange that day, after DAS asked Spencer to shift his position from Campaign Manager to Policy Advisor, DAS reminded Spencer, *"I have a fiduciary responsibility to our donors into the campaign to protect his assets."*

I.    The End of the Campaign

Between April 3, 2018, and May 19, 2018, DAS and Smith withdrew another $92,000 from the DFC Account, at least $84,000 of which was immediately redeposited into one of DAS's hotel business accounts.  On July 15, 2018, the day the report for Q2-2018 was due, DAS texted Chast, *"Hi Eric.  Hope all is well.  Apparently the DCF file for Q1 on your computer is needed for the Q2 filing.  Do you have that file that you can email us?  Thanks.  Beej."*  After Chast asked if he could get back to DAS the next day, DAS wrote, *"The report to the FEC is due tonight.  Any idea if we can file without the prior quarter data?"*  Chast said he was checking on it now, but then DAS replied, *"No worries.  Just spoke to NGP.  We don't need FEC file.  NGP files directly for the FEC for us."*

That next day, on July 16, 2017, DFC filed the FEC Form 3 for Q2-2018 for the reporting period of April 1, 2018, through June 30, 2018.  The report falsely claimed that DFC's total cash-on-hand at the end of the reporting period was $440,685.  In fact, the total balance of the DFC Account on June 30, 2018, was $4,384.10.[18]  The report did not

---

[18] On August 15, 2018, DFC filed an amended FEC 3 that included additional debts and obligations

include the $92,000 withdrawals from the DFC Account or any type of loan from DFC to DAS or the hotel business.

After the primary loss on September 4, 2018, DFC continued to file the required quarterly Form 3 reports.  On October 22, 2018, the FEC received a mailed copy of the Form 3 for Q3-2018 that Smith hand signed as treasurer for the campaign.  DAS had slid the document across the table and asked Smith to sign it.  DAS said it was just something to wind-down the campaign.  Smith did not read it and signed it.  The Form 3 for Q3-2018 reported total cash-on-hand of $120,566.88.  The total balance in the DFC Account was $6,049.99.

The Form 3 also reported, for the first time in the election cycle, $240,500 in loan repayments, that is, loans that had allegedly been extended to DFC that the campaign had now repaid.  These included payments more particularly described in Schedule B (Itemized Disbursements) as payments to DAS of $50,000 on August 14, 2018; $92,000 on August 22, 2018; and $95,000 on August 28, 2018.  These payments, however, did not appear on the DFC Account bank statements, and were an apparent attempt to cover up his theft of funds from the campaign account.

In the beginning of 2019, no longer on speaking terms, Chaudhuri exchanged heated emails with DAS to get his $50,000 repaid.  During one of those exchanges, on January 22, 2019, DAS claimed that he had been trying to get his money out of the DFC

---

(included money owed to LA Harris, a campaign consultant who had never been paid for his work) now totaling $102,512.61 and slightly adjusted the amount of cash-on-hand to $439,773.49.  The Form 3 also reported a new loan, in the category of "All Other Loans" (instead of "Made or Guaranteed by the Candidate") of $41,389.44 from DAS on June 22, 2018.

Account to repay Chauduri, and was having conversations with a Ben Holly with the FEC. DAS claimed that because of a government shutdown, *"we are left without guidance on how to handle the return of additional funds that I lent the campaign."* DAS attached to his email the FEC's guidance on "Personal loans from the candidate"[19] from the FEC website.   In the continued exchange over email, Chaudhuri also referenced his and another advisor's (Anil Mammen) earlier conversations with DAS about "the Bera campaign." Early in the campaign, Chaudhuri warned DAS about some of the hazards of campaign finance rules, and the need to hire an election attorney. One of the examples Chaudhuri cited was the prosecution of the father of U.S. Representative Ami Bera, Babulal Bera in 2016 for causing conduit contributions to his son's campaign.

On December 4, 2019, after Lowell Five sought to foreclose on the Stonehedge, Boston East Tyngsboro Holding, LLC (BETH), the entity that owned the Stonehedge property, filed for Chapter 11 Bankruptcy. DAS's disclosures to the U.S. bankruptcy court about the company's debts and obligations did not include any to loans it had received from Bose, Shah, or Chaudhuri, or the funds it had received from the DFC Account.

---

[19]That webpage, viewed on 1/22/2019, also clearly stated that, "If any person, including a relative or friend of the candidate, gives or loans the candidate money 'for the purpose of influencing any election for federal office,' the funds are not considered personal funds of the candidate even if they are given to the candidate directly." The government will be offering this assertion not for the truth, but for the defendant's state-of-mind and willfulness. Ben Holly, a Senior Campaign Finance and Reviewing Analyst, is expected to testify that he had did not have any conversations with DAS or his counsel until February 1, 2019, and it did not concern the repayment of loans.

Conclusion

Accordingly, the government respectfully submits the foregoing trial brief to provide an overview of the facts and evidence at trial as well as some of the legal issues.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:     /s/ *Neil Gallagher*
        Neil J. Gallagher, Jr.
        Elysa S. Wan
        Assistant U.S. Attorney

Date Submitted: September 18, 2023

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:     *Neil Gallagher*
        Neil Gallagher
        Assistant U.S. Attorney