

FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

## BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matter of ) | |
| Jim Feldkamp for Congress and Patricia ) | MUR 5724 |
| Siegmund, in her official capacity as treasurer; ) | |
| James L. Feldkamp; ) | |
| Phyllis Feldkamp ) | |

### STATEMENT OF REASONS OF VICE CHAIRMAN MATTHEW S. PETERSEN AND COMMISSIONER CAROLINE C. HUNTER

In MUR 5724, the Commission again confronted the thorny question of whether a family gift of money to an individual running for federal office constitutes a contribution to that individual's campaign. In this matter, Mr. James L. Feldkamp, a congressional candidate, allegedly used the proceeds of a monetary gift from his mother to make a loan to his campaign.

The Commission's past handling of enforcement matters involving monetary gifts from family members has been inconsistent, to put it charitably. For instance, in 2003, the Commission extracted a $210,000 civil penalty from a candidate who received a large family monetary gift.[1] But then in 2004, in a matter presenting materially indistinguishable facts, the Commission voted not to pursue the complaint at all.[2] Following the conclusion of the 2004 matter, three Commissioners issued statements roundly criticizing the Commission's incoherent approach to family gifts, labeling it "arbitrary and capricious"[3] and inconsistent with Supreme Court precedent[4] and suggesting that perhaps "the corruption potential of such transfers [i.e., family gifts] is so insignificant as to make penalties for them unnecessary."[5] According to these Commissioners, treating equally situated respondents so disparately was a "gross

---

[1] MUR 5138 (Ferguson).

[2] MUR 5321 (Robert).

[3] MUR 5321 (Robert), Statement of Reasons of Chairman Bradley A. Smith at 1 [hereinafter *Smith Statement*].

[4] MUR 5321 (Robert), Statement of Reasons of Chairman Bradley A. Smith and Commissioner Michael E. Toner at 4 [hereinafter *Smith-Toner Statement*].

[5] MUR 5321 (Robert), Statement of Reasons of Commissioner David M. Mason at 9 [hereinafter *Mason Statement*]. *See also Smith-Toner Statement, supra* note 4, at 4 ("Even if we had concluded that the funds at issue were not the personal funds of the candidate, we could not have supported a recommended civil penalty that is grossly disproportionate to the seriousness of the violations, which stem from transactions among family members.").

injustice"[6]—one that should result in an apology to the respondent penalized in the earlier matter.[7]

Yet notwithstanding that history—which, at the very least, sent mixed signals regarding the current state of the law in this area—the Office of General Counsel ("OGC") recommended that the Commission (1) find reason to believe ("RTB") that Mr. Feldkamp, his campaign committee, and Phyllis Feldkamp—the candidate's mother—(collectively, "Respondents") each knowingly and willfully violated the Federal Election Campaign Act of 1971, as amended ("the Act"), when Mrs. Feldkamp provided a gift of $75,000 to her son and (2) seek a steep civil penalty. We disagreed.

As we explain in greater detail below, it appears that the monetary gift at issue complied with the Commission's regulations. However, even if we were to assume the monetary gift was at variance with the Act and relevant Commission rules, the matter still was properly dismissed as an exercise of prosecutorial discretion pursuant to *Heckler v. Chaney*.[8] Going forward against the Respondents in this matter in an effort to secure a large civil penalty would have been manifestly unfair. The Commission's contradictory approaches in past matters involving family gifts provide inadequate notice to the regulated community about what is permitted and what is not. At this point, respect for due process and fundamental fairness demands that the Commission articulate, either by rule or through policy statement, the permissible boundaries relating to family gifts before pursuing future enforcement actions in this area.[9] For these reasons, we rejected the recommendation to pursue the Respondents any further in this matter and instead voted to close the file.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Feldkamp ran for Congress in 2004 in Oregon's Fourth Congressional District. At issue in this matter is a $75,000 monetary gift that Mr. Feldkamp received from his mother, Phyllis Feldkamp, on or about September 29, 2004. Mr. Feldkamp deposited this amount into his personal bank account and then subsequently made loans totaling $77,500 to his campaign committee in the form of three personal checks.

---

[6] *Smith Statement, supra* note 3, at 1.

[7] *Mason Statement, supra* note 5, at 9 ("That [the *Ferguson* and *Robert* outcomes] are not consistent may suggest that the *Ferguson* respondents are owed at least an apology.").

[8] 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion ... [and] the presumption of reviewability of agency action does not apply to an agency's decision not to undertake certain enforcement actions.").

