UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                               )
UNITED STATES OF AMERICA,       )
                               )          Criminal Action
          Plaintiff,            )          No. 21-10200-RGS
                               )
v.                             )
                               )
ABHIJIT DAS,                    )
                               )
          Defendant.            )
                               )
```


BEFORE THE HONORABLE RICHARD G. STEARNS
UNITED STATES DISTRICT JUDGE


JURY TRIAL DAY FIVE

October 6, 2023
9:00 a.m.


John J. Moakley United States Courthouse
Courtroom No. 21
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Neil J. Gallagher, Jr.
3    Elysa Q. Wan
     United States Attorney's Office
4    John Joseph Moakley U.S. Courthouse
     1 Courthouse Way, Suite 9200
5    Boston, MA 02210
     617-748-3397
6
     On Behalf of the Defendant:
7    Michael Kendall
     Abigail Mahoney
8    White & Case, LLP
     75 State Street
9    Boston, MA 02109
     617-939-9310
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONTENTS

WITNESS                                                          PAGE

TOBY CHAUDHURI

   Cross-Examination By Mr. Kendall                             4
   Redirect Examination By Mr. Gallagher                      44

DEBORAH BELANGER

   Direct Examination By Ms. Wan                              52

RISE LADEBAUCHE

   Direct Examination By Ms. Wan                              64
   Cross-Examination By Mr. Kendall                           85
   Redirect Examination By Ms. Wan                           106
   Recross-Examination By Mr. Kendall                        111

CARMEN TZIOTZIORAS

   Direct Examination By Ms. Wan                             115

LINDA FIRTH

   Direct Examination by Ms. Wan                             123


EXHIBITS

Exhibit No.                    Received

   187                          5
   188                         14
   189                         17
   190                         18
   191, 192, 193               20
   195                         38
   195                         41
   196                         91
   197                         93
   198                         95
   199                         99
   200                        105
   201                        108
   202                        113

```
 1                    P R O C E E D I N G S

 2               (The following proceedings were held in open court

 3    before the Honorable Richard G. Stearns, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

 7    October 6, 2023.)

 8               (Jury enters the courtroom.)

 9               (Case called to order.)

10          THE COURT:  Mr. Chaudhuri, please remember you're

11    still under oath, sir.

12          Good morning, counsel, and good morning again, jurors.

13    Right at 9:00, we're off and running.  All right.

14          MR. KENDALL:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. KENDALL:  Thank you.

17    CROSS-EXAMINATION BY MR. KENDALL:

18    Q.   Mr. Chaudhuri, do you remember yesterday the government

19    put in front of you probably two or so documents relating to

20    your negotiations to get paid in 2018?

21          THE WITNESS:  First, Attorney Kendall, there's some

22    spilled water here.  Is there a way I could request a napkin?

23          COURTROOM CLERK:  I'll get you some.

24          MR. KENDALL:  I left you a pad of paper.  Use some

25    sheets to --
```

1          THE WITNESS:  I already did.  The sheets seem to be

2    wet already.

3          MR. KENDALL:  Sorry for that.

4    Q.   While we're waiting, could you respond to my question,

5    please.

6    A.   I don't remember which documents you're talking in

7    reference to.

8    Q.   Okay.

9    A.   Thank you for the pad of paper.

10          MR. KENDALL:  Ms. Zalzal, could we have 503, please.

11    I'd like to, if we could, show that to the witness, please.

12    503.

13          THE WITNESS:  That was really helpful.  Thank you.

14    The paper didn't absorb the water, but the napkins did.

15    Q.   Mr. Chaudhuri, could you take a look at the document

16    marked for identification I-503.  And can you tell us, is that

17    an email chain that you had with Mr. Das and his mother, dated

18    January 23, 2019 at the top?

19          MR. Gallagher:  No objection to the exhibit coming in.

20          MR. KENDALL:  I'd like to offer it, Your Honor, as our

21    next exhibit.  What is it?

22          COURTROOM CLERK:  One second.  187.

23          MR. KENDALL:  Okay.

24          (Exhibit 187 admitted into evidence.)

25    Q.   Do you recognize 187 as an email chain that you

 1   participated in?

 2   A.   I need a moment just to read it.

 3   Q.   Okay.

 4   A.   I remember.

 5          MR. KENDALL:   Okay.   Could we turn to the third page,

 6   please, Ms. Zalzal.

 7   Q.   I'm going to direct your attention to the middle of it

 8   where it starts, it says on Tuesday, January 22.   I'm going to

 9   read it and ask you if I read it correctly.   On Tuesday,

10   January 22, 2019 at 11:13 a.m., Tobi Chaudhuri wrote, "Hi,

11   Mitra Mashi.   Hope you're well and that 2019 is off to a good

12   start.   Please tell me when you're available this week for a

13   phone call to discuss a way forward regarding an urgent matter.

14   Toby."

15          Did I read that accurately?

16   A.   Besides the pronunciation of my last name, yes.

17   Q.   Thank you.   I'll try to do better.   I apologize.

18          Could you take that pad of paper I left for you.   The

19   white pad of paper, pick it up, please.   I also left you a pen,

20   correct?

21   A.   Correct.

22   Q.   Could you on that white pad of paper write the name Dr.

23   Mitra Das, or Mitra Mashi Das, however you refer to her, could

24   you --

25          MR. GALLAGHER:   Your Honor, I object.   This is not a

1    question.  This is theatrics.

2          THE COURT:  What are we doing?

3          MR. KENDALL:  Your Honor, I have numerous documents

4    when he is writing to her about the loan.  I want him to keep

5    track of the number of times he wrote to her.  I just want him

6    to make check marks so we can keep track of all the time.

7          THE COURT:  Check marks are all right, but we're not

8    creating exhibits.

9          MR. KENDALL:  Okay.

10   Q.   You refer to her there one time; is that correct?

11   A.   Her name is there, yes.

12   Q.   Okay.  Now, if we go to the top of the page, it says on

13   January 22, 2019, at 3:06 p.m., Mitra Das wrote, "Hi Tobi.

14   Mom's return was delayed due to weather in Boston.  She will

15   surely respond this week once settled.  In the meantime, I will

16   get a document over to you that pertains to this matter."

17        Did I read that correctly?

18   A.   I believe so.

19          MR. KENDALL:  Okay.  Then if we go to the bottom of

20   the second page, Ms. Zalzal.

21   Q.   You responded on Tuesday, January 22, 2019 at 9:29 p.m.,

22   Toby Chaudhuri wrote, "Thank you for calling me tonight and

23   promising to repay the loan before the end of the week."

24        Did I read that correctly?

25   A.   Yes.

```
 1   Q.   Okay.  And if we go to the middle of the page, on
 2   Wednesday, January 29, 2019, at 12:03 a.m., Toby Chaudhuri
 3   wrote, "It is an unfortunate and unpleasant situation when
 4   promises to pay me back were broken twice.  I don't appreciate
 5   being lied to, and fighting to get my money back is not how I
 6   like to spend my time, especially when it's urgently needed to
 7   support my family.  I want to put this behind us and am happy
 8   you committed to repay the loan this week.  Attaching the
 9   agreement from December 2017 here and the November 2018 letter
10   you received with bank details.  The updated balance for
11   January 2019 is 54,333.33."
12        Did I read that correctly?
13   A.   It looks so, yes.
14   Q.   Okay.  Mr. Das responded to you --
15        MR. GALLAGHER:  Your Honor, I object to the next
16   paragraph, having just looked at it for the first time today,
17   under 403 grounds.  And if Mr. Kendall wants to get into this,
18   I suggest he's opening a door he should not want to open.
19        THE COURT:  It's to your advantage then.
20        MR. KENDALL:  Okay.
21   Q.   It says on January 23, 2019, at 1:50 a.m. Mr. Das wrote,
22   "Lay off the alcohol Tobes.  There were no lies.  It was an
23   unfortunate episode for sure.  I didn't expect to be so abused
24   by you and your team of carnies.  I had a crew from the
25   steelworkers leadership tell me last week how much they wanted
```

1    to support me further but how awful Carene and Kristy were to

2    them.  I never did thank you for all that fun mismanagement.

3    Don't forget the near sexual harassment claim you created with

4    our employee and potential campaign volunteer, Jane Doe.  You

5    lost the respect of every Stonehedge employee that evening.

6    I'm sure mom could teach students based on that episode.  I'm

7    sure Ruby won't be impressed either but perhaps she would.  Why

8    don't you add her to this email chain and let's discuss your

9    behavior during the campaign.  Go to bed buddy."

10        Did I read that correctly?

11   A.   It looks so.

12   Q.   If we could go to the bottom of the first page, on

13   Wednesday, January 23, 2019 at 9:30 a.m., Toby Chaudhuri wrote,

14   "I don't appreciate this infantilization early in the morning,

15   especially before taking our toddler to school.  Please

16   apologize for it.  We have let this loan go a year overdue out

17   of respect for Mitra Mashi."

18        That's your second reference to his mother in terms of the

19   loan in this document, correct?

20   A.   In this email string.

21   Q.   "Ruby deserves the same respect and we need it paid back

22   now.  Resolve the loan repayment matter this week as promised,

23   and we can address the litany of other issues on your mind last

24   night.  To directly address your most serious accusation

25   intended for blackmail, Jane Doe's complaint is with Stonehedge

1   management, not me.  Ruby is my life partner and fully aware of

2   the situation.  She has her own perspective and understands

3   your motivation for saying this.  My money is her money, and we

4   loaned our savings to Mitra Mashi because we believed in you

5   Babu.  Neither of us expected it to go unpaid for so long that

6   we'd have to fight to get it back.  It has had a negative

7   impact on the quality of life for our family and old folks.

8   We're not rich people.  To the contrary, this situation has put

9   us into debt when we needed it most.  Throwing dust in our eyes

10  doesn't change these circumstances.  I'm sitting here with a

11  lot of information too.  Loan repayment this week will do a lot

12  to resolve many problems."

13      Did I read that correctly?

14  A.  The last sentence says "to solve many problems," but

15  otherwise, yes.

16  Q.  "Solve many problems."  Thank you, I appreciate that.

17      Then if we could go to the top of the first page, if I can

18  go to the second email there that starts in January 23, 2019,

19  9:58 a.m.  Abhijit Das wrote, "Toby, Jane Doe's complaint, as

20  you are fully aware, was with you.  Your apology was to her for

21  that reason.  I am not throwing dust in anyone's eyes, nor am I

22  conflating your financial loan with your conduct.  Your

23  blameless greater than thou nonsense needs to stop however.  I

24  hope you all have a good day.  Mom, dad and I are looking

25  forward to moving past this episode.  The financial and

1   political entanglement with you was a mistake, and we hope to

2   be able to move forward from it shortly.  Take care of yourself

3   and your family."

4        Did I read that correctly?

5   A.   I believe so.

6   Q.   Okay.  And then your response is, "This loan is our own

7   entanglement and a big one for us financially and politically.

8   Thank you for agreeing to settle it this week and putting it

9   behind us.  We're all looking forward to seeing it post soon."

10        Did I read that correctly?

11   A.   I believe so.

12   Q.   Okay.  Now I want to turn to Exhibit 108.  If we could go

13   to the bottom of the first page, on Wednesday, January 23, 2019

14   at 12:18 a.m. Toby Chaudhuri wrote, "Have heard you say you're

15   dealing with FEC for many months.  Has the FEC frozen your

16   accounts?  Why are Ben, Holly and your counsel even in

17   discussion at this late stage?  The campaign ended over a

18   quarter ago.  Either way, the FEC handles reporting, not bank

19   accounts, so it shouldn't be a problem for you to access what

20   you lent the campaign.  Fortunately, the issues with the FEC

21   are independent of my loan agreement with your mother.  I

22   warned you of this potential conflict in 2017 and recommended

23   that you check with counsel.  Heard you say that you checked

24   with counsel and figured this all out before you requested the

25   loan on your mother's behalf at the end of 2017.  I also heard

1    you confirm that you checked with counsel when this was

2    discovered in a conference call with Jay Shah before then."

3         Did I read that correctly?

4    A.   You read correctly.

5    Q.   And there were two references to his mother in that

6    paragraph, correct?

7    A.   I didn't pay attention.

8    Q.   Okay.  Would you accept my representation there were two?

9    A.   I do.

10   Q.   Okay.  Now, if we go to the top of the first page, on

11   Wednesday, January 23, at 1:47 you wrote, "I'm forced into this

12   ridiculous email back and forth because of the situation that

13   has been created.  Now I need to better understand what you're

14   trying to say with the PDF of the FEC website here to

15   understand why I haven't been paid back by your mother yet.

16   Simply stated, it doesn't make sense.  The FEC can't hold your

17   money hostage."

18        Did I read that correctly?

19   A.   I'm seeing those words here.

20   Q.   And there was another reference to his mother, correct?

21   A.   Looks like it.

22   Q.   I'd like to go to Exhibit 9, which I believe is in

23   evidence.  This is an email at the top from Beej Das to you on

24   January 24, 2019, correct?

25   A.   It looks like that.

1    Q.   And that has the attachment Das Chaudhuri.  Did I
2    pronounce it correctly?
3    A.   Chaudhuri, like clam chowder --
4    Q.   Thank you.  Das Chaudhuri Loan Settlement Agreement.
5    Correct?
6    A.   I'm just catching up, reading it right now.  That is the
7    attachment name there.
8    Q.   And if we could go to page 2, please, at the top
9    paragraph.  The top paragraph reads, "This loan settlement and
10   release agreement is entered into as of this blank day of
11   January 2019 by and between Mitra Das," correct?
12   A.   It says "Mitra Das" there.
13   Q.   That's another reference to his mother, correct?
14   A.   This is not written by me -- or is this written by me?  I
15   don't know.
16   Q.   Tell you what, it wasn't written by you, so we won't give
17   a check for that.
18   A.   What number are we up to now on checks?
19   Q.   I have five by my count.  Do you disagree?
20   A.   I have five on my hand as well.
21   Q.   If we could go to I-505, please.  I'd like to offer this
22   into evidence.
23            MR. KENDALL:  I assume that's okay with the
24   government.
25            MR. GALLAGHER:  No objection.

```
 1              COURTROOM CLERK:  188.

 2              (Exhibit 188 admitted into evidence.)

 3    Q.   If you could take a look at page 188, please,

 4    Mr. Chaudhuri.

 5    A.   Is that this email stream?

 6    Q.   Yes, it's an email stream that starts dated January 24,

 7    2019.  And if you look at the bottom of the first page, there's

 8    a document ID number there.  Do you see that?

 9    A.   On the bottom where it says "USA"?

10    Q.   Yes, United States Attorney's Office, then a number after

11    it.  Do you see that?

12    A.   I do.

13    Q.   Do you understand that to be a document ID number that the

14    government puts on the documents before they send them to us?

15    A.   I'm learning.

16    Q.   Okay.  I'd like to start on the bottom of the first page.

17    It states on January 24, 2019, at 8:45 p.m., Toby Chaudhuri

18    wrote, "This complicates the agreement by adding additional

19    parties so expenses should be handled separately as we

20    discussed.  I'm good for paying what I owe for these items.

21    Non-disparagement is one way.  If anything, it should protect

22    both parties.  Confidentiality from accountants could make

23    repayment taxable.  This was a concern on my end from the

24    beginning and my accountant is preparing for the situation

25    already.  This is not income and interested in paying taxes on
```

1   repayment.  In addition, the original agreement will be

2   terminated without representation unless Mitra Mashi is willing

3   to cover legal expenses for the cancellation.  Will send a new

4   draft."

5        Did I read that correctly?

6   A.   You did.

7   Q.   That's another reference to his mother, correct?

8   A.   And reference to law, and I'm not a lawyer, just for

9   clarification.

10  Q.   Next I want to read an email above that where Mr. Das

11  responds to you.  "Sure, happy to handle concerns as needed.

12  Mutuality of non-disparagement needs consideration then.  I

13  need to be added since much of the ire has been directed at me.

14  You've been talking.  I haven't said a word to anyone about the

15  agreement.  I only say positive things about you.  Several

16  people have come to me about what you've been saying.  At any

17  rate, send a draft.  Let's get this done.  Thanks.  Chat soon."

18       Did I read that correctly?

19  A.   I followed along, yes.

20  Q.   Then the email above that you respond, on Thursday,

21  January 24, 2019, at 10:02 p.m. Toby Chaudhuri wrote, "Not

22  interested in adding you as a new party when this arrangement

23  was made in 2017 intentionally to avoid breaking the law.  This

24  should focus on terminating the loan agreement with Mitra Mashi

25  where you are communicating here as her agent.  Happy to create

