UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 21-cr-10200-RGS |
| ABHIJIT DAS | ) | |
| a/k/a "Beej Das" | ) | |
| | ) | |
| Defendant. | ) | |

<u>UNITED STATES' SENTENCING MEMORANDUM</u>

The United States respectfully submits that this Court should sentence the defendant, Abhijit "Beej" Das ("Das") to 24 months of incarceration within the custody of the U.S. Bureau of Prisons.  The government also does not object to the extension of a self-surrender date for a reasonable period to permit the resolution of the still pending case before U.S. District Court Judge Angel Kelley, case number 23-cr-10160-AK.

**U.S. SENTENCING GUIDELINES CALCULATION**

While the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") are advisory and not mandatory, <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." <u>United States</u> v. <u>Gilman</u>, 478 F.3d 440, 445 (1st Cir. 2007).  A properly calculated guideline range is the starting point for most sentences imposed under the advisory sentencing guidelines. <u>See</u> <u>Molina-Martinez</u> v. <u>United States</u>, 136 S. Ct. 1338, 1345 (2016); <u>United States</u> v. <u>Patch</u>, 9 F.4th 43, 48 (1st Cir. 2021).

As described below, the government submits that Das's total offense is level 20, with

criminal history category I, and an advisory sentencing guideline range of 33 to 41 months of incarceration.

### Das Took $314,500 from the Campaign Account

As typical in cases involving fraud, the base offense level for counts 1 through 3 (accepting excessive contributions, conduit contributions, and conversion of campaign funds) are grouped together because the base offense level for these offenses is largely driven by the amount of loss. See USSG § 3D1.2(d). For this case, the amount of loss is driven by count 3, the conversion of campaign funds. The Final Pre-Sentence Report ("PSR") dated May 22, 2024, found that amount to be within a range of between $250,000 and $550,000 under the Loss Table at USSG § 2B1.1(b)(1)(G). This amount is plainly correct.

At trial and now, the defendant does not contest that between January and May 2018, that either Das (and his hotel manager Sean Smith at his direction) withdrew a total of approximately $314,500. See Exhibit 146.2. Under the statute, contributions or donations in a campaign account are "considered to be converted to personal use" if they are used debts that are unrelated to the campaign. See 52 U.S.C. § 30114(b)(2). The money Das withdrew was used for debts unrelated to the campaign. Even giving Das the benefit of the doubt regarding his claim that he paid $54,050 in credit card bills related the campaign from those funds, the total amount that Das converted from the campaign account was still more than $250,000 ($314,500 - $54,050 = $260,450).

In the face of this direct tracing of the money he took from the campaign account – which Das withdrew in convoluted teller transactions at the bank in a desperate attempt to

salvage his failing business - Das makes several claims that he made, and were rejected by, the jury.

First, Das argues that he and his family had money available from a condo sale in India. Thus, while most of these funds never touched the campaign account, and he took money out of his campaign, it was his intention, all along to self-finance his campaign. Second, Das also repeats his argument that the $175,000 in "contributions" were simply loans and not political contributions for the benefit of the Das For Congress campaign. Once loaned, the money was his, and his withdrawal of funds was not conversion, but a repayment of his own money. The court's instructions clearly permitted the jury to consider this argument[1] and by its verdict, rejected it.

Third, Das's argument that the Supreme Court in FEC v. Cruz, 596 U.S. 289 (2022) somehow vindicates his position is just wrong. The Court in Cruz struck down a provision of campaign finance law that limited the amount of funds to $25,000 that a candidate once elected could raise from contributors after an election to help repay loans the candidate (in this case, Senator Ted Cruz) had made to the campaign from their own personal funds. The Court struck down this limitation as a violation of the First Amendment because the regulation was based on the mere fact that raising of money had the appearance, and not proof, of a quid pro quo. Id at 308. Cruz does not apply, because the premise of Das's argument is wrong. In contrast to the facts of the Cruz case, Das did not give himself, or

---

[1]For example, the court's instruction for count 3 provided that "a repayment from campaign funds of a loan or debt a candidate has made to his campaign using his own funds is not deemed by the law to constitute a personal use. Nor does the law impose any limits on the candidate's right to repay himself from the campaign bank account for these loans or debt." See Court's Instructions, Page 18.

loan himself a substantial portion of the money.

