**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **Crim. No. 1:21-cr-10200-RGS** |
| ABHIJIT DAS, | |
| Defendant | |

## DEFENDANT ABHIJIT DAS'S SENTENCING MEMORANDUM

**I.   Summary**

Defendant Abhijit Das respectfully submits this Sentencing Memorandum.  Mr. Das asks that for each of the four counts of conviction, the Court impose a concurrent sentence of:

1. One year of probation, with the first six months to be spent in home confinement. In the alternative, the Court could impose a sentence of one day, credit for time served, with one year of supervised release, with the first six months to be spent in home confinement;

2. Community service of 200 hours, preferably to be served working with the Disabled American Veterans (DAV);

3. $100 Special Assessment; and

4. No fine.

Mr. Das respectfully suggests that a sentence of probation would be sufficient but not greater than necessary to serve the purposes of sentencing.  This would achieve the Guidelines' goal of avoiding unwanted disparities between similarly situated defendants.  18 U.S.C. § 3553(a).  As grounds for this sentence, Mr. Das details below:

a.   Mr. Das had an admirable career and personal life before the 2018 Congressional Campaign.  He was an ethical, successful, community-service minded lawyer and businessman, and a person known for his kindness and empathy.  A sentence of

imprisonment will not accomplish much in terms of deterrence, nor is it necessary to avoid recidivism.  It will fall harshest on his elderly parents, for whom Mr. Das has increasing responsibilities to manage their healthcare.  *See United States v. Prosperi*, 686 F.3d 32, 43-50 (1st Cir. 2012) (upholding downward departure after finding Guidelines overstated seriousness of offense, and upon careful review of defendants' individual circumstances).

b.      Mr. Das was a novice at campaigning and fundraising.  The circumstances of the campaign finance convictions show a person who was panicked and pressured, and in over their head financially and in terms of responsibilities.  The financial juggling and transfers Mr. Das conducted were intended to save a business owned 58% by relatives and friends from the close-knit Indian community; not to steal for personal enrichment.  This case does not involve any allegation of bribery or public corruption.  Mr. Das did not accept an improper contribution from a corporation, a foreign government, or someone who might have been seeking to influence his votes in Congress.  The tragedy of this case is that if Mr. Das had been more thoughtful, he could have structured his campaign loans in a fully legal way, and withdrawn repayment for these loans legally.  He had sufficient funds to do both.  With more experience and care, he could have ethically avoided all of the violations for which he has been convicted.

c.      Mr. Das's Guidelines calculations set forth in the Presentence Investigation Report ("PSR") overstate the seriousness of the offense.  Frequently the Government exercises discretion in such campaign finance matters and pursues civil regulatory enforcement before the Federal Election Commission.  The indictment charged three schemes that primarily involve the same pot of money.  There is substantial ambiguity over how much of the funds should be included in the calculation of the Specific Offense Characteristics, PSR ¶ 73, under Section 2B1.1 of the Guidelines.  Because this is not a crime of violence or an otherwise serious offense, and Mr. Das is a Zero-Point Offender, PSR ¶ 80, he is an appropriate candidate for a downward departure to probation.  U.S.S.G. § 5C1.1, Application Note 10(B).

    d.      Mr. Das and his family have lost millions of dollars – the bulk of his personal savings and inheritance – in the hotel business and campaign.  Moreover, Mr. Das has suffered suspension of his license to practice law and has been unable to work overseas, seriously impacting his earning potential and livelihood.  Any fine would be gratuitously punitive.

## II.    History and Characteristics of Mr. Das

The PSR, ¶¶ 91 to 99, documents the key milestones of Mr. Das's career.  He grew up in North Andover, Massachusetts, and was an excellent student who attended Middlebury College and University of Michigan Law School and clerked for a United States District Court Judge.  He then worked at several reputable law firms, including Goulston & Storrs and Latham & Watkins.  Mr. Das left the practice of law to work in the hotel industry starting in 2007, becoming a senior director of development for Hilton Worldwide in Asia.

He returned to Massachusetts in 2013, with plans to start a boutique-hotel business, focused on providing a high quality, community-oriented and guest-centric experience.  Mr. Das is an only child, who is very close to his parents.  They agreed to use his inheritance to fund the business.

