<pre>
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3        *  *  *  *  *  *  *  *  *  *  *  *  *
      UNITED STATES OF AMERICA      *
 4                                  *    CRIMINAL ACTION
                      v.            *    No. 21-10200-RGS
 5                                  *
      ABHIJIT DAS,                  *
 6    a/k/a Beej Das                *
                                    *
 7        *  *  *  *  *  *  *  *  *  *  *  *  *

 8

 9            BEFORE THE HONORABLE RICHARD G. STEARNS
             UNITED STATES DISTRICT JUDGE and a JURY
10                        JURY TRIAL DAY 2
                         October 3, 2023
11

12    APPEARANCES:

13            UNITED STATES ATTORNEY'S OFFICE, (By AUSA Neil J.
         Gallagher, Jr., and AUSA Elysa Q. Wan) 1 Courthouse Way,
14       Suite 9200, Boston, Massachusetts, 02210, on behalf of
         the United States of America
15

16            WHITE & CASE, LLP, (By Michael Kendall, Esq., and
         Abigail Mahoney, Esq.) 75 State Street, Boston,
17       Massachusetts, 02109-1814, on behalf of the Defendant

18

19
                                 Courtroom No. 21
20                               1 Courthouse Way
                                 Boston, Massachusetts 02210
21

22

23                    James P. Gibbons, RPR, RMR
                        Official Court Reporter
24                   1 Courthouse Way, Suite 7205
                      Boston, Massachusetts  02210
25                       jamesgibbonsrpr@gmail.com
</pre>

```
 1                    P R O C E E D I N G S

 2                      (8:50 a.m.)

 3              THE CLERK:  All rise.

 4         (Whereupon, the Court entered the courtroom.)

 5              THE CLERK:  Court is open.  You may be seated.

 6              THE COURT:  Good morning.  We're waiting on one

 7    juror, but I have hopes she'll be here by nine or not too

 8    long after.

 9         All right.  Today's agenda?

10              MR. GALLAGHER:  So, your Honor, there's a couple of

11    exhibits we want to flag, one of which is Mr. Kendall wanted

12    time to look at and to reserve on.

13         Another one is 404(b), and another relevance objection.

14         (Reporter interrupts.)

15              THE COURT:  I'm sorry?  I missed what you just

16    said.

17              MR. GALLAGHER:  Sorry.

18              THE COURT:  You're speaking a little too quickly

19    even for me.

20              MR. GALLAGHER:  I apologize, your Honor.

21         Three exhibits.  The first one's going to come up with

22    Mr. Chast.  Ms. Wan will address that, Exhibit 66.

23              MS. WAN:  Your Honor, this is an exhibit showing a

24    deposit slip.  I have a copy for your Honor, if you'd like,

25    but it's marked as Exhibit 66.  It's a deposit slip that
```

1      Mr. Chast will testify he filled out and submitted in the

2      name of Ms. Campetti in order to deposit money into

3      Ms. Campetti's account.

4          This was, your Honor, the subject of your Honor's

5      404(b) ruling where you found these straw donations where

6      Mr. Chast took money from Mr. Das, deposited them into

7      Ms. Campetti's account, and then Ms. Campetti made a

8      contribution of this exact same amount around the same time.

9          That's -- that goes to the heart of the subject here.

10          THE COURT:  If Mr. Chast is going to authenticate

11     it, I have no problem.

12          MS. WAN:  Exactly.

13          MR. KENDALL:  Your Honor, it's not in my binder.

14     May I just see the copy?  I'm not disputing --

15          THE COURT:  You can have my copy.

16          MR. KENDALL:  We obviously object, your Honor.

17          You've ruled on it, so I'm not going to try to persuade

18     you to make a more correct ruling.

19          THE COURT:  It's a binary decision.  It's either

20     correct or incorrect.

21          MR. KENDALL:  Ms. Campetti says she wasn't

22     reimbursed.  She's filed an affidavit, but you've ruled.

23          THE COURT:  Affidavits don't count much.

24          MR. KENDALL:  Thank you.

25          MR. GALLAGHER:  Your Honor, the two remaining

1    exhibits I wasn't going to bring up until the midmorning

2    break, but since we have some time.

3        Sean Smith, he will testify on -- there's two contested

4    exhibits.  One, which I think we just reserved on, the

5    actual bank deposit slips that he filled out at the bank in

6    order to withdraw the money from the campaign account and

7    then transfer them to the other specific accounts.  That's

8    Exhibit 127.

9        I think counsel is reserving on that.  I'm not sure if

10   Mr. Kendall still objects to those exhibits?

11           MR. KENDALL:  May I just see the binder?  I doubt

12   that there is a dispute, but let me just look to be careful.

13       (Pause in proceedings.)

14           MR. KENDALL:  There is no dispute.

15           MR. GALLAGHER:  Thank you.

16       And the last remaining one is Exhibit 123.  I can hand

17   that up if the Court wants to see it?

18           THE COURT:  Tell me what it is.

19           MR. GALLAGHER:  123.1.

20       (Pause in proceedings.)

21           THE COURT:  Being an email from the defendant,

22   unless it's irrelevant, which I don't think it is.  I don't

23   see was the objection would be.

24       (Pause in proceedings.)

25           MR. GALLAGHER:  I think he is asking you,

1    Mr. Kendall.

2            MR. KENDALL:  Your Honor, we think it's not really

3    that relevant.  That's the only reason we object.

4            THE COURT:  That's the only basis I see.  I think

5    it's marginal, but just enough to get over.

6            MR. KENDALL:  One thing, your Honor.  You may have

7    noticed, I got a pretty bad hip injury.  If I don't stand up

8    all the time that's appropriate, I would ask the Court to

9    give me some leeway.

10            THE COURT:  I was about to fine you.

11        (Laughter.)

12            MR. KENDALL:  I've seen it happened.

13            THE COURT:  I actually had prior knowledge of that.

14            MR. KENDALL:  Thank you, your Honor.

15            THE COURT:  So don't worry about it.

16        Okay.  Let me check and see whether our other juror is

17    here yet.

18            THE CLERK:  All rise.

19        (Recess.)

20            THE CLERK:  All rise for the jury.

21        (Whereupon, the jury entered the courtroom.)

22        (Whereupon, the Court entered the courtroom.)

23            THE CLERK:  Resuming on the record in Criminal

24    No. 21-10200, United States of America versus Das.

25        Mr. Chast, please remember you're still under oath,

 1    sir.

 2                THE COURT:  Good morning again, counsel.

 3         Good morning, jurors.  It's great to see you.

 4         As you see, we can start without the lawyers, but we

 5    can't start without you.  You are the indispensable people.

 6         All right.  Are we ready to resume, Ms. Wan?

 7                MS. WAN:  Thank you, your Honor.

 8                         **ERIC CHAST, resumed**

 9                     **DIRECT EXAMINATION, (Cont'd.)**

10    **BY MS. WAN**

11    Q    Good morning, Mr. Chast.

12    A    Good morning.

13                MS. WAN:  Could we have Exhibit 2 up, please, which

14    has been previously admitted.

15         (Exhibit published to the jury.)

16    Q    Mr.  Chast, yesterday we left off talking about Mr. Das'

17    year-end fundraising totals.  And looking at Exhibit 2, what

18    were the sources of this -- of the number $425,000 raised in

19    the first fundraising quarter?

20    A    That would have been the amount totaled from Beej in

21    online contributions.

22    Q    And exactly where did you get that information?

23    A    From Beej.

24    Q    And you mentioned on-line contributions.  Where would

25    that information have come from?

1    A    ActBlue.

2    Q    The press release also refers to -- it says, "the

3    campaign currently has $550,000 cash on hand."  How did you

4    arrive that number, $550,000?

5    A    That came are directly from Beej.

6    Q    Do you specifically remember the defendant telling you

7    that the cash on hand was $550.000?

8    A    Either that, or I was there when he told the

9    communications team.

10          MR. KENDALL:  Objection, your Honor.  I move to

11   strike that for lack of foundation.

12          THE COURT:  Denied.

13   Q    What are the different sources -- or let me phrase it

14   this way?  Who on the campaign was able to determine the

15   cash on hand for the campaign?

16   A    Beej.

17   Q    Why do you say just Beej?

18   A    He's the only person I know that had access.

19   Q    Had access to what?

20   A    The bank account.

21   Q    And who paid the bills out of the bank account -- or,

22   excuse me, who paid the bills for the campaign?

23   A    Beej.

24   Q    Why do you say that?

25   A    Well, he had a credit card for the campaign and any

1    other expenses.  I think -- I know he did the payroll.  So,

2    I mean, he's the only person I saw doing any payments

3    either.

4    Q    To your knowledge, did anyone else have access to the

5    credit card?

6    A    Not to my knowledge.

7    Q    And to your knowledge, did anyone else have access to

8    know how much was in the campaign account?

9    A    No.  I don't know of anyone else.

10   Q    Now, the second paragraph states, "I am incredibly

11   grateful for the number of individuals who believe in my

12   campaign enough to support it financially, said Das.  I am

13   particularly proud that more than half of our donations in

14   the fourth quarter are small donations under $200."

15           Now, were you part of the team that determined that

16   more than half of the donations were less than $200?

17   A    Yes.  I believe I was the person that did that part.

18   Q    And who was this quote attributed to?

19   A    Beej.

20   Q    And in your experience would a press release like this

21   go out with a candidate quote without the candidate

22   reviewing the quote?

23   A    Not to my knowledge.

24           MS. WAN:  If we could have previously admitted

25   Exhibit 17.

1          (Exhibit published to the jury.)

2    Q    Now, we've talked a moment ago about the donations under

3    $200.  Generally -- is this an email from -- between you and

4    Ms. Horan in which you provide this information about the

5    percentage of donations under $200.

6    A    Yeah.

7    Q    And generally, how do you know that over 50 percent of

8    donations were under $200?

9    A    What I would have done is take a report from NGP VAN and

10   just sorted it and counted the number up under 200.

11          MS. WAN:  If we could have Exhibit 13, please.

12          (Exhibit published to the jury.)

13   Q    You just mentioned NGP VAN.  Is this attachment on this

14   email a report from NGP VAN?

15   A    Yes.

16   Q    What is a donor report?

17   A    In this case it was a spreadsheet with donor names,

18   amounts, addresses, occupation, employer.

19   Q    Was the donor report shown in Exhibit 13 provided to

20   Mr. Das?

21   A    Yes.

22   Q    How do you know?

23   A    I see that it's to Beej.

24   Q    And this is the donor record attached on page 2 of

25   Exhibit 13?

```
 1    A   Yes.
 2            MS. WAN:  And, Ms. Comcowich, if we could just zoom
 3    into the top part of page 2.
 4    Q   Can you just describe how this report was prepared?
 5    A   This would have been -- well, I would have looked into
 6    NGP VAN.  There's a donor report section where I could have
 7    downloaded all the donors.
 8    Q   And what type of information is provided in this report?
 9    A   Here I see Donor's names, date received, amount,
10    employer, and personal information too, address and email
11    and phone.
12            MS. WAN:  And, Ms. Comcowich, could you zoom in on
13    the first four paragraphs of the first page?  I'm sorry, the
14    first four columns.
15    Q   And does this document show a fair number of
16    contributions that are less than $200?
17    A   Yes.
18    Q   For example, the contribution from Luke Siebert?
19    A   Yes.
20    Q   And a contribution from a Kristen Campetti?
21    A   Yes.
22    Q   And someone name Brian Belanger?
23    A   I'm looking.  Bear me out.  My apologies.
24            There is it is, yes.
25    Q   Let's shift gears and talk about the FEC filings.
```

1           What is the Federal Election Commission?

2      A    The governing body that oversees federal elections.

3      Q    How did you first become aware of the Federal Election

4      Commission?

5      A    Well, they're -- that's a great question.  I mean, any

6      time you -- every quarter people are filing their numbers.

7      So even just by being aware of political news, I would see

8      the FEC reports and emails asking for, you know, today's the

9      deadline.  Yeah, I've been generally aware about it forever.

10     I mean since I was paying attention to all of this.

11     Q    What are congressional candidates required to file with

12     the FEC on a quarterly basis?

13     A    The -- well, their amount -- so the donors, expenses,

14     loans, and other things like credit card reports, things

15     like that.

16     Q    Is this contained on something called a Form 3?

17     A    Yes.

18     Q    And you mentioned donors, expenses, loans.  Does the

19     report also contain a cash on hand amount?

20     A    It does.

21     Q    Who prepared the FEC Form 3s for the Das campaign for

22     the first two quarters?

23     A    I prepared them.

24     Q    And, in general, how did you prepare those FEC reports?

25     A    For online contributions I was able to download those

1    directly, but for everything else, that would come from

2    Beej.

3    Q    Can you walk us through the steps of preparing, taking

4    those contributions and the information from Mr. Das, and

5    preparing what was actually submitted to the FEC?

6    A    Sure.

7         You know, it's a really old program called FECFile

8    that you can download the directly from the FEC's website.

9    I download that on my computer.  And then I can download the

10   spreadsheets of the online contributions.  Then I can use

11   that to upload it directly into FECFile.

12        And then, with everything else, I typically have to

13   take a report and type it in line by line.  But everything

14   goes into this computer program, and from there you can

15   transmit it as an electronic file.

16   Q    You mentioned that you typed a report line by line.

17   What computer program did you use to create that report?

18   A    FECFile.

19   Q    Is that similar to, say, an Excel spreadsheet?

20   A    If you were to download the data, you download it and an

21   Excel sheet, but it's a computer program.  I mean it is --

22   it's a database with a user interface.

23   Q    And once you upload it to the FEC website, how do you

24   upload it?

25   A    You would type in the committees's PIN or password and

1    click "submit."

2    Q    Now, when you mentioned creating a line-by-line report,

3    where did you get the information that you put into that

4    line-by-line report?

5    A    Either from ActBlue or from Beej.

6    Q    What type of information did Mr. Das provide to you?

7    A    Loan information, expenses, paper checks, donations.

8    Q    When you talk about loan information, what types of

9    loans did he provide information about?

10   A    Loans he made to the campaign.

11   Q    And expenses, what types of expenses did he provide

12   information about?

13   A    Payroll, rent, that sort of thing.

14   Q    Can you describe the process of getting that information

15   with Mr. Das?  Was it easy, hard, et cetera?

16   A    It could take some time to get it.  It was not always

17   easy.

18   Q    And how much communication did you have with Mr. Das

19   while you were preparing the FEC filings?

20   A    Especially as the deadline was coming up, I'd be

21   reaching out pretty regularly.

22   Q    In your experience, what information would have made it

23   easier for you to prepare the FEC filings?

24   A    Access to the bank account for sure.

25   Q    And is that something that you had access to?

```
 1    A    I did not.

 2    Q    Was it common for someone in your position to have

 3    access to campaign bank accounts based on your experience?

 4    A    Yes.

 5    Q    Is that something that you've had access to in other

 6    campaigns?

 7    A    Yes.

 8    Q    Now, once you collected the information and submitted it

 9    to the FEC website, is there any confirmation that shows

10    that it was received?

11    A    I believe there is an email receipt, yes.

12         MS. WAN:  If we could have Exhibit 14, which is in

13    evidence.

14         (Exhibit published to the jury.)

15    Q    Mr. Chast, would you tell the jury who are the

16    recipients and what's the date of this email?

17    A    Starting at the bottom here?  It looks like it's me

18    reaching out to Beej and Deb.

19    Q    And who is Deb Belanger?

20    A    She was a member of Beej's staff or campaign.

21    Q    Starting with the email on the bottom dated January 2,

22    2018, what are -- could you read just the text of that

23    email?

24    A    "Hi Deb, Beej.

25         "I'd love to be able to log into the FEC online
```

1    reporting system so that I can better prepare our report.

2    Could you send me the login information?

3           "I won't be putting a thing into the FEC portal

4    until it's been reviewed by you.  I'm only hoping to get

5    oriented at this stage so that I can prep a report for your

6    review."

7    Q    Now, let's focus on the first paragraph first.

8           What is the "FEC online reporting system"?

9    A    That would be FECFile, the computer programs.

10   Q    Why did you need to get the login information from

11   Mr. Das?

12   A    I did not have it.

13   Q    Why -- sorry.

14   A    I believed he had it, yeah.

15   Q    Could you create your own account with FECFile?

16   A    No.

17   Q    Why not?

18   A    It had to come from the person that set up the committee

19   with FEC.

20           Pardon me.

21      (Pause in proceedings.)

22   Q    And I noticed that you wrote this email to Beej and Ms.

23   Belanger.  Did you ever receive any information from

24   Ms. Belanger about the FEC filings?

25   A    Not to my memory.

1    Q    And you wrote in the second paragraph "I won't be

2    putting a thing into the FEC portal until it's been reviewed

3    by you."

4              Why were you providing -- why did you tell that to

5    Beej?

6    A    I thought it was important to know that he had the

7    chance to review.

8    Q    And again you say, I'm hoping to get oriented at this

9    stage.  What did you mean by that?

10   A    I was not familiar with the system.

11   Q    And you said, "So I can prep a report for your review,"

12   and what was the importance of telling him that?

13   A    That I needed his approval in order to file anything.

14   Q    I'm sorry.  Can you say that one more time?

15   A    I'm so sorry about my voice.

16             That I needed his approval to file.

17   Q    Now, going to Beej's response, Mr. Das' response, could

18   you read for the jury what Mr. Das says in response to your

19   email?

20   A    "Great idea.  I have that information in an FEC folder.

21   I will get it Wednesday eve when I'm back in Lowell.  I will

22   see you at LSG in the morning."

23   Q    What can you understand Mr. Das to mean in response to

24   your request for the FEC filing information?

25   A    That he had it and would get it to me.

```
1    Q    Just for completeness, what was your response to that?

2    A    "Sounds great, thanks, Beej."

3    Q    Now, if we could go on to Exhibit 15.

4         (Exhibit published to the jury.)

5    Q    Starting from the bottom of this email chain, what is

6    the first email in this chain?

7    A    It's an email from the FEC to Sean and Beej.

8    Q    Who is Sean@dasforcongress.com?

9    A    Sean was the name of the treasurer.

10   Q    What's his full name, if you know?

11   A    The last name eludes me right now.

12   Q    What was Sean's role in the campaign?

13   A    He was the treasurer?

14   Q    Did he have any involvement in the campaign on a

15   day-to-day basis?

16   A    Not on a day-to-day, no.

17   Q    How do you know that he wasn't involved day to day?

18   A    He was -- he didn't have any specific role day to day.

19   So there was nothing he was in charge of.

20   Q    Did he attend the staff meetings?

21   A    No.  Like the morning calls, he would have been on that.

22   Q    Did he attend any campaign events?

23   A    He may have attended campaign events.

24   Q    Did he help organize any event with you?

25   A    As far as setting up, like, logistics with me, not that
```

1    I remember.

2    Q    Did he help you prepare this FEC report?

3    A    He did not.

4    Q    Now, why is this -- to your knowledge, if you know, why

5    is this email about the new FEC filing password request

6    being sent to Mr. Das and sean@dasforcongress?

7    A    That one of them would have set up the password.

8    Q    And what's the date on this email?

9    A    November 8, 2017.

10   Q    Was this email later forwarded?

11   A    Yes.

12   Q    And what did Sean -- excuse me.  What did Mr. Das write

13   on January 9, 2018?

14   A    "Sean -- Do you know what password is?  Please advise me

15   and Eric.  Thanks."

16   Q    Did you eventually receive the login information for the

17   Das campaign FEC account?

18   A    I did, yeah.

19   Q    Do you remember where you got it from?

20   A    I do not remember.

21              MS. WAN:  Now, going on to Exhibit 16, please.

22       (Exhibit published to the jury.)