[9] *See* MUR 5564 (Knowles), Statement of Reasons of Chairman David M. Mason and Commissioner Hans A. von Spakovsky at 2 ("Because the Commission did not proceed against Respondents, it should not proceed against similarly situated respondents unless the public has notice through a rulemaking. Proceeding against similarly situated respondents would mean that the Commission is not treating like respondents alike, which would be unacceptable.") (internal citation omitted).

Earlier, Mr. Feldkamp's mother had loaned $34,780 to her son's campaign. Upon instructions of the Commission's Reports Analysis Division ("RAD"), the campaign refunded this loan.[10] Approximately two weeks later, Mr. Feldkamp's mother gave her son the $75,000 at issue.

On March 22, 2006, the Democratic Party of Oregon filed a complaint against Mr. Feldkamp alleging that he did not have enough "personal funds" to loan his campaign $77,500. On December 14, 2006, the Commission found RTB that Mr. Feldkamp and his campaign accepted an excessive contribution and approved an investigation to discover the source of the funds that Mr. Feldkamp loaned his campaign. After OGC concluded its investigation, the Commission considered, but did not approve, OGC's recommendation that the Commission seek a substantial penalty from Respondents during pre-probable cause conciliation.[11]

## II. ANALYSIS

### A. Candidates Have a Constitutional Right to Make Unlimited Expenditures from Personal Funds

Since *Buckley v. Valeo*, it has been well-established that candidates for federal office have a First Amendment right to make unlimited expenditures from personal funds to advocate for their own election.[12] At the same time, the Act limits the amounts that third parties may contribute to federal candidates.[13]

Though the *Buckley* Court upheld the application of the Act's contribution limits to a candidate's family members, it acknowledged that the potential for actual or apparent corruption from familial contributions is "diminished" relative to contributions from other sources.[14] The Commission has yet to adopt an approach in matters involving family gifts that adequately takes into account the reduced risk of corruption posed by such gifts and the constitutional right of a candidate to spend an unlimited amount of personal funds on his or her election. This matter represents one more example of the Commission's struggle to determine: (1) under what circumstances gifts from a candidate's family become that candidate's personal funds, (2) when such family gifts instead constitute contributions to the candidate's campaign, and (3) what penalties, if any, are proper for family contributions that exceed the Act's limits.

---

[10] *See generally* 11 C.F.R. §§ 100.52 & 100.82.

[11] MUR 5724, Certification dated Oct. 7, 2008.

[12] 424 U.S. 1, 51-58 (1976). *See also* 11 C.F.R. § 110.10 ("[C]andidates for Federal office may make unlimited expenditures from personal funds as defined in 11 CFR 100.33.").

[13] 2 U.S.C. § 441a(a)(1)(A).

[14] *Buckley*, 424 U.S. at 53 n.59.

Statement of Reasons in MUR 5724
Page 4 of 8

### B. The Commission Has Inconsistently Interpreted Its "Personal Funds" Regulation

The Commission's regulations define "personal funds" as, *inter alia*, "bequests to the candidate; income from trusts established before the beginning of the election cycle; income from trusts established by bequest after candidacy of which the candidate is the beneficiary; [and] gifts of a personal nature which had been customarily received prior to the beginning of the election cycle."[15] As demonstrated below, the Commission has construed "personal funds" inconsistently with respect to family gifts in prior enforcement matters.

For instance, in MUR 5138 (Ferguson), the Commission approved a $210,000 penalty against Congressman Mike Ferguson, his parents, and his campaign committee after Congressman Ferguson loaned his campaign a total of $525,000 after receiving a $1 million family-trust bequest during his 2000 campaign. As former Commissioners Smith and Toner noted in their dissenting Statement of Reasons in that matter,[16] the trust at issue appeared to be a *bona fide* estate planning vehicle:

- Congressman Ferguson's parents established the trust after being diagnosed with cancer.
- The trust named Congressman Ferguson and his three siblings as beneficiaries; though only Congressman Ferguson qualified for a trust disbursement at the time of the trust's establishment, the terms of the trust applied equally to the Congressman's siblings.
- The trust was established only after Congressman Ferguson's parents obtained an opinion of counsel concluding that transferring funds from the trust to the Congressman would not violate the Act.
- Finally, Congressman Ferguson's parents had a history of making substantial monetary gifts to each of their children in the several years preceding Congressman Ferguson's campaigns for Congress. (Congressman Ferguson had received financial gifts from his parents totaling more than $600,000 in the three years prior to the 2000 trust disbursement.)

Thus, since nothing in 11 C.F.R. § 100.33(b)(6) requires financial gifts received by a candidate to be identical or substantially similar in magnitude or form to pre-candidacy gifts in order to be considered "personal funds" of the candidate, it appeared that the $1 million bequest from Congressman Ferguson's parents lawfully became the Congressman's personal funds, which he could then permissibly loan to his campaign. Yet notwithstanding these compelling facts, the Commission still sought, and eventually obtained, a nearly quarter-million dollar civil penalty from these respondents.