```
 1   a separate contract with different parties if you're concerned
 2   about what you heard.  I vouched for you when it has counted.
 3   It's not in my interest to create a negative image."
 4        Did I read that correctly?
 5   A.   Yes.
 6   Q.   When you were preparing for your testimony today here in
 7   court with the government, did they ever show you this
 8   document, Exhibit 188?
 9   A.   They did show me all the documents.  I didn't have a
10   chance to read everything.
11   Q.   Okay.  So did they show you this one in particular?
12            MR. GALLAGHER:  Your Honor, I object.  This is in
13   evidence as 109.1, except for the top part, so this is
14   misleading the jury.
15   Q.   I'm just asking did they show it to you?
16   A.   I can't tell you for sure.
17   Q.   Okay.  If we take a look at the top email, his response
18   is, "Cool.  Send a re-draft.  We'll get this done.  I am
19   speaking as her agent for sure, but you did choose other
20   channels to communicate in a manner that I still don't
21   understand.  But perhaps I was tone deaf.  Anyway, let's get
22   this done."
23        Did I read that correctly?
24   A.   I'm reading what you're reading and following along.
25            MR. KENDALL:  Okay.  Could we now have up on the
```

1    screen I-507.  I'd like to offer that in, if the government has
2    no objection.
3                MR. GALLAGHER:  No objection, Your Honor.
4                COURTROOM CLERK:  189.
5                (Exhibit 189 admitted into evidence.)
6                MR. KENDALL:  If you could show that to the jury, Your
7    Honor.
8    Q.   I'd like you to look at I-189.  That's an email from you
9    to Mitra Das; is that correct?
10   A.   It says "Mitra Das" there.
11   Q.   On my list I'm going to add that as another check.  Then
12   you wrote, "Mitra Mashi, I received Babu's settlement offer on
13   your behalf last night and comprising a final offer just now."
14        You refer to her by name and refer to her on her behalf,
15   so that's two checks.  Do you agree?
16   A.   I've lost count, but I think we're under ten, right?
17   Q.   We're at nine.  Your counting is quite good.
18        "We're willing to compromise to include language that
19   would prevent future legal action and disparagement if the loan
20   is repaid today in full.  Our trust in you and your credibility
21   were the implied collateral in our agreement.  So we're clear,
22   we are not interested in renegotiating the original loan
23   agreement at this late stage to include equity of any of your
24   properties or business interest as collateral.  We're also not
25   interested in receiving anything different from the payment

1    terms we agreed to in December 2017 to close this loop.  This

2    time to negotiate a lesser payment has passed.  Attaching a

3    copy of the final offer here with a reminder that funds

4    transferred may not post before next week if not made in the

5    next few hours."

6         Did I read that correctly?

7    A.   There are three words that you skipped over, but other

8    than that, that is correct.

9    Q.   What did I skip?  Please point out.

10   A.   I think it was "From the start."

11        MR. KENDALL:  Thank you.  I'd now like to offer as our

12   next exhibit, Your Honor, I-506.  I'd like to offer this into

13   evidence, Your Honor.

14        MR. GALLAGHER:  No objection, Your Honor.

15        COURTROOM CLERK:  190.

16        (Exhibit 190 admitted into evidence.)

17   Q.   If we could show everyone.  This is an email from you to

18   Mr. Das, January 25, 2019, titled "Settlement Agreement,"

19   correct?

20   A.   Yes.

21   Q.   Okay.  If we could turn to page 2, please.  And your

22   letter is addressed to Dr. Mitra Das, correct?

23   A.   It's not clear to me who wrote this.

24   Q.   Well, the letter that you're forwarding is the attachment

25   to your email addressed to Dr. Mitra Das, correct?

1    A.    I trust you.

2    Q.    Well, can you read the letter on page 2?

3    A.    I need a moment.

4    Q.    It says, "Dr. Mitra Das, 104 Blueberry Hill Lane, North

5    Andover, Mass."  Correct?

6    A.    I see that.

7    Q.    It says, "Dear Dr. Das."

8    A.    I see that.

9    Q.    Correct.  Then the first paragraph reads, "This letter

10   describes the loan termination agreement between Toby Chaudhuri

11   and you, Mitra Das," correct?

12   A.    I see that.

13           MR. KENDALL:  We'll put another check for a reference

14   to her.  I'd now like to offer Exhibit I-508, Your Honor.  This

15   will be the seventh document in the series we've gone through.

16   I believe I have nine, Your Honor, so I'm almost done.

17           THE COURT:  Very well.

18           MR. GALLAGHER:  I don't have that one, counsel.

19           MR. KENDALL:  Give them 508, 512 and 513, please.

20   That was my oversight.  I'm sorry.

21           MR. GALLAGHER:  No objection to 508, no objection to

22   512, no objection to 513.

23           MR. KENDALL:  Thank you.

24           COURTROOM CLERK:  Do you want to group those?

25           MR. KENDALL:  Why don't we put them in as a set and do

1   them as defense.

2          (Exhibits 191, 192, 193 admitted into evidence.)

3   Q.   If we could take a look at Exhibit 191, please.  That's an

4   email that starts at the top from Mr. Das to you on January 25;

5   is that correct?

6   A.   I see the date here.

7   Q.   Okay.  If we could go -- I represent to you that a lot of

8   this chain is repetition of what we've already been through.

9          MS. ZALZAL:  It's not to the jury.

10          MR. KENDALL:  Can we show the jury, please.

11          COURTROOM CLERK:  Sorry.

12   Q.   I represent to you that the third page of this is

13   repetition and the fourth page is what we've been through.  So

14   let's go to page 2 at the top, please.  You wrote, on January

15   25, 2019 at 12:32 p.m., "Thank you.  This is helpful for me to

16   better understand the situation we're in now.  Collateral in

17   the loan agreement has been Mitra Mashi's trust and credibility

18   from the start, so that's very much at stake."

19          And then if we jump down to, about four paragraphs below

20   that, it says, "Adding Mitra Mashi's stake in Stonehedge into

21   the termination agreement means we'd have to add that equity as

22   collateral in the original letter."

23          Did I read those two portions correctly?

24   A.   I'm saying yes without the context.

25   Q.   Okay.  Then those are two more references to his mother,

1    correct?

2    A.    What is the count we're up to now?

3    Q.    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, but I've not

4    counted every one because sometimes they're in the same

5    paragraph.  Did I read all of that correctly?

6    A.    What you read was read correctly.

7    Q.    Thank you.  Could we go to Exhibit 192, please.  This will

8    be our eighth document.  This is an email from you to Mr. Das

9    dated January 29, 2019, correct?

10   A.    Has this been chronological from the start?

11   Q.    I'm not supposed to answer questions, but I think you'll

12   find they're pretty much chronological, though some things move

13   around, as they're chains.

14   A.    Thank you.

15   Q.    Okay.  You'll see you wrote, "I'd rather talk about things

16   that really matter instead of wasting my time in game-playing,

17   but if you insist.  Claiming my conversation with Gora Mashi

18   about psychology is a violation of the agreement when Mitra

19   Mashi was holding our money and earning interest on it for a

20   year with no plan for repayment, despite a formal letter

21   requesting basic clarification is an interesting strategy.

22   It's like mugging the postman and complaining that the mail

23   wasn't delivered.  Let's isolate the issue you raised, as you

24   wish.  My conversation with Gora Mashi was during Thanksgiving.

25   Have Mitra Mashi hold her side of the agreement to that point

1    and we can continue to discuss the remaining balance in the

2    context of your complaint.  Up until the date of the incident

3    you're claiming, the interest on the principal comes to

4    $3,791.37.  We can discuss the remaining $541.96 after that."

5         Did I read it correctly?

6    A.    I believe so.

7    Q.    You agree with me there's three references to his mother

8    there?

9    A.    I wasn't counting.

10   Q.    Would you accept my count?

11   A.    I do.

12   Q.    Okay.  Let's go to the last document, Exhibit 193.  This

13   is a long document.  It's a long chain.  I'd like to go to the

14   page that has the Bates number ending 601.  It's about the

15   sixth page.

16        If we could go to the bottom, please.  Mr. Das writes to

17   you on January 25, 2019, "Toby, not sure where you are getting

18   equity or interest in mom's assets.  That was not offered, is

19   not our proposal, and is not on the table.  We do not have any

20   interest in your capital for her businesses.  The settlement,

21   given the claims that have been made, needs to be a complete

22   release, have non-disparagement language, and include one final

23   payment that includes what is owed by Mitra to you and what is

24   owed from you to her, including the entities she owns.  Please

25   send a Word version of your document so that we may review,

1  redline if required and finalize.  I am standing by for your

2  document.  Mom is in class until later this afternoon."

3      Did I read that correctly?

4  A.  You did.

5  Q.  Now, if we look above at the top of the page, I'm going to

6  read your response.  "We've made our final offer that meets all

7  these requirements, except adding other entities into the

8  agreement which could break the law.  We were clear from the

9  start that the loan agreement was with Mitra Mashi, as an

10  individual, and not entities around her to avoid violation of

11  federal law on the advice of your campaign counsel in December

12  2017.  Don't move the goalposts now.  If you're concerned about

13  the New York traffic ticket fine and Saab repair expenses which

14  you've raised specifically, we've made it very clear that we

15  will pay any and all expenses outside of this loan agreement

16  and address all other points raised separately.  If this is

17  unsatisfactory and Mitra Mashi is unable to pay off the loan

18  agreement today, we must go into immediate voluntary mediation

19  at the expense of the borrower with a group of close family

20  members to avoid dispute.  Ruby and I are ready to fly up

21  tonight to meet today and Tuesday to address this in person.

22  My mother is ill and her closest sister just passed away, but

23  she's willing to get out of bed and join my father to further

24  this mediation because they have been concerned about this loan

25  agreement with Mitra Mashi for a year now.  I can't go home

1    without hearing about this, and I'm beginning to understand

2    why.  In addition to Mitra Mashi and you, I would recommend

3    that we also include Mukitaku.  We can add a council of

4    relatives, including Gora Mashi, Gennarra Mashi, Batkuka Kalou

5    and Cabi Kalou (phonetic), as well as Ruby's father and mother,

6    Tarum and Jolly Roy.  This is a big deal.  Mitra Mashi realized

7    that Babu is your agent in this matter and that you haven't

8    communicated with me directly through this process, except for

9    your signature on the original loan agreement.  How would you

10   like to proceed?"

11        Did I read that correctly?

12   A.   The names were not so good.

13   Q.   I will concede that.  We're in 100 percent agreement on

14   that, and I apologize, I'm not good at that.  But you'd also

15   agree with me there's at least five references to his mother in

16   that one paragraph?

17   A.   I was distracted by the mispronunciation of the names.

18   Q.   Will you accept my representation there's at least five?

19   A.   I've accepted it.

20        MR. KENDALL:  Thank you.  If we could go to the page

21   before that.

22   Q.   If we look at the top of that page, there's a January 25

23   response at 2:19 p.m., excuse me, that Beej writes, sorry.  And

24   he writes, "This agreement was a personal and private financial

25   instrument between you and Mitra.  Those terms are as clear as

1  any others."  Did I read that correctly?

2  A.   The first sentence, yes.

3  Q.   "Confidential provisions of the agreement have already

4  been violated, so Mitra could easily argue that interest

5  payments are no longer due and other damages are now owed to

6  her."  Did I read that correctly?

7  A.   The second sentence, yes.  Third sentence, sorry.

8  Q.   Now, if we go down two paragraphs -- no.  Excuse me.  Let

9  go me go to the bottom paragraph.  That will speed this up.

10      "As for Mitra's commentary, I am handling this for her as

11  her representative, and it is best that it stay that way.  As

12  you correctly state, you never dealt with her directly, and

13  that is how it will remain.  She's ready to initiate the wire

14  once we have an agreement."  Did I read that correctly?

15  A.   That portion.

16  Q.   Okay.  If we go to the prior page, please.  Mr. Das, on

17  the bottom of that page, on January 25, at 2:51 p.m., Mr. Das

18  writes, "Toby, I had another proposed solution which I have not

19  yet spoken to mom about, but I think she would be amenable.

20  I'm assuming the biggest worry here is the $50,000 principal.

21  I'm going to propose to her that she wire the $50,000 to you

22  even without an agreement in place.  Then we can figure out

23  wording on any releases that we are seeking for the balance of

24  payments that may be due.  Mom has no interest in holding your

25  funds, and until there's an agreement on the final settlement,

1    this might blunt some of the ferocity of all of these

2    discussions.  Let me know your thoughts and whether there are

3    any objections.  Once mom is out of classes, I will confirm

4    that that proposal works for her."

5         Did I read that correctly?

6    A.   I followed along, yes.

7    Q.   Okay.  Then immediately above that your response was,

8    "Thank you for proposing this.  That would be a good start.

9    The principal is my primary concern."

10        Did I read that correctly?

11   A.   Yes.

12   Q.   And then he responds to you at the top of the page, "I've

13   spoken to mom.  She is amenable to this solution.  Mom will

14   wire funds to your Schwab account Monday morning.  With that

15   out of the way, send along the Word file and I will send edits

16   so we can resolve the remaining issues and funds.  I will send

17   the wire confirmation once I receive it from her.  Thanks,

18   Babu."

19        Did I read that correctly?

20   A.   I believe so.

21   Q.   Let's go to page 2.  It's actually page 3, excuse me, the

22   next page.  I'm only going to read one small section from here

23   in the middle.  On January 25, 2019, at 11:32 p.m. from

24   Mr. Das.  He writes, "Toby, mom will transfer funds on Monday.

25   Lowell Five Savings Bank has no capability to do so prior to

1    that.  If that isn't acceptable, our deal is off.  Let's

2    litigate.  Beej."  Did I read that correctly?

3    A.   Yes.

4    Q.   If we could go to the second page, in the middle of that

5    page, Mr. Das writes to you on January 28, 2019, at 10:24 p.m.,

6    "Let's focus on closing out the agreement you had with Mitra.

7    A reminder that continued discussion with others including

8    family is a violation of the agreement.  The campaign was a

9    failure.  We all agree on that.  I think it's premature to

10   think we want to discuss the failures thereof with you.  Beej."

11        Did I read that correctly?

12   A.   Yes.

13   Q.   The last one I'm going read from this series of letters,

14   if you go to the bottom of the first page.  Do you see at the

15   bottom you wrote to him on January 29, "I'd rather talk about

16   things that really matter instead of wasting my time in

17   game-playing, but if you insist."

18        Then we go to the top of page 2, "Claiming my conversation

19   with Gora Mashi about psychology is a violation of the

20   agreement.  When Mitra Mashi was holding our money and earning

21   interest on it for a year with no plan for repayment despite a

22   formal letter requesting basic clarification" -- excuse me.

23   I've read this already, and I don't need to be repeating

24   things.

25        If we could just go to the top of the first page.

1    A.    I feel like I'm holding a lot of information, like a

2    standardized test.

3    Q.    You see this Exhibit 193 is between you and Mr. Das, but

4    Mitra Mashi Das is also included in the communication, correct?

5    A.    I see that.  I'm wondering if we're still on

6    chronologically.

7    Q.    By my count we have at least 20 references by you to Dr.

8    Das in these communications.

9    A.    That's -- I have no reason to doubt your count.

10   Q.    Thank you.  In nine documents, correct?  Do you agree with

11   me, nine documents?

12   A.    I don't know the document count.  I thought this was one

13   email string.

14   Q.    Okay.  I'd next like to go to a very short topic and just

15   clarify some specifics from yesterday's testimony.  Do you

16   remember I raised with you your LinkedIn resume listing your

17   PBS employment?

18   A.    I remember you going on my LinkedIn.

19   Q.    Yeah.  And on LinkedIn, you put down you're employed by

20   PBS through July of 2017, correct?

21   A.    That was what you said.

22   Q.    Okay.  Do you need to look at the resume to confirm that?

23   A.    LinkedIn is not necessarily a resume.

24   Q.    Do you need to look at your LinkedIn entry to confirm you

25   put in July 2017 as the ending date?

1    A.    I provided a --

2    Q.    Excuse me.

3    A.    -- 2017.

4    Q.    Excuse me.  I'm asking a simple question.  Do you agree on

5    your LinkedIn bio you put in July 2017 as the end point of your

6    employment at PBS?

7    A.    I don't remember if it was June or July, but it sounds

8    right.

9    Q.    Does July sound right?

10         MR. GALLAGHER:  Your Honor, we'll stipulate it was

11   July.

12         MR. KENDALL:  Okay.  Thank you.

13   Q.    In fact, you were let go by PBS in December of 2016,

14   correct?

15   A.    Not exactly.

16   Q.    Your employment with them stopped as of 2016?

17   A.    Not exactly.

18   Q.    PBS issued a release saying that as of January 2 you were

19   no longer employed by them.

20   A.    The news release is different from the agreement that I

21   had with PBS.

22   Q.    Okay.  So PBS's release said that as of January 2 from

23   their view you were no longer employed?

24   A.    There was no news release from PBS.  Are you reading the

25   Right Wing Heritage Foundation's coverage of this?

1   Q.   I'm just asking you what the answer is.

2   A.   I'm saying there is no -- I don't know.  I'm not aware of

3   a release from PBS that says that.

4   Q.   When did you stop going to work every day?

5   A.   In January of 2017.

6   Q.   Okay.  Beginning of January 2017 or the end?

7   A.   Do you need further details about my PBS employment?

8   Q.   I'm just asking you one questions.

9   A.   Actually, I'm hearing many questions.

10  Q.   The beginning of January --

11  A.   Sorry?

12       MR. KENDALL:  Actually, I'll withdraw the question.

13       May I have a moment just to get some things organized,

14  Your Honor?

15  Q.   Now, isn't it a fair statement -- if you could just give

16  us a yes or no answer -- that when the FBI first interviewed

17  you about this loan, you stated to them that you believe that

18  the money you invested with Mitra Das would have nothing to do

19  with the campaign based on the trust that you had with Das's

20  parents.  Did you tell that to the FBI, yes or no?

21  A.   I can't remember the exact words.

22  Q.   Is that close enough?

23  A.   I can't remember the exact words.

24  Q.   Okay.  Did you also tell them that you confirmed your

25  signature on the document, you said this loan was made with an

1   8 percent interest rate, this type of loan was normal for

2   individuals like Das's mother that needed to finance hotels,

3   you believe that Das's mother also signed similar agreements

4   with other members in the community.  Did you tell that to the

5   FBI?

6   A.   I can't remember the exact words, but I did know that I

7   was told by Mr. Shah that there were 8 percent loans.

8   Q.   My question is did you say those words to the FBI, yes or

9   no?

10  A.   I can't remember the exact words.

11  Q.   Okay.  I'm going to give you another statement.  Just yes

12  or no, do you remember saying this to the FBI in your first

13  interview.  "Did you tell them that you had cautioned Das to

14  keep this investment separate from the campaign?  You said that

15  it was 100 percent not a campaign contribution."

16      Do you remember telling that to the FBI?

17  A.   Can you repeat that again?  I'm sorry.

18  Q.   You said that you cautioned Das to keep this investment

19  separate from his campaign.  You said that it was 100 percent

20  not a campaign contribution.

21  A.   That was the agreement that Das and I talked about.

22  Q.   I'm just asking, what did you say to the FBI in your first

23  interview?

24  A.   I don't remember the exact words.

25  Q.   Okay.  And then on your second meeting with the FBI, did

 1    you tell them that two weeks prior to your transaction with

 2    Mitra, Beej told you that he was having trouble with his

 3    business?

 4    A.    I'm unclear --

 5    Q.    Just yes or no, did you tell that to the government?

 6    A.    I'm unclear on the reference to the second meeting with

 7    the FBI.  Is that on that first day?

 8    Q.    No.  This would be on May 20, 2021.

 9    A.    Is that the day that the FBI visited me?  I don't know.

10    Q.    No.  It was after that.  That's when you met Mr. Gallagher

11    here in this building.

12    A.    Okay.  What was the statement?

13    Q.    Two weeks prior to your transaction with Mitra, Das told

14    you that he was having trouble with his business.

15    A.    That sounds right.

16    Q.    Thank you.

17          Now, isn't it a true statement that when Das introduced

18    Mr. Bose to you, it was as someone who was involved with the

19    family's business?

20    A.    Maybe partially true.

21    Q.    Is that something you stated under oath in the past?

22    A.    That might be partially, part of the truth, correct.

23    Q.    I'd like to read lines 17 and 18 of the grand jury

24    testimony.

25          MR. GALLAGHER:  Your Honor, I ask that Mr. Kendall