According to records from ActBlue, between November 15, 2017, and December 31, 2017 (during the first quarter of the campaign), the Das For Congress Campaign collected a total of approximately $113,466 in individual online contributions.  Based on the FEC Form for the EOY-2017, the total amount of individual contributions (including checks and online contributions) was $150,847.

While Das claimed to have loaned himself $279,574, the evidence at trial demonstrated that $125,000 of that money were illegal contributions.[2]  By its guilty verdict for counts 1 and 2 regarding illegal campaign contributions, the jury also necessarily rejected Das's argument, that these contributions were simply loans for the hotel business. The jury's verdict was well-grounded in the testimony of two of the donors (Jay Shah and Toby Chaudhuri) and their testimony – that the money they gave was for the benefit of the campaign to get Das into Congress – was corroborated by contemporaneous text and email messages.  See e.g., Exhibit 99 (Email from Das to Shah about the need to get to the $450k level *"even with some engineering"*) and Exhibits 102 (text messages from Das to Chaudhuri that he will *"aggregate and send as one batch"* so *"the 'self-fund' will be close to $250k"*).  Das put "self-fund" in quotes.

The Sentencing Guidelines provide the district court with broad discretion to determine the amount of loss and the court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 app. n.3(C); United States v. Mayendía-Blanco, 905 F.3d 26, 35 (1st Cir. 2018).  While the government of course bears the burden of proving loss by a

---

[2] Out of three illegal contributors, Das repaid one in January 2018, $25,000.

preponderance of the evidence, <u>United States</u> v. <u>Akoto</u>, 61 F.4th 36, 45 (1st Cir. 2023), the evidence presented to the court and the jury established the defendants use of at least $267,000 in campaign funds for hotel related expenses.  Together with the evidence that Das withdrew $314,500 from the campaign account in suspicious, convoluted transactions, the amount of money converted is (more likely that not) more than $250,000.

**Obstruction of Justice**

While not the entire case, one aspect of the evidence against Das at trial was the testimony of several Lowell Five bank tellers.  Each of them testified about the suspicious nature of Das's requests to them.  He wanted to withdraw "cash" from the campaign account, but for the most part, he did not want the cash.  He wanted the teller to redeposit the funds into one of his overdrawn hotel accounts so he could pay a bill.  As part of the coverup, he did not want it to *look like* the money he was depositing into the hotel account came from the campaign account.  Instead of going along with the Das's ploy, the tellers did their job and accurately recorded where the money came from, and where it went.

Following Das's conviction in this case on October 13, 2023, on April 10, 2024, Das retaliated with a civil lawsuit against Lowell Five that repeats and amplifies the same arguments Das made at trial.  This case is now pending before U.S. District Court Judge Allison D. Burroughs, 1:12-cv-10931-ADB. The plaintiffs in the lawsuit include the defendant, the defendant's parents, and entities related to the defendant's hotel business.  Without any doubt, the lawsuit is directly related to Das's prosecution, is materially false, and was conceived with a corrupt intent to undue his conviction before this court.

While the conduct took place after trial,[3] the cases make clear that "post-conviction behavior can be [] obstruction of justice under U.S. Sentencing Guidelines Manual § 3C1.1." United States v. Butler, 2010 WL 4561417, at *2 (9th Cir. 2010); see also United States v. McCarthy, 961 F.2d 972, 980 (1st Cir. 1992) (defendant's flight after conviction supported enhancement that the "defendant willfully impeded ... the administration of justice").  What is also clear from obstruction charges in general, the plan does not need to be successful.  Instead, what matters is the endeavor, and the corrupt intent in the attempt.

The conduct warrants an enhancement because it demonstrates by at least a preponderance of the evidence that "the defendant willfully obstructed or impeded, *or attempted to obstruct or impede*, the administration of justice with respect to the . . . prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct. . . ."  USSG § 3C1.1 (emphasis added).