Mr. Das was following a business plan that is quite common in the Indian American community in the United States.  The hotel industry is an extremely popular business among Indian Americans.[1]  As is common with such immigrant communities, Mr. Das raised a substantial amount of the funds for the business from family and friends in the Indian community.  Approximately 58% of the hotel business was owned by such investors.  With such investors and support comes a tremendous sense of responsibility and honor to protect the investments of relatives and friends.

---

[1]    *See Why Indian Americans Dominate the U.S. Motel Industry*, WALL STREET JOURNAL (June 11, 2021); *Patels Dominate U.S. Hospitality Landscape*, THE ECONOMIC TIMES (July 7, 2024); *see also Mississippi Masala* (1991) (Mira Nair film starring Denzel Washington).

On the personal side, the twenty-plus sentencing letters from friends and family to the Court show Mr. Das is a warm, empathetic, and thoughtful friend and relative—generous with his time, money, and emotional support to persons in need. *See* Exhibit A (Compilation of Letters of Support). For example, the letters state the following:

a.      "At 44 years old, I was denied a heart transplant by Tampa General Hospital for socioeconomic reasons and sent home on hospice to await the end of my life…. Beej volunteered to advocate on my behalf. I was facing the toughest time of my life, struggling with a serious illness and very limited financial means to hire a lawyer to help me navigate the complex legal and medical systems. Beej's selfless act, without any expectation of payment or reward, provided me with the critical assistance I desperately needed."

"Thanks to Beej's tireless efforts, I was able to receive an LVAD device, which was initially denied by the hospital. Additionally, I was placed on a transplant list, transferred to another facility and eventually underwent a successful heart transplant. It has been over a year since the surgery, and I am now thriving, living a life that I was told was nearly impossible to hope for."

"During my recovery, Beej and his family generously opened their home to me, ensuring that I had a clean and safe environment to recuperate." Ex. A at 22-23, J.M. Letter.

b.      "I moved to Florida with my daughters in February 2020 to start anew, away from an abusive relationship …. I found myself on the brink of homelessness with my daughters. When Beej learned of our situation, he immediately reached out, offering financial assistance for housing and reassuring me that it's okay to need help sometimes. His generosity during this critical time prevented us from becoming homeless."

"Beej's kindness didn't stop there; I have countless memories of his selfless actions, not just towards me but also others in our community." Ex. A at 39, J.R. Letter.

c.      "When my wife was terminally ill with cancer, Abhijit took time off from work and spent uninterrupted hours to be with her knowing how important it was to be with her for her emotional comfort and care. Without asking he was available for her unconditionally." Ex. A at 7, S.D. Letter.

d.      "Beej places high value on being present – he always shows up to support his friends and family. He is unflinchingly generous …. He was among the first people to hold our newborn daughter and to visit my wife after she was diagnosed with a serious illness." Ex. A at 12, N.H. Letter.

e.      "[O]nly a few weeks after we met (in India), I fell sick with malaria and was hospitalized. Despite us having met so recently, Beej was quick to come to my aid, making sure that I got any help I needed, given that I was alone and unwell outside of my home country." Ex. A at 13, A.K. Letter.

f.      "When I think of Beej, the first thing that comes to mind is his sense of fairness and kindness. This is especially true for people who cannot advocate for themselves. I have witnessed this so many times, whether it is the person in line to bring their family to a theme park and did not have enough money, and then Beej paying for the difference. Another

example is a person in a customer service line being picked on and Beej gently defusing the situation with a few kind words." Ex. A at 30, K.N. Letter.

       g.     "In 2011, my mother was diagnosed with mesothelioma and her condition deteriorated rather quickly until her subsequent passing one year later.  Being an only child, this was a very difficult and trying time for me personally … during this year he (Beej Das) traveled back to Boston numerous times to spend time with my mother and me….  As my mother's condition worsened, Beej's support only grew.  I will never forget how he gathered family pictures over the years and created photo books and albums.  This allowed us to reminisce in my mother's final days of life." Ex. A at 6, R.D. Letter.

       h.     "One example of Beej's unwavering support occurred when my roommate and childhood friend began battling schizophrenia.  This was a frightening and uncertain time for me, but Beej was there every step of the way.  He frequently checked on me and offered invaluable assistance in navigating the complex channels to get my friend the support she desperately needed."  Ex. A at 37, N.R. Letter.

       i.     "[O]ne of his classmates in college lost his father and his mother was going to be homeless, he asked us if his friend and mom could live in our basement until they had arrangements of their own.  More recently he helped a homeless person he met at a work site, paid him for some odd jobs and housed him with his hotel points for several weeks, guided him to find jobs that would help him get shelter of his own." Ex. A at 4, M.D. Letter.