23   Q    What is this document, Mr. Chast?

24   A    This is an email from me to Beej.

25   Q    And what are -- what's the subject line of the --

1    A    "FEC Reporting Deadlines."

2    Q    What are you communicating to Mr. Das?

3    A    I believe this is the reporting deadlines and the

4    deadline for our end-of-year report specifically.

5    Q    What's the date of that deadline?

6    A    January 31.

7    Q    Why were you giving this information to Mr. Das if you

8    were the one who was preparing the report?

9    A    I mean, he needed to know as the person giving the

10   information.

11   Q    Showing you Exhibit 19.

12        (Exhibit published to the jury.)

13   Q    Can you tell us what's the date and who are the

14   recipients of that email?

15   A    January 22, 2018, from me to Beej.

16   Q    Can you just read the paragraph starting, "I can..."

17   A    "I can start our compliance report today but will need

18   an itemized list of expenses and loans.  For each, I need

19   the amount, date, name, and address."

20   Q    Why were you asking for this information from Mr. Das?

21   A    He was the person that had access to it.

22   Q    And when you talk about the compliance report, what are

23   you talking about?

24   A    The quarterly FEC report.

25   Q    And you mentioned that the easiest way of preparing this

1    report would have been to access the bank account.  Why

2    didn't you ask him directly for access to the bank account

3    in this email?

4    A    In this email, I don't know.

5    Q    Did you eventually get an itemized list of expenses like

6    you asked for?

7    A    Itemized.

8    Q    How did you get that information?

9    A    I believe it was a QuickBooks PDF.

10   Q    Did you do anything to check or corroborate these

11   expenses that were provided in the QuickBooks?

12   A    I did not.

13   Q    Who gave you the QuickBooks PDF?

14   A    Beej.

15   Q    And this was sent about how long before the filing

16   deadline?

17   A    Nine days.

18   Q    Now, going on to Exhibit 20.

19        (Exhibit published to the jury.)

20   Q    What's the date of this email?

21   A    January 30, 2018.

22   Q    What time was this email sent?

23   A    1:23 a.m.

24   Q    Is it true that the report was due the next day on

25   January 31?

1    A    Yes.

2    Q    And what information is Mr. Das providing in this email?

3    A    Here it's the date, name, amount, and that it was either

4    a cash loan or donation from him into the campaign.

5    Q    What was the amount of the loan described in this email?

6    A    $51.

7    Q    And according to this email, Exhibit 20, who made this

8    loan?

9    A    Beej.

10   Q    Now, are you familiar with any dollar limit about what

11   needs to be reported to the FEC?

12   A    Contribution limits.  That's as far as I know.

13   Q    Is there any -- or to your knowledge, is there any

14   dollar limit on donations that need to be reported for, for

15   example, donations above a certain number?

16   A    Well, the occupation-employer over -- I think it's $200.

17         MS. WAN:  And if we could go on to Exhibit 21.

18       (Exhibit published to the jury.)

19   Q    What's the date on this email?

20   A    January 30, 2018.

21   Q    The time?

22   A    2:44 a.m.

23   Q    Again, the day before the filing was due?

24   A    Yes.

25   Q    What's the subject line of this email?

1    A    "Loans from Beej Das - December."

2    Q    What did Mr. Das write to you?

3    A    "Eric.

4            "The following were cash loans from Abhijit Das to

5    Beej Das for Congress in December."

6    Q    What amounts did Mr. Das provide in this email?

7    A    The three amounts for 48,000, 170,000, and 54,000.

8    Q    Why is Mr. Das providing you these loans amounts?

9    A    He's the one that had access to it.

10    Q    Did you do anything to check that these loans were

11    actually made from Mr. Das?

12    A    I did not.

13    Q    Based on the information you were provided, what made

14    you believe that these were loans from Mr. Das himself?

15    A    That he said they were.

16    Q    Did Mr. Das say anything more about the source of these

17    loans?

18    A    No.

19    Q    Did the defendant provide any backup information or loan

20    documents corroborating these loans?

21    A    He did not.

22    Q    What was the total of these three loans?

23    A    $272,000.

24    Q    Now, let's focus for a minute on the $170,000 loan on

25    December 28, 2017.

1          Did Mr. Das tell you that part of the money from

2    this $170,000 loan actually came from three outside

3    individuals?

4    A    No.

5    Q    Did Mr. Das tell you that he received $125,000 out of

6    that loan from contributions of 50,000, 50,000 and $25,000?

7    A    No.

8    Q    And what would you have done if Mr. Das had told you

9    that the part of the money from that $170,000 loan had

10   actually come from three individuals who made large

11   contributions?

12          MR. KENDALL:  Objection, your Honor.  Hypothetical.

13          THE COURT:  Overruled.

14   A    I -- that would have raised a flag.  I imagine I would

15   have had to discuss it first with people at LSG.

16   Q    Why would that have raised a flag for you?

17   A    Because I know a candidate can contribute or loan an

18   amount of money though themselves, but I don't believe you

19   can go out and get a loan as a campaign.

20   Q    And did you ever tell Mr. Das it was okay to take

21   campaign contributions above the limit if they came in as

22   loans?

23   A    No.

24          MS. WAN:  Now, going on to Exhibit 22.  If we could

25   start with page 2.

1          (Exhibit published to the jury.)

2     Q    What information is Mr. Das providing in the first email

3     dated January 30 at 1:16 a.m.?

4     A    So this is the expenses on a personal credit card,

5     $7,574.04.  He's asking this to be reported as a loan.

6     Q    Is this in addition to the other three loans that we

7     just looked at?

8     A    Yes.

9     Q    Now, what was your response when Mr. Das provided this

10    information?

11    A    I believed that we needed to report these as itemized

12    expenses.

13    Q    Why did you believe that?

14    A    Looking at the FEC's website, I believe that's what they

15    were requesting.

16    Q    According to Mr. Das, where did these campaign loans

17    come from?  How were they made?

18    A    This one specifically?

19    Q    Yes.

20    A    From charges made from the credit card.

21    Q    What type of credit card?

22    A    The personal credit card.

23    Q    If we could go on to your response.  Could you just read

24    the portion starting, "Thanks Beej."

25    A    "Thanks, Beej.  I need an itemized list of what they

1    are.  "I need" -- sorry.

2              "I need an itemized list of what they were.  At

3    this point you may need to get me passwords to the accounts

4    so that this will be done in time, unless your treasurer is

5    willing to take the lead."

6    Q    Now, when you say "I need an itemized list of what they

7    were," what kind of itemized list were you talking about?

8    A    The charges on the credit card.

9    Q    And you say, "At this point you may need to get me

10   passwords to the accounts."  What kinds of accounts are you

11   looking for access to?

12   A    In this one it would be the credit card.  It would also

13   be the bank account in order to actually get the report

14   filed.

15   Q    You also say, "unless your treasurer is willing to take

16   the lead."  Is that referring to Sean?

17   A    Yes.

18   Q    I thought you said that Sean didn't have any involvement

19   in the campaign?  Why are you suggesting that the treasurer

20   take the lead?

21   A    It's a bit snarky.  I'm showing frustration in this.

22   Q    You then include a link www.fec.gov.  What is that link?

23   A    That's a link to the rules.

24   Q    Which rules?

25   A    How to file the form.

1    Q    Where did you get those rules?

2    A    The FEC website.

3    Q    And showing you what's been previously admitted as

4    Exhibit 23, are these the --

5              MR. KENDALL:  Objection, your Honor.

6              THE COURT:  Let's see.  Twenty-three is blank on my

7    list.

8              MS. WAN:  We discussed this yesterday.

9              MR. KENDALL:  We discussed it yesterday, but I am

10   objecting, your Honor.

11             THE COURT:  Did you discuss it with me?

12             MR. KENDALL:  Yes.

13             THE COURT:  What did I rule?

14             MR. KENDALL:  You ruled against me, your Honor.

15             THE COURT:  Then I'll be consistent and renew the

16   ruling.

17        All right, overruled.

18   Q    Now, Mr. Chast, what is this document shown in

19   Exhibit 23?

20   A    This is the instructions to file Form 3.

21   Q    Is this the instructions that you linked to in the

22   email?

23   A    Yes.

24   Q    And where did you find these instructions?

25   A    The FEC website.

 1    Q    How hard was it to find?

 2    A    Not hard.

 3    Q    Are you a trained lawyer?

 4    A    No.

 5    Q    And, in general, what's contained in this document?

 6    A    Instructions on what each report is.

 7    Q    As the fundraising director on Mr. Das' campaign, how

 8    did you use these instructions?

 9    A    I used them to guide me in preparing the report.

10    Q    Why were you providing these instructions to Mr. Das?

11    A    We had a disagreement on the credit card report.

12              MS. WAN:  And if we could go back to that email,

13    Exhibit 22.

14    Q    Even after you provided these instructions, what was

15    Mr. Das' response?

16    A    "Eric,

17              "I gave you a list of every single transaction.

18    There is no more itemization.  The itemized list I gave you

19    shows the account and each transaction in 2017.

20              "Call me if you have questions.  I will be

21    available in an hour."

22    Q    How did you interpret this response from Mr. Das?

23              MR. KENDALL:  Objection, your Honor.

24              THE COURT:  How "did you interpret"?  That's

25    acceptable.

1    A    That I would not be receiving an itemized list.

2    Q    And what was your response after getting this email?

3    A    I write, "Yep, the LLBean/Lowell Five splitout answered

4    all my questions.  I'm digging in to build the report."

5    Q    What do you mean when you say, "the LLBean Lowell Five

6    splitout answered all my questions"?

7    A    So this refers to a QuickBooks report that he sent me.

8    That -- and I'm trying to remember the report itself, but it

9    has -- it has the expenses on there.

10   Q    And in addition -- what additional information did

11   Mr. Das provide in this email chain in Exhibit 22?

12        MS. WAN:  If we could go up to the top.

13   A    "Here are the payments into the LLBean account from

14   Lowell Five (loan repayments.)"

15   Q    And what did you understand "loan repayments" to be?

16   A    This was paying the credit card.

17   Q    And where were these payments made from, based on your

18   interpretation of the email?

19   A    I believe Lowell Five was the bank account for the

20   campaign.  So it's the campaign paying the credit card.

21        MS. WAN:  Now if we could have Exhibit 122, please.

22        (Exhibit published to the jury.)

23        MS. WAN:  Let's start by blowing up the email from

24   Eric Chast.

25        I'm sorry, Ms. Comcowich, the email from Eric Chast.

1           Yes, exactly.  Thank you.

2    Q    Mr. Chast, what's the date on this?

3    A    January 31, 2018.

4    Q    The time?

5    A    8:53 p.m.

6    Q    What's the subject line?

7    A    "FEC report FILE BY MIDNIGHT."

8    Q    What does that mean?

9    A    That is the deadline.

10   Q    Who are you sending this email to?

11   A    Beej.

12   Q    What's generally the purpose of this email?

13   A    I'm giving directions on how to file.

14   Q    On how to file what?

15   A    The quarterly FEC report.

16   Q    Why are you giving him the directions?

17   A    Let's see.  It looks like I don't have the password yet.

18   Q    Could you read the line starting "Step One"?

19   A    "Step One. Download the attached file.  It's your

20   report."

21   Q    And what was attached.

22   A    That would be a file from FECFile, which is its own

23   .FEC, but it is the report.  It's all the data from it.

24   Q    And what's contained in that report?

25   A    What will be filed on the quarterly report.

1    Q    And what's Step Two of your instructions?

2    A    "Download FECFile here.

3    Q    And Step Three, generally what are you telling Mr. Das

4    to do?

5    A    I'm showing him how to upload the FECFile into the FEC

6    program.

7    Q    And in Step Four, what information does he need to

8    enter?

9    A    The committee ID and the password and email.

10   Q    And what email is he supposed to enter according to your

11   instruction?

12   A    Either Sean's or his own.

13   Q    Going on to January 31 -- excuse me.

14          Did -- was the FEC report eventually filed on

15   January 31, 2018?

16   A    Yes.

17   Q    Showing you Exhibit 70.  Is this a copy of the actual

18   FEC report?

19   A    Yes.

20   Q    And how do you recognize this document?

21   A    "FEC Form 3" at the top.  The dates for the report at

22   the bottom.

23   Q    What's the covering period of this FEC report?

24   A    October 1, 2017, through December 31, 2017.

25   Q    And based on this, the top right corner, can you see

1    when the document was submitted?

2    A    January 31, at 22:20, which is 10:30 I think.

3    Q    Now, looking at page 1, does the report state the name

4    of the treasurer?

5         MS. WAN:  Could you blow up "I certify"?

6    A    Yes.

7    Q    And who was that?

8    A    Sean Smith.

9    Q    To your knowledge, did Mr. Smith actually review the

10   report?

11   A    Not to my knowledge.

12   Q    Could you read the note under the signature line?

13   A    "Submission of false, erroneous or incomplete

14   information may subject the person signing this Report to

15   penalties of 352 U.S.C. 301089."

16   Q    Now, if Mr. Smith was the one signing the report, why

17   didn't you provide Mr. Smith the report to review before it

18   was filed?

19   A    Beej was the person I was reporting to.

20        MR. KENDALL:  Objection, your Honor.

21        THE COURT:  Sustained.

22   Q    If we could go to the page 4, and on the bottom Cash

23   Summary, what was the total cash on hand reported?

24   A    Cash on hand at close of reporting, 412 -- I'm sorry.

25   Yes, $412,324.37.

1    Q    And what was total receipts for this period?

2    A    $430,421.21.

3    Q    How did you come up with this number, 430,000?

4    A    That number is added by the program itself.  So that's

5    adding the receipts that I entered into it.

6    Q    Again, where did that -- those receipts come from?

7    A    I had access to the online contributions, and the loan

8    information and paper check information came from Beej.

9    Q    What about the total disbursements for this period?

10   What does "disbursements" mean?

11   A    Expenses.

12   Q    And how did you come up with the expenses for this

13   period?

14   A    The same thing.  So that information came from Beej, and

15   I entered it into the commuter program.

16   Q    How was the cash on hand calculated?

17   A    The program does that by subtracting the disbursements

18   from the receipts.

19        MS. WAN:  If we would could zoom out.

20   Q    On the top part of --

21        MS. WAN:  Exactly --

22   Q    -- of the form, does it provide any information about

23   loan repayments?

24   A    There is a Loan Repayments section here, yes.

25   Q    And according to this report, were there any loan

1    repayments?

2    A    No.

3    Q    And was there information about loans made to the

4    account in this report?

5            MS. WAN:  If I could go to page 3, Paragraph 13,

6    please.

7    A    Yes.

8    Q    And does this -- according to this document, how -- who

9    was the person who guaranteed the loan?

10   A    Beej.

11   Q    And what was the total of the loans made in this --

12           MR. KENDALL:  Objection, your Honor.

13           THE COURT:  Overruled.

14           MR. KENDALL:  I don't think she read it accurately.

15   It says "made or guaranteed."

16           THE COURT:  All right, with that rereading.

17           MS. WAN:  I can rephrase.

18   Q    Who made or guaranteed the $279,000 worth of loans

19   according to the FEC report?

20   A    Beej.

21   Q    And if we could turn to page 5, Schedule A.  What's

22   listed in Schedule A?

23   A    These are donations.

24   Q    And if we could look at just a couple of individual

25   donations, starting at page 70.

```
 1              MS. WAN:  Excuse me, page 10 and 11.
 2    Q    Now, shown on page 10 of Exhibit 70, are there
 3    contributions listed from Ajoy Bose?
 4    A    Yes.
 5    Q    And what's the amount of those?
 6              Sorry.  What's the amount of those contributions?
 7    A    $2,700.
 8    Q    And when were those contributions made?
 9    A    They're made on December 20, 2017.
10    Q    To your memory, are these the online contributions that
11    you helped Mr. Bose make?
12    A    Yes.
13    Q    And, in addition, are there contributions from someone
14    name Chandra Bose?
15    A    Right there, yup.
16    Q    And does Chandra Bose live in the same city as Mr. Ajoy
17    Bose?
18    A    I need to find the address here.
19              Is it Saratoga Ave?
20              Saratoga, yes.
21    Q    And what was the date of Chandra Bose's contributions?
22    A    December 20, 2017.
23    Q    And in total how much did Ms. Chandra Bose contribute?
24    A    Two contributions of $2,700.
25    Q    And these are the maximum federal contribution limits?
```

```
 1    A    Yes.  One each for primary and general.
 2              MS. WAN:  Now, if we could go to page 40 and 41,
 3    please.
 4    Q    Are there contributions listed from Mr. Jay Shaw?
 5    A    Yes.
 6    Q    And what were those contributions?
 7    A    $2,700 and $2,700.
 8    Q    And what's listed as Mr. Shaw's employment and
 9    occupation?
10    A    Executive at Hersha, I believe, Hersha Hospitality
11    Trust.
12    Q    What city does he live in?
13    A    That is -- it's a little small.  Wynnewood,
14    Pennsylvania.
15    Q    On page 42, is there a similar contribution from
16    Ms. Susie Shah?
17    A    Yes.
18    Q    And what city does she live in?
19    A    The same city.
20    Q    Does she also give the maximum contribution?
21    A    Yes.
22              MS. WAN:  Now, if we could have page 58, please.
23    Q    What's being reported in Schedule C of Exhibit 70?
24    A    These are loans.
25    Q    And what's the amount of the loan reported here?
```

1    A    On this page, $48,000.

2    Q    And the date?

3    A    December 27.  December 27, 2017.

4    Q    What does it say about the source of this loan?

5    A    Loan Source, Beej Das.

6    Q    Is there a checkmark for personal funds of the

7    candidate?

8    A    Yes.

9    Q    Does the loan information provide any due date or

10    interest?

11    A    No.

12    Q    And where did you get the information about this $48,000

13    loan?

14    A    From an email from Beej.

15         MS. WAN:  And going on to Exhibit 70, page 59, the

16    second box, please.

17    Q    Is this also loan information provided by Mr. Beej?

18    A    Yes.

19    Q    Mr. Das?

20    A    Yes.

21    Q    And again, where did you get this information?

22    A    From that email from Beej.

23    Q    And on page 60, please.

24         What's the amount of this final loan?

25    A    $54,000.

1    Q    And what's the source of this information?

2    A    The email that Beej gave me.

3            MS. WAN:  Now, if you could go on to Exhibit 70,

4    page 61.

5    Q    Did you also report a $7,574 loan?

6    A    Yes.

7    Q    What was the source of this loan?

8    A    That was the credit card.

9    Q    Now, does the FEC report require disclosure of expenses

10   that were spent by the campaign?

11   A    Yes.

12   Q    And what types of expenses are campaigns allowed to use

13   their funds on?

14   A    Anything that furthers the candidacy.

15   Q    Can you give us some examples?

16   A    Staff, rent, office supplies.

17           MS. WAN:  If we could go to page 51, please.

18       And, Ms. Comcowich, if you could just scroll through

19   the next few pages slowly.

20   Q    What type of expenses were reported in that first

21   quarter FEC filing here?

22   A    I see a lot of ActBlue, which is the credit card fee to

23   pay charges, debts, pay for being on the staff here,

24   Comcast, presumably the Internet.

25   Q    Where did you get all this information about the

1    expenses from the campaign?

2    A    From Beej.

3    Q    Did you do anything to confirm or check the accuracy of

4    these expenses?

5    A    I did not.

6    Q    Now, going on to the April FEC report, did you also help

7    prepare that report?

8    A    Yes.

9    Q    And, again briefly, what was the process for preparing

10   that report?

11   A    It was the same process, so gathering the contribution

12   information, either from online or any paper check deposits

13   from Beej, plus any expenses that he sent me.

14        MS. WAN:  Going to Exhibit 25.1, please.

15        (Exhibit published to the jury.)

16   Q    Is this an example of the information that Mr. Das sent

17   you for the second FEC report?