---

[15]   11 C.F.R. § 100.33(b). *See also* 2 U.S.C. § 431(26) (defining "personal funds" as "gifts of a personal nature that had been customarily received by the candidate prior to the beginning of the election cycle").

[16]   *Smith-Toner Statement, supra* note 4, at 3.

Just one year later, in MUR 5321 (Robert), the Commission went the other direction, declining to approve a recommendation to seek civil penalties from congressional candidate Janet Robert and her mother Mary Robert by a 3-3 vote. In that matter, the candidate's mother gave her daughter an $800,000 check during the candidate's 2002 campaign. Shortly thereafter, the candidate loaned $811,219 to her campaign. The Commission's 3-3 vote resulted in the matter being closed with no penalty assessed.[17]

In his dissenting Statement of Reasons, Commissioner Mason demonstrated the manifold ways in which the *Ferguson* and *Robert* matters were materially indistinguishable:

> Both *Ferguson* and *Robert* involve (1) well-to-do families (2) with a history of generosity (3) to their adult children. This generosity continued when (4) the parents decided to give (5) $1 million and $800,000, respectively, (6) to their candidate-children (7) during the campaign of each (8) for the U.S. House of Representatives. In turn, each candidate (9) loaned (10) several hundred thousand dollars (11) to the campaign. In response to a complaint, the respondents assert (12) the money was "personal funds" and that (13) family reasons, including (14) estate planning, were the motivation for the gifts. The respondents (15) note all the children had an opportunity to receive equal amounts and (16) affirm there was no excessive campaign contribution. Nevertheless, the gifts (17) exceeded previous gifts, (18) arrived in September before the November election, (19) departed from whatever gift custom there may have been under Section 110.10(b)(2), and (20) allowed both candidates to loan substantial sums of money to their campaigns at crucial times without having to use other assets they owned.[18]

Commissioner Mason (who voted to penalize both Robert and Ferguson) concluded that the two matters were "not different enough ... to warrant a different result," and that "[i]f the Commission is right in *Robert*, then it erred in *Ferguson*."[19]

Then-Chairman Smith agreed with Commissioner Mason that there were "no material differences of fact" between the two matters and hoped that "the difference in result between the two cases [was] indicative of a new approach by the Commission to this type of alleged violation."[20] Chairman Smith warned, though, that "[i]f, on the other hand, today's result is merely a one-time-only, 'Get Out of Jail Free' card ..., then I

---

[17]  Commissioner Thomas, who supported seeking a penalty in the *Ferguson* matter, voted against finding RTB in *Robert*, largely because each of the nine other Robert children also received identical gifts at the same time. MUR 5321 (Robert), Statement of Reasons of Commissioner Scott E. Thomas at 3-5.

[18]  *Mason Statement, supra* note 5, at 5-6.

[19]  *Id.* at 6.

[20]  *Smith Statement, supra* note 3, at 1.

believe the decision is nothing short of arbitrary and capricious, and a gross injustice to the respondents in [*Ferguson*] and future cases."[21]

### C. The Feldkamp Gift Was Not Clearly an Excessive Contribution

While there is room for good-faith debate as to which approach is more appropriate going forward, there are strong reasons for applying *Robert*'s no-penalty approach in this matter. As a matter of law, it is not clear that the $75,000 gift given to Mr. Feldkamp by his mother during his candidacy can be considered an excessive contribution. Under a plain reading of 2 U.S.C. § 431(26) and 11 C.F.R. § 100.33(b), all that is necessary for a monetary gift to be considered a candidate's personal funds, rather than a contribution to the candidate, is that a custom of gift-giving was established prior to any candidacy. As mentioned above, neither the regulations nor the statute require gifts to be identical or substantially similar in magnitude or form to pre-candidacy gifts.

As in the *Robert* matter, Mr. Feldkamp's mother gave substantial gifts to each of her children, including Mr. Feldkamp, on a regular basis for many years. In *Robert*, most of the earlier gifts were in the form of shares in a family business. Similarly, in this matter, for 16 years, Mr. Feldkamp's mother regularly gifted her children shares of stock in the family business as well as cash. The value of these gifts ranged from approximately $8,000 to more than $182,000. In fact, nearly all of the factors that Commissioner Mason identified as being common to both the *Ferguson* and *Robert* matters are also present in this matter. The only significant difference is that the gift received by Mr. Feldkamp was several magnitudes less than the $1 million and $800,000 gifts given to Ferguson and Robert, respectively. Thus, if the gift at issue in *Robert* did not constitute an excessive contribution, then neither does the gift given to Mr. Feldkamp by his mother.[22]

---

[21] *Id.*

[22] Ultimately, a family gift must be made "for the purpose of influencing a federal election" before it can be deemed a contribution. *See* 2 U.S.C. § 431(8)(A). There is no dispute that Mr. Feldkamp ultimately loaned the money he received from his mother to his campaign. However, the evidence in this matter does not demonstrate that Mr. Feldkamp's mother gave the money to her son for the purpose of influencing his election.