```
1   give the witness an opportunity to see the transcript.
2            MR. KENDALL:  Your Honor, I think I can contradict
3   him.  I don't have to refresh his recollection.
4            MR. GALLAGHER:  I don't think it's been shown that
5   there's a contradiction.
6            THE COURT:  Let me hear it and I'll decide.
7   Q.   Didn't you testify, "I think Das introduced Mr. Bose to me
8   as someone who was involved with the family's business."
9   A.   I said I believe that's partially true.
10  Q.   Okay.  I'm just asking, did you say that?
11       I'll withdraw the question?
12           MR. GALLAGHER:  What page?
13           MR. KENDALL:  I'm going next to 35.
14  A.   My feeling here is I don't remember the exact words, but I
15  do remember he was introduced both as a family friend from the
16  community as well as --
17           MR. KENDALL:  Your Honor, I move to strike as
18  non-responsive.
19           THE COURT:  No.  It's harmless.
20  Q.   Did you also, is it also true to state there were a lot of
21  things that you talked about with Mr. Das and honestly none of
22  it really made sense with respect to the loan in December?
23  A.   Yes.
24  Q.   Okay.  And would it also be true to say that he said he
25  couldn't ask his parents for some of these funds because he
```

1   already asked them for a lot of resources?

2   A.   I said that.

3   Q.   It's also a true statement there was a discussion of

4   whether the money should go to an LLC account?

5   A.   I don't remember this part of it.

6   Q.   Okay.  Go to page 42, starting at line 9.  Question, "Did

7   he explain to you why he was sending money or transferring

8   money to an account in his mother's name versus his own account

9   or a campaign account?  I mean, there was a lot of conversation

10  about this.  There was a question of, you know, does it go to

11  an LLC account, does it go to his personal account.  He said

12  that it was right to send to his mother's account.  He had a

13  lot of reasons for this and none of it again made any sense."

14       That's a true statement, isn't it?

15  A.   This is refreshing my memory.

16  Q.   And he was quite insistent with you that it be a written

17  agreement with his mother, correct?

18  A.   I believe so.

19  Q.   Okay.  Now, you testified yesterday about a conversation

20  you claim occurred with Mr. Shah, Mr. Das, and yourself in

21  Pennsylvania at this vacation weekend retreat.  Do you remember

22  that?

23  A.   There were several conversations.

24  Q.   The one where you talked about where the punch line was

25  plausible deniability.

1    A.    I remember.

2    Q.    The three times you were interviewed before your grand

3    jury testimony, you never told that story, correct?

4    A.    I can't recall.

5    Q.    When you were in the grand jury, you never told that

6    story, correct?

7    A.    When I was in the grand jury, I believe that we focused on

8    the time period between the fall of 2017 to the end of 2017.

9    Q.    Do you agree with me when you were in the grand jury you

10   didn't tell that story?

11   A.    I can't remember.

12   Q.    If you want me to give you the transcript to see if you

13   can find it.

14        MR. GALLAGHER:  Your Honor, we'll stipulate to the

15   question Mr. Kendall is asking.

16        THE COURT:  All right.

17   Q.    So the government has a better memory than you, you didn't

18   testify --

19        MR. GALLAGHER:  Your Honor, I object to the

20   characterization.

21        THE COURT:  Let's not make editorial comments.

22   Q.    It's clarified, you did not testify to the grand jury

23   about this, correct?

24   A.    I'm sorry, I don't have it written in front of me, but I

25   believe you, if that's what the record shows.

1  Q.   The first time you mentioned this to the government was on

2  September 15, 2023 about two and a half weeks ago, correct?

3  A.   I remember sharing it two weeks ago.

4  Q.   And you've been cooperating with the government since

5  2021, more than two years ago, correct?

6  A.   Correct.

7  Q.   Two and a half actually, correct?

8  A.   That sounds right.

9  Q.   Now, I think you testified that you were upset by the

10  pressure that Mr. Das put on you to make this loan and that

11  after that you just didn't communicate with him; is that

12  correct?

13  A.   I felt pressured, and then I did stop communicating with

14  him.

15  Q.   And you testified about that in the grand jury too.  You

16  said you stopped communicating with him for several, several

17  weeks?

18  A.   Correct.

19  Q.   Okay.  Isn't it a fact that you were in touch with him on

20  almost a daily basis by email for that entire following month?

21  A.   That might make sense.

22  Q.   Okay.  So if I were to suggest to you that from January 2

23  to February 2, you and he were on at least 29 email chains

24  together discussing the campaign --

25  A.   I don't recall.

1   Q.   Shall we go through all 29 email chains to count them?

2   A.   That seems to be how we're doing this, right.

3        MR. GALLAGHER:  Your Honor, if Mr. Kendall could show

4   the emails, we'll conditionally accept that as a stipulation.

5        MR. KENDALL:  Want to look at them?

6        MR. GALLAGHER:  Later.

7        MR. KENDALL:  Could we have the chart.

8        Your Honor I have a listing of them, but we'll deal

9   with that later.

10  Q.   So you don't dispute you had at least 29 emails discussing

11  multiple aspects of the campaign?

12  A.   I'll be honest, I do not recall what my involvement in

13  those email -- in that email string was.

14  Q.   It's not a string.  I'm suggesting there's 29 strings.

15  A.   I don't remember the emails.

16       MR. KENDALL:  If I may have a moment, Your Honor.

17  Actually, no.

18  Q.   Now, you worked a good bit with Scott Ferson, correct?

19  A.   I don't know what that means, "a good bit."

20  Q.   It means you had contact with him over the course of his

21  employment by the campaign, correct?

22  A.   I could probably count on a hand or two how many times

23  that I had a substantive conversation with him.

24  Q.   You were involved with a lot of decisions involving

25  Mr. Ferson and his consulting group, correct?

1    A.   I don't know the chain of authority in decisionmaking.

2    Q.   Mr. Das would turn to you for advice repeatedly on how to

3    deal with Ferson and his consulting group, correct?

4    A.   I was a confidante through that.

5    Q.   Okay.  Does that mean you're agreeing with me he consulted

6    with you repeatedly over the course of the campaign about that?

7    A.   Yes.

8         MR. KENDALL:  Thank you.  Can we have I-662.  I think

9    it's been entered.  Can I trouble you for the actual number?

10   March 28, 2018.

11        Your Honor, I do believe this has been entered.

12        MR. GALLAGHER:  Your Honor, it hasn't by us, but we

13   don't object to it coming in.

14        MR. KENDALL:  I'm sorry if I'm mistaken.  I'd like to

15   offer I-662.

16        COURTROOM CLERK:  195.

17        (Exhibit 195 admitted into evidence.)

18   Q.   This is an email chain that you, Beej and Mr. Ferson were

19   on, correct?

20   A.   It appears so.

21   Q.   Okay.  And this was at the time that Mr. Ferson was being

22   downgraded, and there was discussion of reducing the role of

23   Liberty Square, correct?

24   A.   It looks like this is during the time when there's a

25   proposal to do some opposition research.

1   Q.   Okay.  It's an email from you, and it's called rearranging

2   deck chairs; is that correct?

3   A.   I see that subject.

4   Q.   In the very bottom paragraph you write, "Our most urgent

5   challenge right now is how we maintain relevance after this

6   quarter report."  Is that referring to the fundraising?

7   A.   That would be the fundraising report.

8   Q.   Okay.  And "Rearranging deck chairs" is your analogy that

9   things look like a sinking ship, correct?

10  A.   I can't remember who originated that subject line, but

11  it's quite a great metaphor.

12  Q.   Okay.  And this is about three months before you wrote

13  that email to the gentlemen at MIT talking about the

14  neck-and-neck race that Beej Das was in?

15  A.   That gentleman wasn't representing MIT when I wrote that

16  but that's fair.

17          MR. KENDALL:  Okay.  If we could give the government a

18  copy of I-1028, I-455, and if we could show them to the

19  witness, I-1028 to the witness, please.

20  Q.   After Mr. Ferson left the campaign --

21          MR. GALLAGHER:  Excuse me, Your Honor.  I just need to

22  see it.  I haven't seen a copy of it.

23          MR. KENDALL:  I'm going to talk about some things

24  before I put the document in.  If you could give it to the

25  government.

1    Q.   After Mr. Ferson left the campaign, he started to

2    criticize Mr. Das's campaign in public, correct?

3          MR. GALLAGHER:  Your Honor, I object to this line of

4    questioning as to Mr. Ferson.  Mr. Kendall had the opportunity

5    to cross Mr. Ferson.

6          THE COURT:  Sustained.

7          MR. KENDALL:  Your Honor, this was discussed with

8    Mr. Chaudhuri and Mr. Das.  They discussed this issue.  There

9    is a text between the two of them on that topic, so there's no

10   hearsay there.

11         THE COURT:  Let's not repeat ground we've already

12   tilled.

13         MR. KENDALL:  I haven't touched this at all, Your

14   Honor.

15         THE COURT:  On that representation, go ahead.

16         MR. KENDALL:  Okay.

17   Q.   There was some criticisms that Mr. Ferson made by

18   Mr. Das's campaign in that time period, correct?

19   A.   Yes.  I don't know if I'd characterize it as criticism,

20   but there was commentary.

21   Q.   Okay.  I-1028 is a page of text messages between you and

22   Mr. Das about this topic.

23   A.   I will trust you.  I don't see my name on this.

24         MR. KENDALL:  Okay.  Your Honor, I'd like to offer

25   I-1028 as our next exhibit.

1          MR. GALLAGHER:  Your Honor, this is not relevant to

2     this witness, and I'm very concerned about the next chain that

3     Mr. Kendall is trying to get into which should be excluded

4     under 403.

5          MR. KENDALL:  Your Honor, I can impeach Mr. Ferson

6     with whatever evidence you --

7          THE COURT:  Well, Mr. Ferson is not testifying.

8          MR. KENDALL:  Your Honor, he has -- Your Honor, he's

9     already -- he's off the stand, but this is a discussion that

10    Mr. Chaudhuri and Mr. Das had, they observed, they're all

11    percipient witnesses.  It's not hearsay.

12         THE COURT:  You're not giving Mr. Ferson an

13    opportunity to respond.

14         MR. KENDALL:  He's not a defendant, Your Honor.  I

15    don't think I have to.  He criticized the Das campaign.  That's

16    all I'm looking to get out.

17         THE COURT:  All right.  Go ahead.

18         MR. KENDALL:  Okay.  I'd like to offer I-1028.

19         COURTROOM CLERK:  195.

20         (Exhibit 195 admitted into evidence.)

21    A.   I haven't had a chance to read this.  Should I read it?

22    Q.   I'll read through it with you.  If you look at the blue,

23    it says, "Good.  Though Scott Ferson and I had a nasty Twitter

24    war while you were" -- I think it was supposed to be "out, I'm

25    glad you got rest.  You needed it brother."

1      That's Mr. Das writing to you, correct?

2  A.   I'm trusting it.

3  Q.   Okay.  And you then respond, there's a couple of lines,

4  and then you say, "Scott's tweets could step on our message

5  that you're good to our employees, health care, et cetera,

6  let's keep an eye out for how it is covered and used.  On the

7  other hand, it could expose political insider ink and the dark

8  arts of backroom politics which are breaking through by

9  engaging real people."

10      Mr. Das then took your advice, correct?  "Agreed.  I don't

11  know fully why I engaged with him," correct?

12  A.   Let me just read this carefully.  There's a lot going on

13  here.  I'm not actually providing any advice.  I'm making a

14  recommendation based on facts.

15  Q.   We see at the bottom, whatever you call it, a forwarding

16  of Scott Ferson's Twitter message that said, "Such fun.  He

17  will need to report about 800,000 to be competitive or he can

18  pick a fight with me.  Both are winning paths.  At Beej Das."

19  Do you see that?

20  A.   I see that.

21  Q.   And your response was, "I get it.  You're mad he robbed

22  us.  Let's forget about him and focus on what we need to win."

23  Correct?

24  A.   I see that.

25  Q.   That was your response, correct?

 1   A.    Assuming that's me, yes.

 2   Q.    And there was a separate event that you gave Mr. Das

 3   advice on as well with the Twitter criticism from Mr. Ferson,

 4   correct?

 5   A.    Refresh my memory.

 6   Q.    There was an incident at the democratic state committee

 7   where one of the staffers of the Das campaign used illegal

 8   substances and had a bad reaction, and Beej had to step in and

 9   help him, get him to the emergency room?

10           MR. GALLAGHER:  Your Honor, objection to the relevance

11   of this.

12           THE COURT:  Agreed.  Regardless, it has nothing to do

13   with this case.

14           MR. KENDALL:  Your Honor, if I could go through I-455,

15   it will explain everything.

16           THE COURT:  No.

17           MR. KENDALL:  Okay.  We'll keep moving.  If I may have

18   one moment, Your Honor, to check my notes.

19           THE COURT:  You may.

20           MR. KENDALL:  Let me just check, Your Honor.  I think

21   I'm pretty much done.

22           I am done, Your Honor.

23           THE COURT:  Mr. Gallagher.

24           MR. GALLAGHER:  Yes, Your Honor.  Thank you.  If we

25   could pull up Exhibit 102, please, and if we go to page 2.

1    REDIRECT EXAMINATION BY MR. GALLAGHER:

2    Q.   Mr. Chaudhuri, when Mr. Das in this text message on

3    December 27 talked about the name transfer, what funds was he

4    referring to?

5    A.   He was referring to the transactions that Mr. Shah and I

6    made.

7    Q.   And going to the next page, when he says, "Thank you for

8    doing this.  I will aggregate and send as one batch, total fund

9    will be close to 250K."  What funds is he referring --

10   A.   He's referring to the funds that Jay Shah and myself were

11   monitoring.

12   Q.   These funds were for what purpose that you were giving and

13   talking about in this series of text messages?

14   A.   They were for the purpose of posting a large number in his

15   campaign finance.

16   Q.   Can you explain to the jury why the agreement that you

17   signed was not with Mr. Das and the Das campaign but instead

18   with Mr. Das's mother?

19   A.   Mr. Das requested that it be with his mother.

20   Q.   What was the purpose of doing that, Mr. Chaudhuri, from

21   your point of view?

22   A.   Really to -- it was unclear to me, but it was really so

23   that we could get the money into the campaign account.

24   Q.   If we could go to the final couple of pages here.  You

25   were asked questions about just the very last page about your

1   communications with Mr. Das.  Keep going, please, the very last

2   page, please.

3       You see the top text message stops in December and goes to

4   February 7?

5   A.   I do.

6   Q.   Did you have any text messages with Mr. Das in the month

7   of January?

8   A.   I did not have text messages in the month of January.

9   Q.   Okay.  Mr. Kendall asked you some questions about the

10  information you provided about the plausible deniability.

11  A.   Correct.

12  Q.   Can you explain to us why it was that you only recently

13  disclosed this conversation that you had with Mr. Das and

14  Mr. Shah at Walnut Farms by this plausible deniability?

15  A.   I didn't realize I hadn't disclosed that particular

16  conversation, but it came up in the context of my association

17  with Representative Ali Barry of California.

18  Q.   Were you pressured to say that?

19  A.   Absolutely not.

20  Q.   Is this something you brought to our attention on your

21  own?

22  A.   Correct.

23  Q.   Could you tell us, explain to us why it was that you were

24  e-mailing Mr. Das's mother about this money they were trying to

25  get back from Mr. Das?

1   A.   I needed to get my money back.

2   Q.   But why was it that you were communicating that not only

3   with Mr. Das but also mentioning Mr. Das's mother?

4   A.   Because Mitra was -- that agreement was made with Mitra

5   Das, on paper.

6   Q.   And in addition to communications that you were personally

7   having with Mr. Das and Mr. Das's mother, Dr. Das, was your

8   family also involved?  That being your mother and father.

9   A.   I was dealing with my parents.

10  Q.   In what way?

11  A.   Well, in several ways.  My parents began to reach out also

12  to the Das family.

13  Q.   Why was the family involved in trying together to get this

14  issue resolved?

15  A.   My parents were very worried about the money situation.

16  Q.   Prior to engaging in this back and forth of these emails

17  in 2019, did you ask Mr. Das for the money back while the

18  campaign was still going on?

19  A.   I can't remember, but from my calculations, it was

20  difficult to understand what was happening with the money.

21  Q.   Yesterday did you testify about conversations you had with

22  Mr. Das about winding down the campaign and seeking the

23  repayment of loans?

24  A.   Yes.

25  Q.   Okay.  In that conversation did you communicate to Mr. Das

1   about your own loan --

2   A.    I meant everybody's loans, debts.

3   Q.    Did you make it explicit, did you say to Mr. Das, "I want

4   my money back"?

5   A.    I just had that conversation that it's time to wind down

6   and pay all debts.

7   Q.    Okay.  So why didn't you follow up more insistent in 2018

8   while you still worked for the campaign to try to get the money

9   back?

10  A.    Everything was quite confusing to me about where money was

11  and where things stood.  And at the time there were several

12  campaign debts that were unpaid with consultants and staff that

13  I was in a mode to actually figure out how everyone would get

14  paid back.

15  Q.    Okay.  So you were asking questions about the conversation

16  you had with Mr. Bose, and you testified in the grand jury both

17  today and yesterday that parts of that conversation were

18  confusing?

19  A.    Correct.

20  Q.    And that there was a discussion about Mr. Das's business

21  and the family business?

22  A.    Correct.

23  Q.    That same evening did you have further conversations with

24  Mr. Das about that conversation?

25  A.    Yes.

1  Q.   Did you receive further clarity about what Mr. Das was
2  asking for?
3  A.   Yes.
4  Q.   And specifically what was Mr. Das asking for that you
5  understood after talking to him face to face?
6  A.   He was asking for contributions to be able to report a
7  good, a high number in his quarter report.
8  Q.   We had some conversations yesterday from testimony about a
9  person by the name of Neil Mam?
10  A.   Yes.
11  Q.   And you talked about meeting you had with Mr. Mam and
12  Mr. Das on the Troca 1 yacht early in the campaign?
13  A.   Yes.
14  Q.   Why was it that you brought Mr. Mam into the campaign as a
15  potential adviser?
16  A.   He has a lot of experience with the legal pieces and
17  starting up all the infrastructure of the campaign.
18  Q.   Did Mr. Mam give Mr. Das advice?
19  A.   Yes.
20  Q.   Do you know whether or not Mr. Das actually ended up
21  hiring Mr. Mam as an advisor?
22  A.   He did not.
23  Q.   Do you know why?
24  A.   He did not feel comfortable with --
25          MR. KENDALL:   Objection, Your Honor.   If we could have

1    conversations, not characterizations.

2    Q.    Did Mr. Das tell you why he didn't want to him --

3    A.    He didn't like his recommendations for legal counsel.

4    Q.    During that same meeting did Mr. Das disclose that he

5    wanted to run a $10 million campaign?

6    A.    Yes.

7    Q.    Quite a big score, $10 million, correct?

8    A.    Extraordinary.

9    Q.    You were asked some questions, it was Exhibit -- let me

10   just grab it real quick here.   Exhibit 194.

11          MR. GALLAGHER:   If I could approach the witness, Your

12   Honor.

13          THE COURT:   You may.

14   Q.   If you could just read for us and for the jury the bottom

15   again what you said in that email?

16   A.   "Our most urgent challenge right now is how we maintain

17   relevance after this quarter report.   A scenario where we

18   report less than a handful of other candidates will have an

19   impact that's hard to reverse in the media.   Instead, we're

20   discussing putting campaign resources into research on Dan and

21   Lori, which doesn't make sense if we can't get through this

22   reporting period."

23   Q.   What's the date of that email, Mr. Chaudhuri?

24   A.   The date is March 28, 2018.

25   Q.   And when is the close of the quarter?