While the complaint is long and contains numerous conspiratorial-like allegations, one of the central themes is the same argument that the defendant made at trial which was proven false and rejected by the jury verdict.  The complaint is not only materially false and misleading but was made with a clear purpose to deceive a court about his recent conviction.  In sum, the complaint alleges that the civil defendant, Lowell Five, unlawfully retaliated against the defendant, produced false records and testimony to the U.S. government, and that corrupt behavior led to his unlawful conviction at trial in this

---

[3]Undersigned counsel learned of the suit for the first time on June 10, 2024, not from any of Das's various counsel, but from an attorney for one of witnesses in the case.

case.   Some of the materially false allegations include the following:

- First, through its factual allegations, the defendant alleges that the U.S. Attorney's Office and the FBI suborned perjury at trial by receiving and using manufactured evidence and testimony from bank witnesses.  See complaint ¶¶ 19-26, 37-38

- Second, by representing the same defense that he presented to the jury, and which the jury rejected, namely that his conversion of more than $300,000 in campaign funds was simply the defendant's repayment of money he loaned to himself.  As the evidence was adduced at trial, the defendant never reported any loan repayments on the FEC Form 3 until after the campaign. See PSR ¶ 64.

- Third, by falsely claiming that Toby Chaudhuri and the two other contributors to the campaign (Jay Shah and Ajoy Bose) simply lent money the defendant's mother, Mitra Das, to help the family business, see complaint ¶ 182, fn. 11, when Chaudhuri and Shah both testified that their money was for the DFC Campaign.

While docketed as a separate matter, any finding by Judge Burroughs about the veracity of the government's witnesses and evidence would necessarily have an impact on the defendant's conviction, and that appears to be the point.  For that reason, the obstructive conduct is clearly related to the defendant's offense of conviction. Furthermore, under the commentary to USSG § 3C1.1, note 4, the materially false factual allegations in the civil complaint fit the type of conduct that should warrant an enhancement, namely, "providing materially false information to a judge."

Furthermore, while the commentary makes clear that the obstruction of justice sentencing enhancement was "not intended to punish a defendant for the exercise of a constitutional right" (like the right to testify), the allegations in the 103-page civil complaint are not the result of "confusion, mistake, or faulty memory."  See USSG § 3C1.1, comment (n.2). Instead of addressing these issues before this Court, the

defendant has chosen to burden the docket of another U.S. District Court in a civil lawsuit predicated on knowing falsehoods.

What is more, this lawsuit is not the first time within the past year that this defendant, under the guise of legitimate civil proceeding, has knowingly caused false and misleading representations to be made to a U.S. District Court Judge in this courthouse about the criminal charges against him.   Following his June 20, 2023 wire fraud indictment before Judge Kelly (23-cr-10160-AK), on July 10, 2023, Das's law firm, Troca Global Advisors filed an interpleader action in case number 23-cv-11546-AK.  That action represented to Judge Kelly that the basis of the criminal charges in the indictment (alleging that Das misappropriated more than $5 million in escrow funds from his client and their company, MRO Industrial Supply) was simply a commercial dispute (between MRO Industrial Supply and a third party, Global Liquidity), and that Troca Global Advisors was willing to make the funds available in an escrow account.  After several status hearings, it became clear that Troca Global Advisors and Das did not actually have any money to share.  Instead, it was willing to sell its interest in the Troca One Yacht. The case was voluntarily dismissed.

Accordingly, the government submits that the court should increase the defendant's base offense level by 2-levels under USSG § 3C1.1, resulting in a total adjusted offense level of 20,[4] and a GSR of 33-41 months.

---

[4]The government agrees that since the case before Judge Kelly is pending, the defendant qualifies as a zero-point offender under 4C1.1, resulting in a two-level reduction.

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

Section 3553(a) of Title 18 specifies the factors courts are to consider in imposing a sentence and instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. Section 3553(a) then directs a sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed" to serve the four overarching aims of sentencing. §§ 3553(a)(1), (2)(A)–(D); see Gall v. United States, 552 U.S. 38, 50, n. 6 (2007). The Court must also consider the pertinent guidelines and policies adopted by the Sentencing Commission. §§ 3553(a)(4), (5); see Gall, 552 U.S. at 50, n. 6.

### A. The Nature and Circumstances of the Offense and Defendant's Characteristics (18 U.S.C. § 3553(a)(1))

#### 1. Nature and Circumstances of the Offense

Das's violations of the Federal Election Campaign Act ("FECA") went well beyond mere regulatory or reporting offenses. First, Das asked for contributions to his campaign and then stole their money. While a candidate for the United States Congress, during November 2017 and September 2018, some 400 individual donors gave Das a total of more than $200,000 in online contributions alone. In the first quarter of the campaign by the end of 2017, Das solicited a total of more than $100,000 online contributions. After building an impressive cash-on-hand number of $425,000 built on a lie, by January 2018, Das began to steal the same money from his contributors. While part of the money that Das then took

from the campaign account included money from Das's family, the remainder of funds was entrusted to Das for his campaign, not his struggling hotel business.  Voters gave Das money because they believed in his cause, and the defendant abused their trust in him.