## III.    Nature and Circumstances of the Offense

As witnesses Rise Ladebauche and Sean Smith testified at trial, Mr. Das poured large amounts of funds into upgrading charming, but tired and rundown, properties.  When floods and blizzards shut down the properties, he paid his employees their salaries and health care benefits.  When the business needed hundreds of thousands of dollars in emergency loans, instead of asking the shareholders to provide funds on a pro-rata basis, he and his parents bailed out the properties with their own funds, so as not to disappoint his family and friends.

Whatever chance of success the hotel business had was lost when Mr. Das decided in 2017 to run for Congress.  As documented by exhibits at trial, he planned both to loan money to his campaign and to fund a cash reserve for the hotel business.  In mid-2017, in order to finance his campaign, he arranged to cash in his retirement account ("Provident Fund") from working in India, and sell a condominium he and his mother jointly owned in Kolkata, India.  These two assets raised $299,000, more than enough for his campaign loans.  Unfortunately,

because of Indian government red tape, Mr. Das could only bring $192,453 to the United States by December 31, 2017.

Mr. Das does not dispute the convictions for purposes of his sentencing. But it is clear Mr. Das and his family had sufficient funds to loan $272,000 to the campaign, and to keep the loans from family friends separate, purely for the hotel business. The fact that funds were not properly segregated and reported is part of Mr. Das's pattern of reactive, hasty responses to imploding financial pressures. Mr. Das could have provided the same amount of funding to the business and campaign, without breaking any laws, if he had been better disciplined and organized. Mr. Das succeeded as an employee of law firms and Hilton Hotels, but did not succeed when he was the ultimate strategist and decision-maker. The evidence makes clear Mr. Das has significant executive-function problems compounded by chronic inattention to paperwork and process.

## IV. Legal Principles and Mr. Das's Sentencing Recommendations

### A. The Court Should Not Consider the Pending Case Before Judge Kelley

After Mr. Das was charged in the instant case, the Government brought a separate case against him relating to a dispute Mr. Das had with two brothers who were his clients. *United States v. Das*, Docket No. 23-cr-10160 (D. Mass. 2023). That case is pending before Judge Angel Kelley. It should have no impact on the Court's sentence in this matter.

The Government cites no authority that authorizes the Court to consider the second case in sentencing, and that is because the case law forbids it. In *United States v. Cunningham*, probation and the government recommended an obstruction of justice enhancement, citing defendant's indictment in a separate criminal case, because defendant "continued to engage in criminal conduct while on bond." No. 22-3478, 2023 U.S. App. LEXIS 29873, at *3-4 (8th Cir. Nov. 9, 2023) (per curiam) (unpublished). The Eighth Circuit held that the obstruction enhancement did not apply "because nothing in the record demonstrated that Cunningham

engaged in the murder-for-hire plot to interfere with the investigation, prosecution, or sentencing of his fentanyl charge, which is required under U.S.S.G. § 3C1.1." *Id.* at *4 (citing *United States v. Galaviz*, 687 F.3d 1042, 1043 (8th Cir. 2012) (finding an obstruction enhancement does not apply against a defendant who conspired to murder an informant when the defendant was motivated by revenge, not by an intent to impede or interfere with any part of his criminal proceeding)).

The Eighth Circuit emphasized that, just as in this case, the pending separate charge "was not relevant conduct to the [PSR for the] instant offense," and the government had not offered evidence to link the two separate cases. *Id.* at *3. Mr. Das's PSR similarly does not "explain[] how [Mr. Das's alleged] criminal conduct in the [case before Judge Kelley] affected either the investigation, the prosecution, or was related to the instant offense of conviction." *Id.*

The Government seeks to cast a negative pall over Mr. Das with this case, but this sentencing is not the forum for Mr. Das to challenge the Government's allegations in the second case. If he is convicted in this second case, the Government will be able to advocate a sentencing recommendation. If he is vindicated, it would be grossly unfair to Mr. Das to punish him for the indictment when this unfairness could not be reversed. The Government has not offered any evidence, or an opportunity for an evidentiary hearing. The complicated interpleader issue, which the Government itself frustrated, is unrelated to the proceedings at hand. Mr. Das initiated the interpleader at counsel's suggestion, in an effort to pay the funds back, but the Government frustrated the interpleader and prevented him from resolving the client dispute so that it could allege a fraud. Mr. Das has no meaningful opportunity in this sentencing proceeding to challenge the Government's allegations in the second case, nor should he have to. The Government's position is Kafkaesque.