18   A    Yes.

19   Q    What's attached to this document?

20   A    "Profit and Loss Detail" Excel sheet.

21        MS. WAN:  And if we could go to the page 2.

22   Q    Was this sent to you in PDF format or QuickBooks?

23   A    It's a QuickBook's report.  I think -- I don't know the

24   format.

25        MS. WAN:  And if we could zoom in on just a couple

1    of sections, please.

2    Q    What type of information is being provided in this

3    report?

4    A    Expenses.

5    Q    And I see a couple notations, "LLBean Visa."  What does

6    that mean to you?

7    A    L.L.Bean Visa, it's a card.

8    Q    And why is it being listed on this report?

9    A    In QuickBooks, for any card, you set up the account and

10   then it would show up there.  So this would be the expenses

11   made from that card.

12   Q    And does it indicate to you how these expenses were paid

13   for?

14   A    Yes, that these expenses were paid for with that card.

15   Q    And how did you use this information?

16   A    I used this information to fill out the FEC report.

17   Q    What section of the FEC report did this information go

18   into?

19   A    These are disbursements.

20        MS. WAN:  If you could go back out to Exhibit 25.1.

21   Q    What was the date on that email?

22   A    This is April 9, 2018.

23   Q    And do you recall when the second quarter -- I'm

24   sorry -- the Q1 FEC report was due?

25   A    Mid month.

1                MS. WAN:  Now if we could go to Exhibit 25, please.

2    Q    What is -- could you briefly describe what this email is

3    from you dated April 2, 2018?

4    A    This is an email from me to Beej entitled "Compliance."

5    Q    And what are you communicating?

6    A    Here's everything from the first quarter, and it doesn't

7    include my paper check that he still might have on hand.

8    Q    Why are you providing this information to Mr. Das?

9    A    For his review.

10   Q    For his review of what?

11   A    The report, the information in it.

12   Q    Which report?

13   A    Sorry.  The quarterly FEC report.

14   Q    And you originally sent this email on April 2, 2018?

15             MS. WAN:  Ms. Comcowich, if we could back out?

16   Q    What did you do on April 9?

17   A    On April 9, I forwarded it to Beej again.

18   Q    And why are you forwarding it to Mr. Das again?

19   A    To bring it back to his attention.

20             MS. WAN:  Now if we could have Exhibit 26, which is

21   in evidence.

22      (Exhibit published to the jury.)

23   Q    On April 10, what does Mr. Das ask you to do?

24             MS. WAN:  And if you could highlight -- exactly.

25   A    "I need your help on this.  Thanks."

1          MS. WAN:  And if we could go to the email that's

2    below.

3    Q   Can you just read the first sentence starting, "Dear

4    Filer."

5    A   "Dear Filer,

6          "The Federal Election Commission would like to

7    remind you that the 2018 April Quarterly Report is due on

8    April 15, 2018."

9    Q   That's fine, Mr. Chast.

10         What is Mr. Das asking you to do?

11   A   To prepare the report.

12   Q   And what's your response when he asks you to prepare the

13   report a day after you've been sending him information about

14   the report?

15   A   Hey, Beej, I do these for you.  We file the quarterly

16   one.  Working on it this afternoon with the reports you made

17   me."

18   Q   What are talking about when you say, "with the reports

19   you made me"?

20   A   That I filled out this report with the information that

21   Beej gave me.

22   Q   Which reports did he give you?

23   A   Those QuickBooks reports that we saw.

24   Q   And what was Mr. Das' response?

25   A   At the top there, "Oh right, brain fart.

```
1                "Do you know when the House disclosures are due by

2      any chance?"

3                MS. WAN:  Now if we could go to Exhibit 28, please.

4          (Exhibit published to the jury.)

5      Q    Now, what -- what further information are you providing?

6      A    Sixty-five -- sorry.

7                Just in general --

8      Q    You can just read starting, "I've got..."

9      A    "I've got $65,043.67 in monetary donations, $5,000 in

10     in-kind donations, and $4,170.91 in 'loans' spending which

11     puts us at $74,213.91 as of right now."

12     Q    And why are you providing these numbers about donations,

13     in-kind donations, loans, et cetera?

14     A    That would be for the report.

15     Q    For the FEC report?

16     A    Yeah.

17     Q    Why are you using quotation marks around the term

18     "loans"?

19     A    Beej and I -- the disagreement on loans was ongoing --

20     on how to report the credit card expenses was ongoing.

21     Q    Exactly what was the disagreement?

22     A    I believe they needed to be listed as itemized expenses.

23     Q    And what did Mr. Das believe that he told you?

24     A    That they were a loan from him.

25     Q    Now, Mr. Das again asks, "When is the report due," and
```

1    what's your answer?

2    A    "Tomorrow."

3    Q    On Exhibit 27, please, did you provide a draft of the Q1

4    report?

5         (Pause in proceedings.)

6         MS. WAN:  I'll withdraw that.

7    Q    Could you please just read the text messages starting

8    "Hola"?

9    A    Yes.

10        Hola, Captain.  Your Q1 report is complete.  Please

11   get me any additional items you'd like me to include to me

12   before noon tomorrow and I will transmit.

13   Q    What were you conveying to Mr. Das?

14   A    That -- unless there was anything additional, the report

15   was ready to transmit.

16   Q    Why were you telling him that the report was ready to

17   transmit?

18   A    That it was due in a day.

19   Q    And if it was your responsibility to prepare the report,

20   why get Mr. Das involved?

21        MR. KENDALL:  Objection, your Honor.

22        THE COURT:  Overruled.

23   A    To get his approval.

24        MR. KENDALL:  Excuse me?  What was the answer?

25        THE COURT:  "To get his approval."

1    Q    And did you receive his approval before you filed the

2    report?

3    A    I believe I did.

4    Q    Now, showing you Exhibit 71, is this the Q1 report that

5    was submitted for the Das for Congress account?

6    A    Yes.

7         MS. WAN:   And again, can you zoom in on the time it

8    was submitted?

9    A    The time was 11:27.

10   Q    On April 15?

11   A    Correct.

12        MS. WAN:   Now if we could go to page 4 this time.

13   Q    In the Cash Summary, what was the total receipts for

14   this period?

15   A    Total receipts $74,322.91.

16   Q    What was the total disbursements or expenses?

17   A    Disbursements, $88,198.91.

18   Q    What is the cash on hand based on the receipts and

19   disbursements?

20   A    $398,448.37.

21   Q    Was that less cash on hand than in the previous quarter?

22   A    Correct.

23   Q    What was your reaction to having a decreasing amount of

24   cash on hand?

25   A    I -- this early in the campaign, preferably that number

 1    would be going up.

 2    Q   Could you repeat that?

 3    A   It is bad that it's going down.

 4    Q   And is this something that would have raised a concern

 5    for others in the campaign staff?

 6    A   Yes, I believe so.

 7    Q   Is this something that you would have talked about with

 8    the candidate himself?

 9         MR. KENDALL:  Objection your Honor.  Proper

10    foundation.

11         THE COURT:  No.  The question is, Did you talk to

12    the candidate?

13         MS. WAN:  Yes.  I apologize.

14    Q   Is this something that you talked about with the

15    candidate himself?

16    A   The cash-on-hand number probably would have come up

17    between us, yes.

18         MR. KENDALL:  Objection, your Honor.  Move to

19    strike.  Speculation.

20         THE COURT:  The jury will understand he said

21    "probably," so we'll leave it at that.

22    Q   Did you have regular meetings with the campaign staff?

23    A   The campaign staff had a morning phone call every day,

24    yeah.

25    Q   Every day; is that right?

1    A    At least five days a week.  I can't remember if we were

2    doing it on weekends.

3    Q    Did Mr. Das participate in that call?

4    A    Not regularly.

5    Q    And how did things get communicated to Mr. Das?

6    A    From that call?

7            There was a report out via email every morning.

8    Q    And were there also other communications with Mr. Das

9    not by email?

10   A    As did we discuss in person?  Yeah.

11   Q    How often did you see Mr. Das in these days or around

12   April of 2018?

13   A    This would have been around -- in the spring I was going

14   to Lowell maybe twice a week and hoping to spend two hours

15   each time I would go up there with him.

16   Q    As his fundraising director, did you talk with Mr. Das

17   about fundraising?

18   A    Yes.

19   Q    And how much money the campaign had?

20           MR. KENDALL:  Objection, your Honor.

21           THE COURT:  Overruled.

22   A    How much we had raised, yes.

23           MS. WAN:  Now, if we could go on to page 8 of

24   Exhibit 71.

25   Q    Is this -- you described Schedule A.  Could you reorient

```
 1   the jury what's disclosed in Schedule A?
 2   A    These are donations.
 3            MS. WAN:  And could you zoom in on the donations
 4   from Toby Chaudhuri?
 5   Q    According to the report, how much did Mr. Chaudhuri
 6   donate to the campaign?
 7   A    Two donations of $2,700.
 8   Q    What's the date of these donations?
 9   A    March 29, 2018.
10   Q    And where did you get the information supporting these
11   donations?
12   A    From Beej.
13   Q    Now, on page 7, the previous page, is there also a
14   donation from Ruby Chaudhuri?
15   A    Yes.
16   Q    And how much did she give?
17   A    Two donations of $2,700.
18   Q    Was that on the same date as the donation from the --
19   that was reported from Mr. Chaudhuri?
20   A    March 29, yes.
21            MS. WAN:  If you could go to page 28 and again
22   scroll through slowly.
23   Q    What's reported here on Schedule B of the Form 3?
24   A    Disbursements.
25   Q    And what type of disbursement or expenses are being
```

1    reported?

2    A    Here I'm seeing ActBlue, which, again, is the fee they

3    take for credit card contributions.

4    Q    Where did you get this information about ActBlue and

5    other expenses?

6    A    ActBlue, directly from ActBlue.  But things like debts

7    paid out, from Beej.

8    Q    Did Mr. Das tell you that he had made about $200,000 in

9    withdrawals from the campaign?

10    A    No.

11    Q    Would that have affected the cash on hand?

12    A    Yes.

13    Q    And how do you know that he didn't tell you about

14    these -- about $200,000 in withdrawals?

15    A    That's a shocking thing to learn.

16    Q    And if money was taken out of the account and spent on

17    hotel or yacht expenses, how would that have affected the

18    campaign?

19    A    That would be money not available to spend on the

20    campaign.

21    Q    Did Mr. Das ever talk to you about loans from the

22    campaign that he made to his hotel or yacht business?

23    A    No.

24    Q    How do you know that he didn't talk to you about that?

25    A    Same thing.  That's -- that's a very unusual thing.

```
1    Q    And in the report or in your dealings with Mr. Das, did
2    he ever tell you that he withdrew $35,000 from the campaign
3    account to pay off a tax lien for his hotel in Maine?
4    A    No.
5    Q    Why do you believe that didn't happen?
6    A    It was not -- well, first, he didn't tell me, and he
7    didn't put it in his report.
8    Q    Would that have left an impression on you?
9    A    Yes.
10   Q    Why is that?
11   A    Well, I mean, it would be new information, and
12   information not included here.  But it's a lot of money
13   going towards something that is not necessarily going to do
14   anything for the campaign.
15   Q    After you filed the FEC filing shown in Exhibit 71, did
16   you do anything to confirm the accuracy -- excuse me.  If I
17   could start over.
18              What, if anything, did you do to confirm the
19   accuracy of the FEC filing shown in Exhibit 71?
20   A    I mean, other than providing information for review,
21   nothing.
22   Q    For the --
23   A    I provided information for review.
24   Q    To whom?
25   A    To Beej.
```

1            MS. WAN:  Now, if I could have Exhibit 72.

2   Q   After the campaign submitted the Q1 FEC form, did the

3   FEC communicate with the Das campaign about certain issues

4   with that form?

5   A   Yes.

6   Q   And you don't have to read the entire letter, but could

7   you summarize for the jury what issues they had?

8   A   We were missing some information about the

9   disbursements, the expenses, like "purpose" in particular.

10  Q   And what type of purpose are you supposed to list in the

11  FEC form?

12  A   Say, if it's payroll, then there's a line where you say

13  it's for payroll.

14            If it's something, you know, gas station related to

15  an event, you say it's for travel, that sort of thing.

16  Q   Is it fair to say that the original form was missing

17  some descriptions about the expenses?

18  A   Yes.

19  Q   And going to Exhibit 29, did Mr. Das alert you to this

20  letter from the FEC?

21  A   Yes.

22  Q   Could you read the email from Mr. Das on May 7, 2018?

23  A   "Eric,

24            "Please advise on this.  The report we filed the

25  most recent FEC reporting period apparently has errors.

```
 1    I've attached the link and the report.  Please advise."
 2    Q    And is this how you found out about the communication
 3    from the FEC?
 4    A    It is.
 5              MS. WAN:  Now we could go back out of it.
 6    Q    What was your response when Mr. Das provided this
 7    information from the FEC?
 8    A    I wrote, Hey, Beej, some minor tweaks requested here.
 9    I'm looking into it now and will have cleaned up
10    momentarily.
11    Q    What are you trying to convey to Mr. Das?
12    A    That I would make the corrections that they requested.
13    Q    And did you make those corrections?
14    A    Yes.
15    Q    And is the refiled Form 3 shown in Exhibit 73?
16    A    Yes.
17    Q    To your knowledge, did the amounts like the cash on
18    hand, the disbursements, the expenses, the contributions,
19    did those amounts change?
20    A    No.
21    Q    What was the difference between the original and then
22    the refiled Form 3?
23    A    We added or corrected purpose information and
24    disbursements.
25    Q    So you added additional descriptions; is that correct?
```

1   A   Yes.

2   Q   Now, in all of the FEC filings, did you ever go into the

3   bank accounts to confirm the campaign spending or the cash

4   on hand or the contributions?

5   A   No.

6   Q   Why not?

7   A   I did not have access.

8   Q   Now, in your dealings with Mr. Das, did he ever talk to

9   you or have any questions about campaign expenses?

10  A   That's a -- probably, yeah.

11  Q   Do you recall specifically any questions he asked about

12  a campaign vehicle?

13  A   Yeah.  I believe we had a conversation, because it was

14  owned by the hotel, on how -- if the committee could

15  reimburse the company.

16  Q   Let's back up for a second.

17          What vehicle are we talking about?

18  A   It was an SUV.

19  Q   What was it used for?

20  A   The campaign.

21  Q   How was it used for the campaign?

22  A   To my understanding, Beej drove it to events.  It had

23  his logo on it.  That's -- that's basically it.

24  Q   And do you know if it was used solely for the campaign?

25  A   I suppose I don't know that it was solely for the

1    campaign.

2    Q    But you mentioned that it was owned by the hotel.  Who

3    told you that?

4    A    Beej.

5    Q    What questions did he have about using that as a

6    campaign expense?

7    A    The question was, Could the campaign reimburse the

8    company for the use of the company vehicle?

9    Q    What did you tell him?

10    A    I believed that it could.

11    Q    And how much would be reimbursed?

12    A    It has to be a reasonable amount.  So you could do

13    mileage or something like that.

14    Q    Shifting gears again.

15         Are you familiar with a woman named Kristen

16    Campetti?

17    A    Yes.

18    Q    Who is she?

19    A    Someone that Beej knew.  I believe she probably worked

20    for him as well.

21    Q    Worked for him in what business?

22    A    Troca is the name of the business, the hotel business.

23    Q    What, if anything, did Mr. Das tell you to do in

24    relation to Ms. Campetti during the campaign?

25    A    So he gave me money to deposit into her bank account for

1    the -- so that she could make a donation to the campaign.

2    Q    Let's walk through that.

3         MR. KENDALL:  Objection, your Honor.  Can we have

4    what did he say as opposed today characterization?  I move

5    to strike.

6         THE COURT:  No.  Let's clarify.

7         MS. WAN:  Yes.

8    Q    Let's walk through that in detail.

9         So did Ms. Campetti have any role in the campaign?

10   A    No formal role.

11   Q    Did you ever pay -- as part of your fundraising director

12   duties, did you ever pay payroll for the campaign?

13   A    No.

14   Q    Did you ever give money from Mr. Das to anyone else?

15   A    No.

16   Q    Can you describe the conversations you had with Mr. Das

17   when he first approached you about the money for

18   Ms. Campetti?

19   A    Yeah.  I know it was in the LSG office, that he wrote

20   down the bank account number for me.  That it was $1,900 in

21   cash, and he gave me the name of the bank, and to deposit

22   the money into her account.

23   Q    What instructions did he give you?

24   A    Well, the -- to take the money and deposit it into her

25   account so that she could make a donation to the campaign.

1    Q    Did Mr. Das himself tell you what the purpose of the

2    deposit would be?

3    A    Yes.

4    Q    What was that purpose?

5    A    So that she could make a donation to the campaign.

6    Q    And what did the cash look like when he handed it to

7    you?

8    A    I don't remember that.

9    Q    Do you remember how much it was?

10    A    I remember that it was $1,900.

11    Q    You mentioned that he was provided -- you got the bank

12    account information.  Is that bank account information that

13    you had before?

14    A    No.

15    Q    And what did you do with that bank account information

16    and the cash?

17    A    I walked it to her bank and deposited it in her name.

18    Q    Where was the bank where you deposited it?

19    A    The Financial District in Boston.

20    Q    And showing you Exhibit 66, which is in evidence --

21            MS. WAN:  If we could zoom into just the top part.

22        (Exhibit published to the jury.)

23    Q    What is this document?

24    A    This is a deposit slip.

25    Q    Do you recognize the handwriting on this document?

1    A    That is my own.

2    Q    How do you know that it's your own handwriting?

3    A    I have terrible handwriting.

4         (Laughter.)

5    Q    And what's the date on this deposit slip?

6    A    January 11, 2018.

7    Q    What do those numbers 6-6-6-9 represent?

8    A    I believe that's the last four of her account number.

9    Q    And according to this deposit slip, how much is being

10   deposited?

11   A    $1,900.

12   Q    Now, Mr. Chast, when Mr. Das asked you to make this

13   deposit so Ms. Campetti could make a contribution, what was

14   your reaction?

15   A    I don't know that I had much of a reaction at all.

16   Q    Had you been asked to do anything like this before?

17   A    No, not before.

18   Q    And did you have concerns about this?

19   A    Yeah.  It's true, I -- it's a scary thing.  I had

20   concerns.  But, yeah, that's about as far as they probably

21   went.  I don't know if I shared them at all inside LSG.

22   Q    What did you see shortly after that $1,900 deposit?

23   A    She did make the contribution.

24         MS. WAN:  If we could go to Exhibit 70, page 13.

25   If would could focus on the second contribution,

1    Ms. Campetti.

2    Q    What is this -- the amount of this contribution?

3    A    $1,900.

4    Q    And what's the date listed on this contribution?

5    A    December 31, 2017.

6    Q    Now, what's the name of the employer listed?

7    A    Stonehedge Hotel & Spa.

8    Q    Does this correspond with previous donations that she

9    made before?

10   A    That she made or previous donation before?

11   Q    I should have asked it that way.

12          How much was her previous donation?

13   A    This one was for $250.

14   Q    And what was her total donations in the election cycle

15   after this $1,900 donation?

16   A    $2,250.

17   Q    Did you eventually leave the Das campaign?

18   A    Yes.

19   Q    Can you tell us around when you left?

20   A    Spring of 2018.

21   Q    What happened to make you leave?

22   A    Well, there's two different times.  There's me and then

23   there's Liberty Square Group.

24   Q    Let's talk about you first.

25   A    Me first is that Beej wanted to shake up the fundraising

1    and didn't believe that working with me was getting the job

2    done.  So he got another consultant, LA Harris, and brought

3    them in.

4    Q    And then what happened when Liberty Square Group left

5    Das' campaign?

6    A    There was one last meeting with Scott, Beej, and Toby to

7    see if they could work something out.  You know, with me

8    gone, Beej wanted to renegotiate the monthly fee.  And Scott

9    felt that the fee was fair for his services.  So that is the

10    disagreement, and the meeting didn't go well, and that was

11    the end of it.