We also could not accept the allegation that liability could be established on the basis of an affidavit submitted by Mr. Feldkamp's mother that did not affirmatively state that the $75,000 was a gift rather than a campaign contribution. This is far from an admission that the gift was actually intended to be a contribution. *See* 32 AM. JUR. 2D *Evidence* ("[T]he uncertainty which attends interpreting a person's silence as an implied admission of the statement made has led the courts to consider such evidence as dangerous and to be received with caution ...."). Moreover, the Commission did not instruct Ms. Feldkamp, who was not even a respondent at the time, to address specifically in her affidavit whether the $75,000 was a personal gift or a campaign contribution and, accordingly, she did not do so. Rather, as counsel for Ms. Feldkamp explained in the transmittal letter accompanying the affidavit, the submission was intended to demonstrate Ms. Feldkamp's history of making large gifts to each of her sons over the years.

### D. At a Minimum, This Matter Deserved to Be Dismissed as an Exercise of Prosecutorial Discretion

In the aftermath of the *Ferguson* and *Robert* matters—where similar operative facts led to starkly conflicting results—the legal framework governing family gifts became hopelessly muddled. Thus, to have pursued this matter any further would have been grossly unfair to the Respondents.[23] Furthermore, the Commission could not once again take a sudden U-turn on family gifts without whipsawing the public's expectations. Having decided not to proceed against similarly situated respondents in previous matters, the Commission cannot now marshal its enforcement apparatus against Mr. Feldkamp and his mother without appearing as if it is applying shifting standards with respect to family gifts. Therefore, we agree with then-Chairman Smith[24] that, with the *Robert* matter, the Commission effectively took a new approach to family gifts and cannot now abruptly change course without first promulgating a new rule or, at least, drafting a policy statement on the issue.

### III. CONCLUSION

Our votes in this matter should not be read as an indication that we would never support going forward in matters involving family gifts. We can envision circumstances where pursuing civil penalties in family gift-related matters would be warranted—for instance, in a situation where a prohibited source (such as a corporation, labor union, or foreign national) sought to funnel money into a candidate's campaign coffers *via* a family member of that candidate. However, the Commission owes it to the public to provide clarity to an area of the law that has become profoundly murky. And the appropriate vehicle for doing so is not an enforcement action but rather through a rulemaking or a policy statement.

---

[23] In light of the Commission's inconsistent approach towards family gifts, the recommendation to find that the Respondents' alleged violation was knowing and willful was especially inappropriate. After its investigation, OGC added a recommendation that the Commission find reason to believe Mrs. Feldkamp made an excessive contribution by loaning Mr. Feldkamp's campaign committee $34,780. That loan was made and promptly refunded by the Committee before Mrs. Feldkamp gave her son the $75,000 gift. This recommendation was not in OGC's first report, and we ultimately rejected it for the same reasons we rejected the others. Though Mr. Feldkamp's mother previously attempted to loan $34,780 to her son's campaign, nothing in the record indicates she expected her son to repay any of the $75,000 gift or believed her son might spend it all on his campaign. Without further evidence, depositing a gift in a personal checking account is hardly the kind of "elaborate scheme" that establishes knowing and willful intent. To argue that Mr. Feldkamp knowingly and willfully circumvented the Act by "routing" his mother's gift through his bank account in an effort to disguise the contribution as personal funds merely assumes what must be proven—that Mr. Felkamp's mother intended for the $75,000 to be a campaign contribution and not a gift. Nor is it particularly relevant that Mr. Feldkamp responded to the FEC's loan-related inquiries by saying that the funds loaned to his campaign came from "his own banking account." The response was literally true. If Mr. Feldkamp believed the money gifted to him by his mother was his own, then Mr. Feldkamp's answer was perfectly reasonable; it is not a respondent's responsibility to anticipate and answer unasked questions.

[24] *See supra* text accompanying note 21.

Statement of Reasons in MUR 5724
Page 8 of 8

      For the aforementioned reasons, we voted to take no further action in this matter and to close the file.


_____      12/11/2009
Matthew S. Petersen                Date
Vice Chairman


_____      12/11/2009
Caroline C. Hunter                 Date
Commissioner