```
 1    A.    It's approaching.

 2    Q.    Which is what day?

 3    A.    The end of March, March 31.

 4    Q.    Okay.  Thank you.

 5          Mr. Chaudhuri, in addition to the $50,000 that you made to

 6    the Das For Congress campaign --

 7               MR. KENDALL:  Objection, Your Honor.

 8               THE COURT:  Overruled.

 9               MR. KENDALL:  Your Honor, there's been emails with

10    counsel, and this may be something best discussed during the

11    break.

12               MR. GALLAGHER:  Can I ask the question and the court

13    can decide?

14               THE COURT:  Go right ahead.

15    Q.    Mr. Chaudhuri, did you make your own contribution to the

16    Das For Congress campaign in the first quarter of 2018?

17    A.    No.

18    Q.    Are you sure about that?

19    A.    We have no transaction.  My wife and I have looked at

20    this.

21    Q.    At some time after this did you look at the FEC --

22               MR. KENDALL:  Objection, Your Honor.  I suggest we

23    discuss this at the break.

24               THE COURT:  I don't see why we have to reserve

25    discussion.  Go ahead.
```

1    Q.    Did you look at that FEC form for the Das For Congress

2    campaign?

3    A.    I did not, until later.

4    Q.    And when was that?

5    A.    When conversations came up about Mr. Das communicating

6    with Ben Holly at the FEC.

7    Q.    Did you notice anything about that FEC Form 3?

8    A.    My wife and I went into the FEC reports, and we saw that

9    we were listed for contributions both in the maximum amount for

10   both the primary and the general elections.

11   Q.    Did that actually happen?

12   A.    No, and the general election campaign also did not happen.

13            MR. GALLAGHER:  May I have just a second, Your Honor.

14            I have nothing further, Your Honor.

15            MR. KENDALL:  Nothing, Your Honor.

16            THE COURT:  Thank you, Mr. Chaudhuri.  That concludes

17   your testimony.

18            MS. WAN:  Your Honor, the government calls Deborah

19   Belanger.  Sorry, the witness just ran to the bathroom.

20            THE COURT:  We'll wait.

21            DEBORAH BELANGER, Sworn

22            COURTROOM CLERK:  Can you please introduce yourself to

23   the jury, spelling your last name for the record.

24            THE WITNESS:  My name is Debbie Belanger,

25   B-e-l-a-n-g-e-r.

1    DIRECT EXAMINATION BY MS. WAN:

2    Q.    Good morning, Ms. Belanger.

3    A.    Hi, how are you?

4    Q.    Can you tell the jury how old you are?

5    A.    I just turned 66.

6    Q.    And what town do you live in?

7    A.    I live in Lowell, Massachusetts.

8    Q.    How long have you lived in Lowell?

9    A.    My whole life.

10   Q.    What do you do for work, if anything?

11   A.    I'm retired.

12   Q.    And can you give us a brief description of the type of

13   work you did before you retired?

14   A.    Sure.  I was involved in marketing and travel and tourism

15   for my whole career.

16   Q.    And did that involve travel and tourism in the local area?

17   A.    Yes, it did.  I was the executive director of the greater

18   Merrimack Valley Convention and Visitors Bureau for 17 years.

19   Q.    Have you served on any boards or volunteered with any

20   organizations near the Lowell area in addition to your work?

21   A.    Oh, my goodness.  Yes.  I sat on the Merrimack Valley Food

22   Bank Board.  I was a founding partner for the Greater Lowell

23   Chamber of Commerce where I served as the first vice president.

24   I sat on the Local Cultural Council.  I was on a couple of

25   boards for various governors at the Travel and Tourism

1  Executive Committee, I believe it was called.  I sat on

2  Creative Economy boards.

3      Oh, Lord, I have a whole list.  I'm presently a Kiwanian,

4  and I just recently removed myself from the Jack Kerouac

5  Foundation Board.

6  Q.  Fair to say that given your work and your volunteer

7  experience you're fairly well connected in the Lowell area?

8  A.  I would say I'm very well connected in the Lowell area.

9  Q.  At some point did you meet Mr. Das, the defendant here?

10 A.  I did.  I met Mr. Das when he bought what was called the

11 Stonehedge.  We did a -- we used to do member events.

12 Q.  Was that when you were --

13 A.  When I was working at the Convention and Visitors Bureau,

14 yes.  It was a membership-based organization.  They paid us to

15 be a member, and different industries had different rates.  And

16 when Mr. Das bought the Stonehedge, I wanted to give them an

17 opportunity to showcase their hotel, their product, to our

18 other members.  We did that quite often with new members.

19 Q.  Did you work with Mr. Das to put on an event there for the

20 Greater Merrimack Valley Convention and Visitors Bureau?

21 A.  Yes.  He hosted one of our member mixes in the library at

22 the hotel.

23 Q.  Around what time period was this?

24 A.  Oh, goodness.  I was trying to -- it was probably a year

25 after he bought the hotel.

1   Q.   Fair to say it was well before Mr. Das's congressional

2   run?

3   A.   Oh, yeah.

4   Q.   And at some point did you learn that Mr. Das was running

5   for Congress?

6   A.   Yes.  When I left the Convention and Visitors Bureau, I

7   went to work for Megan's House, which was a recovery house for

8   women.  18 to 25 it went from.  I went from travel and tourism

9   fun to something dark, and it just didn't fit in my

10  personality.

11  Q.   And you left Megan's House?

12  A.   I left after six months.

13  Q.   And after you left Megan's House, what did you learn about

14  Mr. Das's campaign?

15  A.   It was, I believe -- no.  He made his announcement on

16  September 25, and I know that because I went to his

17  announcement, and I had to leave because it was my mother's

18  birthday.

19  Q.   Did you go back after seeing your mother?

20  A.   I did, I did.  And there were a number of people, some

21  that I knew, some that I didn't, and we were all having dinner

22  and drinks.

23  Q.   At this point were you employed?

24  A.   No.  I was unemployed.  I left in June, and the next

25  employment I had was with the campaign.

1    Q.   And Ms. Belanger, I just want to ask for the court

2    reporter's benefit if you could try and not speak when I'm

3    speaking, and I'll try and do my best to do the same.  I'm

4    sorry about that.

5         Now, when you were at the campaign event with Mr. Das,

6    what did he ask you about joining the campaign?

7    A.   He knew I wasn't working, and that night he indicated or

8    somebody else indicated, "She would be great working for you."

9    Q.   And did you eventually go and work for Mr. Das's campaign?

10   A.   I did.  He had me talk to two people, and their name

11   escapes me, it was so long ago.  And they interviewed me over

12   the phone.  I had no campaign experience whatsoever.  I believe

13   I was hired for the connections that I had in the City of

14   Lowell and the Merrimack Valley.

15   Q.   What was your title within the campaign?

16   A.   Community outreach.

17   Q.   And can you describe what you did on a day-to-day basis?

18   A.   Oh, when I first started, which I believe was sometime in

19   October, I went to the Chamber Expo to tell people I was

20   working for Mr. Das, and I would reach out to people to see if

21   they would give campaign donations to Mr. Das.

22   Q.   Who asked you to ask for campaign donations?

23   A.   Mr. Das.

24   Q.   And what did he tell you about asking for campaign

25   donations?

1   A.   Well, he knew I knew a lot of people and he needed a lot

2   of money to run for Congress.  And I wasn't successful.

3   Q.   Well, who did you ask for campaign donations?

4   A.   I asked different business owners.  Some gave.  Some came

5   to meet him.  He had a lot of introductions through me, but the

6   money didn't flow.

7   Q.   Why didn't the money come in?

8   A.   Because Lori Trahan ran for Congress as well, and she was

9   the designated appointee by the people that lived in Lowell.

10  Q.   While you were working for Mr. Das, where did you work out

11  of?

12  A.   Oh, I worked out of that Chaston Street apartment.

13  Q.   Describe that Chaston Street apartment.  Who lived there?

14  A.   It was a two-bedroom apartment.  It was small.  There was

15  one bedroom on one side of the building, then there was a

16  couch, a living room area, a little area like a barstool type

17  but for eating, and then there was the other bedroom that was

18  used for our offices.  Mr. Das was sitting here and I was

19  sitting here.

20  Q.   Did Mr. Das live in this apartment before he ran for

21  Congress?

22  A.   No.  He moved to Lowell so he was in the district because

23  he lived in Andover, and he could not run if he lived in

24  Andover.

25  Q.   While you were working in the apartment where Mr. Das was

1    living, were you able to observe his day-to-day activities?

2    A.    Answer -- say it again.

3    Q.    I'll rephrase.  While you were working out of Mr. Das's

4    apartment, did you see him on a day-to-day basis?

5    A.    Yes.  While I worked at the apartment, yes, I did.

6    Q.    And could you tell us what he was doing day to day?

7    A.    I used to get there about 9:00, 9:30.  Mr. Das really

8    wouldn't start his day, unless I had arranged for a breakfast,

9    until like 10:30 or 11:00.  Then he would come out of his

10   bedroom, and then he would, you know, have his coffee or

11   whatever he drank, and then he'd come in and start working.

12   Q.    And what did Mr. Das do day to day?  Was he working on a

13   campaign?  Was he working on his businesses?

14   A.    It was a little bit of both on a daily basis.  He was

15   supposed to do call time.  And call time is calling people for

16   funds.  That's a big part of running for office, especially a

17   congressional office.  He answered a lot of phone calls from

18   people at the Stonehedge.  And then he would go around the

19   district because at one point the district, each town, town

20   democratic committee, would have events and he would go to

21   those events.

22   Q.    You mentioned that Mr. Das started around 10:00, 10:30,

23   11:00.  Why did he get such a late start in the day?

24   A.    Mr. Das liked to burn the midnight oil, whether it was

25   working or whether it was, you know, entertaining people or

1    just going out.

2    Q.   You mentioned call time too.  What was Mr. Das's attitude

3    towards doing call time?

4    A.   Staff was added when every quarter you have to submit

5    reports to the OCF, and so at first, Liberty Square was trying

6    to assist Mr. Das in that.  Mr. Das just hated call time.  And

7    then he hired another organization, and he gave them a roadmap

8    of what he was supposed to follow.  And at that point he hired

9    two young ladies to work for him, and at that point I had found

10   a campaign office in downtown Lowell.

11   Q.   Fair to say that Mr. Das disliked doing call time?

12   A.   Oh, yes.

13   Q.   And if he was having trouble soliciting contributions, did

14   you notice -- excuse me.  Did you have any conversations with

15   Mr. Das about alternative fundraising solutions?

16   A.   He had to do events.  He had to do fundraising events.

17   And we had done some of those, but it never really equated to

18   tons of money.  I did a fundraising event with a woman by the

19   name of Mary Beth Shanahan, and we did that at the Stonehedge,

20   and I would bet we had like 50 people there.  He was an

21   eloquent speaker.  But the money, there wasn't like big money

22   that would be coming in the door.

23   Q.   Did you have any conversations with Mr. Das about campaign

24   contributions that you found unusual?

25   A.   Well, I know it was funny because I know you could give

1    $2,700 to the campaign, and my husband and I gave him $250.

2    That was the limit that my husband and I were going to give.

3    Q.   Did Mr. Das talk to you about your donation?

4    A.   Yes, he did.  He had said to me, "I know you would like to

5    give the $2,700.  Maybe there is a way that you can give it and

6    I could return it on the back end."

7    Q.   What did that mean to you, that you could give the maximum

8    donation and I could return it on the back end?

9    A.   Maybe he thought he could pay it to me through --

10         MR. KENDALL:  Objection, Your Honor.

11   A.   Maybe he thought he could pay it --

12         MS. WAN:  Ms. Belanger, if you could hold on just a

13   second.

14         THE COURT:  She's speculating, the jurors understand

15   that.

16   Q.   Okay.  What did you understand him to mean when he said,

17   "You could give it and I can give it back to you on the back

18   end"?

19         MR. KENDALL:  Objection, Your Honor, again

20   speculation.

21         THE COURT:  No.  What did she take it to mean.  What

22   did you understand that to mean?

23   A.   I took it to mean that he would pay the money back, but I

24   knew that wasn't the right thing to do, and my husband would

25   definitely not have --

1        MR. KENDALL:  Objection, hearsay, Your Honor, with

2    respect to her husband.

3        THE COURT:  Overruled.

4    Q.   You may continue, Ms. Belanger.

5    A.   Mr. Das wasn't always prompt in paying my paycheck.  There

6    was some times I would have to go in on a Monday or a Tuesday

7    and say, "I haven't been paid for last week," which was just

8    wrong on every level.  And to make that insinuation to me that

9    I would be -- that the money would come back to me, it was not

10   something I would even contemplate doing.

11   Q.   You didn't trust that it would come back to you?

12   A.   Oh, God, no.  And I wouldn't have done it anyways.

13   Q.   And did you and Mr. Das have any other conversations about

14   contributions from other parties?

15   A.   I found it very interesting, and this was before he asked

16   me about going to $2,700.  I found it was interesting that he

17   gave Kristen Campetti a $10,000 bonus.

18        MR. KENDALL:  Objection, Your Honor.  I think this is

19   hearsay, what's going on at the hotel where she does not work.

20        MS. WAN:  I can clarify, Your Honor.

21   Q.   Who told you that -- excuse me.  Who told you that Ms.

22   Campetti got a $10,000 bonus?

23   A.   Mr. Das.

24   Q.   And after he told you that Ms. Campetti had got a $10,000

25   bonus, what if anything did you see from Ms. Campetti?

1    A.    I saw a check come in for a thousand dollars.

2    Q.    And where did that check come into?

3    A.    Came into the campaign office.

4    Q.    Now, did you have any other conversations with Mr. Das

5    about different ways of raising money for his campaign?

6    A.    He was trying to look at -- it was a conversation that we

7    had in the living room, and he had mentioned something about

8    maybe being able to get funds for people to invest in the

9    Stonehedge that would go to the campaign.

10   Q.    And what did you understand that to mean, that people

11   would invest in the Stonehedge and those funds would go to the

12   campaign?

13          MR. KENDALL:  Objection, Your Honor.  Her state of

14   mind I don't think is relevant to the issue, my client's state

15   of mind --

16          THE COURT:  Overruled, overruled.

17   Q.    You may go ahead.

18   A.    How I took it was they were going to get shares or a

19   portion of profits from the Stonehedge, depending upon what

20   they gave to the campaign.

21   Q.    You described these three incidents:  a conversation

22   involving your donation, a conversation about Ms. Campetti's

23   donation, or, excuse me, a bonus to Ms. Campetti, and then a

24   conversation about fundraising involving shares in the

25   Stonehedge.

1          When did all three of these conversations take place?

2     A.   They took place before I moved into the campaign

3     headquarters.

4     Q.   And around --

5     A.   So it would have been from October through January or

6     February.  I'm not quite sure when I opened the campaign office

7     on Central Street, but I believe it was January or early

8     February.

9     Q.   So in late 2017 or early 2018?

10    A.   It would have been early 2018.

11    Q.   Now, you mentioned checks coming into the campaign.  Were

12    you involved in any way in the campaign's finances?

13    A.   Yes.  I would put the checks in QuickBooks.  I would make

14    a deposit slip, and sometimes I would bring the deposit slip to

15    the bank.  But most of the time Mr. Das brought the checks to

16    the bank but while I was only in that office.

17    Q.   And while you were putting checks into QuickBooks, could

18    you see any campaign balances, or did you have any assets --

19    A.   No.  It was only what was going in.  I didn't have any

20    access to anything going out or writing checks.

21    Q.   Are you familiar with the FEC filings?

22    A.   I was not familiar.  I had an overview, but that wasn't my

23    responsibility.  Back then, no.  Now I do.

24    Q.   Who was in charge of the FEC filings for the Das campaign?

25    A.   I believe at that point it was Liberty Square or his

1    treasurer, but I never saw the treasurer in the office

2    whatsoever.

3    Q.   And the treasurer was Sean Smith?

4    A.   Yes, ma'am.

5    Q.   And after the Liberty Square group left, stopped working

6    for Mr. Das, who was in charge of the FEC filings then?

7    A.   I don't know.

8    Q.   How long did you work for Mr. Das's campaign?

9    A.   I left in June of 2018.

10   Q.   And whose choice was it to leave the campaign?

11   A.   Mine.

12   Q.   Yours or Mr. Das's?

13   A.   Mine.

14        MS. WAN:  If I could have a moment, Your Honor.

15        Nothing further.  Thank you.

16        THE COURT:  Mr. Kendall.

17        MR. KENDALL:  If I may have one moment, Your Honor.

18        THE COURT:  Of course.

19        MR. KENDALL:  No questions, Your Honor.  Thank you for

20   coming.

21        THE COURT:  Thank you very much, Ms. Belanger.

22        THE WITNESS:  You're welcome.

23        THE COURT:  Next witness, please.

24        MS. WAN:  Your Honor, can we just make sure she's

25   outside?