Second, Das's crimes required a high degree of effort, planning, and deceit.  First, Das concocted a scheme to circumvent the election laws to cheat; to beat out the other candidates for the open seat by knowingly breaking the rules and used his own parents as conduits for his scheme.  Second, Das then took advantage of those newly acquired funds to use it for himself and his struggling business.  It was not a one-time thing.  On *twenty different occasions* between January and May 2018, Das went a branch of Lowell Five and took money from his own campaign account and gave it to himself.  That money was not his; it belonged to his campaign.

### 2.  *History and Characteristics of the Defendant*

Das is not your typical criminal defendant.  He is a Michigan law school trained attorney who clerked for a U.S. District Court Judge in Maryland and grew up in and a secure and supportive environment in North Andover.  There is nothing in Das's background that would suggest any mitigating factors or excuses for his conduct.

### B.  <u>The Need for Sentence Imposed</u> (18 U.S.C. § 3553(a)(2))

### 1.  *To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.*

Many white-collar criminal defendants who appear for sentencing after conviction carry some sense of appreciation of their wrongdoing.  For some of these defendants, the fact of conviction and the mere possibility of incarceration and further punishment is enough to deter them from any further thought of criminal conduct.  That defendant is not

Abhijit Das.

While Das enjoys the presumption of innocence for his pending wire fraud case, the fact that Das has been charged by a grand jury for misappropriating more than $5 million from his client's escrow funds is significant.  Das is alleged to have committed the crime while on pre-trial release in this case.  As alleged in that indictment, the misappropriation started shortly after the indictment in this case.  In other words, Das's response to campaign finance fraud and embezzlement, abusing the trust as a congressional candidate, was to commit an even larger fraud, abusing his trust as a member of the bar. Das's response to the conviction in this case was then to seek to obstruct justice through a bogus civil lawsuit.

Das's conduct that led to the conviction in this case, and his responses to the charges demonstrate a salient fact: the defendant, an attorney, a member of the Massachusetts bar, who was vying to join the U.S. House of Representatives does not believe that the rule of law applies to him.  As the saying goes, the defendant believes that he is "the smartest guy in the room" who can, in his words, "engineer" ways around the law.

The governments submits that a sentence of 24 months of incarceration is the appropriate sentence for the convictions in this case.  While the defendant may face further incarceration in his pending case,[5] the imposition of a sentence of incarceration

---

[5] The conviction in this case will likely result in putting the defendant in the wire fraud case into criminal history category II and an advisory guideline range of 97-121 months before any reduction for acceptance of responsibility based an amount of loss greater than $3.5 million and upward adjustments for abuse of position of trust, sophisticated means, and the commission of offenses while on release.

(and not mere probation) is important for both specific and general deterrence.

In addition to the need to deter Das for his escalating pattern of fraud, a sentence of incarceration is also important to promote respect for campaign finance laws that are there to protect our democratic system of government.  Contribution limits seek to level the playing field for voters, instead of giving outsized influence to wealthy individuals.  Laws that criminalize the conversion of more than $25,000 in campaign funds deters candidates and elected officials from self-dealing.  Finally, the laws mandating truthful reporting of contributions and cash-on-hand in FEC Form 3 are important to ensure the voting public has accurate information to make their voting decisions.  Das violated each of these laws, and any sentence short of incarceration would send the wrong message.

### 2. *Comparable Cases*

A sentence of 24 months is also not disproportionate.  A review of sentences in comparable cases helps "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *See* 18 U.S.C. § 3553(a)(6).  While criminal charges for violations of the FECA are not as commonplace as other fraud offenses, out of 12 FECA cases since 2015, 8 have resulted in sentences of incarceration ranging from 10 to 120 months.  The average period of incarceration, when imposed, is 31.5 months.

A summary of these cases is attached as Exhibit A.

## **Conclusion**

Accordingly, the government submits that the Court should sentence the defendant, Abhijit Das, to a sentence of incarceration of 24 months followed by a period of supervised release of 2 years.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    /s/ *Neil Gallagher*
Neil J. Gallagher, Jr.
Assistant U.S. Attorney

Date Submitted: July 11, 2024

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:    *Neil Gallagher*
Neil Gallagher
Assistant U.S. Attorney