### B. The Court Should Otherwise Reject the Government's Proposed Enhancement

The Second Addendum to the PSR includes the Government's claim that the Court should apply the two-level enhancement for Obstruction of Justice pursuant to § 3C1.1.  As noted in Mr. Das's response in the Second Addendum, the Government's position wholly misconstrues the explicit wording of § 3C1.1 to poison the Court's assessment of Mr. Das.

In *United States v. Khimchiachvili*, the Second Circuit rejected the government's similar misinterpretation of § 3C1.1 Note 4 that "any time a defendant provides materially false information to a judge or magistrate (except as otherwise noted in the Sentencing Guidelines), that defendant is subject to an enhancement for obstruction of justice."  372 F.3d 75, 81 (2d Cir. 2004).  Rather, as the Second Circuit explained, "the enhancement is only intended for those false statements that have a purpose of obstructing the sentencing investigation regarding the offenses for which he was convicted."  *Id.*

Here, a lawyer representing Mr. Das's family filed a complaint in a civil dispute with the Lowell Five Cent Savings Bank.  Even if the Government could substantiate that Mr. Das made materially false statements concerning the offense conduct himself, they still would not qualify, absent a specific nexus between the defendant's allegedly obstructive actions and his sentencing here.  *See id.* at 82.

Being part of a group that authorizes a lawyer to file a complaint in an unrelated civil case, which advocates an interpretation of past testimony, is not the equivalent of suborning perjury or "providing materially false information to a judge" in the context of *this* case, which is what § 3C1.1 requires.  *See United States v. Butters*, 513 F. App'x 103, 105 (2d Cir. 2013) ("It is not enough that the defendant intended to obstruct the course of justice in some judicial or administrative proceeding.  Rather, he must intend to obstruct justice 'with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.'") (quoting U.S.S.G. § 3C1.1(1)).  Mr. Das has not filed anything before this Court and, regardless, this sentencing will be over before anything is resolved before Judge Burrows.  *See United States*

*v. Parker*, 871 F.3d 590, 607 (8th Cir. 2017) ("When there is no evidence that [alleged obstructive conduct] would impede the progress of the defendant's case in any way, the enhancement pursuant to § 3C1.1 cannot be applied.") (quotation marks, citation, and alteration omitted).  Mr. Das also incorporates his submission to the Second Addendum to the PSR and asks that the Court reject the Government's position.

### C.    Loss Amount

In calculating the loss amount under U.S.S.G. § 2B1.1(b)(1), the Court has discretion and "need only make a reasonable estimate of the loss," given the available information. U.S.S.G. § 2B1.1 cmt. (n.3(D)).  Here, the four counts of conviction arise from three separate financial transactions.  As shown below, several of these counts involve the same funds and should not be double-counted in the Court's reasoned, holistic loss assessment.  It is hard to separate improper withdrawals from the campaign accounts from payments made to reduce the campaign's debts to the hotel business.  Thus, for purposes of calculating the amount involved under Section 2B1.1 of the Guidelines, the Court should add 6 points (under $95,000) and not 12 (over $250,000).  *See* PSR ¶ 73.

1. Counts 1 and 2 (The use of loans from family friends as part of the $272,000 loan to the campaign): Mr. Das received $192,453 in condominium proceeds and intended to use it to fund part of his $272,000 campaign loan.  The difference between the loan and condominium proceeds is $79,547.  That should be the maximum amount calculated under 2B1.1 for Counts 1 and 2.  Dr. Mitra Das, who managed the bank accounts and wire transfers for the entire family, did not even use the entire $192,453 in condominium proceeds for the campaign, even though there are months of emails indicating that was Beej Das's intent and the purpose of the transfer.  Dr. Mitra Das put $40,000 of the condo proceeds into a savings account to get a marginally better interest rate, which shows the lack of guile in the handling

of the funds.  Mr. Das did not know all of the details of the movement of those funds.  Mr. Das had sufficient funds to make the loan to the campaign from legal sources, such as the sale of the condominium and over $900,000 in personal and family savings.