12    Q    How much time elapsed between when you left the campaign

13    and when LSG left the campaign.

14            MR. KENDALL:  Objection.

15            THE COURT:  Overruled.

16            MR. KENDALL:  I don't know that he knows when --

17            THE COURT:  Well, then he'll say so.

18            MR. KENDALL:  Excuse me.  I'm sorry, your Honor.  I

19    will withdraw.

20    A    To be fair, I do not know the exact time.  Probably a

21    few weeks.

22    Q    Now, going back to your testimony yesterday, you talked

23    about Jay Shah.  Who was he again?

24    A    The finance chair.

25    Q    If I could show you a couple emails involving you and

1    Jay Shah starting with Exhibit 7.  This is dated

2    November 21, 2018, and it's between you and Jay Shah,

3    copying Mr. Das.

4              What generally are you doing in this email?

5    A    I'm introducing myself.

6    Q    And why are you introducing yourself to Mr. Shah?

7    A    Well, as the finance director, and he as the finance

8    chair, we'd often coordinate to do a finance committee

9    meeting.

10    Q    And going on to Exhibit 11, is this another email

11    between you and Mr. Jay Shah?

12    A    Yes.

13    Q    What's the date on this email?

14    A    December 19, 2017.

15    Q    What are you asking for in this email?

16    A    A donation to the campaign.

17    Q    And did he eventually make a donation for him -- for

18    himself?

19    A    Yes.

20    Q    And going on to Exhibit 18, what's the date on this

21    email?

22    A    January 19, 2018.

23    Q    And who is this email from?

24    A    Beej.

25    Q    And what's the subject line of this email?

1    A    "Thank you and Philly follow-up."

2    Q    Generally, what is Mr. Das asking for in this email, and

3    let me direct your attention to the sentence starting,

4    "towards that end..."

5    A    Towards that end, we could...

6    Q    Go ahead.

7    A    Sorry.

8         "Could we get a date in March that we could hold a

9    fundraiser in Philadelphia at the Shah residence?"

10   Q    And what's he -- what does that mean to you?

11   A    Oh, he's asking for a fundraiser.

12   Q    He's asking Mr. Shah to hold a fundraiser; is that

13   correct?

14   A    Yes.

15   Q    And in the first paragraph, what information is Mr. Das

16   providing to Mr. Shah?

17   A    It's an update on the campaign.  So it's the numbers

18   from the first quarter that were reported out, as well as

19   that we got press coverage for.

20   Q    And that includes the 550 cash on hand; is that right?

21   A    Yes.

22   Q    Now, in your communication with Mr. Shah, do you ever

23   recall Mr. Shah being asked for money for the defendant's

24   business?

25   A    No.

1    Q    Do you ever recall discussion of a rainy-day fund for

2    Mr. Das' hotel?

3    A    No.

4    Q    Do you ever recall him, Mr. Das, talking with Mr. Shah

5    about an agreement with the defendant's mother?

6    A    No.

7    Q    Or a loan to the defendant's mother?

8    A    No.

9    Q    What were the purpose of your emails and communications

10   with Mr. Shah?

11   A    To fundraise for the campaign.

12   Q    Now, Mr. Chast, at some point after you left the

13   campaign, did you speak with federal investigators and

14   members of the U.S. Attorney's Office?

15   A    Yes.

16   Q    And after that, did Liberty Square Group retain a lawyer

17   to enter into an agreement with the government?

18   A    Yes.

19   Q    And showing you Exhibit 31, is this a copy of the

20   agreement that you entered into with the government?

21   A    Yes, it is.

22   Q    What's your understanding of your obligations under this

23   agreement?

24   A    My obligation is to just to be truthful, cooperate.

25   Q    What's your understanding of what the government has

1  agreed to do as part of this immunity agreement?

2  A    That anything I'm sharing with the government wouldn't

3  be directly against me.

4  Q    In your own words, why did you enter this agreement with

5  the government?

6  A    That is what my attorney wanted to do.

7  Q    Have you met with prosecutors and law enforcement as

8  part of this case?

9  A    Yes.

10  Q    Approximately how many times?

11  A    Four or five.

12  Q    Did you also testify in the grand jury?

13  A    Yes.

14  Q    Were you interviewed by investigators before that as

15  well?

16  A    Yes.

17  Q    And you said you met with us about four or five times.

18  How many hours each time?

19  A    You spent two.

20  Q    Have you provided information, truthful information, to

21  the best of your abilities?

22  A    Yes.

23          MS. WAN:  If I could have a moment, your Honor?

24          THE COURT:  You may.

25       (Pause in proceedings.)

1          MS. WAN:  Nothing further.  Thank you.

2          THE COURT:  Mr. Kendall.

3          MR. KENDALL:  Do you want me to get started, your

4    Honor?

5          THE COURT:  Yes.

6          MR. KENDALL:  Sure.

7                        **CROSS-EXAMINATION**

8    **BY MR. KENDALL**

9    Q    Mr. Chast, that Exhibit 31 we just looked at, that's

10   what gives you immunity, correct?

11   A    Yeah, that's the agreement.

12   Q    And was one of the reasons that you thought you needed

13   immunity was because of the deposit you made for the Kristen

14   Campetti donation?

15   A    I didn't -- I didn't think much about it.  This is my

16   attorney's advice.

17   Q    I don't want to hear what your attorney said.

18          Did you think there was something improper about

19   the Kristen Campetti donation?

20   A    Just that, yes.

21   Q    Did the government ever tell you that they have records

22   to show the cash was her own and it was her own donation?

23   Did they ever tell that you when they gave you Exhibit 31?

24          MS. WAN:  Objection.  Facts not in evidence.

25          THE COURT:  Well, he can say they did or they

1    didn't.

2    Q    Did they ever tell you that?

3    A    They never told me that.

4    Q    Did they ever tell you, You don't need Exhibit 31 for

5    Kristen Campetti at all because she got cash out of the

6    business for reimbursement for expenses?  Did they ever tell

7    you that?

8              MS. WAN:  Objection.

9              THE COURT:  We're now making assertions of fact,

10   Mr. Kendall.

11   Q    As you came in here today, the government has left you

12   with the impression that that Kristen Campetti money may not

13   have been her own money, correct?

14             MS. WAN:  Objection.

15             THE COURT:  Well, yes or no.

16             MR. KENDALL:  It's his state of mind, your Honor.

17   A    My assumption was that it was Beej's money.

18   Q    Right.

19             And they never told you they have evidence that it

20   wasn't Beej's money?

21   A    That's correct.  They never said anything like that.

22   Q    They put you up there to put on that testimony and they

23   never tried to change your understanding, correct?

24             MS. WAN:  Objection.  Argumentative.

25             MR. KENDALL:  It's all to his state of mind.

1          THE COURT:  Well, I think it's more the tone that

2    she's objecting to than the question.

3          But, go ahead, you can answer.

4    A    Forgive me.  What's the question?

5    Q    They left you -- when you got up there to testify today,

6    they left you with the impression that that was not Kristen

7    Campetti's money, correct?

8    A    Or I suppose left me with my own impressions, right?

9    Q    Yes.

10   A    That left me with my own impression that it was Beej's

11   money.

12   Q    And they never told you that there may be reasons that

13   they know about that would make your answer improper or

14   incorrect?

15          MS. WAN:  Objection, facts not in evidence?

16          THE COURT:  Well, we'll see if Mr. Kendall can

17   produce the evidence that backs up his assertion.

18   A    Okay.  So -- sorry.

19   Q    They never told you, You're making the wrong inference,

20   did they?

21   A    They -- no, they never said that.

22   Q    They never told you that they have evidence to show

23   you're making the wrong inference, did they?

24          MS. WAN:  Objection.  Asked and answer.

25          THE COURT:  Yes.  That's one we've been over twice

1    now.

2           MR. KENDALL:  All right.

3           I'd like to start, if I may, with a series of the

4    emails all produced by the government and Bates stamped that

5    we've numbered as 1044, and I would like to offer them as

6    the next exhibit.

7           You can just show it to counsel and the witness,

8    please.

9           THE COURT:  163?

10          THE CLERK:  It would be, yes.

11          **(Defendant's Exhibit No. 163 received in evidence.)**

12       (Pause in proceedings.)

13          MR. KENDALL:  If we could start at the top, please.

14   If we could go to the very beginning.

15       (Exhibit published to the jury.)

16   Q    These are the weekly reports that were just discussed;

17   is that correct?

18   A    The daily recap, I believe.

19   Q    So we look at February [sic] 1, 2017, from Liberty

20   Square Group, Erin Thornton, and she says under

21   "Fundraising.

22          "Beej doing call time today with former law

23   colleagues to plan December 19th fundraiser."  Did I read

24   that correctly?

25   A    I don't know that I'm on the same page.  A December 1

1    recap?

2    Q    Yeah, December 1 recap.  "Hello everyone.

3          "Today's call recap."

4          Now let's drop down to "fundraising," the second

5    category.

6    A    Hm-hmm.

7    Q    "Beej doing call time today with former law colleagues

8    to plan December 19th fundraiser."  Did I read that

9    correctly?

10   A    Yes.

11         MR. KENDALL:  If we could drop down to the next

12   report, please, dated January [sic] 8.

13   Q    And it says there --

14         MR. KENDALL:  January, please.

15        Excuse me, December 12.

16   Q    He writes, "Yes," this is from Beej to you, "I will be

17   at LSG tomorrow.  Looking forward to the time there.  Are

18   you free on Friday?  We could do call time the entire day.

19   Sushil Tulli at Leader Bank has also confirmed for Friday."

20   Did I read that correctly?

21   A    Yes.

22         MR. KENDALL:  Could I have the next one, please.

23        And could I have the date of it, please.

24   Q    This is January 8, another one of these weekly reports

25   to you, among other people, correct?

1    A    Yeah.  You say "weekly."  I'm not sure if they were

2    weekly or not.

3    Q    Weekly, daily, whatever period?

4    A    Yes.  Absolutely.

5    Q    Thank you.

6              It says, "Fundraising.

7              "Sonali is working on D.C., San Francisco events,

8    and meetings with the salvation community.

9              "Tentative dates for the SF event is the weekend of

10   2/23," correct?

11   A    Correct.

12   Q    Then it says, "Call time was scheduled for next week

13   with Beej and Eric, Tuesday and Wednesday, 11 to 5,"

14   correct?

15   A    Correct.

16   Q    Then it says, "Beej has meeting with potential big

17   donors in Florida Friday this week, coordinated by Larry

18   Rasky."  Did I read that correctly?

19   A    You read that correctly.

20   Q    Who is Larry Rasky?

21   A    He was a -- unfortunately, he's passed, but he led a

22   consulting firm in Boston and was well known for his ability

23   to do political fundraising.

24   Q    He was one of the most prominent political fundraisers

25   in Massachusetts, correct?

1    A    Correct.

2    Q    He was one of Joe Biden's, one of his most prominent

3    political fundraisers?

4    A    Unfortunately, he didn't make it.

5    Q    He passed away during COVID?

6    A    Yes.

7    Q    And he was a beloved, respected figure in the political

8    field, correct?

9              MS. WAN:  Objection.

10              THE COURT:  Overruled.

11   A    Correct.

12   Q    So Beej was doing a lot of -- trying to do a lot of

13   fundraising work with Larry Rasky, correct?

14   A    He tried to make that connection, absolutely.

15              MR. KENDALL:  If we could have the next one,

16   please, January 9.

17   Q    If we go down to "Finance.

18              "Beej will be in Boston for call time with Eric

19   today," correct?

20   A    Correct.

21   Q    Then it says, "Beej has begun tracking down the FEC

22   login info."

23              Beej had repeatedly tracked it down, didn't he?

24   You asked for it several times, and he had to come back

25   again and again and find it, correct?

1    A    I don't believe he got to me again and again.

2    Q    Well, this is -- he's is asking for it on January 9.

3    Did you ask for it again a couple of weeks later?  You

4    needed it?

5    A    I don't remember the exact dates, but I certainly did

6    need it, yeah.

7         MR. KENDALL:  If we could go to the next date,

8    please.

9    Q    This is January 11.

10         It says, "Finance.

11         "Beej is well prepared for his Florida trip, ready

12    to ask everyone for contributions."  Did I read that

13    correctly?

14    A    You read that correctly.

15         MR. KENDALL:  Can we have the next one, please.

16    Q    January 17.

17         It says, "Finance.

18         "Beej and Eric have call time today."  Did I read

19    that correctly?

20    A    Correct.

21         MR. KENDALL:  Can we have the next one, please.

22         It says, Finance -- this is January 18, "Das for

23    Congress call recap."

24         And under "Finance" it says, "Slow call time yesterday,

25    but did follow up with Larry Rasky."  Did I read that

1    correctly?

2    A    That's correct.

3             MR. KENDALL:  If you go next one, please.

4    Q    January 19th, a recap.

5             "Finance.

6             "Setting call time tentatively for Tuesday and

7    Thursday afternoon next week.

8             "Another call time ongoing this afternoon before

9    the ed board prep."  Did I read that correctly?

10   A    That's correct.

11            MR. KENDALL:  Can we have the next one, please.

12   Q    January 22, "Das for Congress call recap."

13            Under "Finance.

14            "Setting call time tentatively for Tuesday and

15   Thursday afternoon next week.

16            "Another call time ongoing this afternoon before

17   the ed board prep."  Did I read that correctly?

18   A    Yes.

19            MR. KENDALL:  Can we have the next one, please.

20   Q    "January 23, Das for Congress call recap."

21            Under "Finance.

22            "call time today"; isn't that correct?

23   A    That's correct.

24            MR. KENDALL:  Can we have the next one, please.

25   Q    January 24, "Finance.

1          "Working with Eric and setting up the New York

2     fundraiser, made one thousand last night in the process of

3     setting it up."  Did I read that correctly?

4     A    You read that correctly.

5          MR. KENDALL:  Can we have the next one, please.

6     Q    January 25, "Das for Congress call recap."

7          "Finance:

8          "Good call time with Beej yesterday.

9          "More setup for the New York fundraiser.  Toby sent

10    along a name to contact.

11         "Looking into call time for next week." Did I read

12    that correctly?

13    A    You did.

14         MR. KENDALL:  Can we have the next one, please.

15    Q    January 26, Finance:  "Call time set for the Thursday at

16    LSG."  Did I read that correctly?

17    A    Yes.

18    Q    "Congressional --

19         MR. KENDALL:  If we can go to the next one, please.

20    Q    February 1, "Das for Congress call recap.

21         "Finance:  "FEC report was successfully filed last

22    night.

23         "Deb is sending Beej Rasky's cell number to reach

24    out had been using a work number up to now.

25         "Beej and Eric will make more New York calls today.

1          "Beej should also follow up with Sonali's person."

2          Did I read at that correctly?

3     A    Yes.

4          MR. KENDALL:  Next one.

5        (Exhibit published to the jury.)

6     Q    February 2.

7          "Finance:  "Good call time yesterday.

8          "Raised 850 online, 500 of which from a New York

9     guy.

10          "Another 2000 in commitments from New York people.

11          "Booked a space for the New York event.

12          "10,800 from one donor."

13          Did I read that correctly?

14     A    Yes.

15          MR. KENDALL:  Can we have the next, please.

16     Q    February 20.

17          "Finance: "Good call time last Friday and some

18     emails sent out are starting to show good financial returns.

19          "NYC fundraiser tomorrow.

20          "SF fundraiser Friday.

21          "Beej into LSG today, will do some call time."

22          Did I read at that correctly?

23     A    Yes.

24          MR. KENDALL:  Can we have the next one, please.

25     Q    May 1, 2018.  "Here is the agenda for upcoming morning

1    call.

2              "Yesterday's recap.

3              "Beej spent the entire day with LA Harris."  That's

4    the person that was brought in to replace you in the

5    fundraising?

6    A    Correct.

7              MR. KENDALL:  Could I have the next one, please.

8    Q    May 2.

9              "Good morning Everyone.

10             "Here is the agenda for the upcoming morning call.

11             "Yesterday's recap:

12             "Beej spent entire day with LA Harris," correct?

13   A    Correct.

14             MR. KENDALL:  Could I have the next one, please.

15   Q    May 3rd.

16             "Here is the agenda for the upcoming morning call.

17             "Yesterday's recap:

18             "Beej spent the entire day with LA Harris," yet

19   again.  Did I read that correctly?

20   A    Yes.

21             MR. KENDALL:  Could we have the next one, please.

22             MS. ZALZAL:  That's it.

23             MR. KENDALL:  That's it?

24             MS. ZALZAL:  Yes.

25             THE COURT:  Why don't we pause here for the morning

1    break.

2         Jurors, let's take the morning recess, 25 minutes.

3    We should have refreshments for you upstairs.  We'll come

4    back at 11:15.

5         THE CLERK:  All rise.

6       (Recess.)

7         THE CLERK:  All rise.

8       (Whereupon, the jury entered the courtroom.)

9       (Whereupon, the Court entered the courtroom.)

10        THE CLERK:  Court is open.  You may be seated.

11        THE COURT:  All right, Mr. Kendall, are you ready?

12        MR. KENDALL:  Yes.

13      Can we have a Government Exhibit 17, please.

14      (Exhibit published to the jury.)

15   Q   Mr. Chast, do you see Government Exhibit 17.

16   A   Yes, I do.

17   Q   That's an email that starts out from you to Molly Horan

18   on January 16, correct?

19   A   That's correct.

20   Q   And we see that you're giving her the summary of the

21   donations that are going to be reported for Q4 2017,

22   correct?

23   A   Correct.

24   Q   And that's the:  "Number of donations, 269," the number

25   under $200.  And then you write, "Total revenue over 425K

1    (his loans weren't always round numbers, waiting on the

2    totals.)"

3              And she responds, "This is great.  More than

4    50 percent being small donors is a good nugget to add,"

5    correct?

6    A    Yes.

7    Q    And you sent this to her to help her write her press

8    release?

9    A    Yes.

10   Q    And there's nothing in this document that talks about

11   $550,000 cash on hand, correct?

12   A    That's correct.

13   Q    And Beej had given you those numbers about 279, 280

14   thousand in loans and about a hundred and fifty that had

15   been raised, correct?

16   A    That sounds right, yes.

17             MR. KENDALL:  So if we could go to Exhibit 2,

18   please.

19      (Exhibit published to the jury.)

20   Q    This is the press release that announces $425,000 has

21   been raised.

22             That's an accurate number, correct?

23   A    Yes.

24   Q    And then it has the $550,000 cash on hand.

25             Now, you testified that, Oh, Beej gave it either to

1    me or to the communications people.  Wasn't that your

2    testimony?

3    A    The 550 number?

4    Q    Yes.

5    A    Yeah.

6    Q    You have no specific memory he said 550 to you cash on

7    hand, correct?

8    A    I suppose that's right, yes.

9    Q    And you don't know what he communicated to the press

10   people.  You just know they produced a press release with

11   that number, correct?

12           MS. WAN:  Objection.  Misstates.

13           THE COURT:  Overruled.

14   A    You're asking if I'm not sure if this number came from

15   Beej?

16   Q    Yeah.

17   A    I'm fairly confident it did.

18   Q    I'm not asking what you're confident.

19           I'm asking, He didn't say it to you, correct?

20   A    I don't remember.

21   Q    You don't remember.

22           So you can't claim he said it to you because you

23   have no memory of him saying it, correct?

24   A    Okay.  Correct.

25   Q    And the data you had didn't have that number, but

1    subsequently there's a press release that does have that

2    number, correct?

3    A    That's correct.

4    Q    You'd agree with me that's not something Molly Horan

5    would have invented and put into a press release, correct?