```
 1               Your Honor, the government calls Ms. Rise Ladebauche.
 2          RISE LADEBAUCHE, Sworn
 3               COURTROOM CLERK:  You may be seated.  Could you please
 4    introduce yourself to the jury, spelling your last name for the
 5    record.
 6               THE WITNESS:  Rise Ladebauche.  Sorry, what else?
 7               THE COURT:  Spell your last name please.
 8               THE WITNESS:  L-a-u-d-e-b-a-u-c-h-e.
 9    DIRECT EXAMINATION BY MS. WAN:
10    Q.   Good morning, Ms. Ladebauche.
11    A.   Good morning.
12    Q.   Could you tell the jury how old you are.
13    A.   68.
14    Q.   And what do you do for work, Ms. Ladebauche?
15    A.   I'm retired.
16    Q.   What did you do before you retired?
17    A.   Bookkeeper.
18    Q.   Did you get any formal training to become a bookkeeper?
19    A.   No.  Just one accounting course.
20    Q.   And how long did you work as a bookkeeper?
21    A.   Accounts payable, accounts receivable, all different jobs
22    for almost 40 years.
23    Q.   What different companies did you work for?
24    A.   What companies?
25    Q.   Yes.
```

1    A.   The first one was Joanne Fabrics Corporation.  I worked

2    there for 30 years, and then I went over to Stonehedge Hotel

3    and worked there around -- trying to think.  I think I started

4    in '08, 2008.

5    Q.   So you worked there starting in 2008?

6    A.   And I ended in 2019.

7    Q.   Okay.  So you worked there for about 10, 11 years?

8    A.   Yeah.

9    Q.   And who owned the Stonehedge when you first started

10   working there --

11   A.   I --

12   Q.   I apologize, Ms. Ladebauche, but if you could try and wait

13   until I finish questioning and then answer, that will make it

14   easier for the court reporter.

15        Who owned the Stonehedge back in 2008 when you started

16   working there?

17   A.   Levent Bozkurt.

18   Q.   And what type of work did you do at the Stonehedge?

19   A.   The account bookkeeping work and payroll.

20   Q.   Fair to say you're not a licensed CPA?

21   A.   No.

22   Q.   You didn't prepare taxes?

23   A.   No.

24   Q.   You didn't audit financials?

25   A.   No.

1  Q.    So what exactly did it entail, the accounts payable and

2  bookkeeping?

3  A.    Just entering invoices and paying them, counting the

4  receipts every night from the hotel and restaurant, and then

5  the payroll of the wait staff in the restaurant and the hotel

6  employees.

7  Q.    In or around 2014, did the defendant, Mr. Abhijit Das, buy

8  the Stonehedge?

9  A.    Yes.

10 Q.    And how did your responsibilities change after Mr. Das

11 bought the Stonehedge?

12 A.    I just did the accounting function, same thing, payroll.

13 I used to do financials for Mr. Bozkurt, but I didn't for

14 Mr. Beej -- I mean Mr. Das.

15 Q.    Were Mr. Das's bookkeeping practices different from

16 Mr. Bozkurt's?

17 A.    Yes.

18 Q.    Tell us about that.

19 A.    Mr. Bozkurt was very meticulous and detailed.  His was

20 kind of scattered.  I never got all the information I needed.

21 It was just hard working for him.  There was a lot of different

22 things going on.  He was changing, had more than one hotel.  He

23 had a yacht business, and it was just frustrating sometimes.

24 Q.    You mentioned that the defendant had different hotels and

25 a yacht business.  Were you expected to do the bookkeeping for

1    those businesses as well?

2    A.    I eventually was doing that also, yes, eventually the

3    Daniel's books came down to me.

4    Q.    Were there different bank accounts associated with each of

5    those businesses?

6    A.    Oh, yes, yes.

7    Q.    How many different bank accounts approximately were you

8    working with?

9    A.    There was credit card accounts, there was the regular

10   operating account, GM account, payroll accounts, and for each

11   different company it was different too.

12   Q.    Why were there so many different -- excuse me -- different

13   accounts for all of these companies?

14   A.    That's the way he set it up.

15   Q.    And "he" being?

16   A.    Mr. Das.

17   Q.    What information did you rely on when you were doing the

18   bookkeeping?

19         Let me rephrase.  You mentioned that you did the

20   bookkeeping and worked on accounts payable.  How would you get

21   the information to put into the books?

22   A.    The daily mail, or the people at management would give me

23   the invoices that they received.

24   Q.    And how would you know which books, which company --

25   A.    That's what they had.

1  Q.   Ms. Ladebauche, if you could just let me finish.

2       How do you know which books to enter the invoices into?

3  A.   That's what I would have to be told, how to enter, which

4  company it belonged to.

5  Q.   Who would tell you that information?

6  A.   Management, including Mr. Das.

7  Q.   When you talk about management, who are you talking about?

8  A.   Sean Smith, James Foster, Kristin Campetti, anybody else

9  that might have been in the office.

10  Q.   You mentioned that there were credit cards associated with

11  the businesses.  How many different credit cards were there?

12  A.   Many.

13  Q.   Do you know why there were so many different credit cards?

14  A.   That's the way he set it up, and whichever one had

15  available credit to use, that's what was used.

16  Q.   You said "He set it up."  Who set it up?

17  A.   Mr. Das.  I mean, he would do all of that.

18  Q.   How would you describe generally your workload and your

19  stress level while you were working for Mr. Das?

20  A.   Very frustrating, very stressed.  Too much work for two

21  people that worked there.

22  Q.   In general, were Mr. Das's businesses profitable?

23  A.   No, not like Mr. Bozkurt.

24  Q.   Why do you say they weren't profitable?

25  A.   I did not see financials, so I can't attest to that.  It

1  just seems like we always had bills overdue and looking -- just

2  a lot of -- electricity would be going to be shut off, so we'd

3  have to scramble to get the money to pay that, payroll,

4  different things.  Different little signs that there wasn't

5  much money flowing.

6  Q.   Was there sometimes a hard time paying payroll for the

7  employees?

8  A.   Payroll usually got paid but not -- there was a time that

9  the executive payroll was not paid.

10  Q.   Who were the executives who were not getting paid

11  regularly?

12  A.   Management.  That would have been Sean, Kristen.  Beej

13  never, hardly ever, never took a check.  Mr. Foster.

14  Q.   You mentioned Kristen.  Was that Kristen Campetti being

15  one of the employees who continued to work for Mr. Das even

16  though she wasn't getting paid?

17  A.   Yes.

18  Q.   Now, you mentioned that you never got to see the

19  financials.  How much access did you have to the bank accounts

20  and the credit card statements?

21  A.   Daily activity, I could see the activity to see what had

22  cleared.  I could go online and look at the accounts.  I could

23  transfer.  If one account had the money available, I would move

24  it from one account to the other.

25  Q.   Did you pay bills on your own?

1   A.   Personally?

2   Q.   For the business.

3   A.   Personally, no.

4   Q.   Who paid those bills?

5   A.   Okay.  I thought you meant me pay it, my money.

6   Q.   I apologize.  Who paid the invoices that were due for --

7   A.   Yes, I would give him a list of what was coming due, and

8   he would advise how to pay credit card versus cash.

9   Q.   And if we could start with Exhibit 129, please, which is

10  previously in evidence.  Take your time, Ms. Ladebauche.

11  A.   Yes.  That's an example of what I sent him, listing bills

12  that had to be paid, and out of what -- when they were due and

13  what hotel.

14  Q.   I notice the title "Overdue" or "Important."  What's the

15  meaning of that?

16  A.   Meaning either that it was going to be canceled or they

17  were going to -- a shutoff notice received and so forth on the

18  electric.

19  Q.   Are you referring to the National Grid bills?

20  A.   Correct.

21  Q.   Where it says "Shutoff notice"?

22  A.   Correct.

23  Q.   I'll ask you, how often did you send these types of emails

24  with reminders about overdue payments to Mr. Das?

25  A.   For a while it was weekly.

1    Q.   This is dated December 15, 2017, and I notice that many of

2    these bills are from September, October.  Was that regular to

3    be so far behind on bills?

4    A.   At that time, yes.

5    Q.   What was Mr. Das's response in the email shown in Exhibit

6    129?

7    A.   Well, you can see in this exhibit that he has answered.

8    Q.   Could you read the part --

9    A.   Yeah.

10   Q.   -- that's highlighted.  When he says, "Can we push a

11   little less hard and avoid shutoffs," what did that mean to

12   you?

13   A.   I don't know.

14   Q.   If we could back out of that.  In the brackets below where

15   it says "Proceed to pay," who entered that information, the

16   proceed to pay information?

17   A.   That's his instruction to me.

18   Q.   Would you pay a bill without getting permission from

19   Mr. Das?

20   A.   No.

21   Q.   And if we could go to Exhibit 130.  Is this another

22   example of overdue payments that need to be made?

23   A.   Yes, that's the standard email I gave him.

24   Q.   Could you highlight the part that says "National Grid in

25   electric, $10,000, collection notice for Friday."

1          What does that mean when there's a collection notice?

2    A.    That's the shutoff date.

3    Q.    That's when they would shut off the electricity?

4    A.    Right, yeah.  They usually come -- sorry.  They came to

5    the building.

6    Q.    If we could go to Exhibit 131.  Is this another email

7    chain between you and Mr. Das about Stonehedge bills?

8    A.    Okay.  That's another telling him what was going on, yeah.

9    Q.    If we could go to page 2, and if we could just highlight

10   Mr. Das's response.  "Nothing today, we are really tight."

11   What did that mean to you when you would send him bills and he

12   would say, "Nothing today, we are really tight"?

13   A.    Just meaning you can't pay anything.

14   Q.    And this was on January 18, 2018?

15   A.    That's what it says.

16   Q.    If we could back out and go to the first paragraph.

17          THE COURT:  Ms. Das, we will take the morning recess.

18          MS. WAN:  Sure.

19          THE COURT:  It's just about that time.  All right,

20   jurors, let's take the morning recess, 25 minutes.  Back at

21   11:15.

22          (Jury exits the courtroom.)

23          (Recess, 10:48 a.m. - 11:16 a.m.)

24          (Jury enters the courtroom.)

25          COURTROOM CLERK:  Resuming on the record.

1    Q.   Ms. Ladebauche, we left off talking about Exhibit 131.

2    I'm going to direct your attention to the bottom part of

3    Exhibit 131, and let me read a couple of sentences from there,

4    and I'll ask you some questions.

5         This is you writing to Mr. Das.  "I just had to pay the

6    three other Stonehedge liquor bills by check today, totaling

7    2,375.65.  National Grid Inn electric will most likely show up

8    tomorrow.  Shutoff notice was dated last Friday.  I know this

9    week is Daniel's payroll, but we have a few utility installment

10   payments that haven't gone out."

11        Ms. Ladebauche, were these the only bills that were

12   outstanding at this time?

13   A.   No.  It was just the crucial ones.

14   Q.   How can you tell when a bill is crucial?

15   A.   When they're going to shut off.  Liquor bills have to be

16   paid by law by a certain date, and utilities are going to be

17   shut off, and they do, they used to go and shut them off.

18   Q.   What does it mean, "National Grid Inn electric will most

19   likely show up tomorrow."  What does that mean?

20   A.   Well, we had different locations.  We had a spa bill and

21   we had the hotel, the inn.

22   Q.   What does it mean when you say, "They will show up

23   tomorrow"?

24   A.   That they will go, show up to shut it off, literally go

25   and there will be no power.

1  Q.   If we could go to Mr. Das's response.  He responds,

2  "National Grid pay from GM."  What's the GM?

3  A.   GM, it was general manager's account, which was, I had the

4  ability to stamp his name so that I could do checks if he was

5  not available.  So I'm assuming that he was not around for

6  that.

7  Q.   And then he writes, "For the Daniel, utility payments

8  should go out next week.  This week is too tight."  What did

9  you understand that to mean?

10  A.   That the money isn't there to pay them.

11  Q.   Ms. Ladebauche, at this time around January of 2018, were

12  you aware that the defendant and his family had about

13  $1 million in cash reserves for the business?

14  A.   No.

15         MR. KENDALL:  Objection, Your Honor.  Totally

16  misstates the evidence.

17         THE COURT:  She said no.

18  Q.   Now, Ms. Ladebauche, in general, how did you access the

19  funds to pay bills?

20  A.   Not sure.

21  Q.   I can rephrase the question.

22         If there wasn't enough money in one account to pay a bill,

23  how would you get money to pay a critical bill?

24  A.   I did have the ability to transfer some funds between

25  accounts, but it would have to be like from a credit card

1   settlement account to the restaurant or the operating account

2   or to the GM.

3   Q.   So you were able to make intercompany transfers --

4   A.   Correct.

5   Q.   -- between the bank accounts?

6   A.   Correct.

7   Q.   Did you ever have access to the Das For Congress campaign

8   account?

9   A.   No.

10   Q.   And in or around early January, around this time, did

11   Mr. Das start transferring large sums of money into the hotel

12   accounts that you had questions about?

13   A.   I had an account set up called short term that I didn't

14   know payments were coded to.

15   Q.   Let's take a look at Exhibit 132.  Now, Ms. Ladebauche,

16   this is an email between you and Mr. Das dated February 9,

17   2018.  If we could start with the bottom section, Ms.

18   Ladebauche.  You write, "Have you started using the new Lowell

19   Five phone app for transfers between accounts?  The

20   descriptions have changed on the statements and now the account

21   number involved does not show."

22        Let me pause right there.  What did you mean by that?

23   A.   I used to identify the accounts by the last few digits,

24   the last few numbers on the app.  So it was easy to identify

25   which account we're transferring to and from.  But when the new

1   app came out that you could use on your phone, they changed the

2   format.

3   Q.   And is it fair to say you started seeing transfers without

4   information about where the money had come from?

5   A.   Any -- it's not the activity that I'm a talking about.

6   It's just the labeling of the different accounts.  It was

7   harder to identify them.

8   Q.   So you were able to see the last four digits of the

9   account number where the money was transferred?

10  A.   No, it has nothing to do with the transactions themselves.

11  It's only when you have a list of, say, five accounts on the

12  front page of your internet page to show the accounts that you

13  possess and their balances.  I couldn't tell which one it was.

14  Q.   I understand that.  Thank you.

15  A.   Because the identification had changed.

16  Q.   You write also, "I will need to know how to code the

17  deposits that you have put in recently, i.e., 9,500 and 13,000

18  today, 7,000 to TM," et cetera.  What deposits are you talking

19  about in the second sentence?

20  A.   I must have been given green slips that were deposit

21  receipts.  But unless they tell me, identify them, I don't know

22  where, what account it goes into.  Well, I can tell by the

23  account number, but I don't know who it came from or what it

24  came from.

25  Q.   Let's break that down.  What are green slips?

1    A.    Green slips are the deposit receipts from the bank.

2    Q.    From Lowell Five?

3    A.    Yes.

4    Q.    And you said that the deposit receipts didn't tell you

5    where the money came from?

6    A.    Only that it was a receipt for a deposit.

7    Q.    Why was it important to you to know where the money came

8    from?

9    A.    Well, if it was borrowing from one company, like Daniel

10   Hotel, I just needed to know how do I charge it.  I mean, if

11   I'm putting money in, I need to know what's the source.

12   Q.    If we could back out and take a look at Mr. Das's

13   response.  Mr. Das writes, "All deposits from me should be

14   coded Beej Das, short-term loan account.  Create one if there

15   isn't one yet, please."

16   A.    Right.

17   Q.    What did you understand that instruction to mean?

18   A.    That that's where the 9,500 came from.  So that's where I

19   would make the entry.  Because the entry would be, okay, you

20   know, debit the cash account and credit the short-term loan

21   account.

22   Q.    As a bookkeeper, what did you understand the term

23   "short-term loan" to mean?

24   A.    It would be paid back.

25   Q.    Who was making that short-term loan --

```
 1    A.   It was like a six-month note or something that's going to
 2    be paid back right away.
 3    Q.   And who was making the short-term loan?
 4    A.   Well, this one was being labeled "Beej Das."
 5    Q.   Who was receiving the loan?
 6    A.   Oh, the hotel, or whatever company he told me where the
 7    money went.
 8    Q.   And this may seem like an obvious question, but if Mr. Das
 9    was making the loan, what was the understanding about whether
10    the loan would be repaid?
11    A.   All I know is that it went to that account.  It went into
12    the regular operating account, assuming, and it was paid by --
13    the funds were coming from that loan.
14    Q.   Did Mr. Das ever tell you that these transfers came from
15    funds from his campaign account?
16    A.   He never told me, no.
17    Q.   And did he ever tell you that this was money that he had
18    previously loaned the campaign?
19    A.   He never mentioned campaign stuff to me.
20    Q.   Did he ever tell you that the campaign was loaning money
21    to the business?
22              MR. KENDALL:  Objection, Your Honor.
23              THE COURT:  Overruled.
24    Q.   You can answer, Ms. Ladebauche.
25    A.   He never -- he and I never talked about the campaign.
```