2.  Count 3 (Conversion of at least $25,000 in Campaign Funds):  Mr. Das was convicted for withdrawing funds from campaign accounts and depositing the funds into accounts for the hotel business.  As Rise Ladebauche, the hotel bookkeeper, and Sean Smith, the General Manager, testified, many of these funds were credited as repayment of the large debts the campaign owed the hotels, or as a reduction in loans Mr. Das owed to the hotels.  The Court has denied Mr. Das's post-trial motions based on *FEC v. Ted Cruz for Senate*, 596 U.S. 289 (2022), arguing that the withdrawals were wholly legal loan repayments.  For purposes of this sentencing hearing, Mr. Das does not dispute this ruling.  Nonetheless, the numbers are undisputed.

3.  $125,000 was borrowed from three family friends and at least $85,000 was repaid to the friends by the Das family.[2]  If the Government claims the entire $125,000 should be treated as improper donations, then under campaign finance rules, the entire $125,000 should have been withdrawn from the campaign accounts, regardless of where the money was subsequently sent.  It is not conversion to withdraw an improper donation.  The jury verdict finds at least $25,000 was converted, but not necessarily any more.

   i.  Mr. Das loaned well in excess of $326,050 to the campaign, which was documented at trial ($272,000 in December 2017, and at least $54,050 in expenses charged to his credit cards).

---

[2] Messrs Bose and Chaudhuri were repaid in full.  Mr. Shah received a $10,000 check that he did not cash.

      ii.    Mr. Das withdrew $314,000 from the campaign accounts and deposited this into accounts for the hotel business, of which 58% was not owned by Mr. Das and his parents. Much of these deposits went to reduce the amount of money the campaign owed to the hotels.

Juggling and co-mingling funds or a failure to file FEC reports all may give rise to civil or criminal violations, but Mr. Das was not engaged in a conventional scheme to enrich himself through fraud. Nor was he seeking to corrupt decision-making in government. The FEC often addresses such conduct with administrative fines. There is so much ambiguity over which funds paid which expenses—there is not proof by a preponderance of the precise, relevant amount. Thus, the Specific Offense Characteristic in PSR ¶ 73 should be 6 points (under $95,000), not 12 points ($250,000-550,000).

### D.    Sentencing Disparities

Additionally, a key imperative for the adoption of the Sentencing Guidelines was to reduce disparities in sentencing of similarly situated defendants. 18 U.S.C. § 3553(a)(6). The Probation Department noted in the PSR that it could not identify another defendant in the past five years who had a similar Guidelines calculation for a campaign violation who was sentenced to imprisonment. *See* PSR ¶ 126. And even the chart the Government provided to justify its recommendation cites defendants who did not receive prison time. *See* Ex. A to Gov't's Sentencing Mem., *FECA Cases* (ECF No. 182-1) (listing Dale Emmons, 3 years probation with 9 months served in a halfway house, and John Tate, six months in-home detention and probation). Criminal violations of FECA often involve higher dollar amounts and more serious concealment. Jail time is extremely rare in sentencings involving features similar to this case. *See, e.g., USA v. Bennett*, Case No. 1:23-cr-00030-CRC (D.D.C. 2023) (congressional primary candidate pled guilty to conduit contribution violation related to family loan to campaign) (government joined defendant in recommending one year probation and

$7,500 fine); *USA v. Fortenberry*, Case No. 2:21-cr-00491-SB[3] (C.D. Cal. 2022) (former congressman allegedly accepted illegal campaign contributions and lied about it to federal investigators) (sentenced to two years' probation before convictions vacated).