6    A    That's definitely correct.

7    Q    You'd agree with me if you -- I'm going into your state

8    of mind.  If you were to testify here that the most likely

9    source of that fictitious number is Scott Ferson, you'd get

10   fired from your job, correct?

11   A    I --

12   Q    If you can answer my question, please.

13   A    You're -- who else -- forgive me.  No, I don't think he

14   could fire me if I was being truthful.

15   Q    Okay.

16           So if you were to say that he put down a wholly

17   fictitious $550,000, he's a good-natured sport, he wouldn't

18   get upset at all?

19           MS. WAN:  Objection.

20           THE COURT:  Sustained.

21   Q    You gave accurate information to the press people.  Out

22   comes a press release that has $550,000.

23           You agree, that's a crazy number?

24   A    Forgive me.  I can't know that.

25   Q    Well, he had raised $425,000 through December 31.

1    A    Hm-hmm.

2    Q    Are we to assume he raised another 125,000 between

3    January 1 and January 16?

4    A    That is the assumption made by the press release.

5    Q    Yeah.

6         But you just told us that fundraising was going

7    poorly.

8    A    Yes.

9    Q    Do you agree with me if he was raising $7,800 a day for

10   16 days straight, that would be pretty good fundraising?

11   A    Yes.

12   Q    Didn't that strike you as a crazy number?

13   A    No.  It's very much thought out.

14   Q    Correct.  You didn't just -- it just wasn't important to

15   you?

16   A    Campaigns make you very tired.  I apologize.  Yeah.

17   Q    Campaigns make you very tired?

18   A    Tired, yeah.

19   Q    And also, campaigns use the press people to spin things

20   as good as they can get, correct?

21   A    I suppose that's right, yeah.

22   Q    The phrase used is "spin doctor."  You heard that

23   phrase?

24   A    That might be before my time, but I do understand the

25   idea.

1    Q    I may be showing my age.

2              You're not a spin doctor, you're a finance guy,

3    correct?

4    A    Correct.

5    Q    Scott Ferson is a spin doctor.

6    A    I would hate to think he sees himself that way.

7    Q    But as that phrase is used for people of my generation,

8    he falls into that category, correct?

9    A    He is a public relations expert, yes.

10   Q    So that's correct, he's a spin doctor?

11   A    Defined as that, yes.

12              MR. KENDALL:  So if we could then go to Exhibit 18.

13         (Exhibit published to the jury.)

14   Q    This is an email of January 19, which you're copied on.

15              This is three days after the spin doctor has issued

16   the press release, correct?

17   A    Correct.

18   Q    And that's when Beej finally uses that number from what

19   he saw in a press release.

20   A    (No response.)

21   Q    Correct?

22   A    I'm sorry.  I didn't know that was the question.

23              I don't know if that's the first time.

24   Q    That's the first time you're aware of it?

25   A    Sure.

 1    Q    It's the only time you're aware of it?

 2              MS. WAN:  Objection.  Vague.

 3              THE COURT:  Sustained.

 4    Q    Are you aware of any other time he used that number

 5    before January 19?

 6    A    I have no specific memory of it.

 7              MR. KENDALL:  Could we have Exhibit 8, please.

 8         (Exhibit published to the jury.)

 9    Q    Now, you've testified some things about Mr. Bose, do you

10    remember that?

11    A    I remember this, yes.

12    Q    And you were shown this document.

13              If you take a look at Exhibit 8, it's from Mr. Das

14    to Mr. Bose.  It's dated December 11.  It talks about "our

15    call today."

16              Were you on that December 11th call?

17    A    I don't believe I was.

18    Q    And it says, "Dear Ajoy Kaku.

19              "I am sorry I missed you in North Andover."

20              Who related to this campaign lives in North

21    Andover?

22    A    I'm not 100 percent sure.  Is that Beej's parents?

23    Q    Yes.

24    A    Okay.

25    Q    You know Beej grew up in North Andover in his parents'

1    house?

2    A    I would need a refresher on his bio, but, sure.

3    Q    Sure.  I appreciate you're doing the best you can.

4         So Beej is saying, I'm sorry I missed you when you

5    met with my parents, correct?

6    A    Yes.

7    Q    "I was in Miami for fundraising activities."

8         He was in Miami around December 7, December 8,

9    around that time period.  Do you remember that Art Basel was

10   a fundraising event?

11   A    I remember that one, yeah.

12   Q    On the Troca One, the yacht.

13        The yacht wasn't his private boat.  It was a

14   business investment, correct?

15   A    My understanding is that, yeah.

16   Q    It's supposed to be a floating hotel basically?

17   A    Yes.

18   Q    You can rent it for functions.  You can rent it for

19   staying over, or trips, correct?

20   A    Yeah, correct.

21   Q    And he was trying to use it to hold some fundraisers for

22   the campaign.

23   A    Yeah.  That was an idea that had been floated.

24   Q    You'd agree with me as a fundraising expert, if you can

25   hold a fundraising event in kind of a fun, glamorous

1    setting, it may attract more people?

2    A    The biggest thing was putting the ask on a person, but I

3    can imagine it would be more fun to go.

4    Q    More fun than McDonald's?

5    A    Yes.

6    Q    Now, you testified that Beej did not include you in some

7    of the calls with Mr. Bose, correct?

8    A    Correct.

9    Q    And did you think somehow that was not right or sort of

10   caused you concern?

11   A    No.

12   Q    Not at all?  It would be perfectly fine that he didn't

13   include you?

14   A    Yeah.

15   Q    Do you speak Bengali?

16   A    I do not.

17   Q    You understand that Mr. Das and Mr. Bose speak Bengali?

18   A    I do.

19   Q    And they talk to each other in Bengali?

20   A    Yes.

21   Q    Do you know that Mr. Bose has been a family friend of

22   the Das family for decades?

23   A    I do remember the explanation of the title there.

24   Q    Do you know what's the history of the relationship?

25   A    No.  Beyond family friend, no.

1    Q    You don't know that when Mr. Bose came here as an

2    immigrant it was the Das family that welcomed him and helped

3    him get adjusted?

4              MS. WAN:  Objection.

5              THE COURT:  Sustained.

6    Q    Are you aware that Mr. Bose has since become fabulously

7    wealthy?

8              MS. WAN:  Objection.

9              THE COURT:  That could be marginally relevant.

10     Overruled.

11   A    I don't know.

12   Q    He's somebody he's reaching out to for fundraising,

13   correct?

14   A    Yes.

15   Q    And he wanted his family to use their contacts to raise

16   money, correct?

17   A    Correct.

18   Q    You also testified that when you first met Beej he said

19   he had raised 50,000, and that that number, you thought,

20   didn't materialize?

21   A    Correct.

22   Q    Was this back in November?

23   A    Yes.

24   Q    Did he -- did you press him for the details when he said

25   he had raised 50,000?

1    A    I did not.

2    Q    So you didn't ask him whether it was deposits or

3    commitments?

4    A    Correct.

5    Q    Sometime people get commitments and they don't -- and

6    the donor doesn't follow through, correct?

7    A    That is the frustration of fundraising, yes.

8    Q    And you didn't ask him whether the raising was 50,000 of

9    his own money that he planned to commit or was it donations

10    from other third parties, correct?

11    A    I did not ask him that at the time, no.

12    Q    Now, I think you told us that you came to Lowell for

13    call time, correct?

14    A    Correct.

15    Q    Sometimes Beej came down to Boston for call time?

16    A    At times, yeah.

17    Q    Other than call time, did you ever come up to the

18    campaign?

19    A    Yeah.  I mean, there was, I remember, an event in the

20    hotel we were there for.  So, yes, at least one example.

21    Q    So other than one event, you really were there for call

22    time or you didn't come, correct?

23    A    Correct.

24    Q    So you didn't observe what people were doing in the

25    campaign headquarters?

1    A    When I wasn't -- right, because I was not always there,

2    is your point, yeah.

3    Q    Yes.

4         Now, with respect to the issue of bank accounts, do

5    you have a specific memory of asking Beej for access to the

6    bank accounts?

7    A    I remember here that there was the request in writing.

8    You had an email.

9    Q    Well, you remember there was an email that talks about

10   bank accounts.  It wasn't directed to Beej, was it?

11   A    Forgive me.  That was my intent.

12   Q    Well, did you send him an email saying, I need the bank

13   account?

14   A    In those exact words, not that I remember.

15   Q    Okay.

16        You were interviewed twice by the FBI, do you

17   remember that, before the trial, but, you know, years ago?

18   A    Yeah, for the grand jury testimony, yeah.

19   Q    One was in December -- excuse me.

20        One of those interviews, would it remind you, if it

21   was in April of 2021?

22   A    That sounds correct, yeah.

23   Q    And do you remember that Mr. Gallagher, the gentleman in

24   front of me, was present?

25   A    Yes.

1  Q   And your lawyer, Michelle Shapiro?

2  A   Also there.

3  Q   And do you remember FBI Lindsay Capodilupo, who's

4  sitting in the corner (indicating), was there?

5  A   Yes, I do.

6  Q   Do you remember she was taking notes?

7  A   That sounds like a thing, yeah, yeah.

8  Q   And do you remember telling her that you do not remember

9  specifically asking to see Das for Congress bank accounts?

10  A   I don't remember --

11  Q   Yes or no.  Do you remember telling her that?

12  A   That -- yeah, it was -- that was a very interesting

13  time, and I remember saying that, yeah.  I've obviously had

14  years at this point to think though.

15  Q   So your -- so six years after the fact your memory is

16  better than it was three years after the fact?

17  A   I understand your point.

18  Q   My point is, you really don't remember asking for it, do

19  you?

20  A   I -- it is ingrained so strongly in me that I believe

21  that I asked that.

22       But you are correct that I can't tell you the shoes

23  I was wearing the date she wrote about that.

24  Q   At the time you worked for Das, you never worked in a

25  federal campaign as a finance director, correct?

1    A    Correct.

2    Q    Since then you've worked in federal campaigns, correct?

3    A    Correct.

4    Q    And it's become ingrained in you, correct?

5    A    Correct.

6    Q    And, if anything, some of the frustrations that you had

7    in the Das campaign has impressed upon you, Gee, next time I

8    should ask for the bank accounts, correct?

9    A    Absolutely.

10   Q    Did you ever tell anybody on the Das campaign, I've

11   never done this FEC stuff before, I'm really not that good

12   at it?

13   A    They were familiar it was my first time, yeah.

14   Q    Who told who it was your first time?

15   A    I wasn't hiding that at all.

16   Q    I'm not asking whether you were hiding it.  Just because

17   you're not hiding it doesn't mean you're telling it.

18   A    It is correct, what you just stated.  People knew it was

19   my first time.  I never downloaded FECFile before, yeah.

20   Q    You never sent an email to anybody saying, I've never

21   done this before, I'm not very good at it, correct?

22   A    Correct.

23   Q    And you can't tell us when you -- when Mr. Chaudhuri,

24   Mr. Das, and Mr. Siebert came to interview at the Liberty

25   Square Group back for the hiring process, nobody said,

1    Here's Eric, he's never done it before, but you should hire

2    us anyways?

3    A    Nobody stood up and said those words.

4         (Pause in proceedings.)

5    A    We -- yes, I was there for fundraising.

6              MR. KENDALL:  May I have a moment, your Honor?

7              THE COURT:  You may.

8    Q    I do want to go a little bit back into your expertise.

9              MR. KENDALL:  Could we have -- it's been entered

10   into evidence.  I don't know the number -- I-770.

11        (Exhibit published to the jury.)

12             MR. GALLAGHER:  This is from -- what exhibit number

13   is it?

14             THE CLERK:  One hundred sixty-one.

15   Q    I want to show you 161.  This is from the Liberty Square

16   website.  Did you help draft this?

17   A    I did.

18   Q    And if we go down where it says "Compliance," did you

19   draft that section?

20   A    Yeah, I remember.

21   Q    And you wrote, "Campaigns push candidates to the

22   extremes of physical and mental exhaustion."

23   A    Yes.

24   Q    That's true, isn't it?

25   A    Oh, that's 100 percent true.  This was written several

1    years later.  This is the current website.

2    Q    Right.  But this is based upon your experience.  That

3    was true back in 2017?

4    A    That for sure was, yes.

5    Q    And when candidates are pushed to the extremes of

6    physical and mental exhaustion, sometimes they're

7    distracted.

8    A    Yeah.

9    Q    Sometimes they don't follow-up.

10   A    I agree.

11   Q    Sometimes they don't do everything they're supposed to

12   do, correct?

13   A    It can be tough to focus in those circumstances.

14   Q    And then you have here, "The only thing a candidate

15   should worry about is how many voters they've talked to in a

16   day," meaning they should be laser focused on the most

17   essential things and not bother with everything else,

18   correct?

19   A    Getting bogged down in the details is a bad use of your

20   time.

21   Q    "Liberty Square Group will get your paperwork filed, set

22   up your banking and compliance, walk you through the dos and

23   don'ts of campaign finance, and file reports on your

24   behalf."

25           There's part of what you do for your fundraising

1    compliance program, correct?

2    A    Since we brought on someone at the end of 2020, yes.

3    Q    Are you saying for the Das campaign -- you got the

4    paperwork filed, correct?

5    A    Yeah, it happened organically.

6    Q    The banking had already been set up, correct?

7    A    Correct.

8    Q    And you filed reports.  You did that, correct?

9    A    Correct.

10   Q    Now, when Liberty hired you, I take it Scott Ferson was

11   the one who interviewed you?

12   A    Yes.

13   Q    You gave him a resumé?

14   A    Yes.

15   Q    Talked about your background?

16   A    Yeah.  And we had actually worked together in a campaign

17   or two.

18   Q    What campaigns did you work together on?

19   A    Leland Cheung running for state rep., and Marian Ryan's

20   first year.

21   Q    You were honest with him about your background, correct?

22   A    Correct.

23   Q    So you told him you'd done a lot of this work at the

24   state level of finance and compliance, but you made it clear

25   to him you hadn't done any federal work, correct?

1    A    Yeah.

2              MR. KENDALL:  If we could show the witness, please,

3    716, and have a copy to the government, please.

4    Q    Do you recognize this?

5    A    Yes, I believe -- I had a personal website.

6    Q    This is something you wrote, isn't it?

7    A    Yeah.

8    Q    And I pulled it off your website, correct?

9    A    That's correct.

10             It's very cool to see.

11             MR. KENDALL:  I would like to offer this as our

12   next exhibit, your Honor?

13             THE COURT:  All right.  164?

14             THE CLERK:  Yes.

15             THE COURT:  164.

16             **(Defendant's Exhibit No. 164 received in evidence.)**

17             MR. KENDALL:  Could you show it to the jury,

18   please.

19        (Exhibit published to the jury.)

20   Q    The title is, "Why can't I just do it myself?"  That's a

21   question that you want candidates to ask, correct?

22   A    Correct.

23   Q    And this whole article is your sales pitch to

24   candidates.  You gotta hire us consultants to do it all, or

25   to do many of the things.

1    A    This was -- yeah, a short-lived effort to try to be my

2    own consultant, yeah, and it --

3    Q    Just answer my question?

4    A    Yeah, sure.  That was the purpose.

5    Q    This is the pitch to candidates that you need

6    consultants to do a lot of the logistics and paperwork in

7    compliance?

8    A    That if they're sitting there, you know, paying rent,

9    they're not sitting there fundraising.  That's the idea.

10   Q    And they should hire you to take care of that stuff?

11   A    Yes.

12            MR. KENDALL:  Could we show the witness next, No.

13   729, please, for identification, I-729.

14   Q    Do you recognize this as your bio on your firm website?

15   A    Yeah.  This was the LSG's website or --

16   Q    It may be a LinkedIn.  No, it's your bio.  I believe

17   it's LSG, but I will let you answer.

18            It is a bio you put out on the Internet, right?

19   A    That is true, yes.

20            MR. KENDALL:  Your Honor, I would like to offer

21   this as the next exhibit.

22            THE COURT:  165.

23            **(Defendant's Exhibit No. 165 received in evidence.)**

24        (Exhibit published to the jury.)

25   Q    At the top "About."

1              "Eric Chast is the Vice President of Fundraising

2      and Development at Liberty Square Group..."

3              So when you held those titles -- when did you get

4      those titles?

5      A    When I joined in October '16.

6      Q    And if we go down to the second paragraph, it says -- in

7      2018 you became the COO, correct?

8      A    Correct.

9      Q    So this would have been written while you were at the

10     Das campaign, correct?

11     A    That's -- that's a good question.

12     Q    You don't have your COO title in there, do you?

13     A    No, no.  It was before I was COO, but the entirety of

14     the Das campaign there's an overlap with the whole time.

15     But it could be close by, yeah.

16     Q    You became COO in January of 2018, correct?

17     A    I think the COO left in February, but, yeah, January,

18     February 2018.

19     Q    So it's before, January, February of 2018, correct?

20     A    Correct.

21     Q    And it says in the second paragraph, "Eric has a proven

22     track record of stewarding first-time candidates and young

23     nonprofits through growing pains, establishing relationships

24     with new donors."

25              You picked a very unusual word, "stewarding."  Can

1    you tell the jury what "stewarding" means?

2    A    I've never been asked to define that.

3           But the concept is -- it comes from the nonprofit

4    fundraising world, where you do donor stewardship.  So,

5    obviously, you thank your donor.  That's a part of

6    stewarding, growing the relationship.  It's all the things

7    you do along the way to help build a relationship with the

8    donor.

9    Q    If I were to go suggest to you if you looked up

10   "steward" on the dictionary in Google, the meaning of the

11   word is, "A person who does something for others."

12          MS. WAN:  Objection.

13          THE COURT:  Are we testifying now, Mr. Kendall?

14   Q    Would you agree with me?

15   A    I never looked up the definition, but I know --

16          MS. WAN:  Objection.

17          THE COURT:  Sustained.

18   A    -- how it's used in the nonprofit world.

19   Q    You agree with me "stewarding" entails doing things for

20   others?

21   A    Okay.  I can agree with that.

22   Q    If you go to a private club, there might be a steward

23   there that takes care of the guests, correct?

24   A    Yeah.

25   Q    If you go to the racetrack, there might be a steward

1    taking care of the racehorses, correct?

2          MS. WAN:  Objection.

3    Q    You're familiar with the use of that phrase.

4          THE COURT:  Overruled.

5    A    Yeah.  I mean, I understand words can have more than one

6    meaning, and that is one of the meanings of the word.

7    Q    So we can read that as saying, Eric has a proven track

8    record of taking care of things for first-time candidates.

9    That's the meaning you were trying to give, wasn't it?

10   A    No.

11         More -- if you're visualizing it, more of holding

12   their hand down the path than driving the car.  That's what

13   I am trying to convey.

14   Q    Are you holding the hand or driving the car?

15   A    I'm the one holding the hand.  That's the intent of

16   these words.

17   Q    So you're going to hold the candidate's hand and guide

18   them and help them avoid growing pains, correct?

19   A    Correct.

20   Q    And lots of first-time candidates have real growing

21   pains.

22   A    Almost everyone.

23   Q    The political world is very different than the business

24   world, correct?

25   A    I believe that's correct.

1    Q    And the pressures and demands that a candidate faces can

2    be completely new and different to what a business person

3    would be facing, correct?

4    A    Correct.

5    Q    Now, I think you testified that you have -- well, I

6    don't know if you testified or not.

7            You've served as a treasurer in political

8    campaigns, correct?

9    A    At the state level, yes.

10            (Reporter interrupts.)

11    Q    At the state level, not at the federal level?

12    A    At the state level.

13    Q    At the federal level, you've been a finance director?

14    A    Oh?

15            Just looking back, with Beej, and then I haven't

16    really done federal fundraising since then.  No, I don't

17    think I have been a -- in charge of fundraising.