```
 1    Q.   At some point did you learn the source of these deposits?
 2    A.   I was told on the side, yes, that that account was that.
 3    Q.   Was what?
 4         MR. KENDALL:  Objection, Your Honor.  I think this is
 5    hearsay and I don't know the foundation.
 6         THE COURT:  I don't know if --
 7         MS. WAN:  I can move on, Your Honor.
 8         MR. KENDALL:  Move to strike, Your Honor.
 9         THE COURT:  There's nothing to strike.  She hasn't
10    asked the question yet.
11    Q.   How was the money spent after it was transferred into the
12    business accounts?
13    A.   It would have been to pay bills.  We must have needed
14    funds to pay bills.
15    Q.   What types of bills?
16    A.   Either payroll or utility bills or liquor bills.
17    Q.   For the hotels --
18    A.   For the hotel, for the hotel or whichever company it went
19    to, yeah.
20    Q.   And showing you Exhibit 133.1, do you recognize this, Ms.
21    Ladebauche, as an email between you and Mr. Das around March 30
22    of 2018?
23    A.   I remember something to do with the yacht, yeah.
24    Q.   I'll note the subject is "Charge for windlass."  Do you
25    know what a windlass is?
```

1   A.   No.  I'm assuming that was for the yacht because of the

2   companies involved, so it must have been a part for the motor

3   or something.

4   Q.   If we can take a look at the bottom section.  It says,

5   "James, please forward the charge receipt to Rise.  Rise, there

6   is a $12,500 charge coming for Troca 1, capital expense as

7   payable to me in a short-term loan account."  What's the Troca

8   1?

9   A.   Troca 1, if I remember correctly, Troca Yachts was the

10  operating account.  Troca 1 was the owner of the yacht itself.

11  Q.   So this was an account having to do with the yacht, fair

12  to say?

13  A.   Yeah.

14  Q.   And if we could go back to page 1 and blow up just the

15  text, starting "FYI."  So you write, "FYI.  This is how I

16  booked the CSS hydraulic/C-systems and services Windlass.  If

17  not what you wanted, we will fix."

18       Can you explain what the bookkeeping is reflecting?

19  A.   Well, because the TY 1 owned the yacht, any improvements

20  would be booked on the owner of the yacht and not on Troca

21  Yachts because -- it must have been an improvement or something

22  because that's the account that it went to.

23  Q.   If we could highlight the sentence starting "12,500 paid

24  against invoice Beej Das short-term loan."  What is the

25  significance of this notation in the record books?

1    A.    In order to pay it.  That's just saying where that money

2    came from because it wasn't drawn on Troca Yachts.  It wasn't a

3    check drawn on Troca Yachts.

4    Q.    Is it fair to say that $12,500 from the Beej Das

5    short-term loan went to pay for a part for the yacht?

6    A.    Yes.

7    Q.    Now --

8    A.    But it was charged as a loan.  So the TY 1 would owe the

9    campaign that money.

10   Q.    Now, if we could go to Exhibit 133.  At some point did you

11   collect for Mr. Das the charges that you charged to the

12   short-term loan?

13   A.    I'm sorry, can you repeat the question.

14   Q.    Sure.  At some point did you collect and send to Mr. Das

15   the deposits that you charged to the Beej Das short-term loan

16   account?

17   A.    I don't remember any.

18   Q.    Does this look like an email from your email address?

19   A.    Yeah.  No.  That's just saying that they must have given

20   me a whole lot of receipts, and so I recorded them.

21   Q.    Thank you.  And where did you record those receipts?

22   A.    Because I'm just saying, they need to look at what I did

23   to make sure I did it right, but they must have told me which

24   ones.  I don't know how many there were.  It doesn't say that.

25   Q.    We'll go through them in a second, but what's the

1    significance of this statement when you say "Coded to" --

2    A.    The account 25 --

3    Q.    Excuse me, I'm sorry, Ms. Ladebauche, if I could just

4    finish.  The "Beej Das short-term loan," what does that mean

5    that it's coded to "Beej Das short-term loan"?

6    A.    So QBO is QuickBooks.  So the different companies listed,

7    it's just saying that the 25030 is the account number, and

8    "Beej Das short-term loan," that's just the loan account on

9    whatever company of those three companies.

10   Q.    And if we could go to page 2, is this a scan of the

11   receipt that you were talking about?

12   A.    No.  That is a copy of doing the -- I would see a

13   transaction online.  In this case I saw a deposit for 10,000,

14   but I hadn't entered it into QuickBooks anywhere, so I needed

15   to know.  It says 8047 is the account number in QuickBooks --

16   which one I was looking at.  So that 8047 account got 10,000,

17   but I don't know how it got there.

18   Q.    Well, didn't you say on the first page that it came from

19   the Beej Das short-term loan?

20   A.    If that was associated with it, yeah.

21         That was attached?

22   Q.    Yes, yes.  These are the attachments.

23   A.    Then that's what I would have sent, showing, I see these

24   deposits, but I don't know which, so this is where I put them;

25   is this correct?

1  Q.   I see.  So you started seeing deposits online and then you

2  coded them --

3  A.   I --

4  Q.   Sorry, you have to let me finish.  You coded them to Beej

5  Das short-term loan and you were asking Mr. Das if this was

6  correct?

7  A.   Correct.

8  Q.   If we could scroll through just a couple.  So for example,

9  you coded a $13,000 deposit on February 8, 2018 and a $9,500

10  deposit on February 9, 2018, and an $18,000 deposit on February

11  13, 2018.  We'll stop there.  But do these all appear to be

12  deposits that you coded into the Beej Das short-term loan

13  account?

14  A.   Yeah.

15  Q.   Now, to your knowledge, out of this Beej Das short-term

16  loan account, do you know if any of it was ever repaid?

17  A.   I don't remember.

18  Q.   Are you aware of an employee named Kristen Campetti?

19  A.   Yes.

20  Q.   I think we talked about her before the break.  What was

21  her role at Stonehedge?

22  A.   I would say she was marketing or design.  She helped

23  decorating with the account -- I mean, after the flood, she was

24  helping redecorating or changing different things in the

25  hotels.  She dealt with all the hotels.  She dealt with the

1    yacht.  She was more management.

2    Q.   Are you aware if she had a relationship with Mr. Das

3    outside of work?

4    A.   I think they did before, yeah.

5    Q.   And are you also aware of the term "petty cash"?

6    A.   Yes.

7    Q.   What is petty cash?

8    A.   That was so that I could have actual cash to pay, say,

9    someone coming and delivering wood for the fireplace, or if

10   someone went to the store and picked up, if the kitchen was

11   short of milk or something, then I could reimburse those

12   employees right away.

13   Q.   Where was the petty cash kept?

14   A.   In a cabinet.

15   Q.   Is that in your office?

16   A.   Yes, I had the key.

17   Q.   Were you the only one with a key?

18   A.   Yes.

19   Q.   What was the procedure for paying someone using petty cash

20   funds?

21   A.   They would come to me with a receipt, a bill.  If they

22   went to the pool place to get chemicals, they'd come and bring

23   the receipt to me, and then I would reimburse them.

24   Q.   Would you make a notation in the QuickBooks?

25   A.   Yes, because that had to be coded as an expense on the

1  hotel books.

2  Q.   And was it the typical procedure for you to give someone

3  else money from the petty cash to give to the final recipient?

4  A.   Not very often.

5         MS. WAN:  If I could have a moment.

6         Nothing further, Your Honor.  Thank you.

7         THE COURT:  Mr. Kendall.

8         MR. KENDALL:  Sure.

9  CROSS-EXAMINATION BY MR. KENDALL:

10  Q.   Good morning, Ms. Ladebauche.  I thank you for coming.

11  You came down from Maine?

12  A.   I'm sorry?

13  Q.   I said thank you for coming this morning.  Am I correct

14  you drove down from Maine?

15  A.   No.  New Hampshire.

16  Q.   New Hampshire.  How long was your ride?

17  A.   This morning it wasn't bad.  It was only about 45 minutes.

18  Q.   Oh, good.  Thank you.  Did you come alone or did one of

19  the agents pick you up?

20  A.   Alone.

21  Q.   Okay.  Good.  Now, I think you told us that the prior

22  owner, Mr. Bozkurt -- is that the way to --

23  A.   Bozkurt.

24  Q.   He was a much better businessman than Mr. Das, correct?

25  A.   He just had the one business, so he was more interested,

1    you know, more concentrated on the one business.

2    Q.   Okay.  And he ran it quite well?

3    A.   He was very stern.

4    Q.   He was very stern.  And he made a profit?

5    A.   Yeah, not much, but he made a profit.

6    Q.   And when he sold the business to Mr. Das, he hadn't done a

7    lot of preventive maintenance, correct?

8    A.   Correct.

9    Q.   Mr. Das bought on old tired building that Mr. Bozkurt had

10   not put much money into, correct?

11   A.   Correct.

12   Q.   So we can certainly say in that respect Mr. Bozkurt was a

13   much smarter businessman that Mr. Das?

14   A.   He was stingier.

15   Q.   And Mr. Das inherited a building that just had problem

16   after problem, correct?

17   A.   Yes.

18   Q.   They were tired old buildings; is that correct?

19   A.   Yes.

20   Q.   And that made it stressful for everybody who worked there;

21   isn't that correct?

22   A.   Maintenance, especially.

23   Q.   For you especially.  I mean, it was stressful for you, I

24   take it, all those years, correct?

25   A.   I worked in the office.  I didn't --

1   Q.   But you were paying bills and managing a very tight

2   budget; it's stressful, correct?

3   A.   It was always shorthanded as far as help but that's it.

4   Q.   And you started with Mr. Das in 2014 when he bought the

5   buildings, and you stayed through 2019 until you retired from

6   working, correct?

7   A.   Yes.

8   Q.   And you remember Sean Smith?

9   A.   Yes.

10  Q.   Very nice man, would you agree?

11  A.   Yes.

12  Q.   He had a family?  He has a family?

13  A.   Yes.

14  Q.   He was part of that management that kept missing payrolls,

15  but he stayed a long time too, correct?

16  A.   Yes.

17  Q.   And Mr. Foster came from India where he met Mr. Das,

18  correct?  He was a British man.

19  A.   Yes.

20  Q.   Charming accent, wouldn't you agree?

21  A.   Yes.

22  Q.   Mr. Foster was there to do marketing, brought his family,

23  correct?

24  A.   Correct.

25  Q.   And he also was missing lots of paychecks?

1    A.    Yes.

2    Q.    At one point Mr. Das had to lend him money for a

3    condominium so he could buy a place for his family to stay.

4    Are you aware of that?

5    A.    No.

6    Q.    Okay.  And Mr. Foster stayed through sometime mid to late

7    2018, correct?

8    A.    I don't know the date.

9    Q.    But he wasn't as shrewd a businessman, he wasn't as

10   reliable and tight, but he invested into the buildings,

11   correct?

12   A.    Yes.

13   Q.    His parents had to cosign for a new roof.  Do you remember

14   that?

15   A.    That they cosigned?  No, I don't.

16   Q.    Do you remember what the roof cost?

17   A.    No.

18   Q.    Okay.  Mr. Das was a nice guy, wasn't he?

19   A.    Yes.

20   Q.    Okay.  And the employees were much happier with him than

21   they were with Mr. Bozkurt?

22   A.    Depends.

23   Q.    They were getting paid and the paychecks were going

24   through.  And his parents would often come by to help out when

25   there were really tight times at the hotel, correct?

1  A.   Yes.

2  Q.   Sometimes they would come in and make deposits in 10, 15,

3  $20,000, correct?

4  A.   Yes.

5  Q.   Sometimes they'd take out credit cards in their names and

6  run up the charges on their personal credit cards to buy things

7  for the hotels?

8  A.   Correct.

9  Q.   Okay.  And fair to say that the family was really

10  dedicated to trying to make this a successful business?

11  A.   Yes.

12  Q.   And they would put their blood and their sweat and their

13  money into it?  Not their blood, but they put their sweat and

14  stress and money into it, correct?

15  A.   Yes, I did see that.

16  Q.   And as you said, Mr. Das didn't take a paycheck?

17  A.   Correct.

18  Q.   Well, one of the problems the hotel had was the flood in

19  2016.  Do you remember that?

20  A.   Oh, yes.

21  Q.   Valentine's Day, am I correct?

22  A.   Yes.

23  Q.   Why don't you tell us what happened on Valentine's Day of

24  2016.

25  A.   My understanding is the fire alarm system water pipes in

1    the attic froze and burst.

2    Q.    Flooded the hotel, correct?

3    A.    Flooded the hotel.

4    Q.    Now, when that flood happened, the hotel shut down?

5    A.    Yes.

6    Q.    Okay.  It shut down, am I correct to say from Valentine's

7    Day, mid-February to mid-May?

8    A.    Probably longer, I thought.

9    Q.    Okay.  So February to -- let me count, to March, to April,

10   to May.  Something over three months, correct?

11   A.    Definitely.

12   Q.    Okay.  And the hotel paid payroll for those three months?

13   A.    Yes.

14   Q.    Is that something Mr. Bozkurt would have done, do you

15   think?

16   A.    No.

17   Q.    If I could have up on the screen I-548.  I just want to

18   ask you if you could take a look at this picture and tell us if

19   you recall it.

20   A.    I recognize it, yeah.

21   Q.    What is that?

22   A.    That serves -- the company that comes in to clean after a

23   flooding, for the damage.

24   Q.    That was in response to the flooding, correct?

25   A.    Yes.

1          MR. KENDALL:  Okay, Your Honor.  I'd like to offer

2     that picture into evidence, please.

3          THE COURT:  Very well.

4          COURTROOM CLERK:  196.

5          (Exhibit 196 admitted into evidence.)

6     Q.   Now, I'd like to show you Exhibit I-18 for identification.

7     It's an email.  Just for the witness, please.  And if you take

8     a look at that, you'll see it's not addressed to you, but you

9     recognize that as an email that the Troca Hotels used?

10    A.   Yes.

11         MS. WAN:  Objection.  There's no -- this is, first of

12    all, hearsay.  And also there's no indication that this witness

13    has any knowledge about this email.

14         MR. KENDALL:  Your Honor, it's a business record and

15    I'm happy to lay the foundation.

16         THE COURT:  No.  That's not really a business record,

17    but it's not being offered for its truth.  It's advertising.

18         MR. KENDALL:  Excuse me?

19         THE COURT:  It's an advertisement, the little I can

20    see.

21         MR. KENDALL:  I wouldn't call it advertising.  It's

22    with respect to what they were told by their bank.  It was

23    notice, Your Honor, that the bank gave them notice to the

24    business.

25         MS. WAN:  Ms. Ladebauche did not receive this notice.

```
 1            MR. KENDALL:  She can testify this is a company email.
 2            THE COURT:  Have you seen this before?  Why don't we
 3      ask the witness whether she's seen it.
 4      Q.   Have you seen this email before?
 5      A.   It doesn't look familiar to me.  I haven't read it.
 6      Q.   Is it a type of email that the business uses, the email
 7      address?
 8            MS. WAN:  Objection.
 9            THE COURT:  It's not familiar to her.  I don't think
10      this is the right witness.
11      Q.   So after the hotel got through the flood, they reopened,
12      correct?
13      A.   Yes.
14      Q.   In large part because the Das family put their money into
15      it, correct?
16      A.   There was insurance money.
17      Q.   Sure.  There was insurance money, and the insurance money
18      came when it came, but in between the insurance money there was
19      Das family money, correct?
20      A.    It would show whether there was any deposits, yeah.
21      Q.   Okay.  Now, I want to show you a document marked as I-137
22      which your name is on.  Do you recognize I-137?  Do you see
23      your name there in the email to you?
24      A.   Just, I was trying to read from the bottom up.  Okay.
25      Q.   Excuse me.  Do you recognize that as an email that you
```

1    received when you worked --

2    A.   Yes, my name is on there.

3         MR. KENDALL:  Your Honor, I'd like to offer that as

4    our next exhibit.

5         THE COURT:  All right.  Next exhibit.

6         COURTROOM CLERK:  197.

7         MR. KENDALL:  Excuse me, what was it?

8         COURTROOM CLERK:  197.

9         (Exhibit 197 admitted into evidence.)

10   Q.   If you could take a look at page 2 of 197, and I'm going

11   to call your attention to a couple of things that were

12   forwarded to you in this email that you received.  If we look

13   at the middle paragraph that starts, "Remember I have been more

14   than willing to borrow to help" --

15        MS. WAN:  Objection.  This is hearsay.

16        MR. KENDALL:  Your Honor, it's in evidence.

17        MS. WAN:  The defense attorney didn't give us the full

18   copy before --

19        MR. KENDALL:  Your Honor, I showed this in opening.

20        THE COURT:  It's in evidence.  Let's go forward.

21   Q.   It says, "Remember, I have been more than willing to

22   borrow to help you in the past.  Your home loan down payment

23   with different entities borrowed from each other is a perfect

24   example.  That said, I won't return to a situation where the

25   entity does not have enough cash to operate.  At the moment, we

1   have a $40,000 tax bill due in November, the $28,000 borrowed

2   from mom for the marina in Boston, possibly 50K payable for

3   Cape Cod, and possibly now a 30K deficit from where I thought

4   cash flow would be this month.  I know it seems like monopoly

5   money at times, but if we have that large a hole, we will dip

6   below the cash threshold I had set as an absolute minimum.

7   Given that it now seems like the insurance settlement we

8   thought would come might be tied to actually spending that

9   money on HVAC, I simply won't let the company spend any more of

10  that reserve until we know it will be replenished."

11       Did I read that correctly?

12  A.   Mm-hmm.

13  Q.   Based upon your experience as a bookkeeper at the hotel,

14  would you agree trying to establish a cash reserve for its

15  operations would have been very helpful to managing the hotel?

16  A.   It would have been helpful?

17  Q.   Yes.

18  A.   Yes.

19  Q.   It certainly would have been helpful to you, agreed?

20  A.   To pay bills, yes.

21  Q.   Then you could have just paid the bills and not have to

22  worry about triaging which, when, correct?

23  A.   Yes.

24       MR. KENDALL:  Okay.  I'd now like to show the witness

25  I-186, please.

```
 1              MS. WAN:  Can we get the full copy?

 2              MR. KENDALL:  This is the full copy --

 3              MS. WAN:  We object.  It's self-serving statements.

 4              MR. KENDALL:  Your Honor, it's an email between my

 5   client and the witness on an issue that was covered in direct

 6   examination.

 7              MS. WAN:  Can we have an actual copy of the email?

 8              MR. KENDALL:  Sure.

 9              MS. WAN:  Your Honor, it's hearsay.

10              THE COURT:  Well, it really isn't.  It's from Mr. Das,

11   is it?

12              MS. WAN:  Excuse me?

13              THE COURT:  I think that it falls within a pretty

14   clear hearsay exception.

15              MS. WAN:  Which is available to us as a party opponent

16   but not available to the defense.

17              THE COURT:  I think that works both ways.  I don't

18   think there are separate rules for each side.  Let's go

19   forward.

20              MR. KENDALL:  Which number is it, please.

21              COURTROOM CLERK:  198.

22              (Exhibit 198 admitted into evidence.)