This case is similar to *Fortenberry*, where District Judge Stanley Blumenfeld declined to adopt the government's prison time recommendation, which was premised in part on obstruction and abuse of position of trust enhancements. Judge Blumenfeld found probation appropriate because former Congressman Fortenberry's "wrongful, dishonest choice" was out of character for an otherwise law-abiding citizen with no criminal record, and because defendants who committed similar acts had not received prison time for their conduct. Here, a non-custodial sentence is similarly necessary to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).[4]

### E.    Zero Point Offender Departure

In addition, the recently adopted Application Note 10(B) to 5C1.1 of the Guidelines grants the Court substantial discretion to depart from the Guidelines with a defendant such as Mr. Das. Application Note 10(B) to §5C1.1 states that a departure "may" be appropriate "if the defendant received an adjustment under §4C1.1 and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." This Application Note incorporates much of the reasoning that the First Circuit endorsed in *Prosperi*.

---

[3]   After the 9th Circuit reversed the 2022 convictions, ruling that the case should not have been tried in California, the government renewed its case against former Rep. Jeff Fortenberry in the District of Columbia. In May 2024, former Rep. Fortenberry was indicted by a federal grand jury on two counts of falsifying and concealing material facts and making false statements.

[4]   On July 9, 2024, District Judge Colleen Lawless sentenced a former state senator to 42 months in prison. *United States v McCann*, Case No. 3:21-cr-30014-CRL-EIL (N.D. Il.). This case is not comparable to Mr. Das's. The defendant pled guilty to nine charges related to misappropriation of campaign funds for personal enrichment and consented to $683,816.61 in restitution. It does not appear that McCann had made substantial loans to his campaign. He was charged with more serious offenses, including wire fraud and tax fraud, as he engaged in a multi-step process to hide and launder the money he stole to fund a lavish lifestyle. *See McCann*, Case No. 3:21-cr-30014-CRL-EIL, ECF No. 1.

Mr. Das is a Zero-Point Offender.  PSR ¶ 80.  His convictions are not for violence and, given the unusual circumstances of his campaign finance offenses, nor are his convictions for "otherwise serious offenses."  *See* 28 U.S.C. § 994(j).  Although the Guidelines do not specifically define what constitutes "otherwise serious offenses," Mr. Das's offenses are not enumerated among the Commission's introductory comments listing "certain economic crimes . . . that in the Commission's view are serious."  U.S.S.G. Ch. 1, Pt. A. § 4(d), intro. cmt.  Mr. Das did not steal from unwitting victims, nor did he have a quid pro quo scheme to corrupt politics.

The evidence at trial reflected a poorly-run campaign with a distracted and disorganized candidate.  Any funds that the jury deemed illegal contributions were contributed for friendship, not to buy influence.  As detailed above, Mr. Das intended to use his family resources to self-fund his campaign and, all in all, he put more money into his campaign than he took out.  He did not use his campaign to enrich himself personally.

Mr. Das had the financial resources to conduct the loans and repayments without violating the law, but he acted without foresight or proper judgment.  He has lived a life characterized by kindness and generosity to others.  Mr. Das has already suffered the serious collateral consequences of a federal conviction, including the pending loss of his law license.  This serves as adequate deterrence specifically, as Mr. Das will not seek elected office again, and generally, as notice to future political candidates that the government will criminally prosecute those who violate their campaign finance obligations.  A sentence of home detention and community service would be appropriate.

## F.    Home Confinement and Community Service

Mr. Das presently lives in Boca Raton, Florida.  His parents are 80 and 87 years old.  He is intimately involved in their complex medical care and other support.  Ordinarily, he would request home confinement in Florida.  However, because of his father's need for regular

care at the Massachusetts General Hospital for multiple, serious health issues, he may need to be in Massachusetts.  Thus, Mr. Das asks the Court to allow him to resolve the location with the Probation.

As shown above in the quoted letters of support, Mr. Das has assisted numerous people in managing their health care and housing needs.  He has had some contacts with Veterans groups.  He believes working with Veterans on issues of health care, housing, and related issues would be a productive use of his abilities.

## V.      Conclusion

For the foregoing reasons, Mr. Das respectfully requests that the Court impose a noncustodial sentence as described above.

Dated: July 12, 2024                                          Respectfully submitted

Abhijit Das, by his counsel:

/s/ *Michael Kendall*
Michael Kendall (BBO # 544866)
Abigail Mahoney (BBO #709427)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
abigail.mahoney@whitecase.com

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Kendall, hereby certify that on July 12, 2024, I cause a true and accurate copy of the above document and its exhibits to be served on counsel of record by CM/ECF.


<u>/s/ Michael Kendall</u>