18            MR. KENDALL:  Could we have I-726, please.

19    Q    And if you could tell us if that's your LinkedIn resumé?

20    A    This my LinkedIn.

21            MR. KENDALL:  I would like to offer it into

22    evidence, your Honor, please.

23            THE COURT:  166, Tim?

24            THE CLERK:  166.

25            **(Defendant's Exhibit No. 166 received in evidence.)**

1    Q    And if we look down at the third paragraph, it says,

2    "Demmers Chast has staffed, managed, or consulted for nearly

3    40 democratic Campaigns..."  Do you see where I am reading?

4    A    I do.  I'm with you.

5    Q    And then it says on the -- if we go to the third line of

6    that paragraph towards the end, that you "served as

7    treasurer for local, statewide, and federal candidates."  Is

8    that an accurate statement?

9    A    No.

10   Q    So you haven't served as treasurer for federal

11   candidates?

12   A    Correct.

13   Q    Did you write this resumé?

14   A    Yeah.  That's me who wrote it.

15   Q    Was that a mistake?

16   A    Yeah.

17   Q    I don't want to give you a hard time.  You weren't

18   looking to commit a fraud, were you?

19   A    No.  On my LinkedIn?  I just exaggerate a little my

20   resume.

21          At the state and local level, absolutely.

22   Q    Maybe it was an oversight or a mistake, but it wasn't

23   and intentional bad act; do you agree with me?

24          MS. WAN:  Objection.

25          THE COURT:  Yeah, that's a little argumentative,

1      but let's go.

2      Q    It was a mistake, correct?

3      A    Yeah.

4      Q    You meant no harm?

5      A    Correct.

6      Q    Now, you testified earlier that you have looked on the

7      FEC website to get an understanding of some of the

8      requirements of filing FEC forms?

9      A    Yes.

10     Q    And would you agree with me that the FEC website would

11     be a good source of information on how FEC 3 forms should be

12     filed?

13     A    Yes.

14     Q    And how you should have done your work when you were

15     finance directer for the Das campaign?

16     A    Yes.

17           MR. KENDALL:  I would like to show the witness

18     I-28, please.

19     Q    Do you see this is a document from the FEC website?

20     A    I see that it is, yes.

21     Q    It's from May 2017.  So it was in effect during the Das

22     campaign?

23     A    Yes.

24           MR. KENDALL:  I would like to offer it into

25     evidence, your Honor.

```
1              THE COURT:  All right.  Next exhibit.

2              THE CLERK:  167.

3              (Defendant's Exhibit No. 167 received in evidence.)

4         MS. WAN:  I would ask for a limiting instruction as

5    to the purpose of this exhibit.

6              THE COURT:  I'm sorry.  What kind of instruction

7    would you like?

8         MS. WAN:  That it's not a statement of the law, but

9    it goes to the witness's state of mind.

10             THE COURT:  No.  I think as to what he's holding

11   himself out to the candidates he's representing.

12        I think we've kind of burned this one to the ground,

13   but let's go ahead.

14   Q    And it states at the top, "FEC Record:  Outreach.

15   Committee Treasurers (2017).  May 9, 2017."

16             Do you see the top?

17   A    I see where it says that, yeah.

18   Q    And the first line of it says, "Every political

19   committee must designate a treasurer before it can accept

20   contributions or make expenditures."  You know that to be

21   true, correct?

22   A    Yeah.

23   Q    Now, if we drop down two headings to where it says

24   "Treasurer," it says, "The treasurer is not required to have

25   any special training."  That's your understanding, correct?
```

1    A    Well, yeah, I suppose it is.

2    Q    It goes on further, "but a knowledge of basic accounting

3    principles is helpful."  That's your understanding, correct?

4    A    I think it would be helpful, yeah.

5    Q    Then it says, "The treasurer may wish to obtain the

6    services of a bookkeeper or accountant."

7              You're generally familiar with the idea that in

8    many campaigns people hire someone to do all the work for

9    the treasurer?

10   A    I'm familiar with that, yeah.

11   Q    I mean, it could be a wide range of involvement that a

12   treasurer can have, correct?

13   A    Correct, from what I've seen, yeah.

14   Q    It could be very hands-on and detailed on one side,

15   correct?

16   A    Yes.

17   Q    Or to the other extreme, it could be just a figurehead

18   and have a professional staff take care of everything?

19   A    I mean, particularly at the state level, but that is

20   what I've seen.

21              MR. KENDALL:  I would like to turn to the second

22   page, please.

23   Q    It says, "Treasurer's responsibilities" at the bottom.

24   Do you see that?

25   A    Hm-hmm.

1    Q    It says, "The treasurer's duties include:

2            "Filing all committee reports and statements

3    accurately and on time."  You understand that to be part of

4    the treasurer's role?

5    A    Okay.  Yeah.

6    Q    And that's what you were trying to help accomplish when

7    you were at the Das campaign?

8    A    Yes.

9    Q    And the treasurer is supposed to deposit receipts, or

10   somebody else can do it for the treasurer, correct?

11   A    Yeah.

12   Q    And for finance they had Deb Belanger helping out with a

13   lot of the checks coming from in, correct?

14   A    I don't remember if she was handling the checks

15   directly.

16   Q    And a woman named Sunon [ph.] -- I forget Sunon's name.

17   It begins with a P.  Do you remember there was a woman with

18   a South Asian name?

19   A    Sonali Lappin?

20   Q    That's it.  Thank you very much.

21           They were both involved with processing checks and

22   counting the checks, correct?

23   A    I thought Sonali was brought in for a finance role

24   specifically in the South Asian community.

25   Q    Then it says, "Authorizing expenditures or appointing

1  someone else, orally or in writing, to authorize

2  expenditures," correct?

3  A   Correct.

4  Q   And then if we turn the page.

5         If we look at the top, it says, "While the

6  treasurer is responsible for ensuring these activities are

7  carried out, support staff, volunteers or consultants may

8  actually perform these duties."  You come under the category

9  "consultant," correct?

10  A   Correct.

11  Q   And then if we drop down -- strike that.

12         So in terms of how a campaign was supposed to

13  operate in your mind, it was entirely appropriate that you

14  were overseeing all of the FEC filing for the Das campaign,

15  correct?

16  A   I -- yeah, I mean, I guess it was fine, even if it

17  wasn't supposed to be the intent from the beginning.

18  Q   You never called up Scott Ferson and said, Gee, Scott,

19  we got to speak to the client.  I can't be doing this.  Did

20  you?

21  A   No, no.  I don't think I did.

22  Q   You never called up Scott Ferson and said, "They're not

23  doing things the way I think they should be done.  You've

24  got to speak to Beej to change, or, I can't do this.

25         You never had that conversation with Scott, did

1    you?

2    A    I don't think I did.

3    Q    If we drop down a couple of paragraphs on that page, it

4    says "Administrative fines.

5              "Under the Commission's Administrative Fine

6    Program, committees may be required to pay civil money

7    penalties if they file a report late or fail to file a

8    report."  That you're quite familiar with, correct?

9    A    Yeah.

10   Q    There's a whole audit staff at the FEC that reviews

11   reports, correct?

12   A    Correct.

13   Q    And sometimes they can initiate, you know, disciplinary

14   actions, assess fines, and have a process, correct?

15   A    Yeah.  And, of course, all of this I'm much more

16   familiar with now than I would have been at the time.

17   Q    Sure.

18              And then, at the very bottom line it says the

19   phrase "Internal controls."

20              And let's turn to the next page, please.

21              If we drop down to the second paragraph it says,

22   "To help protect committees, the FEC created a safe harbor

23   for political committees that have certain internal controls

24   in place to prevent misappropriations and associated

25   misreporting.

1          "In order to avail itself of the safe harbor, a

2     political committee must implement these minimum internal

3     controls."

4          Are you aware that the FEC has best practices for

5     campaigns?

6     A    It depends.

7          This document -- I'm unfamiliar with this

8     particular document.

9     Q    It states, "In other words to avail itself of the safe

10    harbor, a political committee must implement these minimum

11    internal controls."

12         The first is that, "All bank accounts must be

13    opened in the name of the committee."

14         That certainly happened with the Das campaign,

15    correct?

16    A    I don't know.

17    Q    Well, you're not claiming there was more than one bank

18    account at the Lowell Five for the campaign, are you?

19    A    I never -- I never saw any of it, so I'm just telling

20    you I don't know.

21    Q    As far as you know, there was a bank account at the

22    Lowell Five and no other for the campaign?

23    A    Correct.

24    Q    Just as far as you know, okay.

25         Then it says, "Bank statements must be reviewed for

1    unauthorized transactions and reconciled with the accounting

2    records each month.  Further, bank records must be

3    reconciled with disclosure reports prior to filing.  The

4    reconciliation must be done by someone other than a check

5    signer or an individual responsible for handling the

6    committee's accounting."

7            Were you aware that that was one of the FEC's best

8    practices that they recommend?

9    A    I was not.

10   Q    You never went to Beej and said, Look, Beej, this is

11   important.  I gotta look at the bank statements.  It's good

12   for you and it's good for me.

13           You never had that type of conversation, did you?

14   A    It was clear I wanted the bank access.

15   Q    It was clear you wanted the bank access.

16           My question was, Did you ever say to Beej, go to

17   him directly -- let me withdraw the question.

18           You filed these reports without ever looking at

19   bank statements, correct?

20   A    That is correct.

21   Q    You saw a press release that had a cash-on-hand number

22   that just wasn't, from your professional experience, knowing

23   what you do about how FEC forms are filed, just simply not a

24   possible or real number, correct?

25           MS. WAN:  Objection.

```
 1                THE COURT:  Overruled.
 2   A    I -- it's not something I thought about at the time.
 3   Are you asking me, like --
 4   Q    Looking at it now as a professional with years of
 5   experience, looking at it now, that press release doesn't
 6   make sense, correct?
 7   A    I know what the QR report ended up being, so I know that
 8   it didn't make sense now.
 9   Q    But you know that if you raised 425 in your first
10   quarter, you got 16 days after that and you're doing a lousy
11   job raising money, you didn't bring in another $125,000 in
12   those 16 days, correct?
13                MS. WAN:  Asked and answered, your Honor.
14                THE COURT:  Sustained.
15   Q    You agree with me that somebody who was a professional,
16   who had years of experience in campaigns and knew how these
17   things worked would have sensed there was something
18   suspicious about that 550 number?
19                MS. WAN:  Objection.
20                THE COURT:  That question he can have.
21   A    The truth is at the time it's not something that raised
22   an alarm for me.
23   Q    It didn't raise it for you because you didn't have that
24   type of experience.  But if someone did, it should have
25   raised it for them, correct?
```

1    A    I understand your point, and, likely, yeah.

2    Q    And of the four people who reviewed that press release,

3    the only one that had years of experience in campaigns at

4    the federal level was Scott Ferson, correct?

5    A    I --

6    Q    Yes or no?

7    A    He has years of experience, yes.

8    Q    And he has the job that is commonly known as "spin

9    doctor," as you already testified to, correct?

10   A    Begrudgingly using that title, sure.  He's never used it

11   himself.

12        MR. KENDALL:  May I have a moment, your Honor, to

13   check some notes?

14   A    You may.

15        (Pause in proceedings.)

16   Q    Are you aware of the FEC having a book that's sort of a

17   guide to congressional campaign committees?

18   A    Specifically a book, no.

19   Q    You're not aware of that guidebook?

20        MR. KENDALL:  Could we have -- is it I-28 that I'm

21   looking for that I used in our opening?

22        (Pause in proceedings.)

23        MS. WAN:  I object to the foundation.

24        THE COURT:  I haven't heard a question yet.

25   Q    You told us you looked at the FEC website to familiarize

1    yourself with your job, correct?

2    A    With Form 3 specifically, yes.

3    Q    And you think that's a good resource to look at to

4    understand what would be expected of you with respect to

5    Form 3; is that correct?

6    A    Correct.

7         MR. KENDALL:  Your Honor, this specifically deals

8    with Form 3 issues.  I would like to offer this as our next

9    exhibit from the FEC website.

10        MS. WAN:  Objection.  Your Honor, there is no --

11        THE COURT:  You may be able offer this through an

12   FEC witness, but he says he's never seen it.

13        MR. KENDALL:  If he says this is an authority and

14   he looked on the website and missed it --

15        THE COURT:  No.

16        MR. KENDALL:  -- I think I can --

17        THE COURT:  I thought you were arguing he wasn't an

18   authority on FEC matters.

19        MR. KENDALL:  No.  He said the website was an

20   authority that he confirmed --

21        THE COURT:  That's not good enough.  Not good

22   enough to admit the exhibit.

23   Q    Are you familiar with the fact that the FEC states that

24   A candidate has no responsibility to file FEC 3 forms?

25        MS. WAN:  Objection.  Misleading.

1          MR. KENDALL:  State of mind, your Honor.

2          MS. WAN:  Misstatement of law.

3          THE COURT:  No.  She's objecting to the fact that

4   you're making all kinds of assertions in the question.

5      But can you answer that yes or no.

6          THE WITNESS:  Could you say it again?

7   Q   Is it your understanding that the FEC has given guidance

8   that a candidate has no responsibility to file an FEC 3

9   form?

10  A   I'm not aware of that.

11  Q   You have no idea of the FEC's position on that?

12  A   That a candidate doesn't have to file a Form 3?

13  Q   Yeah.

14  A   I -- that -- I'm a little surprised by that.

15  Q   The committee files Form 3, correct?

16  A   Okay.  I think I understand what you're saying now.  I

17  assumed that you meant that the committee didn't have to

18  file.

19          You're saying that the candidate doesn't have to be

20  the person that files it.

21  Q   The candidate personally is not the one that files the

22  Form 3?

23  A   Okay.  That a committee has to, but it doesn't have to

24  be the candidate.  I understand.

25  Q   The treasurer files it on behalf of the committee,

1    correct?

2    A    Yes.

3    Q    And the individual candidate personally has no reporting

4    obligations, correct?

5            MS. WAN:  Objection.

6            THE COURT:  Well, if he can answer.

7            Do you know?

8            If you don't know, just say, "I don't know."

9    A    I don't know.

10   Q    You don't know in how many federal campaigns you worked

11   on in a fundraising capacity?

12   A    How many?

13   Q    Yeah?

14   A    Federal fundraising?  I mean, other than Beej?

15   Volunteering with one other person around the same time.

16   And then I was with Niki Tsongas, but I never actually did

17   anything for her.

18           This year we did a little bit for Ed Markey while

19   they had a staffing shortage, and that was about two months.

20   Q    So let's see.  The first time you did it was with the

21   Das campaign, and you said you volunteered for another

22   campaign at the same time?

23   A    Yes.

24   Q    Who did you volunteer for?

25   A    Someone in Texas named Rick Kennedy.

1    Q    And how many hours did you spend volunteering for Rick

2    Kennedy?

3    A    It wasn't a lot.  I mean --

4    Q    Was it a meaningful amount in terms of your experience

5    and professional growth?

6    A    No.

7    Q    You count that as zero then, correct?

8    A    Okay, yeah.

9    Q    So other than the Das campaign, you did some volunteer

10   work, not -- excuse me.  You didn't do volunteer work.  And

11   you did some other work for Senator Markey?

12   A    Hm-hmm.

13   Q    And how many hours did you do reporting or FEC work for

14   the Markey campaign?

15   A    The Markey, I am helping them prepare their reports as a

16   part of my current job.

17   Q    Are other people involved in preparing those reports?

18   A    I'm the one that's building it.  Other people are

19   responsible for signing off.

20          So you've got the treasurer, assistant treasurer,

21   campaign chairman, and the fundraising director all receive

22   it and sign off.

23   Q    When did your Markey responsibilities start?

24   A    It started at the end of 2021, beginning of 2022 when we

25   had a sudden departure on the staff, sort of an emergency

1    situation.

2    Q    On the Markey staff or on the Liberty Square staff?

3    A    Liberty Square.  We hired a Markey staffer who was doing

4    it to do it here in-house, and then they left.

5    Q    So up through, let's say January of '22 when the Markey

6    situation started, the Das campaign was the only federal

7    reporting you ever did?

8    A    Yeah.

9        (Pause in proceedings.)

10   Q    Did you explain that to Mr. Gallagher and Ms. Wan, your

11   lack of federal experience?

12   A    I certainly hope that came through clearly.

13   Q    Now, I want to turn next to the topic of Toby Chaudhuri.

14        You've met Mr. Chaudhuri, correct?

15   A    Correct.

16   Q    He came with Mr. Das to his first interview with Liberty

17   Square, correct?

18   A    That's correct.

19   Q    And you know what his title was?

20   A    Campaign chairman.

21   Q    That means he's sort of the top person in the hierarchy?

22   A    Yeah.

23        I mean, it can mean different things.  It could be

24   honorary.  It can be a strong, close adviser, yes.

25   Q    He was Mr. Das' closest adviser, correct?

1    A    At least one of them, yeah.

2    Q    Well, did you see anybody else who had more influence

3    over Mr. Das than Mr. Chaudhuri?

4    A    I guess not.  I can't -- I can't -- I don't feel like I

5    know for sure, but it's more likely him.

6    Q    You didn't observe anybody else have more influence over

7    Mr. Das than Mr. Chaudhuri, correct?

8    A    Correct.

9    Q    Excuse me?

10   A    Yeah, I think that's accurate.

11   Q    And Mr. Chaudhuri, to your understanding, had over 20

12   years of high-level campaign and political consulting,

13   correct?

14   A    I know he worked for PBS at the time.  Sounds right.

15   Q    He finished working at PBS.  His PBS contract had ended,

16   correct?

17   A    I guess I don't know.

18   Q    And he had worked in the Clinton and Obama campaigns,

19   correct?

20   A    I really don't remember his resumé, but, yeah, okay.

21   Q    You seem to know a lot about politics and campaigns,

22   correct?

23   A    Yes.  I think so at the state level especially.  I

24   wouldn't want to put myself out as any sort of expert.

25   Q    Thank you.

1          MR. KENDALL:  Could we next show the witness I-108,

2    please, and I have a copy for the government.

3          And why don't we do it for I-224.  We'll do them all.

4    And I-230, and I-731, and 246.  Can you give those all to

5    the government, please.

6          And if we can put I-108 up on the screen, please.

7    Q    Do you recognize this email as something between you and

8    Mr. Chaudhuri?

9    A    Yes.

10         MR. KENDALL:  Your Honor, I would like to offer

11   this as our next exhibit.

12         THE COURT:  167, Tim?

13         THE CLERK:  Sixty-eight.

14         THE COURT:  168.

15         **(Defendant's Exhibit No. 168 received in evidence.)**

16   Q    And this is Mr. -- you contacting Mr. Chaudhuri about

17   reaching out for thousand-plus donations involving Indian

18   candidates as sort of fundraising in the Indian community,

19   correct?

20   A    Yeah, two emails up.  It looks like he is the one asking

21   for it, and I provide that information.

22   Q    He was involved in some of the fundraising, correct, at

23   a high level?

24   A    Yeah.  I mean, he had committed to help raise.  But any

25   specific targets or amounts, I don't remember those.

1    Q    And he was focusing on affluent members of the Indian

2    community, correct?

3    A    In this email in the New York area, yes.

4         MR. KENDALL:  Could we then show the witness 224,

5    please, and I would like to offer that into evidence.

6    Q    This is another one between you and Mr. Chaudhuri,

7    correct?

8              **(Defendant's Exhibit No. 169 received in evidence.)**

9    A    I'm on this email chain, yeah.

10   Q    This is, again, Mr. Chaudhuri's involvement with

11   fundraising on a New York event, correct?

12   A    Yes.

13        MR. KENDALL:  If we can show the witness 230,

14   please, and I would like to offer this.

15             **(Defendant's Exhibit No. 170 received in evidence.)**

16   Q    Do you recognize this document that would be Exhibit

17   170?