23              MR. KENDALL:  198, wasn't that the last one?

24              COURTROOM CLERK:  No.  The last one was 197.

25   Q.   If we could take a look at Exhibit 198, please.  You see
```

1    that's an email from Mr. Das to Mr. Foster, you, Mr. Smith and

2    Ms. Campetti?

3    A.    Correct.

4    Q.    Yes?

5    A.    Yes.

6    Q.    It's January 2018.  That's really what you call the

7    management group, Mr. Foster and Mr. Smith and Ms. Campetti,

8    and Mr. Das?

9    A.    Yes.

10   Q.    If we look at the middle of it, we see his writing.  "We

11   have seen an enterprise-wide cash depletion of over $200,000 in

12   less than three months.  This, during our busy months

13   nonetheless.  That means we had cash reserves and we were

14   supposed to have added to those reserves for things like gift

15   certificate sales, but rather we lost cash in the end."

16         Did I read that correctly?

17   A.    Yeah.

18   Q.    The cash problems started getting worse and worse from

19   January of 2008 on, correct?

20   A.    I -- the dates I wouldn't remember.

21   Q.    Okay.  Dates you don't remember, but you do remember a

22   time when he was making transfers into the account on almost a

23   two- or three-day-a-week basis --

24   A.    Yes.

25   Q.    -- to cover the bills that day?

1    A.    Yes.

2    Q.    Now, I'd like to show you a document that's a printout,

3    and it's marked as Exhibit 1055, if we could show it to the

4    government, please.

5          You testified with the government that you opened up a

6    short-term loan account for Mr. Das.

7    A.    Set up the account on the GL.

8    Q.    Yeah.  "GL" means general ledger?

9    A.    General ledger, yeah.

10   Q.    And you set up this account, and various charges that were

11   to go to the campaign expenses would be actually billed against

12   the short-term loan account, correct?

13   A.    I don't remember too many, other than the vehicle lease.

14   Q.    Okay.  But you remember setting up a system where he put

15   money into the hotel, so he had a credit.  It's a loan to the

16   hotel that the hotel could pay him, but then expenses that he

17   ran up at the hotel for the campaign could be charged against

18   this.  And you remember doing that for the Yukon, correct?

19   A.    I remember setting up the account, yes.

20   Q.    Okay.  If I ask you to take a look at 1055, does that

21   appear to you to be a printout of that account?

22            MS. WAN:  Objection.  There's no evidence that this is

23   an actual printout that she has seen before or has ever been

24   produced.

25            THE COURT:  I believe she's actually identified it as

```
 1    the same thing.
 2              MR. KENDALL:  Okay.
 3    Q.   Do you remember you had a database in the QuickBooks
 4    account that had that?
 5    A.   You can print out all different reports on QuickBooks,
 6    yes.
 7    Q.   Okay.  And does this look like the type of printout that
 8    would come from your QuickBooks accounts that you maintained
 9    for the Das short-term loan account?
10    A.   Right.
11              MR. KENDALL:  Okay.  Your Honor --
12              MS. WAN:  That's because --
13    A.   But it doesn't show who posted those.
14    Q.   But in the time period, is that what you were posting in
15    2017?
16    A.   I wasn't the only one that posts.
17    Q.   Okay.  Other people would be posting too?
18    A.   Yes.
19    Q.   So multiple people would be posting to this, but it was
20    the books and records of the hotel business, correct?
21              MS. WAN:  Objection.
22    A.   It looks like a --
23              THE COURT:  Everybody is talking over everyone.  I
24    can't quite follow you.  Go again, Ms. Wan.
25              MS. WAN:  Objection.  She hasn't laid a proper
```

 1   foundation.  This is substantive evidence that was not produced

 2   before today.  There is no evidence about the authenticity of

 3   this document, and the witness really hasn't laid a foundation

 4   for it.

 5           MR. KENDALL:  Your Honor, may I respond?

 6           THE COURT:  Yes.

 7           MR. KENDALL:  They stipulated to most of these entries

 8   when I put in that spreadsheet a couple of days ago.  This just

 9   shows the internal handling of those entries on the QuickBooks,

10   and she said she recognizes it.

11           THE COURT:  I'll admit it.

12           MR. KENDALL:  Thank you, Your Honor.

13           COURTROOM CLERK:  199.

14           (Exhibit 199 admitted into evidence.)

15   Q.   If we could show the jury, please.  If you see here, the

16   printout, the date is -- I'm not great with QuickBooks, so

17   please correct me if I don't get it right.  The data is stored

18   in the database with QuickBooks, and you can have various

19   printouts if you tell them what parameters you want, correct?

20   A.   Correct.

21   Q.   Why don't you put it in your own words because I won't do

22   it justice.

23   A.   I'm not sure what you're asking me, but this says there

24   was a charge that was dated a certain date in the first column.

25           MR. KENDALL:  May I approach the witness and give her

1    a paper copy, Your Honor?

2              THE COURT:  You may.

3    Q.   This might be easier to work with.  Okay.  You had a

4    laptop that you would work on, and you would do the QuickBooks

5    work on the laptop, correct?

6    A.   I had a regular computer at my desk.

7    Q.   Regular computer.  And this was a database and a

8    QuickBooks program that several people at the company could

9    access, correct?

10   A.   I think it had permissions for five people to access.

11   Q.   And you were one of the five?

12   A.   Yes.

13   Q.   And Mr. Das was one of the five?

14   A.   Yes.

15   Q.   Do you remember the others?

16   A.   It varied.  It could be changed.

17   Q.   Okay.  And if we take a look here on the document, on the

18   total, on the left column, it says first "Beej Das," then under

19   that "Das campaign," correct?

20   A.   Yes.

21   Q.   Then we have the date.  What would the date represent?

22   A.   The date of the American Express charge.

23   Q.   And then we have the next column where you see under the

24   last "Beej Das" entry, it says "Larry Rasky."  That's just a

25   notation, a memo for bookkeeping purposes?

```
 1    A.    Yes, it is.  I'm sorry, repeat that again.
 2             MR. KENDALL:  If I may approach the witness again,
 3    Your Honor.
 4    A.    I see, I see, I see.
 5    Q.    So you see "Larry Rasky," that's just an internal
 6    bookkeeping reference, correct?
 7    A.    Yes.
 8    Q.    So that somebody in the company would understand
 9    information based upon that?
10    A.    What the item was.
11    Q.    Yeah.  Then if we look underneath it, it says, "Nolo
12    Bistro and Bar, Tyngsborough, Mass."  Is that the restaurant
13    and bar at the hotel?
14    A.    Yes.
15    Q.    Okay.  If you see, if you go over to where it says
16    "Split," it's paid for by the American Express card, correct?
17    A.    Correct.
18    Q.    So for the meal that was held at the Nolo Bistro and Bar,
19    Mr. Das actually paid for it with his American Express card.
20    He didn't just sort of, like the boss, write off his signature
21    on the check and have no charge, correct?
22    A.    Correct, in that case, yes.
23    Q.    Okay.  So the hotel would have paid for that meal the day
24    that the credit charge was processed?
25    A.    The hotel, yes.
```

1   Q.   The hotel charged the American Express, they give the

2   money, minus 3 percent or whatever, and it's paid promptly?

3   A.   Right.

4   Q.   And that's the way standard charges were done, correct?

5   A.   Yes.

6   Q.   And then if you go further down there, you see "Travel

7   expense automobile gas."  You said you were running the Yukon

8   through one of the hotel accounts, correct?

9   A.   Correct.

10   Q.   And this is referring to gas, and we all know that Yukon

11   takes gas.  Then there's a whole series of things down here

12   that are referenced under the Das campaign, correct?

13   A.   I'm seeing that notation, yes.

14   Q.   And what we see here is, Mr. Das put a lot of cash -- not

15   cash -- put a lot of money that he loaned as a short-term loan

16   account to the hotels and then ran up expenses on his credit

17   card that the hotels were paid for, correct?

18   A.   That's what that coding shows, yes.

19   Q.   Sure.  And you don't remember every one you entered into

20   every account?

21   A.   I don't remember doing any of these.

22   Q.   Okay.  Well, you remember doing some of them, don't you?

23   A.   Not the -- no.

24   Q.   Who else would have done them besides you?

25   A.   At one point we had a lot of American Express card charges

1    that were never posted, so it was a team effort that a lot of

2    people went in.

3    Q.    Who was on the team to --

4    A.    I think Sean, James and Beej, Mr. Das.

5    Q.    Sean, James and Beej all together jointly did that?

6    A.    Yes.

7    Q.    Okay.  And that was -- that reduced the amount of money

8    that the hotel would ever have to pay Mr. Das, correct?

9    A.    If you coded to this, it would.

10   Q.    So it would be fair to say every time Mr. Das would code

11   something to that account, he would reduce the amount of money

12   he could claim back from the hotel?

13   A.    That -- posted that way, yes.

14   Q.    Okay.  I'd now like to show the witness G-133.  This is an

15   email between you and Sean Smith in February of 2018, correct?

16   A.    That's what it says, yes.

17   Q.    Okay.

18   A.    '16 or '18?

19   Q.    Excuse me, '16, I'm sorry.

20         Then it says, "Attached are copies of all loan deposits I

21   just entered into book QuickBooks for the various companies and

22   coded to "Beej Das short-term loan."

23         I just want to make clear, your instructions were to treat

24   this as a personal loan for Mr. Das as if it's his own funds,

25   correct?

1    A.    That's the name on the account I was told to put.

2    Q.    He never told you to treat this as a loan from the

3    campaign now, did he?

4    A.    He never told me that, no.

5    Q.    He was consistent, this was always a loan from him of his

6    personal funds, correct?

7    A.    He just said the name on the account.

8    Q.    Yeah.  Well, he told you it was -- he said treat it, book

9    it as his personal funds, correct?

10            MS. WAN:  Object.  Asked and answered.

11            THE COURT:  Actually, it really hasn't been answered.

12   That might be a reason to sustain the objection.

13            MR. KENDALL:  I'll withdraw the question.

14   Q.    When you've met with the government, have they told you

15   their thoughts of where the money came from?

16   A.    I knew, I knew when I worked, but they mentioned that this

17   was being investigated.

18   Q.    Okay.  But let's go back to the time when you worked and

19   the government didn't say anything to you.  Mr. Das told you

20   that the money was his money and he was being paid back by the

21   campaign for loans he made to the campaign, correct?

22   A.    The other email said to label that account that.  I was

23   told by somebody else what it was.

24   Q.    Okay.  And if you thought something was fraudulent and

25   criminal, you wouldn't have gotten involved, correct?

1  A.   I saw that it was a short-term loan.  I assumed that meant

2  he was going to pay it back.

3  Q.   Yeah.  Well, you saw it was a short-term loan from him to

4  the hotel.  It would be the hotel to pay him back for his

5  short-term loan?

6  A.   Because I was told to code it that way, yes.

7  Q.   Sure.  I'd like to show next the witness document I-892.

8       Do you recognize this email?

9  A.   It -- I know it happened a couple of times.

10      MR. KENDALL:  Okay.  I'd like to offer this into

11 evidence, Your Honor, as an email.

12      THE COURT:  Do you recognize it?

13      THE WITNESS:  We had emails like this, yes.  That is

14 not a surprise to see it.

15      THE COURT:  All right.

16      COURTROOM CLERK:  200.

17      (Exhibit 200 admitted into evidence.)

18      THE WITNESS:  I can't remember the specific day.

19      Mr. KENDALL:  May we show the jury, Your Honor?

20      THE COURT:  Yes, it's admitted.

21 Q.   It says from you to Mr. Das, January 20, 2018.  And you

22 wrote, "Elizabeth just went to Lowell Five to cash her check

23 and was refused because account overdrawn.  Six other paychecks

24 and Bush check were returned.  Since Elizabeth was flying out

25 tonight to Las Vegas for a few days, I took a paycheck and gave

 1    her cash from the tip cash in-house.  How do you want to handle

 2    if anyone else calls?  I'll be on the property until 3:30."

 3         That was your email, correct?

 4    A.   Yes, I signed it, yeah.

 5              MR. KENDALL:  If I may have a moment, Your Honor.

 6              THE COURT:  You may.

 7              MR. KENDALL:  No further questions, Your Honor.

 8              THE COURT:  Ms. Wan.

 9              MS. WAN:  Yes, Your Honor.

10    REDIRECT EXAMINATION BY MS. WAN:

11    Q.   Ms. Ladebauche, you were asked a couple of questions about

12    whether or not the government told you where the money that was

13    coded "short-term loans" came from.

14         Do you remember that, Mr. Kendall just asked you a couple

15    of questions?

16    A.   Mm-hmm.

17    Q.   And you said that you knew at the time; is that correct?

18    A.   Yes.

19    Q.   And you said you were told by someone else; is that

20    correct?

21    A.   Correct.

22    Q.   What did you know and who told you?

23              MR. KENDALL:  Objection, Your Honor, hearsay,

24    foundation.

25              THE COURT:  No.  I think she's entitled to the --

1    Q.   Go ahead.

2    A.   When I was given the first deposit slip receipt, I guess,

3    I was told on the quiet side that that's where the funds were

4    coming from.

5           MR. KENDALL:  Objection, Your Honor, to the phrase

6    "the quiet side."

7           THE COURT:  Well, I understand what she means.

8    Overruled.

9    Q.   Who told you that?

10   A.   Sean Smith.

11   Q.   And what did he say about where the funds were coming

12   from?

13   A.   He just said that it was the campaign funds.

14   Q.   Now, Mr. Kendall also introduced an exhibit.  May I have

15   that Elmo, please.  Exhibit 199.

16          COURTROOM CLERK:  It takes a second.

17   A.   I don't have -- oh, there.

18   Q.   And do you recognize this as the spreadsheet that he

19   showed you?

20   A.   Yes, it's right there.

21   Q.   And it has different transactions that were supposedly

22   paid back against the Beej Das short-term loan; is that

23   correct?

24   A.   Correct.

25   Q.   And I'll go to the last page of this document.  Can you

1    read for us the total of how much was paid back from the Beej

2    Das short-term loan account?  I can zoom in --

3    A.   No.  I just want to make sure there wasn't a balance

4    forward on the front page.  Okay.  So if it's just listing

5    categories, 23,753.

6    Q.   And let's compare that to -- we'd like to introduce this

7    as the next exhibit, please.  Could I have it just for the

8    witness?

9              MR. KENDALL:  What is this?

10             MS. WAN:  It's been produced.

11             THE COURT:  201.

12             (Exhibit 201 admitted into evidence.)

13             MR. KENDALL:  Excuse me, it doesn't have a Bates

14   number on it.

15             MS. WAN:  We can get you the Bates number after.  It's

16   just like a balance sheet that you submitted.

17             MR. KENDALL:  Objection, Your Honor.

18             THE COURT:  Can we get a little more information,

19   Ms. Wan?

20             MS. WAN:  Sure.  This is a balance sheet that came

21   from the government's production.  It was produced as part of

22   discovery, and it's the bookkeeping that the witness described

23   for Boston East Tyngsborough Holdings was the company.

24             THE COURT:  Who is it --

25             MS. WAN:  This was attached to I believe an email

```
 1    involving the defendant and the witness.
 2              THE COURT:  Ask the witness if she recognizes it.
 3              MS. WAN:  Yes, we can do that.
 4    A.   It's a standard balance sheet printed off QuickBooks.
 5    Q.   Do you recognize this as a type of balance sheet that you
 6    would regularly create?
 7    A.   Yeah, it's just a report that you run.
 8              MR. KENDALL:  Objection, Your Honor.  "Type of"
 9    doesn't mean recognizes.
10              THE COURT:  That's close enough for me.
11    Q.   And Ms. Ladebauche, what's the date on this balance sheet?
12    A.   December 31, 2018.
13    Q.   And what's the Boston East Tyngsborough Holdings LLC?
14    A.   That's Beth, which is the operating company for the hotel.
15    Q.   And if I direct your attention to page 3 of this document,
16    do you see a listing here for Beej Das short-term loan?
17    A.   Mm-hmm.
18    Q.   And what amount do you see associated with that?
19    A.   259,000.
20    Q.   You'll agree that that's much less than the payments that
21    we saw in Exhibit 199 of 23,000, approximately?
22    A.   Well, this list, yes, 23,000, but I don't know what the
23    timeframe is.
24    Q.   And according to the balance sheet, what does it mean when
25    it says that Beej Das short-term loan is holding an amount
```

1    259,000?

2    A.    That's the total of the borrowing, the hotel borrowed from

3    him.

4    Q.    From Mr. Das?

5    A.    Yes.

6    Q.    Now, Mr. Kendall also asked you several questions about

7    cash reserves.

8    A.    Cash reserves?

9    Q.    Yes, whether or not it would be helpful to have a cash

10   reserve for the business.  Do you recall that?

11   A.    I recall being asked but I never knew about any cash

12   reserve.

13   Q.    So there was never a cash reserve created, to your

14   knowledge?

15   A.    No.

16   Q.    And Mr. Kendall also asked you several questions about the

17   flood at the Stonehedge.

18   A.    Yes.

19   Q.    And during that time employees were paid; is that correct?

20   A.    Correct.

21   Q.    Did Mr. Das submit an insurance claim for that flood?

22   A.    Oh, yes.

23   Q.    And did that include payments for employee salaries, lost

24   wages?

25   A.    There was -- I didn't see all the submittals to the

1  insurance company, but I know that there was a lot of employees

2  that he kept on working in the cleanup so they could be, and we

3  had to document that.

4  Q.   I see.  So they were paid because they continued to work

5  and help with the cleanup from the flood?

6  A.   Yes.

7  Q.   Were you also aware whether Mr. Das also requested money

8  for items that were broken before the flood?

9  A.   I'm not aware, I'm not aware of the detail of the claims.

10        MS. WAN:  That's all I have.  Thank you.

11        MR. KENDALL:  Thank you, Your Honor.  I'll be quick.

12  RECROSS-EXAMINATION BY MR. KENDALL:

13  Q.   The government just put in front of you a balance sheet

14  for Boston East Tyngsborough Holdings, correct?

15  A.   Yes.

16  Q.   And I am putting in front of you short-term loan account

17  for Troca Management, correct?

18  A.   Correct.

19  Q.   Those are two different companies?

20  A.   Correct.

21        MR. KENDALL:  I'd like to show the witness Exhibit

22  I-27 and offer it into evidence.

23  Q.   Do you recognize this document?  That's an email from

24  Mr. Das copied to you directed to Mr. Foster, correct?

25  A.   Yes.

```
 1            MS. WAN:  Objection.
 2    A.   Copied to me, copied to me.
 3            MR. KENDALL:  Yes.  I'd like to offer it into
 4    evidence, Your Honor.
 5            THE COURT:  Has she told us whether she recognized it.
 6    Q.   Do you recognize it?
 7    A.   I see my name.
 8    Q.   You don't dispute you got it when you worked there,
 9    correct?
10    A.   I was cc'd on it.
11    Q.   So it was sent to you, it's the normal email address with
12    the company?
13    A.   (Nods)
14            MS. WAN:  Your Honor, we still object on hearsay
15    grounds.
16            THE COURT:  I'm just not confident that she really
17    recognizes it.
18            MR. KENDALL:  I'll ask a few more questions.
19    Q.   You got lots of emails when you worked at the company,
20    correct?
21    A.   Yes.
22    Q.   You don't remember every one of them?
23    A.   Right.
24    Q.   But you can recognize the email addresses and the form and
25    appearance of the emails to tell whether they appear to be
```

1    legitimate, correct?

2    A.    I see my name, yes.

3    Q.    And you see Mr. Foster's name, correct?

4    A.    Yes.

5    Q.    And you see the Boston East India Hotels, correct?

6    A.    Which is an old company.

7    Q.    Sure.  But this is back in 2017.

8    A.    No.  It was old before that.

9    Q.    Sure.  Do you have any reason to doubt that -- this is an

10   authentic Bate's number.  You'll note the government's Bates

11   number stamp is on the bottom.  This was produced by the

12   government when they took the emails from the company.

13           THE COURT:  Well, that doesn't -- all right.  I'll

14   admit it.

15           COURTROOM CLERK:  202.

16           (Exhibit 202 admitted into evidence.)

17   Q.    So this is an email that was sent to you about the

18   insurance claim for Zurich, correct?

19   A.    It mentions Zurich, yes.

20   Q.    And Mr. Das says, "Thanks, these bills are pre-flood so

21   can't be included to Zurich."  Did I read that correctly?

22   A.    Yes.

23           MR. KENDALL:  Thank you.  No further questions.

24           THE COURT:  Thank you, Ms. Ladebauche.  That ends your

25   testimony.  Drive safely.