18   A    It's an invitation to the weekly team call.

19   Q    Excuse me?

20   A    Yeah.  It's an invitation to the weekly team call.

21        (Counsel conferred.)

22   Q    It's dated February 13, 2018, from Mr. Chaudhuri on

23   behalf of Mr. Chaudhuri to chast@libertysquaregroup, and

24   it's an invitation to a weekly team call.  It would be fair

25   to say that at times Mr. Chaudhuri organized weekly team

1    calls in the campaign?

2    A    Yes.

3    Q    And they may have been more present when campaign

4    managers were not in their job, as opposed to when there was

5    a campaign manager?

6    A    I don't know if there is a direct correlation there, but

7    it's possible.

8        MR. KENDALL:  I would like to next show the witness

9    I-731.

10   Q    And do you agree this is an email between you and

11   Mr. Chaudhuri -- excuse me, from Mr. Das to Mr. Chaudhuri

12   with the cc to you?

13   A    Correct, yes.

14       MR. KENDALL:  I would like to offer this, your

15   Honor, into evidence.

16       THE COURT:  All right.

17       THE CLERK:  171.

18       **(Defendant's Exhibit No. 171 received in evidence.)**

19   Q    And Exhibit 171 -- it's dated February 23, and in the

20   second paragraph Mr. Das introduces him as, "Toby is our

21   National Campaign Chair.  He's out of D.C. and helps on

22   campaign related strategy and high level theory."

23       Is that an accurate description of some of the

24   things that he did for the campaign?

25   A    Yeah.  I mean, I wasn't in the strategy meetings, but I

```
1    do believe that that was part of the purpose he served.

2              MR. KENDALL:  I would like to offer, your Honor, as

3    our next exhibit, which would be No. 172, I-246.

4    Q    Is this also an email between you and Mr. Das?

5    A    Yes.

6              THE COURT:  All right, next exhibit.

7              (Defendant's Exhibit No. 172 received in evidence.)

8    Q    And you write to him, "Beej,

9              "Toby requested we get the band back together with

10   the finance committee."

11             You're referring to the Blues Brothers, I take it.

12   A    Absolutely.  I wrote that, yes.

13   Q    Meaning, it was sort of a loose group of people that

14   Mr. Das referred to as the finance committee, and you were

15   trying to corral them, correct?

16   A    The finance committee -- there was maybe one or two

17   names, but it was always more aspirational than a true group

18   of people.

19   Q    That's exactly the point I wanted to make.

20             The finance committee was some people that Beej

21   kept hoping might coalesce into a real finance committee,

22   but it didn't.

23   A    Like it -- correct.  We had no regular finance committee

24   meeting.

25   Q    And none of these people said actually, "I'm chair.  I'm
```

1    a member.  I have at title, 'finance committee,'" correct?

2    A    No one was a card-carrying member that I can recall,

3    right.

4    Q    And Beej, sort of in an aspirational way, would say, of

5    some of his very wealthy contacts and friends, They're on

6    the finance committee, We'll ask them to be on the finance

7    committee, We'll see if they'll be on the finance committee,

8    things of that nature?

9    A    We had a list of people he wanted.  I mean, outside of

10   Jay Shah, yeah.

11   Q    Was Naimish Patel one of the people who was referenced

12   as possibly being corralled into the finance committee?

13   A    There was someone with the last name Patel.

14   Q    Do you remember if it was a friend of Beej's who had

15   become a very successful business person?

16   A    That describes a lot of people, but I do believe that is

17   probably an accurate description of someone we were trying

18   to get to donate, yes.

19   Q    And was it likely the first name is Naimish, even though

20   you might not have a perfect memory?

21   A    That's very likely.

22   Q    And the finance committee is a group of people that will

23   use their contacts to raise money, correct?

24   A    At its best, yes.

25   Q    And often you will try to give a quota to a finance

1    committee?

2    A    That --

3    Q    -- or a target?

4    A    Yeah.  If we had regular finance committee meetings, we

5    would certainly want to share a goal for the campaign in

6    hopes that they could then commit to a certain amount to get

7    us to that.

8    Q    You might say, you know, It would be great if everybody

9    on this finance committee could raise at least $50,000, you

10   know, that type of conversation?

11   A    It could be.  I would hope we would target a little more

12   specifically, but that is an example.

13   Q    What do you mean by "more specifically"?

14   A    Three people in the room could do 50,000, and three

15   people could raise 25,000.  You know, you wouldn't want to

16   push people away because they can only raise half of what is

17   still a very large number.

18   Q    You set aspirational but realistic targets and you ask

19   people if they'll accept that as their goal?

20   A    That is the hope of the finance committee.

21   Q    And while there never was one, Mr. Das kept on trying to

22   see if he could get one to come together, correct?

23   A    We never --  it never developed into something we hoped

24   would happen.

25   Q    Now, you worked with an FEC filing system what was

1    called FECFile?

2    A    Correct.

3    Q    Now, the very first time you worked on it, did it take

4    some time to get familiar with it?

5    A    Yeah, I think so.

6    Q    Tell us.  I mean, you worked on the state systems, so

7    you had a leg up over most people.  But when you were first

8    introduced to FECFile, tell me what you had to do and what

9    you had to figure out.  Because it's a database, and those

10   of us who are from the Spin Doctor era don't do well with

11   databases?

12   A    That's funny, because my first impression was that it

13   was straight out of the Windows 95 era.

14        (Laughter.)

15   Q    What does that mean, old software?

16   A    It was quite an old program.  You know, it was like gray

17   buttons on the old programs you pushed.

18   Q    We thought that was a great innovation.

19   A    I was there, to be fair.  It was wonderful.  But it's

20   not anything compared to, you know, what I was familiar with

21   in the state system.  It's very different.

22   Q    What were some of the inefficiencies with it?

23   A    Inefficiencies?

24        You know, one thing that frustrated the heck out of

25   me was that ActBlue contributions, you have to mark the

1    people who came to the FEC as ActBlue and from the person

2    who made them.  And I had to go in -- even if we could

3    upload those donations, I had to go in and check every

4    single one that it was connected.  And that was definitely

5    something that counts as a need to be improved.

6    Q    Was there some stuff you had to enter individually, you

7    couldn't upload?

8    A    Yeah.  Or even like, let's say, the expenses, I could

9    upload it, but I had to type it into the spreadsheet, so it

10   didn't save as much time.

11   Q    Excuse me?  Didn't what?

12   A    Like with the expenses, even if I did put it into

13   uploadable Excel document first, it was a lot of typing on

14   my part.

15   Q    And you're someone who's used to these systems?

16   A    Yeah.

17   Q    Was there a way to upload QuickBooks or NGP VAN into

18   FECFile?

19   A    It depends on your meaning.  You can download from any

20   database the spreadsheet.  And then, if you put it into the

21   correct format, you can upload it, which is what I would

22   have to do with ActBlue.  There's plenty of columns that,

23   you know, you're not reporting the email address to the FEC,

24   so you don't use that column.  But you put the Excel sheet

25   into the correct format, and then, you know, you can upload

1    anything, yeah.

2    Q    Is there -- you explained a little bit about NGP VAN.

3    That's a software system produced by the democratic party

4    that's commonly used by democratic candidates, correct?

5    A    Correct.

6    Q    You have to pay a licensing fee, correct?

7    A    You have to pay for it.

8    Q    And if you stop paying for it, you lose access to it?

9    A    That sounds right.

10   Q    The same with QuickBooks?

11   A    Definitely with QuickBooks, yep.

12   Q    So you can only use those and work with them if you're

13   continuing to pay the licensing fees, correct?

14   A    Correct.

15   Q    Now, would it be fair to say that when you worked for

16   the Das campaign you thought you were over your head?

17   A    I didn't think so.

18   Q    Didn't you testify in the grand jury:  It was such a big

19   race to have a big role in, it was my first year there, that

20   I felt that balance -- whether it was really there.

21        Wasn't that your testimony in the grand jury?

22   A    I mean, taking your word for it, yes.

23   Q    It was such a big race for you to have this level of

24   responsibility, correct?

25   A    It -- it -- yeah, it felt that way.

1    Q    And you never had it before that time?

2    A    Correct.

3    Q    And you didn't have it after that time until maybe the

4    Markey people brought you into their campaign, correct?

5    A    Yes.

6              MS. WAN:  Objection.

7              THE COURT:  Overruled.

8    Q    And Beej was often distracted, correct?

9    A    Yeah.

10   Q    Disorganized?

11   A    That's how I'd describe him, yeah.

12   Q    Didn't follow-through?

13   A    Yeah.

14   Q    And you were worried that if you pushed too hard, there

15   may be a client problem, correct?

16   A    A "client problem" is an interesting way to put it.

17             You know, you're in two hours of call time, if he

18   gives up 15 minutes in, call time's done.  So the problem I

19   would describe as smaller.  I mean, even if he needed five

20   minutes, I'd want to give him that than push too hard.

21             So it was frustrating, yeah.

22   Q    Didn't you testify in the grand jury that if you pushed

23   too hard on the candidate, it would come back on you?

24   A    I don't know.

25             Forgive me.  Did I?

1    Q    I'm asking if you have a memory.

2    A    The grand jury testimony was a few years ago.  I

3    apologize.  If -- yeah.

4    Q    I'm going to turn to page 39, line 14.

5              "ANSWER:  Yeah, I mean, I never --

6              MS. WAN:  Objection.  He doesn't have it.

7              MR. KENDALL:  What?

8              MS. WAN:  This isn't the way to refresh a

9    recollection.

10              THE COURT:  Yes.  You typically show it to the

11    witness.

12              MR. KENDALL:  Your Honor, if I may approach?

13    Q    I show you a copy of your grand jury transcript, and if

14    you will just follow along with me, please.

15    A    Sure.

16    Q    If we take a look at page 39, line 14.

17              Can you read from line 14 to line 21, please?

18    A    Sure.

19    Q    To yourself quietly.

20       (Pause in proceedings.)

21    Q    Does this refresh your recollection as to what you

22    testified to?

23    A    Yes.

24    Q    So it would be fair to say that it was such a big race

25    for you to have a role in, it was your first year there at

1    Liberty Square, that you felt the balance, whether or not it

2    was really there.

3            You were concerned about the balance, is how you

4    phrased it?

5    A    That's how I phrased it, yes.

6    Q    And you were also worried that if you did push back on

7    the candidate, it could come back on you, correct?

8    A    That is what I testified, yes.

9    Q    And you're supposed to be a steward for a first-time

10   candidate who is distracted, disorganized, and bad on

11   follow-through, correct?

12   A    Correct.

13   Q    And you didn't want to be too much of a steward because

14   it was your first time and this was an overwhelming campaign

15   and you didn't want to give him the guidance that he needed,

16   right?

17           MS. WAN:  Objection.  Argumentative.

18           THE COURT:  There were about eight questions

19   compounded into that one statement.  Can you break it down

20   and just do one at a time?

21           MR. KENDALL:  Sure.

22   Q    Would you agree with me, knowing what you know today,

23   you could have done a better job on the Das campaign?

24   A    Yeah.  Yeah.  Reflection, looking backwards, I hope for

25   any campaign, and, sure, definitely that one.

1    Q    Now, what was the protocol that existed for the checks?

2    When checks came in, did people make copies of them?

3    A    I received some copies of checks, but I don't believe

4    that was universal.  I don't know that there was a

5    well-established system in place.

6    Q    For your compliance, didn't you get the checks and check

7    off all the information, what did they do for a living, the

8    amount of the check, and all of that?

9    A    Whether or not I got the actual check images for every

10   single check, I don't remember.

11          However, yes, I would look up occupation, employer,

12   and make sure the address was right there.

13   Q    Wasn't the compliance step that you were supposed to get

14   a check and confirm it?

15   A    That is a good system.

16   Q    That wasn't my question.

17   A    I don't believe I got every check.

18   Q    So you didn't -- you didn't input a good system is what

19   you're telling us?

20   A    That is fair.

21   Q    You didn't say, I need to get every check.  That's the

22   way it's done.

23          If they didn't give you a check, you just let it go

24   though, and you didn't do the compliance check on it,

25   correct?

1    A    It -- the first half, we did talk about a system where

2    we would have images of checks.  The follow-through was not

3    there.

4    Q    Now, you were up how often in Lowell for the six months

5    you worked for the campaign?  Average, rough numbers?

6    A    Yeah, because it varied.  Anywhere between two days a

7    week for a few weeks to maybe one or two weeks off.

8    Q    Okay.

9    A    So maybe once a week would be a good average.

10    Q    And when you're up there, you're observing a lot of

11    things that are the activity of a campaign, correct?

12    A    Yes.

13    Q    And you're seeing a lot of expenses that are not getting

14    reported, correct?

15    A    There were a few things that -- yeah.

16    Q    Not a few things, a lot of things?

17    A    The -- I mean, I recall furniture in the campaign office

18    when it opened.

19    Q    Computers?

20    A    The screens in the front, yeah.

21         Computers, like specifically for staffers, I don't

22    remember if that was from the campaign.

23    Q    People running in a democratic primary have to pay money

24    to the democratic state party, correct?

25    A    Say that again.

1    Q    If you're a democratic candidate, don't you have to pay

2    some money to the democratic party, like a registration fee?

3    A    I don't know.  You do have to pay VoteBuilder, that that

4    might be -- take care of that, yeah.

5    Q    So weren't there a lot of expenses going on that you did

6    not see coming through in the expense reports?

7    A    Yeah.

8    Q    And did you ever come to Beej and say, Look, Beej, this

9    will make us look good.  Your loans are actually higher than

10   we're reporting.  Get me the data so I can give you credit.

11         You never had that conversation, did you?

12   A    I never had that conversation.

13   Q    This is somebody who was distracted, disorganized,

14   inexperienced, and may not be giving all of the data that

15   could make his candidacy look good, correct?

16         MS. WAN:  Objection.

17         THE COURT:  We've been over that.  Sustained.

18   Q    And it would be the compliance team's role to run down

19   expenses that they knew about but that they didn't have

20   paperwork for, correct?

21         MS. WAN:  Objection.

22         THE COURT:  We've been over that.  Sustained.

23         MR. KENDALL:  I don't think I covered that, your

24   Honor.

25         THE COURT:  Ask it in a fresher way.

1             MR. KENDALL:  Of course, your Honor.

2      Q   When you saw some expenses that weren't showing up, you

3      never went to, like, the bookkeeper at the hotel and say,

4      What has Beej been spending or doing that you have for the

5      campaign?  I need to put it in my report, correct?

6      A   Correct.

7      Q   You never went to Deb Belanger and said, Deb, you're up

8      there every day.  Can you run down these expenses or find

9      out and help me to report them?

10     A   Did I use Deb to try to get to Beej sometimes?  I

11     probably did.

12            I can't tell you if I remember specifically for

13     expenses.

14     Q   Now, this case focuses on three FEC 3 reports.  I now

15     want to move to those reports, okay?

16            The first one is the Q4 report, which you discussed

17     a bit with the government during your direct testimony.  I

18     just want to get the times laid out.

19            The first report -- they're in quarters of the year

20     of a calendar year, correct?

21     A   Correct.

22     Q   So Q4 is actually the last three months of the year?

23     A   Yes.

24     Q   October, November, December?

25     A   Yes.

1    Q    It starts on the first day of October, ends on the last

2    day of December?

3    A    Yes.

4    Q    Q4 2017 was the first report you worked on?

5    A    Yes.

6    Q    The next report will be Q1 of the next year, 2018?

7    A    Yes.

8    Q    That's January 1 to March 31, correct?

9    A    Yes.

10   Q    Then Q2 would start on April 1 and go to June 30,

11   correct?

12   A    Correct.

13            MR. KENDALL:  If we could have G-14, please.

14        (Exhibit published to the jury.)

15   Q    You testified about this document with the government,

16   correct?

17   A    I believe so, yeah.

18   Q    And if we take a look on the bottom paragraph of the top

19   email it says, "I won't be putting a thing into the FEC

20   portal until it's been reviewed by you.  I'm only hoping to

21   get oriented at this stage so I can prep a report for your

22   review."

23            That's what you put, correct?

24   A    That is what I wrote.

25   Q    You put in receipt information that he gave you,

1    correct?

2    A    Correct.

3    Q    And you put in expenditure information that he also gave

4    you in a QuickBooks file, correct?

5    A    Correct.

6    Q    But you never had him actually look at the draft FEC

7    report itself, did you?

8    A    Printing it out as it looks like in these exhibits,

9    correct, I did not print those out.

10   Q    And you never even showed him a blank FEC report to say,

11   Here's all the questions I'm going to have to answer for the

12   treasurer, did you?

13   A    Correct.  We didn't go over the blank report.

14   Q    So when you say, "I won't be putting a thing into the

15   FEC portal until it's been reviewed by you," you were

16   basically saying, I'm putting in your QuickBooks file, so

17   you'll have seen them already.

18          MS. WAN:  Objection.

19   Q    Is that what you meant?

20          THE COURT:  Overruled.

21   A    Right.  I'm talking about the actual data going into the

22   report.

23          MR. KENDALL:  I want to next go to -- if we could

24   give the government 745 and 199, please.

25   Q    I would like to the show the witness I-745 and ask you

1    if you recognize this as an email you sent Deb Belanger.

2    A    Yes.

3              MR. KENDALL:  I would like to offer this as our

4    next exhibit, your Honor.

5              THE COURT:  All right, 173.

6              **(Defendant's Exhibit No. 173 received in evidence.)**

7    Q    If you could take a look at Exhibit 173.  It's dated

8    January 16, 2018.  It's the same day as the press release on

9    the $550,000, correct?

10   A    Yeah, okay.

11   Q    What you wrote to Deb Belanger as well as Beej was, so

12   you're telling him this, "Do you think you could email me a

13   report (pdf is fine) of QuickBooks?  I'm looking to get

14   Beej's loans reporting accurately so they can be repaid.

15   Not an urgent request."

16             That's what you sent to them, correct?

17   A    Yes.

18   Q    You didn't say, "I need bank accounts and credit card

19   statements for the loans to be repaid."  You didn't say

20   that, correct?

21   A    In this email, no.

22   Q    QuickBooks would be good enough?

23   A    If I may, the reason we need to report the loans is that

24   if you don't report the loans, he'd never be able to repay

25   the loans.

```
1    Q    Exactly, and I appreciate your help there.

2             If he puts in a loan into the report, he could pay

3    himself back, correct?

4             MS. WAN:  Objection.

5             THE COURT:  Overruled.

6    Q    Correct?  He could pay himself back on his loans?

7    A    Correct.

8    Q    And the loans we're putting in here, some is money

9    transfers to the bank accounts, correct?

10   A    I don't know.

11   Q    Well, you saw the 272,000.  Those are some of the loans

12   we're putting in, correct?

13   A    Yes.

14   Q    And also loans he incurred by paying for things with his

15   credit card and not getting reimbursed by the campaign?

16   A    That was also reported as well.

17   Q    Yeah.  And you told him he could get paid back on those

18   things, correct?

19   A    That -- that's not -- I don't know if I shared that or

20   if that was already an understanding.

21   Q    Well, you're saying, I'm -- well, whether it's already

22   an understanding or not, you're confirming one of the

23   benefits of reporting the loans is he will be able to get

24   paid back on them?

25   A    Yeah.
```

1    Q    And that's including the credit card expenditures?

2    A    I don't know if that's something I'm referring to here.

3         MR. KENDALL:  Okay.  If we could next show the

4    witness I-199.

5    Q    And is this another email between you and Deb Belanger

6    with the cc to Mr. Das?

7    A    Yes.

8         MR. KENDALL:  I would like to offer this as our

9    next exhibit, your Honor.

10        THE COURT:  All right, next exhibit.

11        THE CLERK:  174.

12        **(Defendant's Exhibit No. 174 received in evidence.)**

13   Q    Okay.  Now this one is dated January 18, 2018?

14   A    Yes.

15   Q    And it's addressed to Deb and it's, "Hi, Team

16   compliance."  Was Deb Belanger one of the people that

17   assisted you in your FEC compliance?