```
 1              THE WITNESS:  Thank you.
 2              MR. GALLAGHER:  Your Honor, the next two witnesses, we
 3      have two more witnesses, and per the agreement with
 4      Mr. Kendall, we have agreed -- we're moving very fast.  We have
 5      two additional witness that we agreed to put off
 6      cross-examination until Tuesday, but we'd like to get started
 7      with another witnesses, if that's okay with the court?
 8              THE COURT:  Yes.  I'd like to use our time to keep the
 9      jury on schedule.
10              MS. WAN:  We're ahead of schedule as of now.
11              THE COURT:  Good to know.  So I understand it, you're
12      going to testify on direct and reserve cross-examination on
13      both witnesses?
14              MR. KENDALL:  For Tuesday morning, Your Honor.  Thank
15      you.
16              THE COURT:  Okay.
17              MS. WAN:  Your Honor, the first witness is Carmen
18      Tziotzioras.
19              CARMEN TZIOTZIORAS, Sworn
20              COURTROOM CLERK:  You may be seated.  Will you please
21      introduce yourself to the jury, spelling your last name for the
22      record.
23              THE WITNESS:  So my name is Carmen Tziotzioras,
24      T-z-i-o-t-z-i-o-r-a-s.  And I work for the Lowell Five, and I'm
25      a head teller.
```

1    DIRECT EXAMINATION BY MS. WAN:

2    Q.   Good morning, Ms. Tziotzioras.

3    A.   Good morning.  How are you?

4    Q.   Good.  Or good afternoon.  I'm sorry about that.

5    A.   Good afternoon.

6    Q.   What do you do for work?

7    A.   I'm a head teller at the Lowell Five.  And what I do is

8    basically I give cash to the girls or the boys, and I also come

9    -- I'm also a teller as well, so I do both things.

10   Q.   How long have you worked at Lowell Five?

11   A.   Since 2001, yeah, April of 2001.

12   Q.   So more than 20 years?

13   A.   More than 20 years.

14   Q.   And what location do you work in right now?

15   A.   We just moved to a new location, so it's 60 Fletcher

16   Street.  We just moved in this Monday.  So before that it was

17   John Street, which is, that's where the transaction happened,

18   on John Street, Lowell.

19   Q.   If I ask you to go back to the 2018 time period, where

20   were you working at that time?

21   A.   At 34 John Street in Lowell, Lowell Five.

22   Q.   Can you describe, how large is that branch?

23   A.   I mean, it's in a large building, historical building.  I

24   couldn't tell you.

25   Q.   How many tellers worked there?

```
 1    A.   Oh, at that time, five, about five tellers.
 2    Q.   While you worked there, did you become familiar with a
 3    customer named Mr. Abhijit Das?
 4    A.   Yes.
 5    Q.   How did you first meet him?
 6    A.   I was introduced, he came into the branch, and one of the
 7    managers introduced me as a business customer.
 8    Q.   Sorry?
 9    A.   As a business customer.
10    Q.   What types of transactions would Mr. Das do regularly in
11    the Lowell Five branch?
12    A.   He would come in to either make transfers from one account
13    to another account or get bank checks.  Whatever he wanted to
14    do on that day, yes.
15    Q.   Did you see him fairly frequently?
16    A.   Personally, no.  Me personally, not seen him frequently,
17    no.
18    Q.   Did you help him with a couple of transactions?
19    A.   Yes.
20    Q.   And can you tell the jury about the first transaction that
21    you remember with Mr. Das that raised your eyebrows?
22             MR. KENDALL:  Objection, Your Honor, to "raised you
23    eyebrows."
24             THE COURT:  Can we define what we mean by that.
25             MS. WAN:  I can be more specific.
```

1    Q.   Were you familiar with certain transactions with Mr. Das

2    that created concerns for you?

3    A.   There was, just a teller had come up to me and would ask

4    for initial, and then there was a transaction that was one

5    transfer to another account as cash, so I have to.

6    Q.   And were those transactions unusual to you?

7    A.   Correct.

8    Q.   So let's break that down.  Tell us about the first unusual

9    transaction.

10   A.   When a teller wanted to get cash, so I would have to go to

11   the vault to get cash for a certain transaction.

12   Q.   Why did the teller ask for cash?

13   A.   Because at the time the customer wanted to have --

14        MR. KENDALL:  Objection, Your Honor.  I don't know

15   what she observed.  This is what she surmises, so it's hearsay.

16        THE COURT:  I think she can testify.  I don't think

17   she hands out cash freely.

18   Q.   Ms. Tziotzioras, let's start with who was the customer

19   involved?

20   A.   It would be Mr. Abhijit, the gentleman --

21   Q.   Mr. Das?

22   A.   Mr. Das.  Sorry.

23   Q.   And as part of your role as the head teller, would tellers

24   come to you when there were transactions over a certain limit?

25   A.   Yes.  Tellers would come to me for a certain -- if a

1    customer wanted so much money out.  So, for example, if a

2    customer wanted $10,000, if the girl does not have it, the girl

3    has to come to me.  I would have to give them the 10,000.  And

4    that's how the transaction gets to be done, processed.

5    Q.   And this specific transaction, the first transaction we're

6    talking about, is that what happened to you here; a teller

7    asked you to get funds?

8    A.   Yes.

9    Q.   And without asking you the precise number, approximately

10   how much was being requested by the teller?

11   A.   It depends on the transaction, but anything -- if the

12   teller does not have the money in her account, in her drawer,

13   so it can be anything from 8,000 to 10,000.  It all depends on

14   the transaction, how they process it.

15   Q.   So the teller asked you for cash that she did not have in

16   her drawer; is that correct?

17   A.   Correct.

18   Q.   And what did you do next?

19   A.   I would have to go to the vault, get the cash, and then

20   give it to the girl.

21   Q.   What's the vault?

22   A.   The vault is where we have our cash.  It's just a big

23   vault that we have to go in there and get the money and then we

24   give it to the teller.

25   Q.   And after you brought the cash back from the vault, what

1    happened next?

2    A.   So I would -- okay.  Just go back on that.  So any time

3    the girl -- so a lot of times, if the -- sometimes the girls

4    would do it as no cash.  Because if the girl has the money in

5    their drawer, then they don't physically get the cash from me.

6         So if the girl has $20,000 in her drawer and the customer

7    wants to draw out $10,000 in cash, they can go ahead and do the

8    transaction without getting me, and then they come to me after

9    the fact to initial.  But most of the time it depends.

10   Q.   So let's stick with this first instance, this unusual

11   transaction by Mr. Das.  The teller asked you to retrieve a

12   large sum of cash from the vault; you did.  And what did you do

13   with the cash after you got it out of the vault?

14   A.   Give it to the girl.

15   Q.   You gave it to the teller?

16   A.   To the teller.

17   Q.   And what happened after the teller received the cash?

18   A.   She go ahead and put it in her drawer.  Then the money was

19   supposed to be given to the customer, but then the customer

20   requested to put that money into another account, so they're

21   technically -- go ahead.

22   Q.   Let me ask a question before you go on.

23   A.   Sorry.

24   Q.   Who was the customer?

25   A.   Mr. Das.

1    Q.    And what did he say after he got the cash?

2    A.    That he wanted to deposit it into the other account.

3    Q.    And which other account?

4    A.    I'm not sure which -- it's not the business account.

5    Q.    So not the account that he withdraw the money from?

6    A.    It was coming out from one account and going into the

7    other account.  So one was the campaign and one was the

8    business.

9    Q.    And it was coming out of the campaign; is that correct?

10   A.    Correct.

11   Q.    And it was going into the business; is that correct?

12   A.    Correct.

13   Q.    And what did you think was unusual about this type of

14   transaction?

15   A.    That it doesn't make sense to have money coming out, and

16   then it could have been done as an internal transfer versus

17   taking out money and putting it into the company.  It can just

18   be done as a transfer.

19   Q.    Can you explain to the jury, what do you mean by "internal

20   transfer"?

21   A.    So if you want to withdraw money from one account to go

22   into another account, all you have to do is an internal

23   transfer was used.  You just move more money to another account

24   versus to take money out of the vault, give you physical cash

25   to count and then put that into the account as cash.  So

1    basically you don't -- basically there's not a trail.

2    Q.   What do you mean when you say "there's not a trail"?

3    A.   So when you do internal transfer, it shows what it came

4    from, say, for example, ending in account number 3344, going

5    into account number 203.  It shows it came from one account and

6    went into this account.  But when you do it as a cash transfer,

7    then it's just cash, given out from one account and put cash

8    going into the account, but it doesn't show where it's coming

9    from.  It's just two separate transactions.

10        When you do a transfer, it's all in one screen, it shows

11    where it's going to, where it's coming from and who did it

12    versus cash withdrawal.  It just shows customer took out $3,000

13    and then $3,000 was deposited to this account, but it doesn't

14    show where it came from.  It's just as cash.

15    Q.   And with this cash withdrawal by Mr. Das, did he actually

16    take any of the cash that was given?

17    A.   On that transaction, no.

18    Q.   Where did all of the cash go?

19    A.   Into the account.

20    Q.   And that was the first unusual transaction that you

21    remember.  Can you tell us about the second unusual transaction

22    that you remember.

23    A.   So there was one where I personally did where he wanted to

24    take out so much money and transfer it and put it into the

25    other account as cash.  I just did it as a regular transfer.

1  It showed from one account going into the account versus me

2  taking out as cash and then deposit as cash.

3  Q.   Let me break that down a little bit.  Who was the client

4  in the second transaction?

5  A.   That was Mr. Das.

6  Q.   And what do you remember him asking you to do?

7  A.   That he wanted to make sure that when I did that

8  withdrawal I withdraw it as cash and put that into the other

9  account as cash.

10 Q.   And what did you say to Mr. Das?

11 A.   I said to Mr. Das, "It doesn't make sense.  I can just do

12 the transfer."  And he goes, "But I just don't want it to show

13 it's going in and where it was coming from."  So I said, "Okay,

14 but I'll still do the transfer.  I'll just do it the transfer

15 way, internal."

16 Q.   Did you tell Mr. Das that you weren't going to do it the

17 way he wanted it?

18 A.   I said I was going to just do it as a transfer.  No.

19 Q.   And what was Mr. Das's response?

20 A.   "Is this going in as cash?"  I said, "No.  I'm doing it as

21 a transfer," and I go ahead.  And that was -- I just left it at

22 that.

23 Q.   After that, is it fair to say that Mr. Das didn't come to

24 you for any more transactions that you recall?

25 A.   He didn't come to me because I actually -- so I'm a head

1    teller, so the girls would come to me.  When he would come into

2    the building, the girls would come to me because I'm not always

3    on the window.

4              MS. WAN:  If I could have a moment.

5              THE COURT:  You may.

6              MS. WAN:  Nothing further for this witness.  Thank

7    you.

8              THE COURT:  I think the plan is to invite you back

9    Tuesday --

10             THE WITNESS:  Tuesday, okay.

11             THE COURT:  -- for more questions.

12             THE WITNESS:  I'll be here.

13             THE COURT:  Otherwise, you're done for today.

14             THE WITNESS:  Thank you, everyone.  Enjoy the nice

15   long weekend.

16             MS. WAN:  Your Honor, the next witness is Ms. Linda

17   Firth.

18             LINDA FIRTH, Sworn

19             COURTROOM CLERK:  Thank you.  You may be seated.

20   Could you please introduce yourself to the jury, spelling your

21   last name for the record.

22             THE WITNESS:  My name is Linda Firth, F-i-r-t-h.

23   DIRECT EXAMINATION BY WAN:

24   Q.   Ms. Firth, do you work currently, or are you retired?

25   A.   I'm retired.

1   Q.   How long have you been retired?

2   A.   Since June 30 of this year.

3   Q.   Sorry to interrupt during your retirement.

4        Before that, did you work at Lowell Five?

5   A.   Yes, I did.

6   Q.   For how long?

7   A.   11 and a half years.

8   Q.   And what branches did you work at?

9   A.   The North Andover office.

10  Q.   What was your title there?

11  A.   Branch manager.

12  Q.   What does a branch manager do?

13  A.   Oversees the running of the branch, does customer service.

14  Q.   And while you were working in the North Andover branch,

15  did you come to know a gentleman named Mr. Abhijit Das?

16  A.   Yes.

17  Q.   And how did you first meet Mr. Das?

18  A.   I believe when he came into the bank to open an account.

19  I believe he had opened a commercial loan, and he was opening

20  the checking account for his business.

21  Q.   And what business was that?

22  A.   I believe that first one was Boston East, it might have

23  said LLC at the end.  I'm not sure of the title.

24  Q.   Without getting into the specifics of the account name,

25  did you understand that these were businesses associated with

1    the Stonehedge Hotel?

2    A.   Yes.

3    Q.   And how many -- without asking you for a precise number,

4    is it fair to say that he had multiple different accounts?

5    A.   Yes.

6    Q.   Now, how often would you see Mr. Das at the North Andover

7    branch?

8    A.   Typically two to three times a week.

9    Q.   What did he do when he came in?

10    A.   Deposits, withdrawals, sometimes get a bank check or do

11    wires, wire transfers, make loan payments.

12    Q.   And would he sometimes come and talk to you when he came

13    into the bank?

14    A.   Yes.

15    Q.   Are you familiar with the term "VIP customer"?

16    A.   Yes.

17    Q.   What does that mean?

18    A.   A very important customer.  Typically a customer with a

19    larger deposit base, large commercial relationship with the

20    bank.

21    Q.   Was Mr. Das a VIP customer?

22    A.   Yes.

23    Q.   And if I could have Exhibit 134.2, which has previously

24    been entered.

25        Now, Ms. Firth, did you at some point learn that Mr. Das

1    was running for Congress?

2    A.   Yes.

3    Q.   Did he in fact invite you to his kickoff, campaign

4    kickoff?

5    A.   Yes, he did.

6    Q.   And if I could have page 2 of that.  Is this email from

7    Mr. Das dated September 19 an invitation to his kickoff event?

8    A.   Yes.

9    Q.   Did you actually attend?

10   A.   No.

11   Q.   And other than this email about Mr. Das's campaign, did

12   you exchange other emails with Mr. Das?

13   A.   Yes.

14   Q.   And going on to page 4 of this document, please.

15   Ms. Firth, is this an example of an email that you sent to

16   Mr. Das?

17   A.   Yes.

18   Q.   And if we could blow it up.  It's dated September 29,

19   2017.  Subject Troca Hotels Management.  And you write "Needs

20   attention."

21   A.   Yes.

22   Q.   What does that mean?

23   A.   It meant that that account was overdrawn and needed to

24   have money either deposited or we would return the item.

25   Q.   Can you explain that.  How would you know that this

1    account was overdrawn?

2    A.   We would get a report every morning that showed any

3    overdrafts, and we would call customers who were overdrawn and

4    ask them -- tell them what the problem was and have them make a

5    deposit by 11:00 in the morning in order for that item to be

6    paid.  Otherwise, it would be returned.

7    Q.   And when you say "that item to be paid," what are you

8    talking about?

9    A.   It could be a check or an automatic withdrawal from a

10   business.  An example being like the electric company or an

11   Amex payment or a distributor for product that was used by the

12   business.

13   Q.   I notice in this email you don't explain exactly what

14   check is overdrafted or the amount that needs to be added into

15   the account.  Why is that?

16   A.   When he first started having overdrafts in his accounts, I

17   would say, for example, "Troca Hotels Management has an item

18   for $15,000 coming through for Amex.  The balance in the

19   account is only $12,000.  How would you like to proceed to pay

20   this?  We need an answer by 11:00 in the morning."  I did that

21   for some time, and I found I wasn't getting responses after a

22   while.  I wasn't going to spend all day chasing it, so I would

23   just say "Needs attention."

24   Q.   This was shorthand for the --

25   A.   Take a look at this account.

1    Q.   And how often would Mr. Das's accounts be overdrafted?

2    A.   It became more and more frequent as time went by.

3    Sometimes several times a week.

4    Q.   And going on to page 5, is this another example of an

5    email between you and Mr. Das about an overdrafted account?

6    A.   Can we make it just a little bit bigger?  Is that

7    possible?

8    Q.   Sure.

9    A.   Thank you.  Yes.  He was questioning, where it says, "Just

10   to be clear, you're not showing that this is paid."  So I

11   confirmed that, no, it was not paid.

12   Q.   And if we could go to page 11, the email dated December 5,

13   2017.  Is this also an email where you write that "This account

14   needs attention"?

15   A.   Yes.

16   Q.   And is it fair to say that this happened with some

17   frequency?

18   A.   Yes.

19   Q.   Now, while you were working at the North Andover branch,

20   did you learn about certain unusual transactions that Mr. Das

21   was conducting at the bank?

22   A.   Yes.

23   Q.   And without telling us what other people told you, can you

24   tell us what you did after you learned about those unusual

25   transactions?

1  A.    I contacted our compliance officer.

2  Q.    Did anyone pressure you to report anything to the

3  compliance officer?

4  A.    No.

5  Q.    Was the government in contact with you before you reported

6  that information to the compliance officer?

7  A.    No.

8  Q.    And did you tell Mr. Das that you were reporting the

9  transactions to the compliance officer?

10  A.    No.

11  Q.    And what was the name of the employee who gave you the

12  information before you reported that to the compliance officer?

13  A.    Sophavy Eath.

14        MS. WAN:  Thank you.  I have nothing further.

15        THE COURT:  I think the plan is to have you come back

16  first thing Tuesday morning and finish up then.

17        THE WITNESS:  Okay.

18        THE COURT:  Sorry for the inconvenience.

19        THE WITNESS:  That's all right.

20        THE COURT:  Things happen.  All right.  But you're

21  excused for today.

22        THE WITNESS:  Thank you.

23        MS. WAN:  Your Honor, with my apologies to the court,

24  we've gone very fast today and we've actually run out of

25  witnesses for today and would ask if we could adjourn today, if

1    that's okay.

2         THE COURT:  Well, I assume we don't have to sit here

3    for another 20 minutes.  No.  Actually, it's a good sign.

4    Jurors will I'm sure -- it's a bonus start on a three-day

5    weekend, got something to look forward to.

6         The plan, as best I understand it from the lawyers, is

7    the government will finish its case on Wednesday.  The

8    presentation by the defense will probably take us to Thursday.

9    Again, we're on half days.  So plan on Friday as a full day,

10    which I said at the very beginning of the trial that will be

11    the day for the final arguments and the deliberations in the

12    case.  But that is as best I can tell from what the lawyers

13    have told me is our schedule, but it will be in your hands for

14    the end of next week, and it will be a short week.

15         So you can come on Monday if you choose, but it will

16    be very, very dark here.  All right.  The jury is excused until

17    Tuesday morning at 9:00 a.m.

18         COURTROOM CLERK:  All rise.

19         (Jury exits the courtroom.)

20         (Recess, 12:39 p.m.)

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9              Dated this 28th day of October, 2023.

10

11             /s/ Kelly Mortellite

12             _____

13             Kelly Mortellite, RMR, CRR

14             Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25