18   A    No.  She was someone who can help me get ahold of Beej.

19   Q    So who's "team compliance"?

20   A    I'm referring to both of them, yes.

21   Q    It's not addressed to him.  It's addressed to her,

22   correct?

23   A    I don't know that.  I'm sure I would have been happy

24   with an answer.

25   Q    Did you ever tell Mr. Das, "I need you as part of the

1    compliance team to ensure the accuracy of the FEC reports?

2    A    I mean, only that I wouldn't file anything without his

3    review, yeah.  I think we've been over that.  But I didn't

4    say those words.

5    Q    And it's not without his review, it's with data that he

6    provides you?

7    A    Hopefully both.

8    Q    Well, you never showed him the calculations that were

9    done in the FEC reports now, did you?

10   A    He had seen the raw data, but not the printout of the

11   report.

12   Q    He gave you raw data, that's all.

13   A    Yes.

14   Q    He never saw the output from it.

15            MS. WAN:  Objection.

16   Q    To your knowledge?

17   A    To my knowledge, just the information gathered together

18   that would go into the report.

19   Q    Now, if we could take a look down at the bottom

20   paragraph, it states, "You'll see other tabs are still

21   blank, I'll need an itemized list of:

22            "Expenditures made in 2017 (staff, ticket costs, et

23   cetera.)"

24            "Staff" meant salaries for people, correct?

25   A    Correct.

1    Q    Deb Belanger.

2    A    Yes.

3    Q    "Ticket costs" are airplane tickets?

4    A    Anything from airplane tickets, trains, yes.

5    Q    He's flying a lot, correct?

6    A    In Q4 2017?  I don't remember the dates.

7    Q    Florida, Art Basel?

8    A    Art Basel, yeah, he did fly to that.

9    Q    A trip to New York.

10   A    If he flew, then, yeah.

11   Q    "Direct loans made to the campaign (what makes up your

12   275."  You meant 272, correct?

13   A    Yeah.  I didn't have the exact numbers at this point.

14   Q    And then, I need itemized list of expenses picked up by

15   candidate directly, including NGP VAN and anything else on

16   that card?

17   A    Yes.

18          MR. KENDALL:  If we could next go to G-22, the

19   exhibit the government put in.

20      (Exhibit published to the jury.)

21   Q    This is the exchange with him over a credit card that

22   was known as the L.L.Bean Visa card, correct?

23   A    Yeah.

24   Q    And that's a card that he used for expenses that were

25   for the benefit of the campaign?

1    A    Yes.

2    Q    Now, you understand from the FEC rules that when a

3    candidate pays for something on their credit card, it's

4    considered an in-kind contribution?

5    A    My understanding, though, was that the card was acquired

6    for the specific purpose of campaign use.  So that would be

7    different.

8    Q    Meaning what?

9    A    Meaning that the card existed for the sole purpose of

10    the campaign.  So we needed to do itemized receipts for that

11    credit card.

12    Q    It's your position you didn't have to do itemized

13    receipts for the credit card?

14    A    It's my position we did.

15    Q    You should do it.

16         So if he runs up $7,500 on that credit card in Q4

17    and it's for a hundred dollars for this and a hundred

18    dollars for that, you should have each one itemized on the

19    FEC report?

20    A    Correct.

21    Q    You didn't do that on the Q4 report, did you?

22    A    After both in-person and multiple references in writing,

23    yeah, I gave up.

24    Q    You gave up because what?

25    A    I -- in that specific case, I guess the best way to say

1    it is that I got worn down.

2    Q   You got worn down because he didn't give you the

3    information and you couldn't put it in so you filed a

4    defective FEC report?

5    A   We got to the point exchanging words where Beej said it

6    was his legal opinion that he was allowed to do that, and I

7    couldn't argue with that.

8    Q   And you have a specific memory of this conversation?

9    A   Yes.

10          MR. KENDALL:   What do we have up?   Is it Government

11   Exhibit 22?   Correct?

12       I can't see the screen.

13   A   This is Exhibit 22.

14   Q   What's the date of that?   January 30, 2018, at 1:38:44,

15   correct?

16   A   1:38:44.   That is the one at the top, yes.

17          MR. KENDALL:   Could we show the witness Document

18   749, please.

19   Q   Do you recognize this email from Mr. Das to you?

20   A   Yeah.

21          MR. KENDALL:   Could I offer that as our next

22   exhibit, your Honor?

23          THE COURT:   Next exhibit.

24          THE CLERK:   175.

25          **(Defendant's Exhibit No. 175 received in evidence.)**

```
 1    Q    Do you remember getting that document?

 2    A    Only that's it's in front of me.

 3    Q    Excuse me?

 4    A    I didn't walk in remembering this existed, but this is

 5    definitely something I received.

 6    Q    So it's dated January 30, 2018 at 2:51:35.

 7               That's about an hour and 13 minutes after

 8    Government Exhibit 22 we just looked at, correct?

 9    A    Correct.

10    Q    And it says, "Here is the complete expense report by

11    vendor, date and category," correct?

12    A    Correct.

13    Q    And if we turn to page 2, it gives you a complete

14    itemized breakdown of the expenses on the L.L.Bean credit

15    card, correct?

16    A    Yeah.  I mean, if that's the credit card.

17    Q    Well, let's take a look.

18    A    Thank you.

19    Q    It says "Intuit"?  What is "Intuit?"

20    A    Intuit is the owner of the QuickBooks software.

21    Q    That's who you paid QuickBooks for the license for the

22    campaign's QuickBooks account.

23               And who is that charged to?

24    A    That's charged to Intuit.

25    Q    No.  It's charged as an L.L.Bean Visa account.
```

1    A    I understand.  Apologies.  Yeah.

2    Q    And "Anchor Hitch Media," that's the guy doing

3    commercials, correct?

4    A    I don't remember.

5    Q    And there is a Google charge on the Visa, L.L.Bean.

6    Visa, correct?

7    A    Correct.

8    Q    And a subscription to the Boston Globe, correct, on the

9    L.L.Bean Visa?

10   A    Correct.

11   Q    And the Mass. Democratic Party, correct?

12   A    I'm struggling to find it.

13   Q    Mass. Democratic Party.  It's just under the Boston

14   Globe.

15   A    Thank you for that.

16         Yes.

17   Q    Correct.

18         And NGP VAN, correct?

19   A    Correct.

20   Q    You just testified in front of this jury that you had a

21   specific memory of a particular conversation with Mr. Das

22   where he said he would not give you this information, and he

23   gave it to you an hour and thirteen minutes after

24   Government's Exhibit 22.

25         Is that correct?  Just yes or no.

1    A    No.  I said that it was his opinion that we didn't have

2    to report it to the FEC.

3    Q    It was his opinion that you didn't have to report to the

4    FEC the breakdown?

5    A    Correct.

6    Q    Do you realize by not reporting the expense you

7    overstate the cash on hand?

8         You put --

9    A    I understand.

10   Q    -- the cost of the loan on as a loan to the campaign,

11   but you don't put the deduction of the expense that it paid

12   for, correct?

13   A    That is correct.

14   Q    So every time you put credit card receipts on an FEC 3

15   form, you were overstating cash on hand?

16   A    That makes sense.

17   Q    Mr. Das gave you all the data you needed to accurately

18   report it?

19   A    I see the information here.  I don't remember getting

20   permission to file it.

21   Q    Is there any email from him saying you cannot give the

22   breakdown?

23   A    No.

24   Q    Who cares if you paid for the Boston Globe or not?

25   A    I don't know if anyone would care.

1    Q    Who cares if you paid NGP VAN or the Mass. Democratic

2    State Party or anybody on the credit card?  These are all

3    bona fide expenses, correct?

4              MS. WAN:  Objection.

5              THE COURT:  Overruled.

6    A    Those are all expenses.

7    Q    So you had a memory that he prevented you from doing the

8    FEC form correctly, but the emails show him cooperating and

9    giving you everything you need, correct?

10    A    At this -- yeah.

11    Q    Would you agree with me that things that happened six

12    years ago, your memory of each conversation might be a

13    little fuzzy?

14    A    Six years ago -- yes, I take that point.

15    Q    Now, you filed the FEC report and it got submitted,

16    correct?

17    A    I filed the FEC report and it got submitted.

18    Q    And the FEC --

19    A    I'm trying -- forgive me.  I'm trying to remember.

20              The L.L.Bean was not the debit card of -- not the

21    credit card.

22    Q    The L.L.Bean was a Visa credit card.

23    A    It's the credit card.

24    Q    And didn't you report that 7,500-and-odd dollars as a

25    loan?

1    A    I did, yeah.

2    Q    And so you reported that on the Exhibit 70 Q4 as a loan,

3    but you didn't have an offset for the expense?

4    A    Correct.

5    Q    So if I were to suggest to you if we add up the loans

6    from the Q4 FEC 3, there is 272,000.  That's the big loan

7    that -- loans that came in.  And there's $7,574.04, you'll

8    trust me on the addition, as the credit card?

9    A    Correct.

10   Q    And that's what's been represented to you as Beej's

11   money going into the campaign, correct?

12   A    Correct.

13   Q    And from your perspective, if he wants to withdraw that

14   money to pay himself back, he is entitled to do that?

15              MS. WAN:  Objection.

16              THE COURT:  You already asked that.  Sustained.

17   Q    And with respect to the report for Q1 of 2018, you don't

18   really remember filing it but you would agree with me it's

19   mostly likely you who filed that one as well?

20   A    I think that's right, yes.

21   Q    You certainly prepared it in the same way?

22   A    Yeah.

23              MR. KENDALL:  Your Honor, I'm starting a new topic.

24   We are not going to finish, but I assume you want me to take

25   it right up to one o'clock?

```
 1              THE COURT:  One o'clock.

 2              MR. KENDALL:  Sure.

 3    Q    Now, I do want to spend some time on the Q1 report that

 4    got filed.

 5              MR. KENDALL:  I would like to show the witness

 6    I-0252.

 7    Q    And can you tell us if you recognize that as an email

 8    that you sent to Scott Ferson?

 9    A    Yes.

10              MR. KENDALL:  I would like to offer this into

11    evidence, your Honor.

12              THE COURT:  All right, next exhibit.

13              THE CLERK:  176.

14         (Defendant's Exhibit No. 176 received in evidence.)

15    Q    If we could take a look at 176 and go down to the bottom

16    of the email on the first page where it starts "Scott" from

17    Beej Das.

18              Do you see the email dated March 13, 2018?

19    A    Yes.

20    Q    And it's from Beej to Scott Ferson with cc to Toby

21    Chaudhuri, correct?

22    A    Correct.

23    Q    And Beej writes, "Scott,

24              "I tried to reach you twice by phone over the past

25    two days and wasn't able to.  We need to speak soon.  Toby
```

1    and I feel that our engagement needs to be made more

2    efficient.  The current LSG/BlueLab engagement isn't quite

3    where I want it to be, and I need to better understand the

4    way forward."

5            Do you remember seeing that message from Beej back

6    at that time in the campaign?

7    A    I remember this happening, yeah.

8    Q    Then, if we look's top email -- well, if we look at the

9    middle email, it's Scott Ferson forwarding it to you saying

10   he wants to get your thoughts, correct?  That's in the

11   middle.

12   A    Yes.

13   Q    Then you respond, "I was worried about an email like

14   this coming from Beej.  He sent two emails yesterday about

15   switching to a national digital fundraising plan for

16   Bengali-Americans and another asking if we could do Tammy

17   Baldwin's national call center strategy.  We've been honest

18   with Deb about how Beej has been unable to meet his

19   commitments to us, which she scheduled a conversation with

20   him to fix."

21            It' would be fair to say you were disappointed in

22   him as a candidate, and he was unhappy with you as a

23   consultant?

24   A    Correct.

25   Q    And it was particularly the fundraising aspects he

1    wasn't happy about, correct?

2    A    Yes.  This is about me, yeah.

3    Q    He was happy with Molly Horan doing the press work,

4    correct?

5    A    From what I remember, yeah.

6    Q    And then, if we look at the third paragraph of your

7    email.

8            "Here's my summary thoughts.  He isn't happy [sic]

9    with our work.  He is unhappy with our strategy and

10   unwillingness to change it.  However, he's a big client, and

11   if my spending two days a week in Lowell again would extend

12   the commitment a month, I'd fall on that grenade."

13           Is that what you wrote?

14   A    That is what I wrote.

15   Q    Well, let's break down that paragraph.

16           He's unhappy with your work fundraising, correct?

17   A    Correct.

18   Q    However, he's a big client.  You're referring to the

19   $10,000 a month?

20   A    That's what I am referring to, yes.

21   Q    Was anybody else paying $10,000 a month back then?

22   A    I don't remember.

23   Q    But it was a lot of money for Liberty Square for one

24   candidate, correct?

25   A    It was pretty good, yeah.

1    Q    Yeah.

2         How much of your time was spent on the Das

3    campaign?

4    A    I don't remember.  We talked about specifically call

5    time.

6    Q    Rough guess.  Did you spend a quarter of your time, a

7    third, half?  We'll take whatever your best --

8    A    No.  I appreciate that.

9         Maybe a quarter.

10   Q    A quarter.  What were you getting paid a year?

11   A    In 2018 I think it was 60,000.

12   Q    Sixty thousand.

13        So you're making five grand a month, and you're

14   spending about a quarter of your time on the campaign, and a

15   quarter of your time is costing Scott Ferson about 1,250,

16   correct?

17   A    That's -- yeah.

18   Q    It's you and Molly, each of your time, and a $10,000

19   retainer, correct?

20        MS. WAN:  Objection.

21        THE COURT:  Sustained.

22   Q    "And if me spending two days a week in Lowell again

23   would extend the commitment a month, I'd fall on that

24   grenade."

25        So you haven't been in Lowell for a while, correct?

1    A    That -- I mean, that sounds right based on this, yeah.

2    Q    And you'll spend two days a week up there if you can get

3    another $10,000 for another month, correct?

4    A    Yes.

5    Q    It would be fair to say by this time you had written off

6    the Das campaign?

7    A    I was becoming cynical at this point.  It's clearly

8    written out here.

9    Q    And this is about the same time he got put on the

10   kiddie's table, correct?

11             MS. WAN:  Objection.

12             THE COURT:  We know the reference.

13   A    Forgive me.  I don't.

14   Q    You recall in the March, April time period, polls were

15   coming out showing he couldn't even hit 1 percent, correct?

16   A    Okay, yeah.

17   Q    And there was a debate that the Boston Globe and UMass

18   Lowell sponsored where they had two tiers of candidates,

19   correct?

20   A    That's sounds right.  I don't remember a lot about the

21   debates.

22   Q    And he didn't make the top tier, correct?

23   A    I am taking your word for it, yes.

24   Q    And those in the bottom tier were called the "kiddie's

25   table"?

1    A    All right.

2    Q    Fair to say by March the campaign is showing it's not

3    gaining any traction, correct?

4    A    That would be my personal opinion, yes.

5    Q    Your personal opinion as somebody who's worked years and

6    years in campaigns at this point?

7    A    Yeah.

8    Q    And so your whole perspective is, If I can do something

9    that will bring in another $10,000 for a month, I'll do

10    whatever it is as unpleasant as it may be?

11            MS. WAN:  Objection.

12            THE COURT:  Well, you're trying to now

13    recharacterize what we already know he said, so sustained.

14    Q    Was that your state of mind?

15            THE COURT:  Sustained.

16            MR. KENDALL:  I'd like to next show the witness

17    753, and can you give a copy to the government, please.

18    Q    Do you recognize this document?

19    A    It's an email between me and Sean Sinclair.

20    Q    Who's Sean Sinclair?

21    A    He was a consultant that came on and helped with

22    campaign management.

23    Q    He worked for Liberty Square, correct?

24    A    He was associated with us, but he runs his own firm.

25    Q    He was involved in the Das campaign through Liberty

1    Square?

2    A    Yes.

3    Q    Subcontracting, or whatever you call it?

4    A    Yeah, I think that's right.

5            MR. KENDALL:  Your Honor, I would like to offer

6    that as our next exhibit.

7            THE COURT:  Next exhibit.

8            THE CLERK:  177.

9            **(Defendant's Exhibit No. 177 received in evidence.)**

10   Q    If you take a look at this email, you're discussing the

11   reporting of expenses on the Q1 report, correct?

12   A    I'm not sure.  I'm trying to get to the start here.

13   Q    Please take the time to look at it as much as you'd

14   like.

15   A    At the top, having a QuickBooks report no later than

16   April, I'm referring to that, yes.

17   Q    Can we take a look at the top?

18           Mr. Sinclair asks you, Do we know all other smaller

19   stuff," referring to other smaller expenses, correct?

20   A    Correct.

21   Q    And you respond, "Unfortunately I don't.  When and what

22   to print, what to spend on events, spending anything on

23   furniture, etc, hasn't gone through us.  I'll have the

24   QuickBooks report no later than April 1st to start reporting

25   and can get it to you by then if Beej hasn't."

 1             That's your response.

 2    A    Yes.

 3    Q    Beej is giving you a QuickBook report of the visa card,

 4    and that's still not showing all the expenses that the

 5    campaign's incurring that he's paying for, correct?

 6    A    Well, I think this happens -- I don't know about the

 7    timing, but I think Sean is asking about what's going on in

 8    a quarter we're in, not -- or is that --

 9             Sorry.  I think what I am saying is I will have

10    that information once we start filing the report for the

11    period we're in.

12    Q    But my point to you is, the April 9 QuickBooks report of

13    expenses comes out a few weeks after that, that still

14    doesn't show all the costs that have been incurred?

15    A    I believe that's right.

16    Q    Did you ever think, I got to speak to Beej and find out

17    what we're missing on expenses?

18    A    I don't remember.

19             THE COURT:  All right.  This is close enough to one

20    o'clock.

21        All right, I want to get you out by one as promised.

22        There has been some press interest in the case.  Marsha

23    is going to keep copies of any articles for you which you

24    will have after the trial is over.  This is just by way of

25    cautioning you not to, again, look for outside sources about

1    what is happening because you know it better than anyone

2    because you've been watching it here in the courtroom.

3        I'll look forward to seeing you tomorrow at

4    nine o'clock sharp.

5            THE CLERK:  All rise.

6        (Proceedings adjourned.)

7

8

9                    **I N D E X**

10   WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS

11   ERIC CHAST, resumed

12   By Ms. Wan              6

13   By Mr. Kendall                    63

14

15                E X H I B I T S

16   **DEFENDANT'S:**                    **ID.**        **IN EV.**

17   163        LSG DFC call recap emails            66

18   164        Chast blog article, "Why Can't I     92

19               Just Do It Myself."

20   165        Eric Chast website "About"           93

21   166        Chast LinkedIn profile               97

22   167        FEC "Committee Treasuerers" doc      100

23   168        Email, 12/1/17, Chaudhuri to Das     115

24   169        Email, 2/2/18 Lappin to Chaudhuri    116

25                    cont'd

| DEFENDANT'S: | ID. | IN EV |
|---|---|---|
| 170 | 2/13/18 email, Chaudhuri to Chast | 116 |
| 171 | 2/23/18 email, Das to Chaudhuri | 117 |
| 172 | 2/25/18 email, Chast to Das | 118 |
| 173 | 1/16/18 email, Chast to Belanger | 133 |
| 174 | 1/18/18 email.  Chast to Belanger | 135 |
| 175 | 1/30/18 email, Das to Chast | 139 |
| 176 | 3/13/18 email, Chast to Ferson | 145 |
| 177 | 3/28/18 email, Chast to Sinclair | 151 |

* * * *

# **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                    February 4, 2025
     James P. Gibbons


JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jamesgibbonsrpr@gmail.com